Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Karen L. Wallace (SBN 272309)
Karen.Wallace@capstonelawyers.com
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:    (310) 556-4811
Facsimile:    (310) 943-0396

Attorneys for Plaintiffs

*[Additional Counsel Listed on Signature Pages]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| OMAR VARGAS, ROBERT BERTONE, MICHELLE HARRIS, and SHARON HEBERLING individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. CV12-08388 AB (FFMx)<br><br>The Hon. André Birotte Jr.<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:        April 24, 2017<br>Time:        10:00 a.m.<br>Place:       Courtroom 7B |

1  **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that on April 24, 2017, at 10:00 a.m., in Courtroom

3  7B of the above-captioned Court, located at 350 West First Street, Los Angeles, CA

4  90012, the Honorable André Birotte Jr. presiding, Plaintiffs, on behalf of themselves and

5  all others similarly situated, will, and hereby do, move this Court to:

6      1.    Preliminarily approve the settlement described in the Settlement

7  Agreement, attached as Exhibit 1 to the Declaration of Jordan L. Lurie;

8      2.    Conditionally certify the Settlement Class;

9      3.    Approve distribution of the proposed Notice of Class Action Settlement

10  and Claim Form to the Settlement Class;

11      4.    Appoint Plaintiffs Omar Vargas, Michelle Harris, Sharon Heberling,

12  Robert Bertone, Kevin Klipfel, Andrea Klipfel, Maureen Cusick, Eric Dufour, Abigail

13  Fisher, Christi Groshong, Virginia Otte, Tonya Patze, Lindsay Schmidt, Patricia

14  Schwennker, Patricia Soltesiz, Joshua Bruno, Jason Porterfield, and Jamie Porterfield as

15  the Class Representatives;

16      5.    Appoint Capstone Law APC as Lead Class Counsel and Berger &

17  Montague and Zimmerman Law Offices P.C. as Class Counsel;

18      6.    Appoint Kurtzman Carson Consultants ("KCC"), as the Claims

19  Administrator; and

20      7.    Set a hearing date and briefing schedule for final settlement approval and

21  Plaintiffs' fee and expense application.

22      This Motion, unopposed by Ford, is based upon: (1) this Notice of Motion and

23  Motion; (2) the Memorandum of Points and Authorities in Support of Motion for

24  Preliminary Approval of Class Action Settlement; (3) the Declarations of Jordan L.

25  Lurie, Russell D. Paul, and Thomas A. Zimmerman, Jr.; (4) the Settlement Agreement

26  and attached exhibits thereto; (5) the [Proposed] Order Granting Preliminary Approval

27  of Class Action Settlement; (6) the records, pleadings, and papers filed in this action; and

28

1   (7) such other documentary and oral evidence or argument as may be presented to the

2   Court at or prior to the hearing of this Motion.

3

4   Dated:  March 24, 2017                    Respectfully submitted,

5

6                                  By: */s/ Jordan Lurie*

7                                       Jordan L. Lurie
                                        **CAPSTONE LAW APC**
8                                       1875 Century Park East, Suite 1000
                                        Los Angeles, CA 90067
9
                                        Russell D. Paul
10                                      **BERGER & MONTAGUE P.C.**
                                        1622 Locust Street
11                                      Philadelphia, PA 19103

12
                                        Thomas A. Zimmerman, Jr.
13                                      **ZIMMERMAN LAW OFFICES P.C.**
                                        77 W. Washington St., Suite 1220
14                                      Chicago, Illinois 60602

15                                      *Attorneys for Plaintiffs and the Proposed*
                                        *Class*
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................ 1

II.  SUMMARY OF THE SETTLEMENT BENEFITS ................................ 1

III.  FACTS AND PROCEDURE ................................................................. 5

  A.  Overview Of The Litigation .......................................................... 5

  B.  Plaintiffs' Considerable Investigation And Discovery ................. 7

  C.  The Parties' Protracted Arms-Length Settlement Negotiations..... 9

IV.  MATERIAL TERMS OF THE PROPOSED CLASS ACTION
  SETTLEMENT................................................................................... 10

  A.  The Proposed Settlement Class .................................................... 10

  B.  Cash Payments or Vehicle Discount Certificates for Transmission
      Hardware Replacements ............................................................... 11

      1.   11

  C.  Cash Payments for Software Flashes............................................ 12

  D.  Arbitration Program for Repurchase ............................................ 12

  E.  Arbitration Program for Breach of New Vehicle Limited Warranty ............ 14

  F.  Reimbursement For Clutch Replacement..................................... 14

  G.  A Consumer-Friendly Claims Process ......................................... 14

  H.  The Proposed Notice to the Settlement Class .............................. 16

  I.  Proposed Attorneys' Fees, Litigation Expenses, and Service Awards .......... 17

V.  ARGUMENT..................................................................................... 17

  A.  The Court Should Grant Preliminary Approval of the Class Settlement ....... 17

      1.   The Standard for Preliminary Approval Has Been Met ........................ 17

      2.   The Settlement Is Entitled To A Presumption of Fairness .................... 18

      3.   The Proposed Settlement Is Well Within the Range of
           Reasonableness As The Class Relief Is Substantial And Justified
           In Light of The Risks of Continued Litigation ..................................... 19

|  |  |  |  |
|---|---|---|---|
|  | 4. | The Settlement Was Finalized After a Thorough Investigation | 24 |
|  | 5. | The Views of Experienced Counsel Should Be Accorded Substantial Weight | 24 |
| B. | | Conditional Class Certification Is Appropriate for Settlement Purposes | 25 |
|  | 1. | The Proposed Class Meets the Requirements of Rule 23 | 25 |
|  | 2. | The Proposed Class Is Sufficiently Numerous and Ascertainable | 25 |
|  | 3. | There are Questions of Law and Fact that Are Common to the Class | 26 |
|  | 4. | Plaintiffs' Claims Are Typical of the Proposed Settlement Class | 27 |
|  | 5. | Plaintiffs and Plaintiffs' Counsel Will Adequately Represent the Interests of the Proposed Settlement Class | 28 |
|  | 6. | Common Issues Predominate Over Individual Issues | 28 |
|  | 7. | A Class Settlement Is Superior to Other Available Means of Resolution | 30 |
| C. | | The Proposed Class Notice Adequately Informs Class Members About the Case and Proposed Settlement | 31 |
| VI. | | CONCLUSION | 32 |

1

# TABLE OF AUTHORITIES

2

3  **FEDERAL CASES**

4  *Aarons v. BMW of N. Am. LLC*, No. 11-7667, 2014 U.S. Dist. LEXIS

5      118442 (C.D. Cal. Apr. 29, 2014)...............................................................22

6  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ....................... 25, 29

7  *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001)..........................................27

8  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. Jan. 3, 2017) ................. 26, 31

9  *Browne v. American Honda Motor Co., Inc.*, Case No. 09-cv-06750, 2010

10      WL 9499072 (C.D. Cal. 2010)............................................................ 27, 32

11  *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524 (N.D. Cal. 2004)...............................27

12  *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012) .................21

13  *Churchill Village v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004).......................................19

14  *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006) ................................................27

15  *Eisen v. Porsche Cars North American, Inc.*, Case No. 11-09405, 2014

16      U.S. Dist. LEXIS 14301, 2014 WL 439006 (C.D. Cal. Jan. 30, 2014)............... 24, 25

17  *Estrella v. Freedom Fin'l Network*, No. C-09-03156-SI, 2010 U.S. Dist.

18      LEXIS 61236 (N.D. Cal. June 2, 2010) ......................................................26

19  *Fleisher v. Phoenix Life Ins. Co.*, No. 11-8405, 2015 WL 10847814

20      (S.D.N.Y. Sept. 9, 2015) .........................................................................19

21  *Franklin v. Kaypro*, 884 F.2d 1222 (9th Cir. 1989) .......................................18

22  *Grodzitsky v. Am. Honda Motor Co.*, No. 2-01142-SVW, 2014 U.S. Dist.

23      LEXIS 24599 (C.D. Cal. Feb. 19, 2014)...................................................21

24  *Halley v. Honeywell Int'l, Inc.*, No. 10-3345, 2016 WL 1682943 (D.N.J.

