1   Nancy Gray (SBN 150214)
2   ngray@grayfirm.com
    GRAY & ASSOCIATES, P.C.
3   11500 West Olympic Blvd, Suite 400
4   Los Angeles, CA  90064
    Telephone: 310-452-1211
5
6   David J. Gorberg (*pro hac vice* to be filed)
    david@mylemon.com
7   Emma C. Robison (*pro hac vice* to be filed)
    emma@mylemon.com
8   DAVID J. GORBERG AND ASSOCIATES
9   103 Sibley Ave, Ardmore, PA 19003
    Telephone: (215) 665-7660
10
11  Michael T. Kirkpatrick (*pro hac vice* to be filed)
12  PUBLIC CITIZEN LITIGATION GROUP
    1600 20th Street NW
13  Washington, DC 20009
14  Telephone: (202) 588-1000
    E-mail: mkirkpatrick@citizen.org
15
16  Attorneys for Objectors Lott, Lutz,
    Olivant, Slomine, and Woloszyn
17

18                    **UNITED STATES DISTRICT COURT**

19          **CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION**

20
    OMAR VARGAS, ROBERT BERTONE,          ) Case No. CV 12-8388 AB
21  MICHELLE HARRIS, and SHARON           )
    HEBERLING individually, and on behalf ) The Hon. Andre Birotte Jr.
22  of a class of similarly situated individuals, )
23                                        ) **OBJECTIONS OF CLASS**
                        Plaintiffs,       ) **MEMBERS LOTT, LUTZ,**
24                                        ) **OLIVANT, SLOMINE, AND**
    v.                                    ) **WOLOSZYN**
25                                        )
26                                        )
    FORD MOTOR COMPANY,                   ) Date:      October 2, 2017
27                                        ) Time:      10:00 a.m.
                        Defendant.        ) Place:     Courtroom 7B
28

# TABLE OF CONTENTS

IDENTITY OF OBJECTORS AND INTENT TO APPEAR ................................... 1

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

STANDARDS UNDER RULE 23(e) ................................................................... 3

ARGUMENT ........................................................................................................ 5

I. The Cash Payment Provisions Of The Proposed Settlement Are Not Fair, Reasonable, And Adequate ................................................................................... 5

    A. Many class members will not qualify for the cash payment provisions of the agreement and will receive nothing in return for the release of their claims ................................................................................................................... 5

    B. The claims that will be released for nothing have significant value .......... 6

    C. The settlement cannot be approved because its value is unknown. ........... 9

    D. The value of the settlement is unknown because Ford has not agreed to any minimum payment in exchange for the discharge of all liability ....... 10

    E. There is an intra-class conflict between the subclass eligible for relief and the subclass that is not. .......................................................................... 11

II. The Arbitration Program is Not Fair, Reasonable, and Adequate, Because It Benefits Ford Rather Than The Class .................................................................. 12

    A. The arbitration program limits relief to repurchase claims under the applicable state lemon law or the settlement's default standard and preempts all other causes of action and forms of relief, many of which would provide greater benefit to the class .................................................... 13

    B. The arbitration program imposes requirements and restrictions in excess of those imposed by state lemon laws. ............................................. 15

    C. The arbitration program shortens the time for class members to make a claim ............................................................................................... 15

D. The arbitration program's cap on attorneys' fees will severely limit
class members' ability to secure representation............................................17

III. To Enable An Informed Assessment of The Proposed Settlement, The Court
Shoud Require Ford to Disclose The Value of Judgments and Settlements of
Individual Cases Brought Against Ford Based on Alleged Problems With The
PowerShift Transmission..........................................................................................17

IV. The Attorneys' Fees are Excessive Given The Low Value of The Settlement
to The Class. .............................................................................................................18

V. The Court Should Not Defer to The Views of Class Counsel. ..........................20

VI. The Number of Objections and Opt-Outs Does Not Indicate that The Settlement
Is Fair. .......................................................................................................................21

CONCLUSION.........................................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE(S)**

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974) ....................................................................... 16

*In re Bluetooth Headsets Products Liability Litigation*,
    654 F.3d 935 (9th Cir. 2011) .............................................. 4, 19, 20

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) ....................................................................... 16

*Diaz v. Romer*,
    961 F.2d 1508 (10th Cir. 1992) ..................................................... 11

*In re Ford Motor Co. Bronco II. Products Liability Litigation*,
    1994 U.S.Dist. LEXIS 15867 (E.D. La. Oct. 28, 1994) ................................ 17

*Gusse v. Damon Corp.*,
    470 F. Supp. 2d 1110 (C.D. Cal. 2007) ........................................ 8

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................ 4

*Harrison v. Nissan Motor Corp. in U.S.A.*,
    111 F.3d 343 (3d Cir. 1997) ......................................................... 14

*Hemphill v. San Diego Association of Realtors, Inc.*,
    225 F.R.D. 616 (S.D. Cal. 2005) ................................................. 17

*Hewlett-Packard Co. v. Superior Court*,
    83 Cal. Rptr. 3d 836 (Cal. Ct. App. 2008) ................................... 12

*Holmes v. Continental Can Co.*,
    706 F.2d 144 (11th Cir. 1983) ..................................................... 20

*James Michael Leasing Co., LLC v. Paccar Inc.*,
    No. 11-C-0747, 2015 WL 1128630 (E.D. Wis. Mar. 12, 2015) ................. 17

*In re Katrina Canal Breaches Litigation*,
    628 F.3d 185 (5th Cir. 2010) ......................................................... 6

