**DYKEMA GOSSETT LLC**
TAMARA A. BUSH (197153)
tbush@dykema.com
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Tele: (213) 457-1800 / Fax:  (213) 457-1850

**DYKEMA GOSSETT PLLC**
JOHN M. THOMAS (266842)
jthomas@dykema.com
KRISTA L. LENART (admitted *pro hac vice*)
klenart@dykema.com
JANET L. CONIGLIARO (admitted *pro hac vice*)
jconigliaro@dykema.com
FRED J. FRESARD (admitted p*ro hac vice*)
Ffresard@Dykema.com
2723 South State Street, Suite 400
Ann Arbor, MI  48104
Tele:  (734) 214-7613 / Fax: (734) 214-7696

Attorneys for Defendant
FORD MOTOR COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| OMAR VARGAS, ROBERT BERTONE, MICHELLE HARRIS, and SHARON HEBERLING, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY,<br><br>Defendants. | Case No. 2:2012-cv-08388 AB (FFMx)<br><br>[Assigned to Hon. Andre Birotte, Jr., Rm 7B Magistrate Frederick F. Mumm, Rm 580] Courtroom 790]<br><br>CLASS ACTION<br><br>**DEFENDANT'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD**<br><br>**DATE:  NOVEMBER 17, 2017**<br>**TIME:   10:00 A.M.**<br>**ROOM: 4**<br><br>Complaint served: October 1, 2012<br>1st Amended Complaint:  Dec. 12, 2012<br>2nd Amended Complaint:  Aug 30, 2013 |

**TO THIS HONORABLE COURT AND TO ALL PARTIES AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on November 17, 2017, at 10:00 a.m., or as soon thereafter as counsel may be heard in Courtroom 4 of the above-entitled Court, at 312 N. Spring Street, Los Angeles, CA 90012, Defendant Ford Motor Company ("Ford") will move, pursuant to Federal Rule of Civil Procedure 23(d) and the All Writs Act, 28 U.S.C. § 1651, for an order that:

(1) Finds that Stern Law PLLC and The Liblang Law Firm solicited clients and induced them to exclude themselves from the settlement, either by filing lawsuits before the Notice Date (July 14, 2017) or by opting out before September 5, 2017 (or both), through the use of false and misleading statements concerning the settlement and its purported advantages over "mass actions" to be filed in Michigan;

(2) Requires Stern Law PLLC and The Liblang Law Firm to mail to these clients a court-approved notice correcting the false and misleading statements;

(2) Amends the certified settlement class to include clients on whose behalf Stern Law PLLC and The Liblang Law Firm filed actions against Ford based on alleged defects in the PowerShift transmissions installed in Class Vehicle;

(3) Allows recipients of the corrected notice to opt out of the settlement by mailing an opt-out form with a personal signature (not a digital or typewritten signature) to the Settlement Administrator within 30 days of the mailing of the corrective notice;

(4)  Provides that recipients of the corrective notice who do not timely and properly opt out are bound by the terms of the settlement.

This Motion will be based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declarations, and upon all the pleadings, papers and records on file herein, and upon such further evidence and argument as may be submitted at or before hearing on the Motion.

2

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1        This motion is made following the conference with counsel for Plaintiffs

2   pursuant to Central District Local Rule 7-3, which took place on October 3, 2017.

3   Plaintiffs do not oppose this motion.  Repeated attempts to meet and confer with

4   Stern Law PLLC and The Liblang Law Firm, starting on September 28, 2017, have

5   been unsuccessful.

6

  Dated:  October 13, 2017              DYKEMA GOSSETT PLLC

7

8                                /s/John M. Thomas

9                                John M. Thomas
                                 Tamara A. Bush
10                               Attorneys for Defendant
                                 FORD MOTOR COMPANY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1
2
3
4

**DYKEMA GOSSETT LLC**
TAMARA A. BUSH (197153)
tbush@dykema.com
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Tele: (213) 457-1800 / Fax: (213) 457-1850

5
6
7
8
9
10

**DYKEMA GOSSETT PLLC**
JOHN M. THOMAS (266842)
jthomas@dykema.com
KRISTA L. LENART (admitted *pro hac vice*)
klenart@dykema.com
JANET L. CONIGLIARO (admitted *pro hac vice*)
jconigliaro@dykema.com
FRED J. FRESARD (admitted p*ro hac vice*)
Ffresard@Dykema.com
2723 South State Street, Suite 400
Ann Arbor, MI 48104
Tele: (734) 214-7613 / Fax: (734) 214-7696

11
12

Attorneys for Defendant
FORD MOTOR COMPANY

13

## UNITED STATES DISTRICT COURT

14

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15
16
17

OMAR VARGAS, ROBERT BERTONE, MICHELLE HARRIS, and SHARON HEBERLING, individually, and on behalf of a class of similarly situated individuals,

18
19

Plaintiffs,

20

vs.

21
22

FORD MOTOR COMPANY,

23

Defendants.

Case No. 2:2012-cv-08388 AB (FFMx)

[Assigned to Hon. Andre Birotte, Jr., Rm 7B Magistrate Frederick F. Mumm, Rm 580] Courtroom 790]

CLASS ACTION

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD**

**DATE: NOVEMBER 17, 2017
TIME: 10:00 A.M.
ROOM: 4**

24
25
26
27

Complaint served: October 1, 2012
1st Amended Complaint: Dec. 12, 2012
2nd Amended Complaint: Aug 30, 2013

28

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

FACTUAL BACKGROUND ..................................................................... 1

    **A.**   This Litigation and the Settlement Agreement. .......................... 1

    **B.**   Preliminary Approval And Notice to the Class. ......................... 3

    **C.**   Stern And Liblang's Campaign To Solicit Exclusions From The Settlement. ............................................................................ 4

ARGUMENT ............................................................................................. 6

STERN AND LIBLANG'S MISLEADING CAMPAIGN TO SOLICIT EXCLUSIONS FROM THE SETTLEMENT REQUIRES A CORRECTIVE NOTICE AND A SECOND OPT-OUT PERIOD ..................................... 6

    **A.**   This Court Has Authority to Remedy Deceptive and Misleading Attempts to Solicit Exclusions From a Class Action Settlement. ...................................................................... 6

    **B.**   Stern's and Liblang's Successful Campaign to Solicit More Than 12,000 Exclusions From The Settlement Was Deceptive and Misleading. ........................................................ 9

    **C.**   The Appropriate Remedy:  Amending the Class Definition, Requiring Stern and Liblang to Mail a Court-Approved Corrective Notice, and Allowing Stern and Liblang's Clients a Second Opt-Out Period ................................................ 22