25      Apr. 26, 2016) ......................................................................................19

26  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)................................... *passim*

27  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995).............................................25

28  *In re Portal Software, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 88886

(N.D. Cal. Nov. 26, 2007) ....................................................................23

*In re Toys "R" Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438 (C.D. Cal.
    2014) ................................................................................. 18, 19, 22

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ..........................24

*Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718 (9th Cir. 2007).........................27

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-00302 MRP,
    2013 WL 6577020 (C.D. Cal. Dec. 5, 2013) ...........................................19

*Marisol v. Giuliani*, 126 F.3d 372 (2nd Cir. 1997) ........................................27

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D.
    Cal. 2004)..........................................................................19

*Officers for Justice v. Civil Service Comm'n*, 668 F.3d 615 (9th Cir. 1982)..................18

*Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008) ............................27

*Philips v. Ford Motor Co.*, No. 14-02989, 2016 WL 7428810 (N.D. Cal.
    Dec. 22, 2016).....................................................................21

*Rafofsky v. Nissan N.A.*, No. 15-01848-AB (MANx) (C.D. Cal. Feb. 17,
    2017) ..............................................................................22

*Rodriguez v. West Pub. Corp.*, 463 F.3d 948 (9th Cir. 2009) .................................. 20, 22

*Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364 (N.D. Cal.
    Sep. 5, 2008) ......................................................................30

*Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980 (N.D. Cal. 2010) .................................20

*Staton v. Boeing Company*, 327 F.3d 938 (9th Cir. 2003) ..............................................18

*Sullivan v. DB Invs. Inc.*, 667 F.3d 273 (3d Cir. 2011) ......................................29

*Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036 (2016).....................................28

*Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114 (E.D. Cal.
    2009) ..............................................................................25

*Wakefield v. Wells Fargo & Co.*, No. C 13-05053 LB, 2014 WL 7240339
    (N.D. Cal. Dec. 18, 2014) .........................................................29

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)....................................26

1   *Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168 (9th Cir. 2010)...............................27

2   **FEDERAL STATUTES**

3   Fed. R. Civ. P. 23 .................................................................................17, 22, 23, 24

4   Fed. R. Civ. P. 23(a) .......................................................................................... 17, 18

5   Fed. R. Civ. P. 23(a)(1) ...............................................................................................18

6   Fed. R. Civ. P. 23(a)(2) ...............................................................................................18

7   Fed. R. Civ. P. 23(a)(4) ...............................................................................................20

8   Fed. R. Civ. P. 23(b)(3) ................................................................................. 17, 21, 23

9   Fed. R. Civ. P. 23(c)(2)(B)..................................................................................... 23, 24

10   Fed. R. Civ. P. 23(e)(1) ...............................................................................................24

11   Fed. R. Civ. P. 23(e)(1)(A)...........................................................................................11

12   Fed. R. Civ. P. 30(b)(6) ...............................................................................................6

13

14   **SECONDARY AUTHORITIES**

15   Manual for Complex Litigation (4th ed. 2004) ........................................................ 12, 17

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

After nearly four years of litigation, including over a year of intensive and protracted settlement negotiations, the Parties have resolved this consumer class action on behalf of owners and lessees of the 2011-2016 Ford Fiesta and 2012-2016 Ford Focus vehicles ("Class Vehicles").[1]  As detailed below, the Settlement provides Class Members with a range of available remedies, including cash payments and reimbursements, credits towards the purchase of new vehicles, and the repurchase of Class Vehicles through a streamlined Arbitration process that allows claims to be submitted for up to six years from the date of original sale.

Class Members will be notified of the proposed Settlement and its benefits through a direct mailing to each Class Member, a long-form notice published on the Settlement website, and publication notice.[2]  The Settlement website also shall maintain all Settlement documents for review by Class Members.

Because the Settlement is fair, adequate, and reasonable, Plaintiffs respectfully request that it be preliminarily approved.

## II.    SUMMARY OF THE SETTLEMENT BENEFITS

During the course of this hotly litigated action, thousands of Class Members contacted Class Counsel to report that their Class Vehicles slip, buck, kick and/or jerk, resulting in sudden or delayed acceleration—problems that echo Plaintiffs'[3] allegations against Defendant Ford Motor Company ("Ford") in the Complaint.

Plaintiffs diligently investigated these claims, reviewing millions of documents

---

[1] All capitalized terms herein are defined in the Settlement Agreement attached as Exhibit 1 to the Declaration of Jordan L. Lurie.

[2] The three forms of class notices are attached to the Settlement Agreement as Exhibits A, B, and C.

[3] Plaintiffs are Omar Vargas, Michelle Harris, Sharon Heberling, Robert Bertone, Kevin Klipfel, Andrea Klipfel, Maureen Cusick, Eric Dufour, Abigail Fisher, Christi Groshong, Virginia Otte, Tonya Patze , Lindsay Schmidt, Patricia Schwennker, Patricia Soltesiz, Joshua Bruno, Jason Porterfield, and Jamie Porterfield.

and cataloguing Class Members' experiences with the PowerShift dual clutch transmission ("Transmission"). For its part, Ford denies any wrongdoing. Following many months of negotiations, including three meetings in Boston with respected mediator, Professor Eric D. Green, and several face-to-face meetings in Detroit, the Parties have reached a Settlement that addresses Class Members' concerns and provides them substantial relief. The proposed Settlement has several key components.

**First**, the Settlement entitles Class Members to substantial cash payments from Ford for the inconvenience of taking their Class Vehicles to Ford Dealers for often unsuccessful repairs, even where Class Members have incurred no out-of-pocket costs. Following Plaintiffs' lawsuit, though Ford issued customer service programs providing free repairs and warranty extensions to affected Class Members, the Class nonetheless had to expend considerable time and energy in an attempt to remedy the alleged defect. In very many cases, multiple software and hardware repairs were necessary, and, due to parts' backlogs, Class Members often had to wait weeks, if not months, for repairs.

The Settlement provides Class Members with payments for two types of repairs. Class Members with more serious problems—those who have three or more Service Visits for a replacement of one of the primary Transmission parts ("Transmission Hardware Replacement")[4]—will receive $200 for the third Service Visit, with increasing payments for each additional Service Visit. In lieu of cash, Class Members may elect to receive a Vehicle Discount Certificate ("Certificate") toward the purchase of a Ford vehicle for twice the cash value. Class Members may collect up to $2,325 in total cash payments or $4,650 in Certificate value. With over 6,000,000 of the qualifying replacement parts sold to dealers for the roughly 1,500,000 Class Vehicles, the Parties expect that a substantial number of Class Members will qualify for this benefit.

Class Members who have had at least three Software Flashes performed by Ford

---

[4] The Transmission Hardware Replacement must have been performed within 7 years or 100,000 miles from the date of original sale and cannot be performed in connection with a safety or non-safety Recall Program.

Dealers will receive $50 starting with the third Software Flash, with an additional $50 for each subsequent Software Flash, up to $600 (or 12 flashes).[5] Software Flashes are exceedingly common. Accordingly, these cash payments will compensate a large number of Class Members for the nuisance of repeated Service Visits.

**Second**, the Settlement provides that Class Members can expeditiously obtain from Ford a repurchase of or a replacement for their defective Class Vehicles through a Settlement-created private dispute resolution program ("Arbitration Program" or "Program"), paid for by Ford. This Program will resolve the claims of each qualifying Class Member, based on his or her state's lemon law, in one or two months, compared to a protracted lemon law action in court that would span a year or longer.

Aside from speed and efficiency, the Program protects Class Members' rights and, in many cases, expands them. The Arbitrator has authority to award a repurchase or replacement under the claimant's own state lemon law. A repurchase or replacement may also be awarded through the Program's default rules, which authorize a repurchase or replacement if the Vehicle has had four visits for Transmission Hardware Replacements within 5 years/60,000 miles and is still malfunctioning. For any Class Member residing in a state with onerous lemon laws or other legal requirements for repurchase, the Settlement provides remedies that would otherwise be unavailable. Class Members will benefit from consumer-friendly rules in the Program that are not available in court, including an extension of the statute of limitations to six (6) years (or 6 months from the Effective Date[6] of the Settlement, whichever is later) for current

---

[5] The Software Flashes must have been performed within 7 years or 100,000 miles from the date of delivery of the class vehicle to the first owner and cannot be performed in connection with a safety or non-safety Recall Program.

[6] The "Effective Date" is defined as the first date after (1) the Court enters a Final Order and Judgment approving the Settlement Agreement, substantially in the form attached to the Settlement Agreement as Exhibit F, and (2) all appellate rights with respect to said Final Order and Judgment, other than those related solely to any award of attorneys' fees, costs or incentive payments, have expired or been exhausted in such a manner as to affirm the Final Order and Judgment. (Settlement Agreement ¶ I.R.)

owners or lessees, $6,000 in attorneys' fees if they prevail (with Ford having <u>no right</u> to be awarded attorneys' fees from the claimant), and the right to appeal to a second arbitration panel staffed by JAMS arbitrators (with no corresponding appellate rights for Ford). Further, unlike a claim brought before a state or federal court that is subject to *res judicata*, Class Members may pursue arbitration through the Program even if they were already denied a repurchase claim but their vehicle continues to malfunction, accruing additional repairs.

**Third**, Class Members who believe they were either improperly charged for repairs or denied repairs that should have been covered under Ford's New Vehicle Limited Warranty can pursue these warranty claims in a more limited arbitration ("Warranty Arbitration"). Ford will also cover the cost of the Warranty Arbitration, and the Arbitrator is authorized to award to the prevailing Class Member reimbursement of out-of-pocket costs, complimentary repair, or warranty extension by Ford.

**Fourth**, the Settlement provides full reimbursement to Class Members who replaced a third clutch after having had two clutches replaced within the five years/60,000 mile Powertrain Warranty for certain vehicles. The replacement clutch will come with a 2-year warranty.

**Fifth**, Ford will provide dealers with language designed to make prospective buyers aware of issues related to the unusual characteristics of the Transmission.

Together, these Settlement benefits compensate Class Members for the alleged Transmission defect. Class Members already have benefitted from the warranty extension and other services under the two customer service programs implemented by Ford following the filing of this suit.[7] However, without the Settlement, Class Members would not be compensated for the inconvenience of taking their Vehicles in for multiple Transmission repairs. And by creating a consumer-friendly resolution forum for Class

---

[7] These are the 14M01 and 14M02 Customer Service Programs, which were implemented by Ford after the lawsuit but which Plaintiffs allege did not fully remedy the problems alleged by Plaintiffs.