*Koby v. ARS National Services, Inc.*,

    846 F.3d 1071 (2017) ........................................................................6

*Lane v. Facebook, Inc.*,

    696 F.3d 811 (9th Cir. 2012)....................................................4, 20

*In re Literary Works in Electronic Databases Copyright Litigation*,

    654 F.3d 242 (2d Cir. 2011) .........................................................11

*Lyeth v. Chrysler Corp.*,

    734 F. Supp. 86 (W.D.N.Y. 1990) ...............................................17

*McClelland v. Hyundai Motor America*,

    851 F. Supp. 677 (E.D. Pa. 1994) ................................................17

*Milicevic v. Fletcher Jones Imports, Ltd.*,

    402 F.3d 912 (9th Cir. 2005).........................................................13

*Milicevic v. Mercedes-Benz USA, LLC*,

    256 F. Supp. 2d 1168 (D. Nev. 2003) ..........................................15

*Millan v. Cascade Water Services, Inc.*,

    310 F.R.D. 593 (E.D. Cal. 2015) .................................................10

*National Super Spuds v. New York Mercantile Exchange*,

    660 F.2d 9 (2d Cir. 1981) .............................................................11

*Officers for Justice v. Civil Service Commission*,

    688 F.2d 615 (9th Cir. 1982)...........................................................4

*Ortega v. Toyota Motor Sales, USA, Inc.*,

    572 F. Supp. 2d 1218 (S.D. Cal. 2008) ........................................13

*Philips v. Ford Motor Co.*,

    No. 14-CV-02989, 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ...............8

*Pyskaty v. Wide World of Cars, LLC*,

    856 F.3d 216 (2d Cir. 2017).........................................................13

*Reddin v. Toyota Motor Distributors, Inc.*,

    No. WD-90-2, 1991 WL 21522 (Ohio Ct. App. Mar. 21, 2003) ...................7

*Robertson v. Fleetwood Travel Trailers of California, Inc.*,

     50 Cal. Rptr. 3d 731 (Cal. Ct. App. 2006) ...................................................... 7

*Staton v. Boeing Co.*,

     327 F.3d 938 (9th Cir. 2003)........................................................................ 3, 4

*Suber v. Chrysler Corp.*,

     104 F.3d 578 (3d Cir. 1997) .......................................................................... 14

*Sylvester v. CIGNA Corp.*,

     369 F. Supp. 2d 34 (D. Me. 2005) ............................................................... 10

*True v. America Honda Motor Co.*,

     749 F. Supp. 2d 1052 (C.D. Cal. 2010)...................................................... 5, 12

*Weinberger v. Great Northern Nekoosa Corp.*,

     925 F.2d 518 (1st Cir. 1991) ......................................................................... 19

## RULES & STATUTES

15 U.S.C. § 2302, *et seq* ................................................................................ 13

Fed. R. Civ. P. 23(a)(4)..................................................................................... 11

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 8

Fed. R. Civ. P. 23(c)(5)..................................................................................... 11

Fed. R. Civ. P. 23(e) ........................................................................... 1, 3, 11, 20

Md. Code, Com. Law. § 14-1504 ..................................................................... 13

N.C. Gen. Stat. § 20-351.8................................................................................ 13

Or. Rev. Stat. § 646A.412................................................................................. 13

## MISCELLANEOUS

Brian Wolfman, *Judges! Stop Deferring to Class-Action Lawyers*, 2 U. Mich.

     J.L. Reform 80 (2013) ................................................................................ 20

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems*

     *and Class Action Settlements*, 59 Fla. L. Rev. 71 (2007)............................ 21

Martin H. Redish & Nathan D. Larsen, *Class Actions, Litigant Autonomy, and*

     *the Foundations of Procedural Due Process*, 95 Cal.L.Rev. 1573

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(2007)..............................................................................................22

Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand.L.Rev. 1529 (2004)..............................................................21

Thomas E. Willging *et al.*, *Federal Judicial Center, Empirical Study of Class Actions in Four FederalDistrict Courts: Final Report to the Advisory Committee on Civil Rules* 10 (1996)..............................................21

### IDENTITY OF OBJECTORS AND INTENT TO APPEAR

These objections are filed on behalf of class members Brenda Lott, Suzanne Lutz, Carlie Olivant, Gail Slomine, and Philip Woloszyn. The accompanying certification of each objector contains the information required by § III(D)(1) of the settlement agreement. *See* Certifications, attached as Exhibits 1-5. Objectors intend to appear at the final approval hearing through counsel and present argument in support of their objections. The information regarding counsel that is required by § III(D)(1)(e) & (f) of the settlement agreement is set forth in Exhibit 6.

### INTRODUCTION

Class members Lott, Lutz, Olivant, Slomine, and Woloszyn object to the proposed settlement for three main reasons. First, the settlement provides substantial benefits to defendant Ford Motor Company (a low-value settlement that rids Ford of a costly legal problem), to class counsel (about $8.9 million in attorneys' fees and costs), and to the representative plaintiffs (incentive awards ranging from $1,000 to $10,000), but provides no benefit to a large portion of the class. A settlement that forces class members to surrender their claims in exchange for no consideration is not "fair, reasonable, and adequate" as required by Federal Rule of Civil Procedure 23(e)(2).

Second, because this is a claims-made settlement without a non-revertable fund to compensate the portion of the class potentially eligible for relief, the proposed settlement provides no guarantee that defendant Ford will pay anything significant in exchange for the release of the class members' claims, and there is no reliable way to estimate the value of the settlement.

Third, the arbitration program under which certain class members can pursue repurchase claims benefits the defendant more than it does the class by restricting the relief that would otherwise be available, imposing additional barriers to recovery, and capping attorneys' fees at a level that will force class members to arbitrate their

claims *pro se*. Because the settlement provides absent class members with either no relief or relief that is highly speculative at best, the Court should deny final approval.