CONCLUSION ....................................................................................... 23

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arteaga v. Carmax Auto Superstores W. Coast, Inc.*,
    No. CV-14-1888 ........................................................................................................15

*Chaudoin v. Thor Motor Coach, Inc.*,
    No. 15-13871, 2017 U.S. Dist. LEXIS 129231 (E.D. Mich. Aug. 15, 2017)..............15

*Georgine v. Amchem Prods.*,
    160 F.R.D. 478 (E.D. Pa. 1995)............................................................................ passim

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981)......................................................................................................7

*Harper v. Navistar, Inc.*,
    No. 2:15-cv-03558, 2016 U.S. Dist. LEXIS 37473 (S.D. W. Va. Mar. 23, 2016)................15, 16

*Hernandez v. Vitamin Shoppe Indus. Inc.*,
    174 Cal. App. 4th 1441 (2009) .................................................................................21, 22

*Impervious Paint Indus., Inc. v. Ashland Oil*,
    508 F. Supp. 720 (W.D. Ky. 1981).............................................................................7

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan
    Litig.*,
    418 F.3d 277 (3d Cir. 2005) ......................................................................................7, 8

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1239 (N.D. Cal. 2000)................................................................ passim

*In re Synthroid Mktg. Litig.*,
    197 F.R.D. 607 (N.D. Ill. 2000)................................................................................8

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*,
    2001 U.S. Dist. LEXIS 18370, 2001 WL 1403007 (N.D. Ill. Nov. 9, 2001) ................8

*Milicevic v. Mercedes-Benz USA, LLC*,
    256 F. Supp. 2d 1168 (D. Nev. 2003)......................................................................13

*Parran's Flooring Ctr., Inc. v. Ford Motor Co.*,
    Civil Action No. DKC 11-1151, 2011 U.S. Dist. LEXIS 135984 (D. Md. Nov.
    28, 2011) ................................................................................................................15

*Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.*,
    No. 12-cv-00944-JST, 2016 U.S. Dist. LEXIS 99720 (N.D. Cal. July 29, 2016)................7, 8, 22

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977)...............................................................................................7

*Wang v. Chinese Daily News, Inc.*,
    623 F.3d 743 (9th Cir. 2010) ..............................................................................8

*Williams v. Quinn*,
    No. 05 C 4673, 2010 U.S. Dist. LEXIS 77140 (N.D. Ill. July 27, 2010) ........8

**STATUTES**

All Writs Act..................................................................................................4, 6, 19

Cal. Civ. Code § 1793.2(d)(1) ...........................................................................13

Magnuson-Moss Warranty Act....................................................................2, 3, 15

Uniform Commercial Code .....................................................5, 12, 13, 14, 16

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

**INTRODUCTION**

District courts evaluating and supervising class action settlements are charged with the responsibility of closely monitoring the notice process and taking steps to safeguard class members from misleading communications from the parties, their counsel, or third parties.  This includes the responsibility and authority under Rule 23 and the All Writs Act to order corrective action in those cases where lawyers, pursuing their own financial interests, engage in misleading and deceptive campaigns to solicit class members and potential class members to exclude themselves from class settlements.

Here, two lawyers have engaged in just such a campaign.  In lieu of relying on the notice approved by this Court—notice characterized by the campaign as "very misleading" and "very deceptive"—the campaign encouraged class members and potential class members to rely on web sites and videos that were designed to portray the Settlement negotiated by class counsel and preliminarily approved by this Court as "fine print" created by Ford alone with the intention of tricking owners of class vehicles into forfeiting their rights to have their vehicles repurchased by Ford.  In fact, it was the campaign itself that tricked thousands of owners of class vehicles into forfeiting buyback claims that could have been asserted under the Settlement (with substantive and procedural advantages not available in litigation) and to instead join "mass action" litigation in which no viable buyback claims are being asserted.  As a remedy, this Court should order the lawyers responsible for the misleading and deceptive claim to issue a corrective, court-approved notice to their clients and to allow these clients a second opt-out period for clients of these two law firms.

**FACTUAL BACKGROUND**

**A.     This Litigation and the Settlement Agreement.**

This class action litigation alleges that 2011-2016 Ford Fiesta vehicles and 2012-2016 Ford Focus vehicles ("class vehicles") have defective PowerShift automatic transmissions and that Ford failed to disclose the existence of this defect to

1

consumers.  After extensive settlement negotiations that spanned more than a year, the parties reached a settlement agreement ("Settlement") that provided significant benefits to the class.  Among other benefits, the Settlement allows class members to seek to have their vehicles repurchased by Ford.  (Doc. 121-1, Settlement Agreement ("SA") ¶ II(N).)  The Settlement preserves all of Class Members' rights to have their vehicles repurchased under the lemon laws of their states.  (SA ¶ II(N)(1)(a).)  But the Settlement also expands the circumstances under which Ford is required to repurchase Class Vehicles beyond the requirements of state lemon laws, it significantly extends the time within which claims for vehicle repurchase can be brought, and it relaxes lemon law requirements regarding notice.  (SA ¶¶ II(N)(1)-(4).  The Proposed Settlement provides for an award of reasonable attorney fees (up to $6,000) incurred in pursuing a successful claim for vehicle repurchase.  (SA ¶ II(N)(1)(h).)

Under the Settlement, repurchase claims can be asserted in an arbitration program in which claims for vehicle repurchase (and claims for violation of Ford's express warranty) can be quickly and efficiently resolved within 30-60 days.  (SA ¶ II(N), Exh. H.)  To administer the arbitration program, Ford and class counsel chose DeMars & Associates ("DeMars").  (SA ¶ I(D).)  DeMars has been designing and administering dispute resolution processes since 1988.  (Declaration of Kyle Morris ("Morris") ¶ 2.)  The program will be implemented by DeMars through its Consumer Arbitration Program for Motor Vehicles (CAP-Motors).  (Morris ¶ 6.)  CAP-Motors selects, trains, and pays the arbitrators who decide the repurchase claims, with no input from Ford (although Ford does, of course, pay DeMars and reimburses it for expenses).  (Morris ¶ 6.)  CAP-Motors is audited on an annual basis by the Federal Trade Commission, by the Florida Department of Legal Affairs, and by the California Department of Consumer Affairs for compliance with the requirements of Magnuson-Moss Warranty Act ("MMWA"), and for certification pursuant to the Florida Motor Vehicle Warranty Enforcement Act and the California Arbitration Certification

1   Program.  (Morris ¶ 3.)

2          To comply with the Magnuson-Moss Consumer Warranty Act and the

3   certification requirements of  Florida and California, CAP-Motors is required to be

4   funded and competently staffed at a level sufficient to ensure fair and expeditious

5   resolution of all disputes.  (Morris ¶ 4.)  It is also required to take all steps necessary

6   to ensure that arbitrators deciding disputes are sufficiently insulated from the

7   manufacturer, so that the decisions of the arbitrators are not influenced by the

8   manufacturer.  (Morris ¶ 4.)  CAP-Motors has maintained compliance with all

9   requirements of the MMWA, and all requirements for certification under California

10  and Florida law, since its inception.  (Morris ¶ 5.)  No DeMars program has been

11  denied certification, where certification was sought, since the company was founded.