1  Members to initiate a repurchase of their vehicles, protecting and expanding Class

2  Members' rights while doing so, the Settlement helps Class Members who were most

3  affected by the alleged defect.  Consumers with pending suits related to the Transmission

4  are automatically excluded from the Settlement but may opt-in, and personal injury and

5  property claims are not released.

6       The Settlement's benefits are particularly impressive in light of the considerable

7  risks faced by Plaintiffs if litigation continued, including the difficulties in certifying the

8  class on vehicle defects, prevailing at trial, and surviving an appeal.  In particular, Class

9  Members benefit by the final resolution of this litigation and the opportunity to obtain a

10  repurchase before their claims get stale and their Vehicles lose all value.

11       In sum, the proposed settlement is fair, reasonable, and adequate.  Accordingly,

12  the parties respectfully request that the Court enter an order (a) granting preliminary

13  approval of the Settlement, (b) certifying the proposed Settlement Class, (c) appointing

14  Plaintiffs as Class Representatives, (d) appointing Capstone Law APC ("Capstone") as

15  Lead Class Counsel and Berger & Montague P.C. and Zimmerman Law Offices P.C. as

16  Class Counsel, (e) approving the parties' proposed form and method of giving Class

17  Members notice of the proposed Settlement, and (f) setting a hearing date and briefing

18  schedule for final settlement approval and Plaintiffs' fee and expense application.

19  **III.    FACTS AND PROCEDURE**

20       **A.    Overview Of The Litigation**

21       On September 28, 2012, Plaintiff Omar Vargas filed the initial complaint in this

22  putative class action in the Central District of California against Defendant Ford Motor

23  Co., complaining of symptoms of the Transmission Defect, including lunging or jerking

24  forward when attempting to decelerate, hesitation, and jerking when attempting to

25  accelerate, akin to a slingshot effect.  (Dkt. No. 1.)  The Complaint alleged that the

26  Transmission, which Ford billed as a new type of transmission that combines the best

27  features of automatic and standard transmissions, causes Class Vehicles to slip, buck,

28  and jerk and to suffer sudden or delayed acceleration and delays in downshifts.  Plaintiff

1    Vargas alleges that he began experiencing these types of Transmission problems with

2    his 2011 Ford Fiesta soon after his lease began and made multiple visits to Ford dealers

3    to have the Transmission repaired, to no avail.

4         The Complaint alleges that Ford knew that the Transmission was defective and

5    presented a safety hazard but did not disclose this information to its customers.  The

6    Complaint seeks damages and injunctive relief against Ford for violating California

7    consumer protection laws, breach of express warranty, and breach of implied warranty

8    under the Song-Beverly Consumer Warranty Act.

9         The First Amended Complaint was filed on December 12, 2012, to add a claim

10   for damages.  (Dkt. No. 24).  The Second Amended Complaint was filed on August 30,

11   2013, to join additional plaintiffs Robert Bertone, Michelle Harris, and Sharon Heberling

12   and to add a claim for violation of Florida's consumers' laws.  (Dkt. No. 57.)

13        Another suit alleging the same claims, *Klipfel v. Ford Motor Co*., No. 15-

14   CVP0044, was first filed in San Luis Obispo Superior Court on February 20, 2015.  Ford

15   then removed *Klipfel* to the Central District of California under the assigned case

16   number 2:14-cv-02140-AB (FFMx).  Ford's motion to dismiss the *Klipfel* Plaintiffs'

17   claims was denied as moot after Plaintiffs filed a First Amended Complaint.  (*Klipfel*

18   Dkt. No. 17.)  The Parties later stipulated to consolidate the *Vargas* and *Klipfel* actions.

19   The stipulation was granted on December 2, 2015.  (*Vargas* Dkt. No. 34.)

20        Ford instituted two Customer Satisfaction Programs, called 14M01 and 14M02,

21   during the pendency of the litigation.  The 14M01 Program attempted to address the

22   problems Plaintiffs identified in this lawsuit by extending the warranty coverage for the

23   Transmission's input shafts, clutch, and software calibration in those Class Vehicles

24   manufactured prior to June 5, 2013.  The 14M02 Program extended the warranty on the

25   Transmission Control Module to 10 years of service or 150,000 miles for specific 2011-

26   2015 Fiesta and 2012-2016 Focus vehicles.  However, Plaintiffs allege that neither

27   program fully remedied the harm Class Members experienced.

28        Two additional actions alleging the same claims, *Cusick v. Ford Motor Company*,

1   Case No. 2:15-cv-08831-AB (C.D. Cal.), filed on November 12, 2015, and *Anderson v.*
2   *Ford Motor Co*., No. 1:16-cv-01632 (N.D. Ill.), filed on April 21, 2016, were brought by
3   Ford consumers. *Cusick* was consolidated with the instant action on February 22, 2017
4   (*Vargas* Dkt. 52), and the First Amended Complaint in *Cusick*, filed on February 22,
5   2016, was deemed the "Operative Complaint" for settlement purposes.

**B.    Plaintiffs' Considerable Investigation And Discovery**

7        Both before and after these actions were filed, Plaintiffs thoroughly investigated
8   and litigated their claims, including conducting testing regarding the Transmission
9   defect, which allowed Plaintiffs' counsel to evaluate Ford's representations concerning
10  the alleged Transmission problems and repair solutions. (*See*, *e.g*., Declaration of Jordan
11  L. Lurie ["Lurie Decl."], ¶ 8].)  Among other tasks, Plaintiffs' Counsel fielded thousands
12  of inquiries from prospective Class Members and investigated many of their reported
13  claims. They consulted and retained automotive experts and researched publicly
14  available materials and information provided by the National Highway Traffic Safety
15  Administration ("NHTSA") concerning consumer complaints about the Transmission.
16  They reviewed and researched consumer complaints and discussions of Transmission
17  problems in articles and forums online as well as various manuals and technical service
18  bulletins discussing the alleged defect. Finally, they conducted research into the various
19  causes of actions and other similar automotive actions. (*Id.*)

20       Plaintiffs also propounded discovery on Ford. (Lurie Decl. ¶ 9.)  In response,
21  Ford produced over 1.5 million pages of documents as well as spreadsheets with
22  millions of lines of data, including owners' manuals, maintenance and warranty
23  manuals, design documents (*e.g.*, technical drawings), VIN Decoders, technical service
24  bulletins, field reports, customer comments detail reports, warranty data, internal emails,
25  and emails between Ford and third parties regarding the Transmission.  Furthermore,
26  Plaintiffs' Counsel defended depositions of four (4) class representatives. (*Id.*)

27       Plaintiffs also obtained significant discovery from third-parties Getrag
28  Transmission Corporation ("Getrag"), and LuK USA LLC, LuK Clutch Systems, LLC

and LuK Transmission Systems, LLC. (collectively, "LuK"), the manufacturers and suppliers of the Transmission and its clutches. Plaintiffs subpoenaed and received over 20,000 documents comprised of 117,000 pages from Getrag and nearly 10,000 documents comprised of over 36,000 pages from LuK.  In addition, Plaintiffs took the deposition of Getrag's corporate representative.  (Declaration of Russell D. Paul ["Paul Decl."] ¶¶ 7-10.)

In reviewing this discovery, including reviewing hundreds of thousands of pages of email correspondence and databases containing millions of lines of data produced by Ford, Plaintiffs identified information that was instrumental to the case and to Plaintiffs' efforts during mediation (Lurie Decl. ¶ 10.)  For example, Plaintiffs identified the "DPS6 Evidence Book (November 22, 2013)," a 166 page document compiled by Ford after the original *Vargas* action was filed that catalogued the steps taken by Ford during the Transmission's development, manufacture, and implementation.  (*Id.*)

Moreover, Plaintiffs identified topics for their Fed. R. Civ. P. 30(b)(6) depositions, including Chris Kwasniewicz, the engineer Ford assigned to "problem solve" the DPS6 Transmission, and Matt Fyie, a Design Analysis Engineer for automatic transmissions.  (Lurie Decl. ¶ 11.)  Mr. Kwasniewicz's deposition elicited information about the DPS6's design, its dual-clutch function, the manufacturing processes of its various components, the problems it exhibited and their root causes, changes to the clutch material, the input shaft seals, control software, and the customer service programs and warranty extensions Ford initiated during the litigation.  (*Id.*)  Matt Fyie's deposition elicited information about the incidences of Transmission problems and the number of replacement parts provided to the class.  (*Id.*)

Lastly, in the course of litigation, thousands of Class Members contacted Plaintiffs' Counsel to report problems with their Class Vehicles.  (Lurie Decl. ¶ 12.)  Plaintiffs' Counsel logged each Class Member's complaint in a database and developed a plan for litigation and settlement based in part on Class Members' reported experiences with their Class Vehicles and with Ford dealers.  (*Id.*)