## BACKGROUND

This class action consolidates three cases brought against Ford seeking damages under a variety of statutory and common law theories on behalf of a class of consumers who bought or leased a 2011-2016 Ford Fiesta or 2012-2016 Ford Focus equipped with the PowerShift transmission. The consolidated cases allege that the transmission is defective and poses serious safety concerns. Specifically, the operative complaint alleges that the defective transmission "slips, bucks, kicks, jerks and harshly engages; has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration and difficulty stopping the vehicle, and eventually suffers a catastrophic failure." First Amended Complaint, ¶ 2. The complaint asserts eighteen separate causes of action, including claims for violations of various state consumer protection laws, fraud, breach of warranty, and unjust enrichment. *Id.* ¶¶ 286-501.[1]

The Court granted preliminary approval of the proposed settlement on April 25, 2017, and the settling parties then provided notice of the proposed settlement to the class. The proposed settlement covers nearly 1.5 million vehicles and about 1.9 million class members. If approved, the settlement will release Ford from liability for any claims that could have been asserted in connection with the transmission defect, other than personal injury and property damage claims.

The proposed settlement has two main components. First, it provides for cash payments (or discount coupons) to class members who had at least three software flashes, three transmission hardware replacements, or three clutch replacements, and

---

[1] The Australian Competition and Consumer Commission recently instituted proceedings against Ford in Australia based on similar allegations of false or misleading representations made to consumers who complained about the performance of the PowerShift transmission. "ACCC takes action against Ford," July 26, 2017, available at: https://www.accc.gov.au/media-release/accc-takes-action-against-ford.

who file a timely claim form with extensive required documentation. *See* Settlement Agreement, §§ II(B), (C), and (G). The cash payment provisions of the settlement provide no relief to any class member with fewer than three of any single qualifying event, but class members ineligible for relief must still release their claims.

Second, the proposed settlement bars class members from litigating individual claims in favor of an arbitration program under which a class member can seek repurchase under the standards of the class member's state lemon law or under a default standard set forth in the agreement, but the arbitrator cannot award any relief other than repurchase, even where additional relief is available under the applicable state lemon law or any of the other myriad causes of action waived by the settlement. *Id.*, § II(N). Further, the arbitration program imposes requirements to bring a lemon law claim in arbitration that exceed those required to bring a lemon law claim in court. Finally, the arbitration program caps attorneys' fees for a class member who successfully arbitrates a repurchase claim at no more than $6,000, which will likely force class members to arbitrate their claims *pro se*.

Plaintiffs admit that they cannot ascertain the value of the proposed settlement because they do not know what portion of the class will qualify for a settlement benefit and because the settlement contains no dedicated fund available to compensate the class. In contrast, the value of the settlement to the class representatives and class counsel is firmly established. The settlement includes a "clear sailing" provision under which Ford agrees not to oppose an award to class counsel of up to $8,856,600 in attorneys' fees and costs, and incentive awards ranging from $1,000 to $10,000 to each of the named class representatives.

### STANDARDS UNDER RULE 23(e)

A district court may approve a class action settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The settling parties bear the burden of showing that the settlement meets this standard. *Id.* The factors to be

OBJECTIONS OF LOTT, ET AL.

considered are "multifarious and indeterminate," *Lane v. Facebook, Inc.*, 696 F.3d 811, 830 (9th Cir. 2012) (Kleinfeld, J., dissenting), but may include:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (noting that such factors are "by no means an exhaustive list of relevant considerations. . . . The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.").

Where, as here, a proposed settlement is reached prior to class certification, consideration of the usual factors "is not enough." *In re Bluetooth Headsets Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Rather, "such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Id.* (citations omitted). This "more exacting review . . . is to ensure that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane*, 696 F.3d at 819 (quoting *Hanlon*, 150 F.3d at 1027). Thus, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947 (citing *Staton*, 327 F.3d at 960).

1    The essence of the fairness inquiry is whether the settlement reflects a

2   reasonable compromise in light of the prospects of further litigation. A critical

3   element of this analysis, particularly in cases such as this one where the class seeks a

4   monetary recovery, is consideration of the value of the proposed settlement in

5   comparison to an appropriately discounted valuation of the possible recovery if the

6   case were to proceed to judgment, and the fairness of the distribution of any benefits

7   among the class members. *See True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052,

8   1070 (C.D. Cal. 2010) (court must determine whether "settlement is reasonable in

9   relation to the value of the claims surrendered"). Such an analysis is impossible here

10  because the settling parties have not provided an estimate of the value of the claims

11  surrendered or the value of the settlement to the portion of the class that might be

12  eligible for relief.

13                                    **ARGUMENT**

14  **I.     The Cash Payment Provisions Of The Proposed Settlement Are Not Fair,**

15         **Reasonable, And Adequate.**

16    The proposed settlement provides for cash payments or coupons to class

17  members who had at least three software flashes, three transmission hardware

18  replacements, or three clutch replacements, and who submit claim forms with

19  extensive supporting documentation within 180 days of the approval date or the

20  qualifying event. The cash payment provision is not fair to the class for several

21  reasons.

22       **A. Many class members will not qualify for the cash payment provisions**

23          **of the agreement and will receive nothing in return for the release of**

24          **their claims.**

25    The cash payment provisions of the settlement agreement provide no relief to

26  any class member who had fewer than three of any single qualifying repair. The

27  number of class members *ineligible* for relief is unknown, but it is certainly a

28  significant portion of the class. To require class members to release their right to

assert damages claims against Ford in exchange for nothing of value would be fundamentally unfair.