12  (Morris ¶ 5.)

13         **B.     Preliminary Approval and Notice to the Class.**

14         On April 25, 2017, this Court preliminary certified a settlement class and

15  preliminarily approved the Settlement, finding that "its terms appear sufficiently fair,

16  reasonable, and adequate to warrant dissemination of notice" to the class.  (Doc. 133,

17  Preliminary Approval Order ("PAO") ¶ 8.)  The settlement class consisted of all

18  current residents of the United States who purchased or leased new or used class

19  vehicles, with certain exclusions.  (PAO ¶ 4.)

20         This Court also approved a notice program that consisted of two components.

21  First, a short form notice was mailed to potential class members and published in

22  USA Today.  (SA Exs. A, C.)  This short-form notice advised class members that

23  "[t]o protect your rights and for information on how to obtain Settlement benefits you

24  must go to ww.FordTransmissionSettlement.com or call (844) 540-6011."  (SA Exs.

25  A, C.)  The Settlement website included a long-form notice with details of the

26  Settlement necessary for class members to make a fully informed decision.   (SA, Ex.

27  B.)  This Court found that the complete notice program, including the long-form

28  notice posted on the web site, was "the best notice practicable under the

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1  circumstances" and was "reasonably calculated … to apprise the Class of … the

2  terms of the proposed Settlement."  (PAO ¶ 9.)  Mailing of the short-form postcard

3  notice was completed by July 7, as ordered by this Court.  (Doc. 150-3, Declaration

4  of Kathleen Wyatt, ¶ 11.)

5      Pursuant to the Preliminary Approval Order, there were two ways for

6  purchasers and lessees of class vehicles to exclude themselves from the Settlement:

7  • Owners or lessees who filed and served lawsuits before the Notice Date (July 14,

8     2017) were excluded from the class definition.  (PAO ¶¶ 4, 19; SA ¶ I(W); Doc.

9     135, Order.)  However, these owners and lessees had the right to "opt-in" to the

10    Settlement by dismissing their actions and submitting a request to the Settlement

11    Administrator.  (PAO ¶¶ 4, 19.)

12  • Class members who wished to opt out after July 14, 2017, could do so with a

13    written request to the Settlement Administrator, personally signed and

14    postmarked no later than September 5, 2017.  (PAO ¶ 16; Doc. 135 ,Order.)

15      **C.    Stern and Liblang's Campaign to Solicit Exclusions from the**

16          **Settlement.**

17      Beginning on April 20, 2017, just days before this Court entered its

18  Preliminary Approval Order, two lawyers, Kenneth Stern and Dani Liblang, began

19  filing a series of "mass actions" in the Circuit Court for Wayne County Michigan

20  Wayne County state court.  (Declaration of Scott Erskine ("Erskine") ¶¶ 3-4.)

21  According to records maintained by the State Bar of Michigan, Stern is a sole

22  practitioner in his own firm, Stern Law PLLC, and Liblang is the named partner in

23  The Liblang Law Firm, which consists of Liblang and two other attorneys.[1]

24      Each "mass action" filed by Stern and Liblang purported to assert claims on

25

---

26  [1] *See* https://www.zeekbeek.com/SBM/Search-

27  Results#firm=Stern+Law&mtype=good&profession=Lawyers&region=MI;
    https://www.zeekbeek.com/SBM/Search-

28  Results#firm=Liblang+Law+Firm&mtype=good&profession=Lawyers&region=MI

behalf of numerous individual Plaintiffs.  (Erskine ¶¶ 3, 7.)  These mass actions are based on the same alleged transmission defects alleged in this class action.  (*Compare* Declaration of Alison Carruthers ("Carruthers") Ex. G with Doc. 1, Complaint.)  By August 10, 2017, Stern and Liblang had filed 56 mass actions asserting claims on behalf of almost 8,000 Plaintiffs from most if not all 50 states.  All of the mass actions demanded that Ford buy back Plaintiffs' vehicles based on (1) Ford's alleged breach of express and implied warranty, (2) Ford's alleged violation of MMWA, and (3) Plaintiffs' alleged revocation of acceptance pursuant to the Uniform Commercial Code ("UCC") § 2-608.  (Carruthers Ex. G, Representative Mass Action Complaint ¶¶ .)  *None of the mass actions sought relief pursuant to the lemon law of any state*.[2] (Carruthers ¶ 12, Ex. G, Representative Mass Action Complaint.)

While they were in the process of filing these mass actions, Stern and Liblang began a public campaign purportedly designed to inform owners and lessees of class vehicles—including potential and existing clients—about the benefits of their mass actions relative to the Settlement and to encourage them to exclude themselves from the Settlement.[3]  (Carruthers Ex. D, Web Page).  Various Stern websites included text and videos urging clients and potential clients to opt out of the settlement by "clicking a button to take you to a form in which you will provide us with the basic information needed to complete your opt put form."  (Carruthers Ex. A, 8/11 Video Tr. at 47; *see also* Carruthers Exs. B-D.)  The form simply required owners and lessees of class vehicles to provide name, address, phone number, and vehicle owned.  (Carruthers Ex. C, 9/2 Video Tr. at 20.)  "We'll fill out the form for you.  We even provide you with an electronic signature tool.  You just scratch your name and you're

---

[2] The complaints also allege common law and statutory fraud and unjust enrichment, but they do not seek vehicle repurchase on the basis of these claims.

[3] The misleading representations and omissions were made by Stern on his various web pages, but Liblang referred class members to those web pages.  (Carruthers Ex. E.)

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

done." (Carruthers Ex. A, 8/11 Video Tr. at 31.)  According to Stern, "I don't need your repair orders ...." (Carruthers Ex. C, 9/2 Video Tr. at 19-20.)  As late as September 2, three days before the opt-out/opt-in deadline, Stern was advising clients and potential clients to opt-out of the Settlement (or, in the case of Plaintiffs in the already filed mass actions, not to opt-in) regardless of their individual circumstances and regardless of the laws of their states.  (Carruthers Ex. C, 9/2 Video Tr. at 19-27.)