## C.     The Parties' Protracted Arms-Length Settlement Negotiations

The proposed Settlement is the culmination of lengthy discussions between the Parties, consultation with their experts, comprehensive discovery, and thorough analysis of the pertinent facts and law at issue. (Lurie Decl. ¶ 13.)  To facilitate settlement, the Parties, on August 18, 2015, attended the first of a series of mediation sessions in Boston, Massachusetts with one of the top mediators in the field, Professor Eric D. Green of Resolutions LLC. (*Id.*)  In advance of the mediation, the Parties submitted detailed mediation briefs setting forth their positions. (*Id.*)  The Parties were unable to reach an agreement on all material terms of the proposed relief to the Class in this initial mediation but agreed to engage in further negotiations with Prof. Green. (*Id.*)

In a subsequent mediation in Boston on May 6, 2016, the Parties made substantial progress, and, with Prof. Green's continuing assistance, on June 2, 2016, were able to agree to terms regarding relief for the Class. (Lurie Decl. ¶ 14.)  After confirming the terms for class relief, on June 9, 2016, the Parties participated in another mediation in Boston with Prof. Green solely on the issue of attorneys' fees, costs, and incentive awards, which they were ultimately able to resolve. (*Id.*)  Plaintiffs and Class Counsel took care to ensure that their interests aligned with those of the Class by negotiating attorneys' fees only after the class relief had been settled. (*Id.*)

After completing the mediation, the Parties worked diligently to formalize this complex, sweeping Settlement.  Counsel for the Parties devoted considerable effort and time to, *inter alia*, (a) refining and harmonizing the separate cash payment components of the Settlement, (b) drafting the Arbitration Rules, (c) creating notices that would clearly answer Class Members' questions regarding the Settlement, and (d) drafting the final settlement and motion papers. (Lurie Decl. ¶ 15.)

During the Settlement negotiation process, dozens of Class Members have continued to contact Plaintiffs' Counsel every week, inquiring about possible remedies for the Transmission problems they continue to experience. (Lurie Decl. ¶ 16.)  Plaintiffs' Counsel continue to devote considerable time and resources to respond to

1    Class Member inquiries and have designed a plan to alert these Class Members, which

2    now number in the tens of thousands, to the benefits of the Settlement following

3    preliminary approval.  (*Id.*)

4    **IV.    MATERIAL TERMS OF THE PROPOSED CLASS ACTION**

5          **SETTLEMENT**

6          **A.    The Proposed Settlement Class**

7          The Settlement Class consists of all current residents and entities, who, prior to

8    the Preliminary Approval date, purchased or leased a Class Vehicle, defined as any

9    2011-2016 model year Ford Fiesta or 2012-2016 model year Ford Focus equipped with

10   the Transmission that was sold by Ford in the United States of America and/or U.S.

11   Territories.  (Settlement Agreement, ¶ I.L.)

12         The following are expressly excluded from the Settlement: (1) all owners or

13   lessees of Class Vehicles who have filed and served litigation against Ford alleging

14   problems with the Transmission in Class Vehicles that was pending as of the Notice

15   Date and who do not both dismiss their actions before final judgment and affirmatively

16   elect to opt-in to the Settlement;[8] (2) Ford's officers, directors, employees, affiliates and

17   affiliates' officers, directors and employees; their distributors and distributors' officers,

18   directors, and employees; and Ford Dealers and Ford Dealers' officers and directors; (3)

19   judicial officers assigned to the Actions and their immediate family members, and any

20   judicial officers who may hear an appeal on this matter; (4) all entities and natural

21   persons who have previously executed and delivered to Ford releases of their claims

22   based on the Transmission; (5) all parties to litigation against Ford alleging problems

23   with the Transmission in Class Vehicles in which final judgment has been entered; and

24   (6) all those otherwise in the Class who timely and properly exclude themselves from the

25   Class as provided in this Settlement.  (*Id.*)

26

27

28         [8] Excluding the Named Plaintiffs and the putative class in the *Anderson* case.

**B.      Cash Payments or Vehicle Discount Certificates for Transmission Hardware Replacements**

The Settlement provides that Class Members who have had three or more Service Visits to authorized Ford dealers to replace qualifying Transmission Parts[9] will be entitled to either a cash payment or a Certificate, valued at twice the amount of the cash payment, toward the purchase or lease of a Ford vehicle. (Settlement Agreement ¶ II.C.) The Transmission Hardware Replacement must have been performed within seven years of the date of the delivery of the Vehicle to the first retail customer or within 100,000 miles, whichever comes first. The value of each cash payment or Certificate is based on the number of repair visits, with $2,325 cash or $4,650 Certificate value being the maximum amount payable. The full payment schedule is below:

| Number of Service Visits For Transmission Hardware Replacements | Cash Payment | Certificate Value |
|---|---|---|
| 3 | $200 | $400 |
| 4 | $275 | $550 |
| 5 | $350 | $700 |
| 6 | $425 | $850 |
| 7 | $500 | $1,000 |
| 8 | $575 | $1,150 |
| Total maximum | $2,325 | $4,650 |

The Settlement imposes no formal cut-off date for Class Members to qualify for benefits or to obtain additional benefits. (Settlement Agreement ¶ II.D.) So long as a Service Visit for a Transmission Hardware Replacement is made within the 7 year/100,000 mile period and the Class Member timely files a claim, the Class Member

[9] Transmission Parts are defined as the following parts for the Transmission: (1) 7B546 Disc Asy-Clutch; (2) 7Z369 Control Mod Trans (TCM); (3) 7052 Oil Seal-Trans Rear; (4) 7000 Transmission Asy-Aut; (5) 7C604 Motor-Frt Clutch; (6) 7A508 Rod-Cl/Slave Cyl Pus; (7) 6K301 Seal/RetC/Shft Oil; (8) 7060 Shaft/Bshg Asy-Out; (9) 7048 Seal-Input Shaft Oil; and/or (10) 7515 Lever Asy-Clutch Rel. These ten parts are the most common parts replaced on the Transmission.

will qualify for new or additional benefits.  For example, a Class Member may qualify for a $200 payment even if her third Service Visit for a Transmission Hardware Replacement takes place months after the Effective Date of the Settlement, provided that her claim is made within 180 days of the Service Visit.  Likewise, a Class Member who received a $200 payment (for the third Transmission Hardware Repair made prior to the Effective Date) may receive a $275 payment for a Transmission Hardware Replacement performed after the Effective Date, provided that she submits her claim within 180 days of that fourth Service Visit.

### C.     Cash Payments for Software Flashes

The Settlement provides that Class Members are also entitled to receive $50 for each Software Flash, starting with the third Software Flash, performed within the 7 years/100,000 miles period.  (Settlement Agreement ¶ II.B.)  Class Members may not receive more than $600 for Software Flash payments.  As with the payments for the Transmission Hardware Replacements, Class Members may continue to submit new or additional claims so long as each qualifying Service Visit is made within the 7 year/100,000 mile period.  (*Id.*, ¶ II.D.)  Once Class Members have qualified for a Transmission Hardware Replacement payment, they are no longer eligible for the Software Flash payments.

### D.     Arbitration Program for Repurchase

The Settlement provides that Class Members are eligible to participate in the Program, paid for by Ford, to seek the repurchase or replacement of their Class Vehicles. (Settlement Agreement ¶ II.N.)  This Program enhances Class Members' rights in several ways.  First, the Program resolves Class Members' lemon law claims quickly—within two months rather than the year or more for a lemon law suit filed in court.

Second, for repurchase claims brought by current owners or lessees, the Program extends the statute of limitations by preserving claims for six years from the date of original sale or six months of the effective date of the Settlement, whichever is later. (*Id.*, ¶ II.N.1.d.)

Third, Ford will pay a maximum of $6,000 in attorneys' fees to a Class Member who prevails in the Program.  (*Id*., ¶ II.N.1.h.)

Fourth, Class Members will have the opportunity to appeal an adverse decision to a second arbitrator; however, any costs for an appeal must be advanced by the Class Member, to be reimbursed by Ford if the Class Member prevails. (*Id*., ¶ II.N.1.g.)  Ford does not have a corresponding right to appeal.  The Arbitrator may not award civil penalties or punitive damages, which are available in some jurisdictions, and Class Members cannot appeal an adverse award to a court.  (*Id*., II.N.1.g & II.N.3.)

Fifth, even if a Class Member's first repurchase claim is denied, he or she may pursue a second repurchase claim under the Program if his or her Class Vehicle has subsequent qualifying Transmission repairs.  (*Id*., ¶ II.N.1.i.) And Class Members will not be denied any opportunity to submit a Program repurchase claim even if a claim for a buyback made prior to the Settlement was denied by an arbitrator with the Better Business Bureau or other similar organization.  (*Id*.)

Claims submitted to the Arbitration Program will be governed by the state law applicable to each Class Member.  (*Id*., ¶ II.N.1.e.) The Arbitrator is authorized to grant for all Class Members an award consistent with the claimant's state lemon law or warranty law—including former owners and lessees of Class Vehicles.  Importantly, for current owners or lessees, the Settlement also authorizes the Arbitrator to award a repurchase if four or more Transmission Hardware Replacements were performed and the vehicle continues to malfunction, even if the applicable state law does not otherwise authorize a repurchase under the claimant's circumstances.  For a repurchase award under this default rule, Ford will refund the actual amount that the Class Member paid for the vehicle (excluding any modifications or additions after the vehicle's purchase or lease), including finance charges, less a reasonable allowance for use.  If the vehicle was leased, Ford will refund to the Class Member payments made to the lending institution or lessor plus net trade-in and cash down payment (excluding rebates, if any), less a reasonable allowance for use.  Class Members who sold or returned the Class Vehicle

may seek a repurchase if their states' lemon laws permit it *and* if the request for Arbitration is filed before the expiration of the applicable state's statute of limitations for the claim or 180 days after the Approval Date, whichever is earlier.