In *Koby v. ARS National Services, Inc.*, 846 F.3d 1071 (2017), the Ninth Circuit reversed the district court's approval of a class action settlement that would have relinquished the right of class members to seek damages in any other class action because the proponents of the settlement failed to demonstrate that class members would benefit from the settlement. *Id.* at 1079. The Court held that "[b]ecause the settlement gave the absent class members nothing of value, they could not reasonably be required to give up anything in return." *Id.* at 1080. "The fact that class members were required to give up anything at all in exchange for worthless injunctive relief precluded approval of the settlement as fair, reasonable, and adequate under Rule 23(e)(2)." *Id.* at 1081; *see In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010) ("The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants.").

The proposed settlement should be rejected on this basis alone.

**B. The claims that will be released for nothing have significant value.**

Plaintiffs may argue that the class members forced to release their claims for nothing are not harmed because their claims are of minimal value, but such an assertion would be incorrect. As a matter of law, a fair settlement cannot require the release of claims for no consideration, even if the claims "might be worth relatively little." *Koby*, 846 F.2d at 1081. In any event, here, class members with fewer than three of the same type of qualifying repair required for relief under the proposed agreement may be relinquishing claims that would generate significant relief in litigation.

For example, to maintain a breach of warranty action, a consumer must be able to show that a defect arose in the vehicle during the warranty period that the manufacturer was unable to fix within a reasonable amount of time or number of

repair attempts. Under this standard, *every* visit to the dealership counts, whether a repair is actually performed or not. Thus, if a consumer visited a dealership but no repairs were made due to a lack of time, inability to duplicate the problem, or failure to recognize that a defect exists, the visit still qualifies as a repair attempt. *See*, *e.g.*, *Robertson v. Fleetwood Travel Trailers of Cal., Inc.*, 50 Cal. Rptr. 3d 731, 741 (Cal. Ct. App. 2006) ("Each occasion that an opportunity for repairs is provided counts as an attempt, even if no repairs are actually undertaken."); *Reddin v. Toyota Motor Distribs., Inc.*, No. WD-90-2, 1991 WL 21522, at *6 (Ohio Ct. App. Feb. 22, 1991) (finding repair-attempt requirement satisfied where defendant was given the opportunity to examine and repair the vehicle, even if the defendant could not discover the defective part). Thus, a class member who visited a dealership four times, but on two occasions software updates were performed and on two occasions transmission hardware was replaced may have a breach of warranty action on an individual basis, with each of the four visits to the dealership qualifying as a repair attempt. In contrast, the class member will not qualify for any relief under the proposed settlement, because it requires class members to document three or more of the same type of repair to qualify for any relief.

The settling parties have not presented any principled reason for restricting the cash payment provisions to class members with three or more of the same type of repair attempt, and the requirement appears to have been imposed solely to reduce the number of claims. Because the proposed settlement draws arbitrary distinctions among class members with respect to eligibility for relief, the settlement should not be approved.

Further, many class members who do not qualify for compensation under the proposed settlement are sacrificing claims worth substantially more than the compensation available to class members who qualify for relief. Damages in individual breach of warranty actions are set by state law, and many provide relief equal to the diminished value of the vehicle. Some states also allow a consumer to

return the defective good for a full refund. *See*, *e.g.*, *Gusse v. Damon Corp.*, 470 F. Supp. 2d 1110 (C.D. Cal. 2007) (discussing relief available under various breach of warranty claims). Such relief may be available in individual actions to class members ineligible for *any* relief under the proposed settlement and would likely dwarf the cash payouts available to the portion of the class that does qualify for relief under the settlement. Indeed, the cash payouts available under the proposed settlement are not based on diminished value or other measures of damages attributable to the transmission defect. Rather, the cash payments are based on the inconvenience of making multiple service visits for transmission-related repairs. The mismatch between the nuisance damages available to some class members under the proposed settlement and the damages sought under plaintiffs' legal theories of liability militates against approval of the settlement. Indeed, because plaintiffs have failed to produce a damages model that is consistent with their liability case, the Court should revisit its predominance analysis under Rule 23(b)(3). *See Philips v. Ford Motor Co.*, No. 14-CV-02989, 2016 WL 7428810, at *23 (N.D. Cal. Dec. 22, 2016) (denying class certification in automobile defect case where plaintiffs failed to offer a damages model capable of measuring, on a common basis, the economic harm actually caused to class members by alleged defect).

Finally, many class members likely will not qualify for the cash payment program—not because they did not experience transmission problems, but because they were discouraged by Ford from making the required number of service visits. As plaintiffs have explained, Ford prepared a handout for its dealers to give to customers who complained about the transmission defect, "in an apparent attempt to induce customers into believing the problems they were experiencing were 'normal driving characteristics.'" First Amended Complaint, ¶ 251. Class members who received that handout would have believed it futile to continue visiting Ford dealerships to seek warranty repairs for their defective transmission. For example, class member Adam Felix experienced problems with the transmission on his 2013

Ford Focus, but on at least two occasions the dealership told him that there was nothing wrong with his vehicle, discouraging him from making further dealership visits to complain about the transmission defect. *See* Decl. of Felix, attached as Exhibit 7. As a result, Mr. Felix is not eligible for any relief under the proposed settlement.

**C. The settlement cannot be approved because its value is unknown.**

Plaintiffs concede that the Court must assess the settlement's value to determine whether to grant final approval, *see* Pl.'s Mtn. at 24, but plaintiffs offer no basis for the Court to make that assessment. Plaintiff speculates in a footnote that, because Ford shipped 8 million transmission parts to its dealers to use in warranty repairs, a "significant proportion" of the class may qualify for the cash payments associated with three or more service visits that involved transmission hardware replacements. *Id.* at 25, n.12. Such speculation is entirely insufficient to establish the value of the settlement.