As discussed below, the text and videos posted on Stern's websites were replete with significant misrepresentations and omissions designed to portray the Settlement as "fine print" created by Ford alone, with no participation by class counsel or this Court, with the intention of tricking owners of class vehicles into forfeiting their rights to have their vehicles repurchased by Ford.  Stern and Liblang's Internet  campaign to secure clients and opt-outs was successful.  Not one of the Plaintiffs in the filed "mass actions" elected to opt-in to the Settlement.  And, in addition, Stern and Liblang secured more than 4,000 digitally signed opt-outs.  (Doc. 180, Third Supplemental Declaration of Kathleen Wyatt, Ex. D.)  Stern and Liblang have represented to the Michigan state court that they plan to file additional mass actions on behalf of these more than 4,000 additional Plaintiffs by early December. (Erskine ¶ 13.)

## ARGUMENT

## STERN AND LIBLANG'S MISLEADING CAMPAIGN TO SOLICIT EXCLUSIONS FROM THE SETTLEMENT REQUIRES A CORRECTIVE NOTICE AND A SECOND OPT-OUT PERIOD

### A.  This Court Has Authority to Remedy Deceptive and Misleading Attempts to Solicit Exclusions from a Class Action Settlement.

The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172

6

(1977).  "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *Id.* (citations omitted).  Specifically with respect to class actions, a district court "has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).  "It is essential that the class members' decision to participate or to withdraw [from a class] be made on the basis of independent analysis of its own self-interest," and "[i]t is the responsibility of the Court as a neutral arbiter … to insure this type of free and unfettered decision." *Impervious Paint Indus., Inc. v. Ashland Oil*, 508 F. Supp. 720, 723 (W.D. Ky. 1981).  "Because the advantage of class action litigation comes at the cost of binding absent class members through the res judicata effect of litigation over which they lack control, the district courts must closely monitor the notice process and take steps to safeguard class members from 'unauthorized [and] misleading communications from the parties or their counsel.'" *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 310 (3d Cir. 2005); *see also, e.g.*, *Georgine v. Amchem Prods.*, 160 F.R.D. 478, 497 (E.D. Pa. 1995) ("Included in my responsibility to direct to the class the best notice practicable is the duty to ensure that the class receives accurate information.").

The obligation of the court to safeguard class members from misleading communications extends to communications from non-parties as well. *See, e.g.*, *Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.*, No. 12-cv-00944-JST, 2016 U.S. Dist. LEXIS 99720, at *17 (N.D. Cal. July 29, 2016).  Non-parties "are free to encourage class members to opt out of or vote against a class action settlement, provided they do so in a fair manner that avoids material misrepresentations or omissions." *Id.* at *17.  But "[m]isleading communications by

7

1  soliciting counsel have a detrimental effect on the class notice procedure and,

2  therefore, on the fair administration of justice." *Wang v. Chinese Daily News, Inc.*,

3  623 F.3d 743, 756 (9th Cir. 2010), *quoting In re Cmty. Bank*, 418 F.3d at 311.

4  Indeed, as one California district court has observed, "[c]lass members have a due

5  process right to not be misled while they are deciding whether to participate in a class

6  settlement affecting their rights." *Retiree Support Grp.*, 2016 U.S. Dist. LEXIS

7  99720, at *25.  The risks of abuse are particularly great where, as here, exclusions

8  from a class "are solicited … over the Internet, and when retaining separate counsel is

9  as easy as pressing a 'Click Here' button on a web page." *In re McKesson HBOC,*

10  *Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1244 (N.D. Cal. 2000)

11  Accordingly, "[i]n the face of evidence of coercive behavior by a party

12  opposing a class, district courts may regulate communications with class members

13  related to the notice and opt-out processes." *Wang*, 623 F.3d at 755-56 (9th Cir.

14  2010). "This includes the power to send notices correcting misleading

15  communications with the Class." *Williams v. Quinn*, No. 05 C 4673, 2010 U.S. Dist.

16  LEXIS 77140, at *10-11 (N.D. Ill. July 27, 2010); *accord, e.g.*, *Retiree Support Grp.,*

17  2016 U.S. Dist. LEXIS 99720, at *8; *In re McKesson*, 126 F. Supp. 2d at 1241;

18  *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2001 U.S. Dist. LEXIS 18370, 2001

19  WL 1403007 *7 (N.D. Ill. Nov. 9, 2001); *In re Synthroid Mktg. Litig.*, 197 F.R.D.

20  607, 610 (N.D. Ill. 2000); *Georgine v. Amchem Prods.*, 160 F.R.D. 478, 489 (E.D. Pa.

21  1995).  Indeed, "[c]ommunications that contain incorrect information are particularly

22  a subject of 'a curative notice from the court, at the expense of those at fault.'"

23  *Ladegaard,* 2001 U.S. Dist. LEXIS 18370, at *27.  The power to regulate notice to

24  class members also includes the power to invalidate opt-out requests made by class

25  members who may have been misled and to establish a second or extended opt-out

26  period for those class members. *Id.* at *27-28; *Retiree Support Grp.*, 2016 U.S. Dist.

27  LEXIS 99720, at *15; *Georgine*, 160 F.R.D. at 504-505.

28

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

**B.** **Stern's and Liblang's Successful Campaign to Solicit More than 12,000 Exclusions from the Settlement Was Deceptive and Misleading.**

Virtually everything said by Stern on his websites and in his videos was designed to (1) discourage his existing and potential clients from actually reading the notice approved by this Court, and (2) encourage them to exclude themselves from the Settlement, regardless of their individual circumstances. While claiming that he was fighting to force Ford to buy back class vehicles, Stern made misleading representations and omissions that persuaded thousands of owners of class vehicles to give up buyback claims that could have been asserted under the Settlement and to instead join a mass action in which no viable buyback claims are being asserted. The court should be "particularly troubled" by the misleading representations and omissions detailed below given the "assembly-line pre-authorization of class 'opt outs.'" *In re McKesson*, 126 F. Supp. 2d at 1246.

1. The "very misleading" and "very deceptive" court-approved notice.

Stern affirmatively discouraged clients and potential clients from reading or trusting the notice that this Court ordered be provided to the class. Stern repeatedly characterized the short-form postcard notice as "very misleading" and "very deceptive." (Carruthers Ex. A, 8/11 Video Tr. at 8; Ex. C, 9/2 Video Tr. at 12.) According to Stern, only by reading the "fine print" could owners of class vehicles understand the actual terms of the settlement. (Carruthers Ex. A, 8/11 Video Tr. at 8.) The "fine print," he said, was the Settlement Agreement itself—"two inches of fine print that most of you are not going to have the time to read or understand." (Carruthers Ex. A, 8/11 Video Tr. at 8, 10.) "[W]hat they are not telling you there [in the postcard] is in here, in the actual settlement agreement none of you were ever expected to see or read." (Carruthers Ex. A, 8/11 Video Tr. at 26.) According to Stern, "I wouldn't blame you " if owners did not take the time to read or understand

9

1   the Settlement Agreement, and "[t]hat's why it should mean so little to you."