### E.    Arbitration Program for Breach of New Vehicle Limited Warranty

Class Members who have incurred out-of-pocket expenses for repairs they believed were covered by Ford's New Vehicle Limited Warranty ("Warranty") or who believe that a Ford dealer improperly denied Warranty repairs are eligible to pursue their claims in a limited version of the Arbitration Program ("Warranty Arbitration"). (Settlement Agreement ¶ II.N.2.)  Ford will pay the costs of each Warranty Arbitration. The Arbitrator is authorized to award reimbursement, a complimentary repair, or an extension of warranty by Ford.  Ford will not be responsible for a claimant's attorneys' fees incurred for the Warranty Arbitration.

### F.    Reimbursement For Clutch Replacement

The Settlement provides that Class Members who own or lease a Class Vehicle manufactured after June 5, 2013, and had two clutches replaced during the 5-year/60,000 mile Powertrain Warranty are entitled to a third, complimentary clutch replacement (or reimbursement for out-of-pocket costs for a clutch replacement) within 7 years/100,000 miles from delivery to the first retail customer.[10] (Settlement Agreement ¶ II.G.)  The replacement clutch will be covered by a two-year warranty.

### G.    A Consumer-Friendly Claims Process

The claims process has been designed to minimize the burden on Class Members while ensuring that only valid claims are paid.

**Standard Documentation**.  The Settlement requires Class Members to supply standard documentation to substantiate claims for each cash payment or Certificate. (Settlement Agreement ¶ II.E.)  In addition to providing information on the website's

---

[10]   Customer Service Program 14M01 covers clutch replacements for Class Vehicles manufactured before June 5, 2013.  This benefit is available to Class Members whose Class Vehicles were not covered by 14M01.

claim portal (a paper claim form will also be available to Class Members upon request), Class Members need only provide a receipt or repair order containing standard information, (*e.g.*, repair date, a description of the vehicle, the dealership or facility where the work was performed, the vehicles' mileage at the time of repair, an itemized list of parts and labor), along with proof of ownership and a sworn declaration attesting to the authenticity of the documents provided. (*Id.*) Subsequent claims for cash payments will have a reduced standard for proof. (*Id.* ¶ II.E.4.) For reimbursement of a clutch replacement, Class Members will need to show proof of payment (common for such claims) and a diagnostic from a Ford dealer showing that a clutch replacement was necessary (provided as a matter of course). (*Id.* ¶ II.G.1-2.) This process imposes minimal burdens on Class Members while satisfying the need for proof.

**Web Site Claims Portal**. Claims may be submitted through the Settlement website immediately following Final Approval. A portal will walk Class Members through a series of prompts with fields for Class Members to fill in. The site will provide clear instructions, and the portal will permit Class Members to upload scanned documents to support their claims.

**Timing and Continuing Duties to the Class**. Ford will pay a Claims Administrator to process these claims expeditiously following Final Approval, including reviewing all claims. (Settlement Agreement ¶ II.O.) Class Members who are entitled to a cash payment or Certificate will be paid promptly following the claim submission or after the Effective Date, whichever is later. (*Id.*)

The Claims Administrator's duties will continue for many years. As explained above, so long as a Service Visit for a Transmission Hardware Replacement or Software Flash is made within the 7-year/100,000 mile period, the Class Member will qualify for benefits for Service Visits made after the Effective Date. For such claims, Class Members will have up to 180 days from the qualifying repair to submit a claim.

Furthermore, the Settlement provides that Class Members have 30 days to cure and resubmit a claim if the Claims Administrator rejects it due to missing information or

1    for some other reason where a cure is available.

2        **Arbitration**.  The Arbitration Program is also streamlined.  A Class Member

3    initiates the arbitration process by calling a dedicated phone number or by submitting a

4    form through the Settlement website that indicates his or her intent to arbitrate (Class

5    Members can obtain a paper claim form for submission upon request).  (Settlement

6    Agreement ¶ II.N.1.)  Ford will then have ten days to try to resolve the matter informally

7    with the Class Member.

8        Moreover, if the Class Member has had no more than three Transmission repair

9    attempts, Ford will have an opportunity to perform a single, additional repair at no cost

10   to the Class Member.  If that additional repair does not immediately resolve the problem,

11   the Class Member may then proceed to Arbitration after the 10-day notice period.

12   (Settlement Agreement ¶ II.N.1.b.)  Class Members who have had four or more repair

13   attempts on the Transmission by a Ford dealer or who have already sold or returned the

14   Class Vehicle may proceed directly to Arbitration after the 10-day Notice period. (*Id.*)

15       **H.    The Proposed Notice to the Settlement Class**

16       Ford will pay for and the Claim Administrator will send a Short-Form Class

17   Notice, in the form approved by the Court, within 75 days of the Court's entry of the

18   Preliminary Approval Order.  (Settlement Agreement ¶ III.C.)  The Short-Form Class

19   Notice will be disseminated by direct mail following the Claims Administrator's running

20   the name of each potential Class Member, obtained through Ford and HIS Automotive

21   (formerly R.L. Polk), through the National Change of Address Database.  The Parties

22   expect to  reach most Class Members through the Short-Form Class Notice.

23       In addition, the Long-Form Class Notice will be published on a website

24   maintained by the Claims Administrator and can be mailed to any Class Member upon

25   request. (*Id.*)  The Long-Form Class Notice provides a comprehensive summary of the

26   Settlement and answers to anticipated questions.   Both the Long-Form Class Notice and

27   the website will instruct Class Members how and when to submit a Claim Form, opt-out,

28   or object. (*Id.*)  The Claims Administrator will also arrange for the Publication Notice to

1   be published in *USA Today* by the day that the Claims Administrator completes the

2   mailing of Class Notices.

### I.     Proposed Attorneys' Fees, Litigation Expenses, and Service Awards

4          The Parties have negotiated sums for attorneys' fees, expenses, and service

5   awards separately, with the amount finally awarded by the Court not affecting the Class

6   benefits in any way.  (*See* Settlement Agreement ¶ II.P.)  Subject to Court approval, Ford

7   has agreed to pay Class Counsel's attorneys' fees and documented costs of a combined

8   sum up to $8,856,600 on behalf of all Plaintiffs' Counsel.  (*Id.*)  Subject to Court

9   approval, Ford has also agreed to pay service awards to the named Class Representatives

10  for their efforts to secure relief on behalf of the Settlement Class, in the sum of between

11  $1,000 and $10,000 each, to be paid separately from the benefits to the Settlement Class.

12  (*Id.* ¶ II.Q.)  Further details will be provided when Plaintiffs submit their application for

13  fees, costs, and service awards.

### V.     ARGUMENT

#### A.     The Court Should Grant Preliminary Approval of the Class Settlement

##### 1.     The Standard for Preliminary Approval Has Been Met

18         Class action settlements must be approved by the court, and notice of the

19  settlement must be provided to the class before the action can be dismissed.  Fed. R. Civ.

20  P. 23(e)(1)(A).  Court approval occurs in three steps: (1) preliminary approval of the

21  proposed settlement, including (if the class has not already been certified) conditional

22  certification of the class for settlement purposes; (2) notice to the class providing them an

23  opportunity to object or exclude themselves from the settlement; and (3) a final fairness

24  hearing concerning the fairness, adequacy, and reasonableness of the settlement.  *See*

25  Fed. R. Civ. P. 23(e)(2); Manual for Complex Litigation § 21.632 (4th ed. 2004).

26         As a matter of policy, federal courts favor settlements, particularly in class

27  actions, where the costs, delays and risks of continued litigation might otherwise

28  overwhelm any potential benefit the class could hope to obtain.  *See Class Plaintiffs v.*

1  *City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong policy that favors

2  settlements, particularly where complex class action litigation is concerned").

3  As one court put it, "[t]he economics of litigation are such that pre-trial settlement may

4  be more advantageous for both sides than expending the time and resources inevitably

5  consumed in the trial process." *Franklin v. Kaypro*, 884 F.2d 1222, 1225 (9th Cir.

6  1989). Thus, in reviewing class action settlements, the court should give "proper

7  deference to the private consensual decision of the parties." *Hanlon v. Chrysler Corp.*,

8  150 F.3d 1011, 1027 (9th Cir. 1998).

9  At the preliminary approval stage, the Court first determines whether a class

10  exists. *Staton v. Boeing Company*, 327 F.3d 938, 952 (9th Cir. 2003). The Court makes

11  only a preliminary determination of the settlement's fairness, reasonableness, and

12  adequacy, granting preliminary approval unless the settlement terms are so unacceptable

13  that a formal fairness hearing would be a waste of time. *See* Manual for Complex

14  Litigation § 21.632.

15  ## 2.    The Settlement Is Entitled To A Presumption of Fairness

16  In reviewing what is "otherwise a private consensual agreement negotiated

17  between the parties to a lawsuit," the district court's scrutiny should be "limited to the

18  extent necessary to reach a reasoned judgment that the agreement is not the product of

19  fraud or overreaching by, or collusion between, the negotiating parties and that the

20  settlement, taken as a whole, is fair, reasonable and adequate in all concerned." *Officers*

21  *for Justice v. Civil Service Comm'n*, 668 F.3d 615, 625 (9th Cir. 1982).