First, the settling parties have presented no evidence that the 8 million transmission parts can be used only in class vehicles or that the parts will be used at all. Second, multiple transmission parts are typically used in a single repair visit that involves transmission hardware replacements. *See* Repair orders, attached as Exhibit 8 (showing the use of at least two transmission parts during each repair visit). Third, a large proportion of the transmission parts that are used in class vehicles could be used in vehicles that are not returned for a third transmission parts replacement, which is the minimum number of visits required to qualify for relief.

Thus, plaintiffs' attempt to extrapolate the value of the settlement from the number of replacement parts Ford has shipped to dealers is misplaced. Notably, although Ford is in a superior position to predict the number of class members potentially eligible to submit a claim, Ford has not endorsed plaintiffs' speculation as to the number of class members who may be eligible for some type of relief.

**D. The value of the settlement is unknown because Ford has not agreed to any minimum payout in exchange for the discharge of all liability.**

It is not surprising that plaintiffs are unable to estimate the value of the settlement, because there is no dedicated fund set aside for the benefit of the class. Rather, in this proposed claims-made settlement, Ford's total payment is unknowable, because it will be pay only those class members who qualify for a benefit and successfully navigate the claims process. Claims-made settlements without a non-revertable fund are highly disfavored because the actual benefit to the class is unknown, *see*, *e.g.*, *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015), and the claims rate in class-action settlements is typically less than ten percent of the class members eligible for relief, *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005).

Here, the claims rate is likely to be low for several reasons. First, as explained above, only a fraction of the class is eligible to make a claim for relief. Second, the documentation requirements associated with making a claim are onerous: To qualify for a cash payment, a class member must complete and submit a claim form and attach substantial documentation of each of the qualifying repairs, as well as proof of ownership of the vehicle at the time of each qualifying repair, and a sworn written statement attesting to the authenticity of the documents provided. A class member whose qualifying service visits were years ago or who may no longer own the vehicle is unlikely to have retained all the paperwork required to support a claim. Finally, as explained above, because Ford had a practice of informing class members that the transmission problems they were experiencing were "normal driving characteristics," service visits may not have resulted in the actual repair attempts needed to qualify for relief under the proposed settlement.

A settlement that requires the class to release all of its claims against Ford in exchange for a net payout that is unknown is not reasonable, and for Ford to be discharged from all liability without being bound to pay some guaranteed amount for

the benefit of the class is not fair. This defect in the proposed settlement is particularly problematic here, where the complaint is premised in part on unjust enrichment but the lack of a non-revertable dedicated fund means that Ford will not have to disgorge its ill-gotten profits.

### E. There is an intra-class conflict between the subclass eligible for relief and the subclass that is not.

The proposed settlement presents an intra-class conflict between the subclass that surrenders its claims for no relief and the subclass that may be eligible for relief. This conflict suggests that the interests of one subclass may have been traded off against the interests of the other. In such situations, each subclass should have had independent representation. Because they did not, the Court should not approve the settlement under Rule 23(e)(2) and should revisit its adequacy of representation analysis under Rule 23(a)(4). *See, e.g., In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011) ("Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented."); *Diaz v. Romer*, 961 F.2d 1508, 1511 (10th Cir. 1992) (upholding district court's order creating subclasses with separate counsel where proposed consent order settling class action created a conflict of interest between two parts of the class); *see also* Fed. R. Civ. P. 23(c)(5) (allowing court to create subclasses "[w]hen appropriate"); *Nat'l Super Spuds v. New York Mercantile Exchange*, 660 F.2d 9, 19  (2d Cir. 1981) ("An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of [other] members.").

Further, the distinction between the subclass eligible for relief (those with three or more of a single type of repair attempt) and the rest of the class is arbitrary because there is no evidence to suggest that one group has different legal claims, or greater damages, than the other. This Court faced a similar situation in *True v. American Honda Motor Company*. In *True*, the Court denied final approval of a

OBJECTIONS OF LOTT, ET AL.

1    proposed class action settlement that would have provided a cash payment only to a

2    subgroup that had complained to Honda before a specific date. 749 F. Supp. 2d at

3    1066-67. Plaintiffs contended that an extra reward for members of the subgroup was

4    appropriate because those class members were aggrieved enough to have

5    complained. *Id.* Noting that "Courts generally are wary of settlement agreements

6    where some class members are treated differently than others," *id.* at 1067, the Court

7    rejected the settlement, finding that the distinction between class members was

8    arbitrary because whether Honda had a written record of a complaint was not within

9    the class member's control, and the class members had identical legal claims and

10   injuries. *Id.* at 1068-69.   Here, class members have the same legal claims and

11   injuries based on the transmission defect, whether or not they had three or more of a

12   single type of repair attempt. *See Hewlett-Packard Co. v. Superior Court*, 83 Cal.

13   Rptr. 3d 836, 842 (Cal. Ct. App. 2008) (affirming certification of a class of owners

14   of a notebook computer with a defective part, and explaining that if the part is found

15   to be defective, each plaintiff would not need to separately prove a malfunction, but

16   only that he or she had a computer that contained the defective part).

17   **II.     The Arbitration Program Is Not Fair, Reasonable, And Adequate,**

18          **Because It Benefits Ford Rather Than The Class.**

19          The proposed settlement includes an arbitration program that the settling

20   parties characterize as part of the consideration that Ford agrees to provide class

21   members in exchange for their surrendering the right to litigate their claims in court.