2   (Carruthers Ex. A, 8/11 Video Tr. at 10.)  According to Stern, "This is how people

3   get confused.  This is how people are misled.  This is how people get deceived, and

4   it's not right."  Stern promised that "[w]e are not going to play this kind of game with

5   you."  (Carruthers Ex. A, 8/11 Video Tr. at 10.)

6       Nowhere does Stern mention the long-form notice.  Nowhere does Stern refer

7   his existing or potential clients to the Settlement website containing the long-form

8   notice.[4]  Nowhere does Stern disclose that the notice program was negotiated by

9   attorneys representing the class.  Nowhere does he disclose that class counsel—

10  attorneys who this court found would "serve as adequately counsel for the class"

11  (PAO ¶ 6)—were another source of information regarding the Settlement.  And

12  nowhere does Stern disclose that the notice program that they claim is "very

13  misleading" and "very deceptive" was approved by this Court as the best notice

14  practicable under the circumstances.  (PAO ¶ 9.)[5]  *See Georgine*, 160 F.R.D. at 496

15  ("[M]ost [of the improper opt-out solicitations] do not even note the existence of a

16  Court-approved notice packet or how to obtain one."); *id.* ("[T]he failure of the letters

17  and advertisements to discuss the notice materials … increased the likelihood that

18  class members did not consider the accurate Court-approved information that this

19  Court deemed to be necessary to enable class members to make an informed choice

20  of whether or not to opt out of the class."); *In re McKesson*, 126 F. Supp. 2d at 1245

21  ("The solicitations do not identify the court-appointed lead plaintiff and counsel or

22  the procedures safeguarding the appropriateness of class certification.").

23

24  ───────────────

25  [4] Stern provided links to the "deceptive" postcard notice and to the settlement
    agreement "which no one expects you to read," but no links at all to the long-form
26  notice specifically intended to be read by class members.

27  [5] No objections were made to the Settlement based on inadequacies in the notice
28  program.

10

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

2.    <u>The arbitrators "selected, appointed, and paid for by Ford."</u>

Stern acknowledged that the Settlement included a "buy-back scheme," but "guess who is in charge of that buy-back process." (Carruthers Ex. A, 8/11 Video Tr. at 9.) Again and again, Stern told owners of class vehicles that "Ford's own selected, appointed, and paid for arbitrator will decide whether or not you qualify," and that "[w]hat you qualify for will be buy-back as determined by Ford." (Carruthers Ex. A, 8/11 Video Tr. at 9.)

> I want you to imagine, for a second, that the dealership was going to be the entity that would determine whether or not you qualify for a buy back. Guess what, folks. This is really no different. This is another Ford agent that's going to determine whether or not you qualify for a buy-back, and if so, what you're entitled to receive.

(Carruthers Ex. A, 8/11 Video Tr. at 28; *see also* Carruthers Ex. D, Web Page at 10, 14.) According to Stern, under the Settlement's arbitration program, "the wolf is loose in the henhouse." (Carruthers Ex. C, 9/2 Video Tr. at 22.)

Nowhere does Stern tell owners or lessees of class vehicles that arbitrators will be selected, appointed, and paid by DeMars. (Morris ¶ 6.) Nowhere does Stern tell owners or lessees of class vehicles that DeMars is audited annually by the federal government and the states of Florida and California to ensure that arbitrators remain impartial. (Morris ¶ 4.) Nowhere does Stern tell owners that DeMars was approved by counsel representing the class. (SA ¶ I(D).) Nowhere does Stern tell owners that the Settlement, which created the arbitration program administered by DeMars, was preliminarily approved by this Court as fair and reasonable—and would be subject to final approval by this Court.[6]

---

[6] No objections to the Settlement were made based on DeMars inability to impartially administer the arbitration program.

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

3.   The mass action litigation in which more than 12,000 owners will "get everything the law says [they are] entitled to receive."

According to Stern, Ford should be required to buy back all class vehicles. "That's what's fair.  That's what we are fighting for."  (Carruthers Ex. C, 9/5 Video Tr. at 16.)  Stern repeatedly told owners and lessees of class vehicles that the Stern and Liblang mass actions are preferable to the Settlement because the more than 12,000 Plaintiffs will get "everything that the law says you're entitled to receive," that "you get every penny that you are entitled to receive," that "we want to make sure that you are fully compensated for all of your damages and for all of your losses, whatever they may be"; that "we'll be able to get everything that the law requires"; and that "Owners and Lessees receive all the damages they are entitled to receive, including a buyback."  (Carruthers Ex. A, 8/11 Video Tr. at 9-10, 13, 18, 19; Ex. D, Web Page at 17.)  (And, as discussed in more detail below, Stern represented that these incredible results will be achieved "within the next six to nine months." (Carruthers Ex. A, 8/11 Video Tr. at 3.))

Stern claimed that he and Liblang will achieve these results by pursuing claims for violation of the MMWA, which he characterizes as a "federal form of lemon law," and for fraud.  (Carruthers Ex. A, 8/11 Video Tr. at 34.)  According to Stern, it is possible "to get a buyback through the Mass Action Complaint under Federal (breach of implied warranty) law known as Magnuson Moss or the Uniform Commercial Code, without meeting … strict [state] Lemon Law requirements." (Carruthers Ex. D, Web Page at 12-13.)  The MMWA and UCC claims are preferable to state lemon law claims, according to Stern, because state lemon laws often "require that you've had three or more repairs *and* that you provide the manufacturer with written notice before filing a Lemon claim."  (Carruthers Ex. D, Web Page at 9.)

In contrast, according to Stern, "Ford's arbitrator will be instructed to strictly follow state Lemon law."  (Carruthers Ex. D, Web Page at 9.)  "We feel very few may benefit from the Ford's Class action buyback," Stern said, "because they have

12

1   failed to provide the required Notice before making a claim and because Ford rarely

2   if ever performed three or more repairs."  (Carruthers Ex. D, Web Page at 9-10.)  In

3   addition, according to Stern, many repair attempts went undocumented because Ford

4   dealers falsely represented that the transmission was operating normally, and owners

5   or lessees could lose their lemon law claims because they cannot show the required

6   number of repairs.  (Carruthers Ex. D, Web Page at 10.)  Even further, according to

7   Stern, buyback arbitration under the Settlement is "all or nothing," and there "there's

8   seemingly no ability to settle, compromise or secure any 'middle ground' by which

9   owners could recover something less than a complete buyback."  (Carruthers Ex. D,

10  Web Page at 11.)  This, according to Stern, "can be a significant barrier to receiving

11  compensation."  ((Carruthers Ex. D, Web Page at 12.)