22  A non-collusive settlement, negotiated with the involvement of a respected

23  mediator, is entitled to "a presumption of fairness." *In re Toys "R" Us-Del., Inc.*

24  *FACTA Litig.*, 295 F.R.D. 438, 450 (C.D. Cal. 2014). The proposed Settlement is the

25  product of multiple mediations before one of the preeminent mediators in legal practice,

26  Eric D. Green. Professor Green is the co-author of the first textbook on alternative

27  dispute resolution and has successfully mediated many high stakes cases, including the

28  *United States v. Microsoft* antitrust case. *See Fleisher v. Phoenix Life Ins. Co.*, No. 11-

8405, 2015 WL 10847814, at *3 (S.D.N.Y. Sept. 9, 2015) (summarizing Prof. Green's impressive credentials). Through this experienced mediator's guidance, the Parties forcefully advocated their respective positions in arms'-length negotiations over many months. (Lurie Decl. ¶¶ 13-14.) The Parties then reached a resolution for class relief before conducting a separate mediation on attorneys' fees and class representative payments. (*Id.* ¶ 14.) Based on these factors, the Settlement is entitled to a presumption of fairness.[11] *See In re Toys "R" Us-Del FACTA Litig.,* 295 F.R.D. at 450 (finding a presumption of fairness where the settlement was reached following a mediation).

In addition, the Court may consider some or all of the following factors in evaluating the reasonableness of a settlement: the extent of discovery completed and the stage of proceedings; the strength of the plaintiff's case and the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout trial; the amount offered in settlement; and the experience and views of counsel. *See Churchill Village v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004). "Under certain circumstances, one factor alone may prove determinative in finding sufficient grounds for court approval." *Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 525-526 (C.D. Cal. 2004).

### 3. The Proposed Settlement Is Well Within the Range of Reasonableness As The Class Relief Is Substantial And Justified In Light of The Risks of Continued Litigation

The proposed Settlement is well within the range of reasonableness, particularly when compared to the likely outcome of prosecuting the action. In its evaluation, "the

---

[11] *See, e.g., Halley v. Honeywell Int'l, Inc.,* No. 10-3345, 2016 WL 1682943, at *12 (D.N.J. Apr. 26, 2016) (considering the participation of mediator Eric Green, "whose background the Court has independently reviewed," as an important factor in approving a $10 million settlement); *Fleisher,* 2015 WL 10847814, at *5 (finding that "the extensive participation of an experienced mediator [Prof.. Green] also 'reinforces that the Settlement Agreement is non-collusive'" in a case valued at over $100 million); *Maine State Ret. Sys. v. Countrywide Fin. Corp.,* No. 10-00302 MRP, 2013 WL 6577020, at *12 (C.D. Cal. Dec. 5, 2013) (naming Prof. Green as one factor in finding presumption of fairness of a settlement valued at over $500 million).

district court's determination is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." *Officers for Justice*, 688 F.2d at 625 (internal quotation omitted).  Thus, there is "no single formula" to be applied, but the court may presume that the parties' counsel and the mediator arrived at a reasonable range of settlement by considering the plaintiffs' likelihood of recovery.  *Rodriguez v. West Pub. Corp.*, 463 F.3d 948, 965 (9th Cir. 2009).

This Settlement offers substantial benefits to Class Members, including cash payments for multiple repair visits and an Arbitration Program that expands Class Members' rights while providing an expeditious process for resolving their claims. Plaintiffs expect that a substantial number of Class Members will qualify to receive cash payments, which, to be clear, is not reimbursement for out-of-pocket expenses but payment for the inconvenience of taking their vehicle for repairs covered under warranty.  The ability to obtain a repurchase under an expedited program with expanded rights is also significant—and directly provides a remedy to Class Members harmed by the alleged defect.  *See Kearney v. Hyundai Motor Am.*, No. 09-1298-JST, 2013 U.S. Dist. LEXIS 91636, *17 (C.D. Cal. June 28, 2013) (finding that the settlement benefits, including the arbitration for repurchase if a complementary repair does not fix airbag problem, is fair and reasonable).

When weighed against the risk of further litigation, the Settlement clearly falls within the range of reasonableness.  To be sure, while Plaintiffs believe that their case is strong on the merits, Ford has raised a number of substantive defenses that present serious risks to Plaintiffs' case.  These defenses include, among others, that no Transmission defect exists, or that, even if a defect existed, Plaintiffs would not be able to show that it constitutes a safety concern.  And Ford would likely have argued that individual issues as to liability and damages would prevail over common issues.

As a threshold matter, the existence of a defect may not lead to legal liability under federal or state statutes.  *See*, *e.g.*, *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 991-92 (N.D. Cal. 2010) (granting defendant's motion for summary judgment and

1    finding alleged ignition-lock defect not a safety risk), *aff'd*, 462 F. App'x 660 (9th Cir.

2    2011). Accordingly, Plaintiffs must meet a high burden to establish violations of state

3    and federal consumer protection and warranty statutes.

4           Second, Plaintiffs may well be unable to maintain class status through trial. Ford

5    contends that, as a result of changes in the manufacturing process, design and software,

6    there are multiple versions of the Transmissions, precluding the likelihood that one

7    common defect exists. (Lurie Decl. ¶ 27.) Had litigation continued, Ford would have

8    argued that the variations in the Transmission and in the defects also preclude class

9    certification of the consumer fraud claims for omission. In addition, Ford would have

10   argued that, among other individual variations, questions regarding each customer's

11   proper maintenance of the vehicle, driving conditions, and repair attempts, such as

12   whether the vehicle was taken to the dealer in a reasonable time period for repairs,

13   among others, would preclude certification of the warranty claims.

14          While Plaintiffs would vigorously dispute these claims, consumers bringing

15   automotive defect actions are frequently denied class certification due to lack of

16   common proof. *See, e.g.*, *Grodzitsky v. Am. Honda Motor Co.*, No. 2-01142-SVW,

17   2014 U.S. Dist. LEXIS 24599 (C.D. Cal. Feb. 19, 2014) (denying certification due to

18   lack of evidence that common materials were used for all defective "window regulators"

19   in the class); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 553 (C.D. Cal.

20   2012) ("There is also no evidence that a single design flaw that is common across all of

21   the drains in question is responsible for the alleged water leak defect…").

22          Recently, a California district court denied class certification involving a theory

23   based on material omission of a similar defect involving a Ford vehicle. *See Philips v.*

24   *Ford Motor Co.*, No. 14-02989, 2016 WL 7428810, *17 (N.D. Cal. Dec. 22, 2016)

25   (finding that the plaintiffs failed to present a compelling damages model supporting a

26   classwide determination regarding Ford's alleged omission of a "systemic defect" in the

27   vehicle's electronic steering system). *Philips* underscores the heightened litigation risk

28   for Plaintiffs seeking class certification. This Court has also recently denied certification

of a consumer fraud claim in *Rafofsky v. Nissan N.A.*, No. 15-01848-AB (MANx) (C.D. Cal. Feb. 17, 2017), finding that Nissan's advertising campaign was not so pervasive as to result a presumption of classwide reliance.

This body of recent case law demonstrates that, had the case continued, "plaintiffs [would] face[] a substantial risk of incurring the expense of a trial without any recovery." *In re Toys "R" Us-Del FACTA Litig.*, 295 F.R.D. at 451. Indeed, the risk of continuing litigation, including the risk of new adverse statutory or case law, increased costs, and expiration of a substantial amount of time, weigh heavily in favor of settlement. *Rodriguez*, 463 F.3d at 966. In particular, Plaintiffs shoulder exceedingly high financial risks in pursuing this action. A class action against a major automotive manufacturer, where Plaintiffs allege that over a million vehicles suffer a serious defect, has the strong potential to engulf plaintiffs and attorneys in protracted, resource-draining court battles.

The difficulty of certifying such a class generally, and of prevailing on a contested motion in this technologically complex case specifically, is daunting. In a contested certification motion, Ford would likely submit expert testimony from a Ford engineer showing that the Transmission for various Class Vehicles differs in kind—for example, that some Transmissions contain a linear-sliding piston while others do not, or that some contain an "Anti-Shuffle Control" while others do not. Plaintiffs would rely on the testimony of a technical expert to dispute the import of these minor part variations, along with that of an expert on consumer expectations and a damages expert. These hefty costs would have to be advanced by Plaintiffs and Class Counsel and would add significantly to the risks of proceeding in litigation. *See Aarons v. BMW of N. Am. LLC*, No. 11-7667, 2014 U.S. Dist. LEXIS 118442, at *29-31 (C.D. Cal. Apr. 29, 2014) (approving a settlement for repairs/reimbursement of transmission defect and observing that "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." [citation omitted]).