22   In fact, the arbitration program benefits Ford rather than the class. To obtain relief in

23   arbitration, a class member must prove the elements of a repurchase claim under the

24   applicable state lemon law or the settlement's default standard. Yet unlike in

25   litigation, the proposed settlement would impose additional requirements, offers

26   narrower relief than if the claim were litigated, and requires class members to waive

27   all other potential causes of action. Thus, what is characterized as a benefit of the

28   proposed settlement is actually the post-hoc imposition of mandatory binding

arbitration that is less favorable to class members than proceeding in court. Because almost all class members would be better off without the arbitration program, the proposed settlement is not fair, reasonable, or adequate.

**A. The arbitration program limits relief to repurchase claims under the applicable state lemon law or the settlement's default standard and preempts all other causes of action and forms of relief, many of which would provide greater benefit to the class.**

State and federal lemon laws, although they vary in their details, generally provide that if a substantial defect arises early in a vehicle's life and the manufacturer cannot fix it within a reasonable number of repair attempts, the manufacturer must replace the vehicle or give the purchaser a refund. *See*, *e.g.*, *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 916 (9th Cir. 2005) (describing Nevada's lemon law); *see also Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 222 (2d Cir. 2017) (describing the Magnuson-Moss Warranty Act, the "federal lemon law," 15 U.S.C. § 2302, *et seq.*). In addition to vehicle repurchase or replacement, many lemon laws authorize restitution, damages, and, in certain circumstances, civil penalties and punitive damages. *See*, *e.g.*, *Ortega v. Toyota Motor Sales, USA, Inc.*, 572 F. Supp. 2d 1218, 1221 (S.D. Cal. 2008) ("Damages recoverable under [California's lemon law] include restitution, incidental and consequential damages, attorneys' fees and costs, and, if there has been a 'willful' violation of the Act, a civil penalty."). Oregon, for example, allows up to treble the amount of any damages awarded, with a cap of $50,000, if the manufacturer did not act in good faith. Or. Rev. Stat. § 646A.412. In addition to any other remedies, Maryland allows up to $10,000 if the manufacturer acted in bad faith. Md. Code, Com. Law. § 14-1504(b). North Carolina permits treble damages if the manufacturer unreasonably refused to make or arrange for repairs or provide a refund or replacement.  N.C. Gen. Stat. § 20-351.8.

In addition to the remedies provided under state lemon laws, consumers who purchase a defective vehicle may be entitled to relief under a variety of statutory and common-law claims, including claims under state implementations of the Uniform Commercial Code (UCC), state consumer protection and products liability statutes, and state tort law. *See*, *e.g.*, *Harrison v. Nissan Motor Corp. in U.S.A.*, 111 F.3d 343, 346 (3d Cir. 1997) (asserting claims under Pennsylvania lemon law, UCC, detrimental reliance, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law); *Suber v. Chrysler Corp.*, 104 F.3d 578, 582 (3d Cir. 1997) (asserting claims under state and federal lemon law, the New Jersey UCC, and the New Jersey Consumer Fraud Act).

In contrast to the wide range of relief available in litigation, the relief available to a class member through the arbitration program is severely limited. In general, the arbitration program provides that only the state lemon law where class members obtained their vehicles will apply. *See* Settlement Agreement, § II(N)(1)(a). The only relief that can be awarded by the arbitrator, however, is repurchase or replacement under the terms of the state lemon law, *id.*, § II(N)(1)(f), even if the state lemon law would provide greater relief and even if additional causes of action would have been available to the class member in litigation. Indeed, the settlement provides that "[n]otwithstanding any provision of state law to the contrary, the Arbitrator may not award civil penalties or punitive damages to any Arbitration Claimant." *Id.* § II(N)(3).

The crucial question for determining whether the proposed settlement is "fair, reasonable, and adequate" is a comparison of the value of the settlement in comparison to the value of the claims surrendered. Because the potential recovery in the arbitration program pales in comparison to the relief that would be available to class members in individual litigation, the Court should not approve the proposed settlement.

**B. The arbitration program imposes requirements and restrictions in excess of those imposed by state lemon laws.**

Regardless of the requirements of the applicable state lemon law, the arbitration program requires that a class member with three or fewer repair attempts give defendant Ford another opportunity to try to repair the vehicle before becoming eligible for potential repurchase through arbitration. *Id.* § II(N)(1)(b). This provision imposes an additional barrier to bringing a claim in arbitration, because most state lemon laws require only one to three repair attempts depending upon the severity of the defect, and many state lemon laws provide that the car may be "nonconforming" regardless of the number of repair attempts if the vehicle is out of service for a set number of days. For example, in *Milicevic v. Mercedes-Benz USA, LLC*, 256 F. Supp. 2d 1168, 1175-76 (D. Nev. 2003), the court found that "under some circumstances a single attempt, or no attempt at all, can be a reasonable number. If, for example, the manufacturer or dealer refuses to repair or correct, claiming there is no defect, or after a single repair takes the position that further repair would be unnecessary or unavailing, the buyer is not precluded from exercising his or her right under the lemon law."

Further, under the proposed settlement, at least ten days before filing any arbitration claim, a class member must provide Ford with notice of the class member's intent to pursue arbitration. *See* Settlement Agreement, § II(N)(4). Like the requirement of four repair attempts, the notice requirement imposes an additional barrier for class members seeking relief in arbitration, which benefits only Ford and not the class.

**C. The arbitration program shortens the time for class members to make a claim.**

The arbitration provision of the proposed settlement is also unreasonable and unfair because it provides class members a shorter time within which to make claims

OBJECTIONS OF LOTT, ET AL.

than they would have absent the settlement. This problem applies to both class members who no longer have their vehicles and to those who still do.