12          All of these statements regarding the Settlement's arbitration program are

13  either false or seriously misleading:

14  •   It is true that under the Settlement arbitrators will in the first instance apply state

15      lemon law to determine if a buyback is appropriate.  (SA ¶ II(N)(1)(a).)  But state

16      lemon law claims do not typically require three or more repairs, as Stern claimed.

17      Rather, they simply require that the vehicle remain unrepaired after a "reasonable"

18      number of attempts.  *See, e.g.,* Cal. Civ. Code § 1793.2(d)(1).[7]  While more than

19      one repair is usually required, under some circumstances, even one repair can

20      constitute a reasonable number of attempts.  *See, e.g.*, *Milicevic v. Mercedes-Benz*

21      *USA, LLC*, 256 F. Supp. 2d 1168, 1175-76 (D. Nev. 2003).   And under the

22      Settlement's arbitration program, class members have the same right to rely on

23      undocumented repair attempts as they would under state lemon laws—or under

24      the MMWA or the UCC.

25  _____

26  [7] Stern himself acknowledges this in one of his current pages, where he offers to help

27  class members who did not opt out and who have fewer than three repairs, because
    "for these owners, we can still pursue a full buyback within Ford's established

28  arbitration setting."  (Carruthers Ex. E, Web Page at 2.)

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

- No one will be denied a buyback in arbitration for failure to give the notice required by state lemon law.  Those sometimes burdensome notice requirements under state lemon laws do not apply to buyback claims in the Settlement's arbitration program.  Under the Settlement, class members merely need to fill out a web form, or call a toll free number, to give Ford notice of their intention to arbitrate ten days before filing arbitration.  (SA ¶ II(N)(4).

- It is simply untrue that there is no ability to settle or compromise for something less than a full buyback. The Settlement specifically provides that during the ten-day period between notice and commencing arbitration, Ford "may contact the Class Member … in an attempt to resolve the matter."  (SA ¶ II(N)(4).) Moreover, unlike a settlement that precludes future litigation, a pre-arbitration settlement does not necessarily preclude arbitration; any compensation offered and accepted is simply deducted from any later arbitration award.  (SA ¶ II(N)(4).)

- Nowhere does Stern tell owners or lessees that an automatic buyback is available under the Settlement, even if it is not available under state lemon law, if a class member has had four hardware replacements within 5 years or 60,000 miles and the vehicle is still malfunctioning.  (SA ¶ II(N)(1)(e).)  Nowhere does Stern tell owners and lessees that the Settlement extends the statute of limitations for buyback claims.  (SA ¶ II(N)(1)(d).)  Nowhere do Stern and Liblang tell owners or lessees about *any* of the benefits of the arbitration program.

Further, Stern's representations that buybacks can be achieved more easily under the MMWA or the UCC than under the settlement agreement is also false and misleading for several reasons.  First, nowhere does Stern advise owners or lessees of class vehicles that they will be subject to discovery in the mass actions, including depositions.  *See, e.g.*, *In re McKesson*, 126 F. Supp. 2d at 1245 ("There is no advice [in the communications soliciting opt-outs] that individual plaintiffs may be subject to the discovery requirements of the Federal Rules of Civil Procedure.").

Second, Stern and Liblang's clients *cannot* obtain buybacks under the MMWA

14

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

for two separate reasons.  First, the MMWA's provisions addressing a manufacturer's obligation to repurchase or replace a vehicle apply only where the manufacturer provides an express "full warranty" as defined in the Act.  15 U.S.C §§ 2303, 2304(a)(4).  As Ford's "warranty is not an express full warranty, Plaintiff[s] [are] not entitled to § 2304(a)(4)'s 'refund and replace' remedy."  *Chaudoin v. Thor Motor Coach, Inc*., No. 15-13871, 2017 U.S. Dist. LEXIS 129231, at *36 (E.D. Mich. Aug. 15, 2017); *accord, e.g.*, *Arteaga v. Carmax Auto Superstores W. Coast, Inc.*, No. CV-14-1888 RSWL (CWx), 2014 U.S. Dist. LEXIS 95593, at *17 (C.D. Cal. July 11, 2014) ("[T]he MMWA does not provide remedies for breach of 'limited' warranties."); *Harper v. Navistar, Inc*., No. 2:15-cv-03558, 2016 U.S. Dist. LEXIS 37473, at *14-15 (S.D. W. Va. Mar. 23, 2016) ("[The] motorhome's engine warranty is a limited one and the MMWA's substantive remedies are thus unavailable."); *Parran's Flooring Ctr., Inc. v. Ford Motor Co*., Civil Action No. DKC 11-1151, 2011 U.S. Dist. LEXIS 135984, at *7 (D. Md. Nov. 28, 2011) ("By definition, no federal minimum standards apply to a limited warranty; thus, limited warrantors are not obligated to provide consumers with the minimum remedies found in § 2304."), *quoting Laing v. Volkswagen of Am., Inc*., 180 Md. App. 136, 156, 949 A.2d 26, 37 (2008).

Further, the MMWA permits manufacturers to establish an informal dispute settlement procedure, and to require customers to submit their dispute to such a procedure before bringing suit under the MMWA.  15 U.S.C. § 2310(a)(3).  Ford has established such a procedure, administered by the Better Business Bureau ("BBB"), and its warranty provides that disputes must be submitted to the BBB before seeking relief under the MMWA.  (Carruthers Ex.  ¶ H, Ford Warranty Guide.)  The vast majority of the 7,000 Plaintiffs in the mass actions already filed by Stern and Liblang have not submitted their claims to the BBB, and the same is almost certainly true of the 4,000-5,000 Plaintiffs whose claims have yet to be filed.  In other words, the vast majority of Stern's and Liblang's clients cannot pursue a MMWA claim.