Even if Plaintiffs were to certify the Class on contested motion, and prevail on

dispositive motions and at trial,[12] the years of litigating this action would almost certainly diminish the value of the relief to Class Members, as their Vehicles' value will depreciate over time.  Any restitution remedies they could obtain would also be subject to offsets for car owners' use of the vehicles.  For example, even under consumer-friendly California law (the Song-Beverly Consumer Warranty Act), a repurchase would require an offset for the mileage driven.  *See* Cal. Civ. Code § 1793.2(d)(2)(C); *see also Robbins v. Hyundai Motor America, Inc*., 2015 WL 304142, at *6 (C.D. Cal. Jan. 14, 2015).  State law offsets could also apply to claims under the federal Magnuson-Moss Warranty Act, which applies state substantive law for federal causes of action.  *See Clemens v. DaimlerChrysler Corp*., 534 F.3d 1017, 1022 (9th Cir. 2008) ("[C]laims under the Magnuson-Moss Act stand or fall with… express and implied warranty claims under state law").  Furthermore, California's Lemon Law specifically enumerates a method for calculating depreciation on vehicles.  See Cal. Civ. Code § 1793.2(d)(2)(C). The National Traffic and Motor Vehicle Safety Act likewise includes depreciation in any remedy following a safety recall.  49 U.S.C. §30120(a)(1)(A)(iii).

Because any repurchase or rescission remedy requires that a consumer return the product in a condition comparable to what he or she received, and because the vehicle's value depreciates significantly with use and time, Plaintiffs believe that a prompt resolution of this action provides the most benefit to Class Members.  Thus, Plaintiffs negotiated a dispute resolution program that expeditiously resolves Class Members' claims while preserving their right to their own state lemon law remedies.  The Program also expands Class Members' rights by increasing the statute of limitations for current owners and lessees bringing suit and providing for a default repurchase remedy.

In light of the substantial risks of continued litigation, including the risk of maintaining class certification, the significant relief secured for the Class by the

---

[12] The inherent risks of proceeding to trial weigh in favor of settlement.  *See In re Portal Software, Inc. Sec. Litig*., 2007 U.S. Dist. LEXIS 88886, *7-8 (N.D. Cal. Nov. 26, 2007) (recognizing that "inherent risks of proceeding to… trial and appeal also support the settlement").

1    proposed Settlement should be viewed as a fair, reasonable, and adequate compromise

2    of the issues in dispute.

3    **4.      The Settlement Was Finalized After a Thorough Investigation**

4         Courts may also consider the extent of discovery and the current stage of the

5    litigation to evaluate whether parties have sufficient information to make an informed

6    decision to settle the action.  *See Linney v. Cellular Alaska Partnership*, 151 F.3d 1234,

7    1239 (9th Cir. 1998).  A settlement negotiated at an earlier stage in litigation will not be

8    denied so long as sufficient investigation has been conducted.  *Eisen v. Porsche Cars*

9    *North American, Inc.*, 2014 WL 439006, at *13 (C.D. Cal. Jan. 30, 2014)(finding that

10   counsel had "ample information and opportunity to assess the strengths and weaknesses

11   of their claims" despite "discovery [being] limited because the parties decided to pursue

12   settlement discussions early on.")

13        As described in Section II.B, *supra*, Plaintiffs engaged in extensive investigation

14   and discovery, including reviewing over a million documents, retaining experts and

15   conducting their own testing, and taking depositions of two of Defendant's corporate

16   representatives in Michigan, as well as a deposition of a corporate representative of third

17   party Getrag Transmissions Corporation.  (*See* Lurie Decl ¶¶ 9-11; Paul Decl. ¶¶ 7-10.)

18        Based on this discovery and on their independent investigation and evaluation,

19   Class Counsel is of the opinion that this Settlement for the consideration and on the

20   terms set forth in the Settlement Agreement is fair, reasonable, and adequate, and is in

21   the best interest of the Settlement Class in light of all known facts and circumstances,

22   including the risk of significant delay and uncertainty associated with litigation of this

23   type, as well as the various defenses asserted by Defendants.

24   **5.      The Views of Experienced Counsel Should Be Accorded**

25        **Substantial Weight**

26        The fact that sophisticated parties with experienced counsel have agreed to settle

27   their dispute should be given considerable weight by courts, since "parties represented

28   by competent counsel are better positioned than courts to produce a settlement that fairly

1   reflects each party's expected outcome in the litigation." *In re Pac. Enters. Sec. Litig.*,

2   47 F.3d 373, 378 (9th Cir. 1995).

3       Here, the Parties achieved a settlement after a thorough review of relevant

4   documents and testimony, as well as a rigorous analysis of the Parties' claims and

5   defenses.  The expectations of all Parties are embodied by the Settlement, which, as set

6   forth above, is non-collusive, being the product of arms'-length negotiations and

7   finalized with the assistance of an experienced mediator.  The Parties were represented

8   by experienced class action counsel possessing significant experience in automotive

9   defect and class action matters.  (*See, e.g.*, Lurie Decl. ¶¶ 35-36 & Ex. 2; Paul Decl. ¶¶

10  20-27.)  Likewise, Ford's counsel, Dykema Gossett, is a renowned defense firm. The

11  Parties' recommendation to approve this Settlement should therefore "be given great

12  weight." *Eisen v. Porsche*, 2014 WL 439006, at *5 (crediting the experience and views

13  of counsel in approving a settlement resolving automotive defect allegations).

### B.    Conditional Class Certification Is Appropriate for Settlement Purposes

#### 1.    The Proposed Class Meets the Requirements of Rule 23

17      Before granting preliminary approval of the Settlement, the Court should

18  determine that the proposed settlement class meets the requirements of Rule 23.  *See*

19  *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); Manual for Complex Litigation,

20  § 21.632.  An analysis of the requirements of Rule 23(a) and (b)(3), commonly referred

21  to as numerosity, commonality, typicality, adequacy, predominance, and superiority,

22  shows that certification of this proposed Settlement Class is appropriate.

#### 2.    The Proposed Class Is Sufficiently Numerous and Ascertainable

25      The numerosity requirement is met where "the class is so numerous that joinder

26  of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Generally, courts will find a

27  class sufficiently numerous if it consists of 40 or more members.  *Vasquez v. Coast*

28  *Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1121 (E.D. Cal. 2009) (numerosity is

1   presumed at a level of 40 members).  Here, the settlement Class consists of current and

2   former owners of approximately 1,500,000 vehicles, satisfying this requirement.

3     The Ninth Circuit recently clarified that there is no threshold "ascertainability"

4   requirement in this Circuit.  *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125

5   n.4 (9th Cir. Jan. 3, 2017).  Nonetheless, the Class is ascertainable as they can be readily

6   identified by each state's department of motor vehicle records.

### 3. There are Questions of Law and Fact that Are Common to the Class

9     The second Rule 23(a) requirement is commonality, which is satisfied "if there

10   are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The

11   operative criterion for commonality is "the capacity of a classwide proceeding to

12   generate common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores,*

13   *Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The "commonality requirement has been

14   'construed permissively,' and its requirements deemed minimal."  *Estrella v. Freedom*

15   *Fin'l Network*, No. C-09-03156-SI, 2010 U.S. Dist. LEXIS 61236, at *25 (N.D. Cal.

16   June 2, 2010) (quoting *Hanlon*, 150 F.3d at 1019-1020).  The existence of a single

17   common question of law or fact satisfies this requirement.  *See Dukes*, 564 U.S. at 369.

18     Here, each Class Member purchased a Ford vehicle equipped with the

19   Transmission that suffered from an alleged Transmission defect that Ford failed to

20   disclose to its customers.   Ford contends that the Transmission is not defective.  Given

21   that the issues in dispute—*e.g.*, whether the Transmission is defective, and, if so, whether

22   and when Ford knew about the defect; whether Ford had a legal obligation to disclose

23   the defect pursuant to consumer protection statues; and whether Ford had the legal

24   obligation to repair the defect under warranty—all reflect common questions of fact and

25   law, the resolution of those issues are apt to drive resolution of this litigation.[13]

---

[13] Ford denies that whether a defect exists is a common question.  However, Ford agrees that the commonality requirement is satisfied by the existence of one common question of law or fact.  Ford believes that one common question exists for all class members—whether the settlement agreement is fair, reasonable and

The need to determine whether an inherent defect exists not only satisfies Rule 23's commonality requirement, it raises the overarching common question that has resulted in class treatment in other automotive defect cases. *See*, *e.g*., *Hanlon*, 150 F.3d at 1020 (allegedly defective rear liftgate latches); *Browne v. American Honda Motor Co., Inc.*, Case No. 09-cv-06750, 2010 WL 9499072, at *1 (C.D. Cal. 2010) (allegedly defective braking system); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 595-97 (C.D. Cal. 2008) (allegedly defective flywheels); *Chamberlan v. Ford Motor Co*., 223 F.R.D. 524, 526 (N.D. Cal. 2004) (allegedly defective engine intake manifolds); *Daffin v. Ford Motor Co*., 458 F.3d 549, 552 (6th Cir. 2006) (allegedly defective throttle body assembly); *see also*, *Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168, 1172 (9th Cir. 2010) (holding that whether the LR3's alignment geometry was defective, whether Land Rover was aware of the defect, whether Land Rover concealed the nature of the defect in violations of consumer protection statutes, and whether Land Rover was obligated to pay for or repair the alleged defect pursuant to the express or implied terms of its warranties are all common issues of law or fact that satisfy the commonality requirement).