Class members who have sold class vehicles or returned leased class vehicles can participate in the arbitration program only if the applicable state lemon law allows repurchase claims in such circumstances, but the request for arbitration must be filed before the applicable state statute of limitations or within 180 days after the approval date, "whichever is earlier." *Id.* § II(N)(1)(c). By curtailing the time in which such class members can pursue a claim, the arbitration program benefits Ford and not the class.

As for class members who still own or lease the vehicle, the proposed settlement provides that, regardless of the applicable state law, the statute of limitations for current owners to seek repurchase through arbitration is the later of six years after delivery of the vehicle to the first purchaser or 180 days after the settlement approval date. *Id.* § II(N)(1)(d). The settlement agreement characterizes this provision as an "extension" of the statute of limitations applicable in some states, making available "a repurchase remedy for many Class Members who otherwise would have been without recourse because their claims would have expired." Pl.'s Mtn. at 26. In fact, no class member has yet suffered the loss of a claim due to a statute of limitations. As the Supreme Court made clear in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983), the commencement of a class action tolls the statute of limitations for all members of the putative class until class certification is denied. This case was filed on September 28, 2012; thus, the statute of limitations for class members' claims has been tolled for the last five years.

The settlement agreement's imposition of a six-year statute of limitations for seeking relief under the arbitration program does not benefit the class by extending the time in which to bring individual claims. It benefits only the defendant by stripping the class of the benefit of *American Pipe* tolling.

**D. The arbitration program's cap on attorneys' fees will severely limit class members'ability to secure representation.**

Under most state lemon laws, prevailing plaintiffs are entitled to recover reasonable attorneys' fees. *See, e.g.*, *James Michael Leasing Co., LLC v. Paccar Inc.*, No. 11-C-0747, 2015 WL 1128630, at *1 (E.D. Wis. Mar. 12, 2015) (citing Wisconsin's lemon law); *McClelland v. Hyundai Motor Am.*, 851 F. Supp. 677, 678 (E.D. Pa. 1994) (Pennsylvania); *Lyeth v. Chrysler Corp.*, 734 F. Supp. 86, 98 (W.D.N.Y. 1990) (New York). These fee-shifting provisions enable car owners to engage counsel to represent them at little or no cost and assure that individuals with meritorious lemon law claims can pursue them. Lemon-law claims that are litigated to judgment can result in substantial attorneys' fee awards.

The proposed settlement caps the attorneys' fees that can be awarded in arbitration at $6,000. *See* Settlement Agreement, § II(N)(1)(h). This provision will make it difficult for class members to engage lawyers to represent them in arbitration, because most attorneys with experience litigating lemon-law claims will be unwilling to take on the representation of a class member for so little. Thus, the attorneys' fee cap benefits Ford by stripping class members of the ability to secure the assistance of counsel to pursue their claims.

**III.   To Enable An Informed Assessment of The Proposed Settlement, The Court Shoud Require Ford to Disclose The Value of Judgments and Settlements of Individual Cases Brought Against Ford Based on Alleged Problems With The PowerShift Transmission.**

In determining whether a proposed class settlement is fair, a "fundamental question is whether the district judge has sufficient facts before him to intelligently approve or disapprove the settlement." *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 620 (S.D. Cal. 2005) (citations omitted). Here, the Court is lacking crucial information about the value of the individual claims that will be surrendered under the proposed settlement agreement. Such information, however, is

within Ford's control, because Ford has resolved individual cases. The Court should order Ford to produce it.

The settling parties have failed to provide the Court with any evidence of the value of individual settlements and judgments based on the transmission defect at issue in this case, and plaintiffs' description of discovery taken from Ford does not indicate whether plaintiffs received such information. Without information about the value of individual claims, the Court cannot make a well-informed determination whether the proposed settlement is fair, reasonable, and adequate. *See In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 1994 U.S. Dist. LEXIS 15867, at *11 & n.10 (E.D. La. Oct. 28, 1994) (granting discovery request insofar as it related to issues not addressed by previous discovery, including "defendant's 'track record' in other cases involving the Bronco II").

To remedy this information gap, the Court—if it is otherwise inclined to approve the proposal, notwithstanding the numerous defects described above—should take the motion for final approval under advisement and order a report of the value of settlements or judgments in individual claims asserted against Ford based on alleged transmission defects. In particular, the Court should order Ford to provide the total number of claims that resulted in either a settlement or judgment and the total amount paid by Ford pursuant to the settlements and judgments, including attorneys' fees. Provision of such information in the aggregate will not violate any confidentiality provisions that may be part of individual settlements, and it will allow the Court to compare the value of the relief available under the proposed settlement to the value of individual settlements or judgments.

## IV.   The Attorneys' Fees are Excessive Given The Low Value of The Settlement to The Class.

The Ninth Circuit has identified three "signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations": 1) a disproportionate distribution of fees to counsel; 2) a clear sailing

18

agreement; and 3) the reversion of unawarded fees to the defendant. *Bluetooth*, 654 F.3d at 947 (citations omitted). The proposed settlement includes all three of these warning signs.

First, the value of the settlement to the portion of the class eligible for relief is unknown, as discussed above, but it may well be substantially less than the attorneys' fees sought by class counsel. Because the proponents of the settlement have not presented the Court with any reliable estimate of the settlement's value to the class, the Court is unable to examine the fee provision in light of the rest of the agreement, and cannot use the percentage-of-recovery method to assure that the attorneys' fees calculated under the lodestar method do not dwarf the class recovery. To the extent plaintiffs argue that the presence of a neutral mediator and the separate negotiation of fees following an agreement on relief for the class are factors weighing in favor of a finding of non-collusiveness, the court in *Bluetooth* rejected the claim that such factors are dispositive of "whether the end product is a fair, adequate, and reasonable settlement agreement." *Id.* at 948.