15

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

Stern's claim that buybacks can also be achieved based under the UCC is also false or, at best, misleading.  Stern is presumably referring to the remedies allowed when a purchaser revokes his or her acceptance under UCC § 2-608.  But "[t]he majority of courts to have addressed the question have held that a buyer is not entitled to revocation of acceptance against a remote manufacturer with whom the buyer is not in privity." *Harper*, 2016 U.S. Dist. LEXIS 37473, at *15.  "Doing so would 'require a manufacturer to refund a purchase price it had not received in exchange for a product it did not sell to the revoking party.'" *Id.*  Stern made no attempt to target his representations to owners or lessees in the minority of states that might allow revocation of acceptance against a remote manufacturer, or to warn class members that the lemon laws of their states, enforced through arbitration, might provide a better avenue for achieving a buyback than the claims raised in the mass actions. *Cf. Georgine*, 160 F.R.D. at 494 (solicitations were an attempt to "scare individuals into believing that considerably more will have to be done to obtain compensation under the terms of the settlement than in the tort system"; "[g]enerally, this is untrue").

In short, "almost all of [Stern's communications] contain one-sided attacks on the proposed settlement without any mention of its benefits." *Georgine*, 160 F.R.D. at 496; *accord In re McKesson*, 126 F. Supp. 2d at 1245 ("The solicitations provide an inadequate disclosure of the comparative costs and benefits of participating in a class action.").

    4. <u>The mass action litigation in which more than 12,000 owners will "get everything the law says [they are] entitled to receive"—within six to nine months.</u>

Not only did Stern repeatedly tell owners and lessees of class vehicles that they would get "everything that the law says you're entitled to receive" in the mass actions—even though they have asserted no viable claims that could result in a buyback—he also told them that the mass actions "are progressing at a rapid pace"

16

1    and these incredible results will be achieved "within the next six to nine months,"

2    "well within a year from now." (Carruthers Ex. A, 8/11 Video Tr. at 3; *see also* 8/11

3    Video Tr. at 5-6 (mass actions "will be settled probably within the next six to nine

4    months"); 23 ("[W]e think we are going to be able to get these cases resolved within

5    the year, and perhaps as soon as six to nine months").

6            These assertions are false or seriously misleading in a number of respects.

7    First, the representation that the mass actions "are progressing at a rapid pace" was

8    simply false. At the time this representation was made in August 2017, three months

9    had elapsed since the first of the mass actions was filed in April—and yet nothing

10   significant had happened except that Ford had filed answers and the court had

11   decided that all of the cases should be consolidated before a single judge. (Erskine

12   ¶18.) As of October 3, 2017—about two months later, at the time of the very first

13   status conference—nothing *still* had happened, and the parties were still waiting for

14   several of the cases to be transferred to the designated judge. (Erskine ¶¶ 12, 18.)

15   Moreover, Stern represented to the Michigan judge that it would be another several

16   weeks before he could file their remaining cases on behalf of the 4,000-5,000 opt

17   outs. (Erskine ¶ 13.)

18           Moreover, it is patently absurd to suggest that the claims of more than 12,000

19   Plaintiffs can be resolved within six to nine months, or even with a year. Stern told

20   his clients and potential clients that "[d]epositions have been taken in our cases," and

21   that "[w]e have all the information we need to complete this case." (Carruthers Ex.

22   A, 8/11 Video Tr. at 6.) The truth is that no depositions have been taken and

23   discovery has not even begun. (Erskine ¶ 18.) Even if Stern and Liblang will agree

24   that they do not need any discovery from Ford—an unlikely assumption—Ford does

25   not have all the discovery it needs from Plaintiffs. This is particularly true since

26   Stern and Liblang rely heavily on their assertion that many repair attempts went

27   undocumented, which will require depositions of at least those Plaintiffs who claim to

28   have had undocumented repair attempts. Assuming that a mere 3,000 out of 12,000

17

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1  Plaintiffs will need to be deposed, that each deposition will take only a half day, and

2  that four depositions can be taken simultaneously every business day, it will take 75

3  weeks—about a year and a half—for Plaintiff depositions alone.  Depositions of Ford

4  witnesses and experts will take even more time.  Briefing and arguing dispositive

5  motions under the laws of 50 states will take even more time.  And assuming that a

6  mere 260 cases will be tried, and that each case can be tried in one business day,

7  trying those 260 cases will require another full year.

8  Nowhere do Stern and Liblang tell owners and lessees of class vehicles that

9  litigating their claims before a single judge in Michigan could well take years.

10  Nowhere do they allege that their claims for a buyback could be arbitrated pursuant to

11  the Settlement within 30-60 days.  (SA Ex. H at 120; Morris ¶ 7.)  *See, e.g.*, *In re*

12  *McKesson*, 126 F. Supp. 2d at 1245 ("There is no indication [in the improper

13  communications] that participating in a class action may (or may not) be more

14  economical, both in terms of time and money.").

15  5.   The never-ending "opt-in" period.

16  Incredibly, Stern told owners and lessees of class vehicles that they could opt

17  out of the settlement, and then, if they "ever" changed their minds "down the road,"

18  they had the "right" to opt back in:

19  You know, it is important for everybody to understand this. Once you

20  opt out, you are outside of Ford's class action settlement. What few

21  people may realize though, if, for some reason, you ever decided you

22  wanted back into the class action settlement, you can do that too. You

23  actually have the ability to opt back in if you want to.  It gets very

24  complicated. I don't think it's in your best interest, but I want you to

25  know.  The most important thing to do before  September 5 is opt out.

26  Opt out, preserve your rights.  Get outside of that class action settlement.

27  If you ever change your mind down the road, do that. I don't encourage

28  it. I don't believe you'll get fairly compensated, but I want you to know

1     you have that right. We are an open book on this case, folks. I want you
2        to have the truth.

3   (Carruthers Ex. A, 8/11 Video Tr. at 48.)  This, of course, was far from the truth.

4   Once the opt-out deadline passed, class members who opted out had no right to opt

5   back in.

6        6.    The class action settlement in which "most people will recover the

7              same amount."

8        Stern told owners and lessees of class vehicles that "in our mass action, every

9   award is customized, which is to say that depending upon everyone's individual

10  circumstances, there will be different awards." (Carruthers Ex. A, 8/11 Video Tr. at

11  11.)  In a class action, he said, "typically and historically, most people will recover

12  the same amount." (Carruthers Ex. A, 8/11 Video Tr. at 11.)  In fact, all of the

13  benefits available under *this* Settlement will be customized to each class member's

14  individual circumstances.  Stern's suggestion to the contrary was false.

15       7.    The class members who did not opt out and who Stern and

16             Liblang cannot help.

17       Stern told owner and lessees that if they did not opt out by September 5 "you're

18  going to be locked up in Ford's class action settlement, and we will not be able to help

19  you." (Carruthers Ex. A, 8/11 Video Tr. at 22-23.)  "The only way that we can help

20  you," Stern reiterated,  "is if you complete and sign the opt out form and get it back to

21  us and allow us to begin representing you." (Carruthers Ex. A, 8/11 Video Tr. at 23.)