### 4.  Plaintiffs' Claims Are Typical of the Proposed Settlement Class

"In determining whether typicality is met, the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 734 (9th Cir. 2007).  Thus, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (citation omitted).

Here, Plaintiffs assert that Class Members' claims arising from the defect are reasonably coextensive with the legal claims asserted by the named Plaintiffs.  Each Class Member's claims arise from the same alleged course of conduct—that Ford knowingly failed to disclose that the Transmission is defective to its customers.

adequate—thus satisfying the commonality requirement.

Plaintiffs' claims are thus typical of the Class, as "they are reasonably coextensive with those of absent class members." Plaintiffs and Class Members would also similarly benefit from the relief provided by the Settlement. Accordingly, typicality is satisfied.

### 5. Plaintiffs and Plaintiffs' Counsel Will Adequately Represent the Interests of the Proposed Settlement Class

Adequacy is satisfied because "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4); specifically: (1) the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) Plaintiffs are represented by qualified and competent counsel. *Hanlon*, 150 F.3d at 1020. Here, Plaintiffs are adequate class representatives, as they have no conflict of interest with the proposed Class. In fact, Plaintiffs share a common interest in holding Ford accountable for selling vehicles with an alleged Transmission defect that they did not disclose to their customers. In addition, Plaintiffs are represented by competent counsel well-versed in prosecuting automotive litigation and/or class action matters. (*See, e.g.*, Lurie Decl. ¶¶ 35-36; Ex. 2; Paul Decl. ¶¶ 20-27; Declaration of Thomas Zimmerman, ¶¶ 16-18.)

### 6. Common Issues Predominate Over Individual Issues

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)." *Hanlon*, 150 F.3d at 1022. The predominance inquiry under Rule 23(b)(3) asks "whether the common, aggregation-enabling issue are more prevalent or more important than the non-common, aggregation-defeating, individual issues." *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* So long as there is a "clear justification for handling the dispute on a representative rather than an individual basis" (*Hanlon*, 150

F.3d at 1022), the inquiry is satisfied.

Manageability at trial is not a concern in the class action settlement context, "for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. Indeed, the predominance inquiry in the context of a nationwide settlement should be considered under "three guideposts":

> [F]irst, that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class.

*Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc); *see also, Wakefield v. Wells Fargo & Co.*, No. C 13-05053 LB, 2014 WL 7240339, at *4 (N.D. Cal. Dec. 18, 2014) (adopting *Sullivan*'s analysis that state law variations dissipate in a settlement class). Under similar guiding principles, the Ninth Circuit has similarly upheld settlement-only class certification in nationwide settlements. *See, e.g.*, *Hanlon*, 150 F.3d at 1022–23 ("[G]iven the limited focus of the action, the shared factual predicate and the reasonably inconsequential differences in state law remedies, the proposed class was sufficiently cohesive to survive Rule 23(b)(3) scrutiny.").

Here, for purposes of settlement, the predominance test is satisfied, as the proposed Settlement makes the relief for cash payment or Vehicle Discount Certificates available for all Class Members based on easily ascertainable criteria, bypassing whatever individual evidentiary and factual issues that could arise in litigation in determining liability or damages. Furthermore, the Arbitration Program incorporates variations in different states' lemon laws into its design, thereby neutralizing any choice-of-law concerns. Specifically, each Class Member's claim shall be governed by the law of their state. Further, to the extent a Class Member's state does not provide for a lemon law, or the individual does not meet his or her state's requirements, the default lemon law program allows for a universal method for a repurchase or replacement.

1    Consequently, common questions predominate over individual issues that might have

2    arisen had this action continued to be litigated.

3              **7.        A Class Settlement Is Superior to Other Available Means of**

4                        **Resolution**

5              Similarly, there can be little doubt that resolving all Class Members' claims

6    through a single class action is superior to a series of individual lawsuits. "From either a

7    judicial or litigant viewpoint, there is no advantage in individual members controlling the

8    prosecution of separate actions. There would be less litigation or settlement leverage,

9    significantly reduced resources and no greater prospect for recovery." *Hanlon*, 150 F.3d

10   at 1023. Indeed, the terms of the Settlement negotiated on behalf of the Class

11   demonstrate the advantages of a collective bargaining and resolution process.

12             The damages sought by each Class Member here, while representing an

13   important purchase for Class Members, are not so large as to weigh against the

14   certification of a class action. *See Smith v. Cardinal Logistics Mgmt. Corp*., 2008 WL

15   4156364, at **32-33 (N.D. Cal. Sep. 5, 2008) (finding that class members had a small

16   interest in personally controlling the litigation even where the average amount of

17   damages were $25,000-$30,000 per year). The sheer number of separate trials that

18   would otherwise be required also weighs in favor of settlement.

19             The superiority of proceeding through the class action mechanism is

20   demonstrable. Through the class action device, Class Counsel was able to negotiate a

21   global Settlement with Ford that, if approved, will provide Class Members with

22   substantial cash benefits, and an opportunity for a repurchase of their vehicle. By design,

23   this Settlement provides benefits to all Class Members who may have been harmed

24   while offering an opportunity for those with the most serious problems to resolve their

25   claims through the binding Arbitration Program, where they can marshal individual

26   evidence to obtain a repurchase or replacement. Moreover, those with pending lemon

27   law actions are excluded from the Settlement.

28             As the class action device provides the superior means to effectively and

1  efficiently resolve this controversy, and as the other requirements of Rule 23 are

2  satisfied, certification of the proposed Settlement Class is appropriate.

3      **C.      The Proposed Class Notice Adequately Informs Class Members**

4           **About the Case and Proposed Settlement**

5      Upon certifying a Rule 23(b)(3) class, Rule 23(c)(2)(B) requires the Court to

6  "direct to class members the best notice that is practicable under the circumstances,

7  including individual notice to all members who can be identified through reasonable

8  effort." *See also, Briseno*, 844 F.3d at 1129 (recognizing that [t]he rule does not insist on

9  actual notice to all class members in all cases" and "recognizes it might be impossible to

10  identify some class members for purposes of actual notice" (citation omitted)).  In

11  addition, Rule 23(e)(1) requires that before a proposed settlement may be approved, the

12  Court "must direct notice in a reasonable manner to all class members who would be

13  bound by the proposal." *See Zakskorn v. Am. Honda Motor*, 2015 WL 3622990, *3, *6

14  (E.D. Cal. June 9, 2015) (finding class notice by U.S. mail to over 1 million class

15  members as having "adequately protected class members' interests").

16      The Parties have agreed on a notice plan that satisfies the requirements of

17  Rule 23.  (Settlement Agreement ¶ III.C.)  Under this plan, Ford will pay the claims

18  administrator to mail a Short-Form Class Notice to all current and former owners and

19  lessees of Class Vehicles who can be reasonably identified (through Ford and HIS

20  Automotive, which obtains Class Member information from state motor vehicle

21  agencies); to publish a Publication Notice in the first section of the National Edition of

22  USA Today; and to publish the Long-Form Class Notice—which contains a series of

23  questions-and-answers about the Settlement in a readable format—on a website

24  maintained by the Claims Administrator.  *See In re Toyota Motor Corp. Unintended*

25  *Acceleration Mktg., Sales Practices, & Prod. Liab. Litig*., No. 8:10ML2151 JVS

26  FMOX, 2012 WL 6733023, at *3 (C.D. Cal. Dec. 28, 2012) (approving a notice plan

27  like the one proposed here, with a short-form postcard notice mailed to all class

28  members, and a long-form class notice stored on a settlement website); *Browne*, 2010

1   WL 9499072, at *7 (finding notice by mail sufficient after Honda employed a consultant

2   similar to the one proposed here to find addresses of potential class members).

3         The form of the notice to be mailed, attached to the Settlement Agreement as

4   Exhibits A-C, includes all the content required by Rule 23(c)(2)(B), such as a description

5   of the action and Class claims, as well as the Class Members' right to opt out of, object

6   to, or comment on the proposed Settlement.

7   **VI.   CONCLUSION**

8         The Parties have negotiated a fair and reasonable settlement.  Accordingly,

9   Plaintiffs move the Court to preliminarily approve the Settlement Agreement; direct the

10  dissemination of notice to the class as proposed; and set a hearing date and briefing

11  schedule for final Settlement approval and Plaintiffs' fee and expense application.

12

13  Dated:  March 24, 2017                    Respectfully submitted,

14

15                                       By: */s/ Jordan Lurie*
                                             Jordan L. Lurie (SBN 130013)
16                                           Jordan.Lurie@capstonelawyers.com
                                             **Capstone Law APC**
17                                           1875 Century Park East, Suite 1000
                                             Los Angeles, California 90067
18                                           Telephone: (310) 556-4811

19                                           Russell D. Paul
                                             **Berger & Montague, P.C.**
20                                           1622 Locust Street
21                                           Philadelphia, PA 19103
                                             Telephone: (215) 875-4601
22

23                                           Thomas A. Zimmerman, Jr.
                                             **Zimmerman Law Offices P.C.**
24                                           77 W. Washington St., Suite 1220
25                                           Chicago, Illinois 60602
                                             Telephone: (312) 440-0020
26

27                                           *Attorneys for Plaintiffs*

28