Second, the clear sailing agreement, although not prohibited, imposes a heightened duty on the Court to "scrutinize closely the relationship between attorneys' fees and benefit to the class." *Id.* (citation omitted). Here, however, the Court cannot do so because the value of the settlement to the class is unknown. *See also Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) (explaining that clear-sailing provision provides a strong temptation for class counsel to accept a settlement that provides less for the class "in exchange for red carpet treatment on fees").

Finally, the proposed settlement contains a kicker provision, under which unpaid attorneys' fees revert to Ford rather than to the class. Unless the Court "is able to conclude that in this particular case, a kicker provision is in the class'[s] best interest as part of the settlement package, the kicker makes it less likely that the settlement can be approved if the district court finds that the clear sailing provision

authorizes unreasonably high attorneys' fees." *Bluetooth*, 654 F.3d at 950. Because nothing in the proposed settlement suggests that the class will benefit if Ford retains any fees not awarded to class counsel, this provision also demonstrates that the proposed settlement should be rejected as not fair, reasonable or adequate.

## V.      The Court Should Not Defer to The Views of Class Counsel.

Plaintiffs argue that the proposed settlement should be approved because experienced class counsel "believes the proposed Settlement is fair, adequate, and reasonable." Lurie Decl. ¶ 40; *see* Pl.'s Mtn. at 30. The Court should not defer to class counsel's settlement-approval recommendation because the court has a duty, imposed by Rule 23(e), to act as a guardian of the absent class members and analyze independently the fairness of the settlement. *See Lane*, 696 F.3d at 830. Rule 23(e) imposes this duty in recognition of the fact that, once a proposed settlement has been reached, the settling parties and their counsel are non-adverse because both sides favor the agreement. This realignment of interests leaves the absent class members without a champion; thus, the court must act as a fiduciary and serve as guardian of the class. Deference to the judgment of counsel is contrary to the court's role. *Holmes v. Cont'l Can Co.*, 706 F.2d 144, 1150 (11th Cir. 1983) ("Reliance on counsel's opinion tends to render the district court captive to the attorney and fosters rubber stamping by the court rather than the careful scrutiny which is essential in judicial approval of class action settlements."). Indeed, consideration of the views of class counsel contributes nothing as a factor to determine the fairness of a settlement because class counsel necessarily favors approval in every case; the court is never asked to evaluate a proposed settlement that class counsel have not endorsed. *See* Brian Wolfman, *Judges! Stop Deferring to Class-Action Lawyers*, 2 U. Mich. J.L. Reform 80, 85 (2013) ("[A] court should never give weight to settling counsel's judgment about the wisdom of a class settlement or rely on class counsel's reputation or experience in assessing a settlement's fairness or legality.").

## VI.   The Number of Objections and Opt-Outs Does Not Indicate that The Settlement is Fair.

Although the total number of objections and opt-outs will not be known until after the deadline of September 5, 2017, plaintiffs argue that the 1,081 opt-out requests received as of August 28, 2017, "demonstrates that Class Members have reacted favorably to the Settlement, supporting final approval." Pl.'s Mtn. at 31. Plaintiffs are incorrect. The silence of the vast majority of class members is typical and unhelpful in determining whether the settlement is fair, reasonable, and adequate.

Although the reaction of the class to a proposed settlement is included in the litany of factors a district court may consider in determining whether a settlement meets the requirements of Rule 23(e), it is the *substance* of the opposition, rather than the *number* of objectors and opt-outs, that the court should consider. The Court should not equate a small number of objectors with approval of the settlement. *See* Christopher R. Leslie*, The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 104 (2007) (explaining that there are numerous disincentives to filing objections and that the benefits of objecting to a proposed settlement are minimal).

Similarly, a low rate of opt-outs is not demonstrative of the settlement's fairness. As several empirical studies have concluded, most class-action settlements have very low opt-out rates. *See, e.g.*, Thomas E. Willging *et al.*, *Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 10 (1996) (finding that the median percentage of class members who opt out of a settlement is 0.1% or 0.2% of the class); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1534, 1549 (2004) (finding the average opt-out rate in product liability class actions is less than one tenth of one percent and concluding that courts should not credit low

rates of class dissent as evidence that the settlement receives the affirmative endorsement of the class); Martin H. Redish & Nathan D. Larsen, *Class Actions, Litigant Autonomy, and the Foundations of Procedural Due Process*, 95 Cal. L. Rev. 1573, 1612 (2007) (criticizing inferences of support drawn from purely passive behavior on the part of the absent class member).

## CONCLUSION

The Court should deny final approval of the proposed class action settlement.

Respectfully submitted

/s/ Nancy Gray_____
Nancy Gray
Gray & Associates, P.C.
11500 West Olympic Blvd, Suite 400
Los Angeles, CA  90064
Telephone: 310-452-1211
E-mail: ngray@grayfirm.com

/s/ David J. Gorberg_____
David J. Gorberg
Emma C. Robison
David J. Gorberg and Associates
103 Sibley Ave, Ardmore, PA 19003
Telephone: (215) 665-7660
E-mail: david@mylemon.com

/s/ Michael T. Kirkpatrick_____
Michael T. Kirkpatrick
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
Telephone: (202) 588-1000
E-mail: mkirkpatrick@citizen.org

Attorneys for Objectors Lott, Lutz, Olivant, Slomine, and Woloszyn

*22*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I certify that this document was filed through the CM/ECF System which will automatically generate a Notice of Electronic Filing and send it by email to all attorneys who have appeared in the case in this Court and who have consented to receive service through the CM/ECF System.

/s/ Nancy Gray_____