22  This was untrue.  Now that the opt-out deadline has passed, Stern now claims that

23  "we can still provide you with the help securing the buyback so many of you we

24  know deserve." (Carruthers Ex. F., Web Page at 2.)  Accordingly, "Stern Law is now

25  reviewing and accepting requests for a complete buyback from [owners of class

26  vehicles] who have had more than one transmission-related part replacement for their

27  vehicle," because "[f]or these owners, we can still pursue a full buyback within

28  Ford's established arbitration setting." (Carruthers Ex. F., Web Page at 2.)

8.   The deceptive Settlement crafted and approved solely by Ford with no approval by class counsel or the Court.

Ultimately, Stern urged owners and lessees of class vehicles to reject the Settlement in favor of his mass actions simply because Ford crafted the Settlement and because Ford had already demonstrated that it could not be trusted:

> So you just have to ask yourself, has Ford been fair with you, have they been straight with you in recognizing and acknowledging your rights so far?  And if the answer to that is no, … what makes you think things are going to be different now? And I would urge you at this point to just reflect on that.  What makes me think that things will be different now?  There's a real problem with Ford.  And another thing that I wanted to share with you is that in the fine print … Ford says we're not responsible, we haven't done anything wrong.  …  So if Ford is still telling you in this document they've done nothing wrong, that there's nothing wrong with their transmission, what makes you think that now things are suddenly going to be different?  They've gone to great lengths here to put this package together for you and I submit to you that if this was a car that I owned or that a family member of my own family was involved in, we would not have anything to do with this deal because I don't trust these people, I don't trust them to suddenly do the right thing. …
>
> [W]e will get you what you deserve under the law.  I cannot say the same for Ford.  You  will not get, in my opinion, what you're entitled to under the law.  You will get what Ford's selected and paid-for arbitrator says you're entitled to.  You will get what this postcard has to say.  You will get what it offers based on this.  Be aware of the fine print, be aware of the tricks, be aware of the misleading behavior and the deception that you've been subjected to so far.  Don't forget that.

(Carruthers Ex. C, 9/2 Video Tr. at 22-25.)

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1    Nowhere does Stern mention that counsel for the class had a substantial role in

2    developing the postcard and the "fine print." Nowhere does he mention that this

3    Court approved the postcard  and preliminarily approved the "fine print" (i.e., the

4    Settlement). Nowhere does Stern note that the Settlement "would be implemented

5    only if the Court concluded that it was fair to the class." *Georgine*, 160 F.R.D. at

6    478. And when Stern did invite owners and lessees to consult other sources, he did

7    not urge them to review the long-form notice approved by this Court. He did not

8    refer them to lawyers representing the class. He never mentioned either possibility.

9    Instead, "if you question anything about what I've said here today I urge you all go to

10    our website and read about Ford's deception." (Carruthers Ex. C, 9/2 Video Tr. at

11    26.)

12       The circumstances presented here are virtually identical to those in *Hernandez*

13    *v. Vitamin Shoppe Indus. Inc*., 174 Cal. App. 4th 1441 (2009), where the court

14    invalidated opt-outs and imposed monetary sanctions against the lawyer responsible

15    for misleading communications:

16       Spencer [the lawyer] stated a wholly biased view of the settlement in

17       inflammatory language in order to persuade class members to opt out of

18       the Perry class action and join *Thompson* [another case]. His

19       communications misled members about the substance of the settlement

20       by what he did and did not state, encouraging  them to think that they

21       were doing nothing less than "forfeiting" "substantial compensation" if

22       they remained in the class, ignoring the numerous risks and uncertainties

23       of litigation, remaining silent about defendant's arguments, leaving

24       unsaid that the court had reviewed and preliminarily approved the

25       settlement and would again review the matter before giving final

26       approval, and prejudicing class members' view of the settlement before

27       they received the court-approved notice. Rather than disclose his

28       financial interest in their joining *Thompson*, he characterized himself,

1   rather than the court, as the protector of the class. It is difficult to

2   imagine a more inappropriate "end run around the court's supervisory

3   powers."

4   *Id.* at 1455.

5       **C.**    **The Appropriate Remedy:  Amending the Class Definition,**

6             **Requiring Stern and Liblang to Mail a Court-Approved Corrective**

7             **Notice, and Allowing Stern and Liblang's Clients a Second Opt-Out**

8             **Period.**

9         As noted above, courts have recognized that the appropriate remedy for

10   misleading and deceptive solicitations of opt-outs is a corrective notice paid for by

11   the offending party and a second opt-out opportunity.  *See In re McKesson*, 126 F.

12   Supp. 2d at 1247 (ordering the offending law firm to bear the printing and mailing

13   costs of the curative notice); *Retiree Support Grp.*, 2016 U.S. Dist. LEXIS 99720, at

14   *35 (same).  This is clearly the appropriate remedy as to the Stern and Liblang clients

15   who submitted opt out requests after July 14 and after Stern and Liblang's campaign

16   to solicit exclusions from the Settlement began, but before September 5, the opt-out

17   deadline.

18         This is also the appropriate remedy for Plaintiffs in the mass actions filed

19   before July 14.  These Plaintiffs were not required to opt out, because Plaintiffs who

20   served lawsuits before July 14 were excluded from the class.  However, these

21   Plaintiffs had the right to opt-in to the Settlement if they so desired.  Nowhere in

22   Stern's public statements does he advise these Plaintiffs of this right.  Moreover, the

23   same misrepresentations that prevented other class members from intelligently

24   exercising their right to opt out also prevented the Plaintiffs in the mass action from

25   intelligently exercising their right to opt in to the Settlement.  To correct this, the

26   class definition should be modified to include these Plaintiffs in the class and to give

27   them the same right to opt out as Stern and Liblang's other clients.

28

**MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

**CONCLUSION**

The class should be modified to include Plaintiffs in the Stern and Liblang mass actions. Stern and Liblang should be ordered to send a corrective notice, approved by the Court, to clients who are Plaintiffs in their mass action or who timely opted-out of the settlement. These clients should be given 30 days from the receipt of the corrective notice to opt out by mailing an opt out form approved by the Court, and personally signed by the client (not by counsel on their behalf) to the Settlement Administrator.

DATED: October 13, 2017   Respectfully submitted,

           DYKEMA GOSSETT PLLC

           /s/John M. Thomas
           John M. Thomas
           Tamara A. Bush
           Attorneys for Defendant
           FORD MOTOR COMPANY

23