**STERN LAW, PLLC**
KENNETH A. STERN (*pro hac vice* to be filed)
Ken@Sternlawonline.com
41850 W 11 Mile Rd, Suite 121
Novi, MI 48375
Telephone: (248) 347-7300

**THE LIBLANG LAW FIRM, P.C.**
DANI K. LIBLANG (*pro hac vice* to be filed)
danil@liblanglaw.com
346 Park Street, Suite 200
Birmingham, MI 48009-3436
Telephone: (248) 540-9270

**GIELEGHEM LAW OFFICE**
NEIL GIELEGHEM (CSBN 107389)
neil@ngattorney.com
1840 Century Park East, Suite 430
Los Angeles, CA  90067
Telephone: (310) 929-4900

Attorneys for Opt-Outs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| OMAR VARGAS, ROBERT BERTONE, MICHELLE HARRIS, AND SHARON HEBERLING, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No.: 2:2012-CV-08388 AB (FFMX)<br><br>[Assigned to Hon. Andre Birotte, Jr., Rm 7B Magistrate Frederick F. Mumm, Rm. 580, Courtroom 790]<br>CLASS ACTION<br><br>**OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD**<br><br>**DATE: NOVEMBER 17, 2017**<br>**TIME: 10:00 A.M.**<br>**ROOM: 4** |

---

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

# **TABLE OF CONTENTS**

INTRODUCTION..................................................................................................1

FACTUAL BACKGROUND.................................................................................2

ARGUMENT.........................................................................................................5

       **A.**    Ford's Legal Authorities Do Not Give This Court
              Unlimited Authority To Censor Attorneys' Website And Video................5

       **B.**    Ford's Accusations Re Lawyers' Ethically Approved Website
              And Video Are Either Factually False; Unsupported By Evidence;
              Or Challenge Fair Comment/Opinion.............................................12

              **Issue**: Alleged representations re the "very misleading"
              and "very deceptive" court-approved settlement..............................12

              **Issue**: Alleged representations re the arbitrators
              "selected," "appointed, and paid for by Ford"...................................13

              **Issue**: Alleged Representations re the Mass Actions in
              which more than 12,000 owners will "get everything the
              law says [they are] entitled to receive" ..........................................15

              **Issue**: Alleged Representations re the Mass Actions in
              which more than 12,000 owners will "get everything the
              law says [they are] entitled to receive – within six to nine months"..........15

              **Issue**: Alleged Representations re the never-ending "opt-in" period.........16

              **Issue**: Alleged representations re the class action settlement in which
              "most people will recover the same amount"....................................17

              **Issue**: Alleged representations re the class members who did not opt
              out and whom Lawyers cannot help................................................17

              **Issue**: Alleged representations re the "deceptive Settlement
              crafted and approved solely by Ford with no approval by
              class counsel or the Court".............................................................17

       **C.**    The Remedy Sought By Ford Is Neither "Appropriate" Nor
              Warranted Given The Actual Facts And Controlling Law,
              And Given The Approval Of The Settlement...................................18

CONCLUSION....................................................................................................21

i

## TABLE OF AUTHORITIES

**CASES**                                                                     **Page(s)**

*Georgine v. Amchem Prods.,*
160 F.R.D. 478 (E.D. Pa. 1995)...................................………...7, 10, 11, 15, 18

*Hernandez v. Vitamin Shoppe Indus., Inc.,*
174 Cal. App. 4th 1441 (2009)………………………………………………...…………18

*In re McKesson HBOC, Inc. Sec. Litig.,*
126 F. Supp. 2d 1239 (N.D. Cal. 2000)…………………….....6, 7, 8, 9, 11, 12, 13, 14, 15, 19

*McMullen v. Meijer, Inc.,*
335 F. 3d 485 (6th Cir. 2004)………………………………………………………..14

*Retiree Support Group of Contra Costa County v. Contra Costa County,*
2106 WL 4080294 (N.D. Cal.)………………………………...………………………19

*Wang v. Chinese Daily News, Inc.,*
623 F. 3d 743 (9th Cir. 2010)………………………………………………………….6

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

## INTRODUCTION

The *Motion to Invalidate Certain Opt-Outs, To Amend Class Definition, To Require Corrective Notice, and To Establish A Second Opt-Out Period* ("Motion")[1] of Defendant Ford Motor Company ("Ford") rests on the core accusation – as stated in the first paragraph of Ford's Motion – that "lawyers, pursuing their own financial interests," engaged in a "misleading and deceptive campaign . . . to solicit class members and potential class members to exclude themselves from the class action Settlement in this case.[2] According to Ford, this "campaign" was conducted via a website ("Website") and "Facebook" page "video interview" ("Video") by Kenneth A. Stern, Esq. of Stern Law, PPLC and Dani K. Liblang, Esq. of The Liblang Law Firm, P.C. (collectively, "Lawyers").

The challenged Website and Video – which is accessed by interested members of the public, rather than being an unsolicited direct mailing to Class Members[3] – were entirely proper, as even a cursory review will quickly confirm.[4] Indeed, Lawyers respectfully suggest that, the best and most efficient use of this Court's scarce judicial resources would be for the Court to access the Website and Video, and *"See For Itself"* how grossly Ford has misrepresented both.

Further, Lawyers' operation of the Website and Video were pursuant to, and consistent with, an express agreement between Lawyers and Ford to the effect, in exchange for their not objecting to the Settlement, Lawyers could solicit Class Members to opt out of the *Vargas* Class.[5]

---

[1] As this Court's files evidence, the Motion was filed on October 13, 2017 (Dkt. # 188). On October 16, 2017, Ford filed an Amended Notice of Motion (Dkt. # 190). For the purposes of this Opposition, the Notice and Amended Notice need not be distinguished.

[2] See Motion (MPA), p. 1, lns. 6-9.

[3] See accompanying Declaration of Kenneth A. Stern ("Stern Decl."), ¶ 8 et seq.

[4] The Website and Video are both accessible via the internet: www.FordTransmissionProblems.com (Website) https://www.facebook.com/YourLegalJustice/ (Video).

See Stern Decl., ¶ 125, Exh. 5(website pages of no less than eight (8) other Lemon Law firms that criticize the Settlement and urge Members to opt out).

[5] See Stern Decl., ¶¶ 26-27, Exh. 3 (emails memorializing agreement).

1

Thus, Ford is now complaining about something it expressly agreed Lawyers could do!

Via the Website, Lawyers were contacted by literally thousands of Members of the Class who were confused about the then-proposed Settlement, and/or concerned about its terms. Those concerns included that <u>the Settlement will result in no benefit whatsoever to fully 94% of the Class,</u> <u>***by Ford's own admission!***</u> [6] The information that Lawyers provided via the Website and Video was not "misleading" or "deceptive" in any way.

Accordingly, there are no grounds, either factually or legally, for the relief Ford seeks. This is particularly true given that, since the Motion was filed, the *Vargas* Settlement was approved by this Court. At this juncture, the notice, opt out, and settlement objection/approval process cannot be "partially redone" as to Lawyer's Opt-Out clients, in the manner Ford demands, and Ford presents no legal authority to the contrary.

## FACTUAL BACKGROUND

Ford's Motion is based on the premise that the "campaign" allegedly conducted by Lawyers consisted largely, if not entirely, of the Website and the Video, and the contents thereof. <u>See</u>, <u>e.g.</u>, Motion, pp. 5-6. Accordingly, initially this Opposition will describe the Website and Video, and the contents of each, more generally. To the extent that Lawyers need to respond with more specificity as to certain of Ford's accusations about the Website and Video, this will be done either later in this Opposition or in the accompanying supporting Declarations of the Lawyers (which are incorporated by reference).

As an initial matter, the Website and Video about which Ford complains had to be <u>intentionally accessed</u> by users, e.g., vehicle owners and potential members of the then-putative

---

[6] <u>See</u>, <u>e.g.</u>, Declaration of Ted Stockton in Support of Plaintiffs' Supplemental Memorandum in Support of Final Approval and Response to Objections (Dkt. # 170-3), filed on September 25, 2017. As this Court may recall, Ford's admission that 94% of the Class are "not eligible for anything" was addressed at the October 2, 2017 hearing on the Motion for Approval.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

Class.  Thus, Ford does not complain, and cannot complain, about any direct mail "mass mailings" or other direct, "involuntary" solicitation of Members.  Ford cannot make such a complaint, as there were no such direct mass mailings, etc.  Instead, Ford's accusations are based only on the content of the Website and the Video, both of which users had to access <u>voluntarily</u>.

Further, the content of Lawyers' Website was approved – both prior to the websites' "launch" and after Ford belatedly made its accusations – by multiple legal ethics experts.[7]

Finally, the Website contains express and detailed disclaimers in its "Terms and Conditions," e.g.:

> The use of the content, links, message boards, discussion groups, material and other information accessible at this Website . . . is for general informational purposes only. None of the information at this Website . . . is intended to constitute, nor does it constitute, legal . . . advice, and none of the information necessarily reflects the opinions of the Kenneth A. Stern and Stern Law, PLLC or any of its attorneys or clients.

> The material contained herein is general in nature, only, and may not apply to you[r] . . . particular factual . . . or legal circumstances. We also do not necessarily undertake to update any material in our Website to reflect subsequent legal . . .or other important developments. <u>Internet subscribers and online readers should not act on this information</u> . . . without seeking independent legal . . . or other professional counsel.

> You should not act or rely on any . . . legal information at this Website without seeking the advice of . . . an attorney for legal advice. The determination of whether

---

[7] <u>See</u> Stern Decl., ¶ 9 (detailing review by ethics counsel).

3

you need . . . legal services and your choice of a . . .lawyer are very important matters that should not be premised alone on websites or advertisements. [8]

As far as substantive content:  The Website included <u>multiple</u> references to the *Vargas* Class Action Settlement Agreement, and included multiple "links" [9] to the *Vargas* Settlement Agreement (which included the Short-Form and Long-Form Notices, and directions to access the Class Action Settlement Website), and other information that users could easily access.  The Website also encouraged users to read and become familiar with this documentation and information and to confer with other knowledgeable counsel, in order to confirm that the information supplied had been accurately presented. [10]

In turn, the Video – which Ford repeatedly misquotes out-of-context – was an informal, hour-long "live" interview during which Mr. Stern touched on a number of issues.  But Mr. Stern repeatedly stressed the same warnings and disclaimers in the Website, e.g., viewers should read and become familiar with the Settlement documentation and information and to confer with other knowledgeable counsel, in order to confirm that the information supplied had been accurately presented. [11]

The Video was first posted on August 11, 2017.  But by August 10, 2017 (i.e., the day before the Video was posted), Lawyers <u>already</u> had received and responded to <u>14,195</u> leads/initial requests for legal services from Class Members.  Further, <u>7,814</u> of these Members already had initiated litigation.  An additional <u>2,277</u> Members 25<u>already</u> had entered into Representation Agreements with Lawyers, who currently represent approximately one-half of the remaining

---

[8] Stern Decl., ¶¶ 12, Exh. 2 (printout of Website's Terms and Conditions page).
[9] "Links" (or "hyperlinks") are internet software features that allow a site user easily to access other websites or documents.). <u>See</u> Stern Decl., ¶ 17.
[10] <u>See</u> Stern Decl., ¶¶ 18-20.
[11] <u>See</u> Stern Decl., ¶¶ 22-26.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

number that eventually opted out (4,480).  Of these retained clients of Lawyers, <u>1,233 already</u> completed opt-out paperwork. [12]

Given this history, a substantial number of Lawyers' Opt-Outs never even saw the Video, and could not have been "misled" or "deceived" in the manner Ford claims.  That such a large number of Members opted out having never viewed the Video is probative as to whether it, or anything in the Website that Lawyers set up to address the widely reported DPS6/Powershift transmission litigation/problem and the Settlement, had any causal effect on any Member's decision to opt out of the Class.[13]

## ARGUMENT

### A. Ford's Legal Authorities Do Not Give This Court Unlimited Authority To Censor Attorneys' Website And Video

Fairly read, the various cases that Ford cites in the opening of its "Argument" section (Motion, pp. 6 – 8) boil down to the (unremarkable) proposition that *"[i]n the face of evidence coercive behavior by a party opposing a class, district courts may regulate communications with class members related to the notice and opt-out process."*  Motion, p. 8, lns. 11-14 (italics added; quoting *Wang v. Chinese Daily News, Inc.*, 623 F. 3d 743, 755-56 (9th Cir. 2010)).

Lawyers have no argument with this proposition <u>in the abstract.</u>  But this begs the question:

---

[12] See Stern Decl., ¶¶ 25; <u>see also</u> Declaration of Brandon M. Harig ("Haig Decl."), *passim.*
[13] While acknowledging the potential attorney-client privilege and *ex parte* communication issues, Lawyers submit that it is significant that Ford has not offered even a single statement from even <u>one</u> Member to the effect that they were "misled" or "deceived" by – or even saw or heard – the Website or the Video.  Notably, some of the cases cited by Ford include situations in which class members had complained and expressed their desire to return to the class.  No such *"Opt Back In"* Class Members exist here.
Lawyers also submit that it is significant that the Class Plaintiffs are not parties to Ford's Motion.  Further, Ford makes no effort to show that it, <u>as the Defendant</u>, somehow has been harmed by the Lawyers' challenged actions.  Conceptually, any "harm" would have been incurred by those who allegedly were "misled" or "deceived" (i.e., the Opt-Outs represented by Lawyers), not by Ford.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

*Did Lawyers somehow actually engage in "coercive behavior" (as per the Wang court's formulation), or in "misleading and deceptive campaigns" (to use Ford's formulation)?* As detailed below, Ford accuses Lawyers of eight (8) instances/types of such wrongdoing, all of which are based on the Website and Video. But on examination, each of these instance turns out to be a false charge.

Further, none of the cases cited by Ford hold, or otherwise support, the proposition that a court should "strictly scrutinize," or otherwise "censor," communications to a class in the manner or to the degree that Ford implies. In fact, a number of the cases that Ford cites note that communications regarding a settlement may be constitutionally protected statements of opinion. See, e.g., *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1244 (N.D. Cal. 2000) ("alleged misrepresentations are not deceptive and may even be constitutionally protected statements of opinion . . . .").

In addition, none of the cases cited by Ford involved a situation in which the party litigants (e.g., the plaintiff class attorneys or the defendant) had entered in an agreement that, in exchange for not objecting to the settlement, the lawyers could speak with, inform, educate and solicit class members for representation during the notice period. As shown in the Introduction to this Opposition, ***this is precisely what happened in this case:*** Ford agreed that, in return for their not objecting to the Settlement, Lawyers could solicit Class Members to opt out of the *Vargas* Class.[14] Thus, Ford now is trying to renege on the deal that it made with Lawyers – but only after Ford has gotten the benefit of its bargain!

Further, in these cases the courts involved focused more on whether alleged misrepresentations rose to the level of <u>deliberate</u> or <u>intentional</u> deception; or unintentional or

---

[14] See Stern Decl., ¶ 27, Exhs. 3 (emails memorializing agreement).

accidental misrepresentations that were so pervasive that they would have deprived a reasonable class member of the opportunity to make an informed, intelligent decision whether to opt out, or to remain in the class.

In this regard, and given the way Ford has structured its argument as to the eight (8) instances/types of purported wronging of which Ford accuses Lawyers, two of the cases on which Ford relies – *In re McKesson HBOC, Inc. Sec. Litig.*, *supra,* 126 F. Supp. 2d 1239; and *Georgine v. Amchem Prods.*, 160 F.R.D. 478 (E.D. Pa. 1995) – warrant discussion "up front." Ford relies heavily on these cases, citing/quoting from them throughout its Motion. But read correctly, neither case supports Ford's arguments under the facts presented. In fact, at certain points these cases rebut Ford's arguments.

The first case, *In re McKesson* was a class action in which lawyers competed for designation as lead counsel. When the district court rejected the competing lawyers' bids, they initiated a solicitation campaign to recruit individual McKesson shareholders to assert non-class federal securities claims. These solicitations were done through direct mailing, and the use of a supplemental website, that expressly targeted the district court and its judicial decision-making process. These solicitations accused the district court of various purported wrongdoing, e.g., "diluting" claims; contributing to less-successful claims for class members. *McKennson,* 126 F. Supp. 2d at 1241-1242.

This solicitation campaign was conducted by way of letters, mailed directly to class members. These direct mail letters were misleading headed/entitled "Notice," as if they were "official" communications, and disclosed that these letters were attorney advertising only at the bottom of the page. Further, these direct mail "Notice" letters (and the website) included direct access to representation materials and power of attorney forms that gave the lawyers the authority

7

to opt out class members. *Id.*

The district court held that this solicitation campaign was improper, and required service of a curative notice (drafted by the lead plaintiffs' counsel) that <u>offered</u> those who had opted out the opportunity to rejoin the class <u>if they wished to do so</u>. (In contrast, Ford demands the Opt-Outs be <u>coercively</u> returned to the Class, regardless of their wishes.) The district court's ruling was based on:

- The use of "Notice" at the top of the direct mail solicitation letters;

- The direct mail solicitation letters did not make reference to court-appointed counsel;

- The solicitation letters failed to adequately measure the benefits of remaining in the class; and

- The solicitation letters created a false sense of urgency in regards to the opt-out and other deadlines;

126 F. Supp. 2d at 1244-1245.

As detailed below in their responses to the eight (8) instances/types of purported wronging about which Ford complains, Lawyers did not engage in anything even remotely like these misleading or deceptive practices. To the contrary: In a number of instances, Lawyers acted to <u>prevent</u> any potentially misleading communications, e.g., by providing "links" from their Website to the actual Settlement Agreement, including its Exhibits, the Short-Form and Long-Form Notices, and the instructions on how to access the Class Settlement website. Thus, *McKesson* amounts merely to another abstract statement of law that Ford cannot "tie" to any <u>facts</u> in <u>this</u> case.

Ford implies that Lawyers are the equivalent to the competing lawyers in *McKesson* because one of the Lawyers is a "solo practitioner" (Mr. Stern), or a member of a three-attorney

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

firm (Ms. Liblang).[15]  These underhanded and unprofessional "digs" are particularly inappropriate, given the experience, expertise, and very significant, recognized accomplishments of both Lawyers on behalf of consumers.[16]

The *McKesson* court also expressed concern about the competing firms' use of what it characterized as an "assembly-line pre-authorization of class 'opt outs'" by way of powers of attorney.  126 F. Supp. 2d at 1245.  Once again, *McKesson* is distinguishable on the facts.  The Powers of Attorney ("POA") used by Lawyers here merely ensured that each Opt-Out included all of the necessary information.  In essence, the POA merely helped move the "information intake process" online so that the information obtained could be inserted, without error and without any issue as to Lawyers' authority, into the opt-out documentation required by this Court.  Further, the POA and opt-out procedures used by Lawyers <u>expressly required Client signature and confirmation of information in order to be submitted.</u>

Thus, *McKesson* is, as to Ford's accusations about Lawyers' use of POAs, merely another abstract statement of law that Ford does not, and cannot, tie to any facts in this case.  *McKesson*, however, is relevant in one sense: The *McKesson* court expressly noted that it was <u>not</u> "unethical for [the challenged attorneys] to express an unfavorable opinion" of the district court's underlying orders, and the competing attorneys were "not obliged to provide a glowing reference to the [lead plaintiff selected by the court]."  126 F. Supp. 2d at 1244.  <u>Ford</u> may believe that any criticism of the Settlement is "unethical" or improper, but this is not the law – as Ford's own case authority shows.

The other case that Ford repeatedly cites/quotes, *Georgine v. Amchen Prods, supra*, 160

---

[15] <u>See</u> Motion, p. 4, lns. 21-22 (reference to Mr. Stern); p. 4, lns. 22-23 (reference to Ms. Liblang).

[16] <u>See</u> Stern Decl., ¶¶ 5-7; Declaration of Dani K. Liblang ("Liblang Decl."), ¶¶ 1-12.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

F.R.D. 478, also involves various opt-out "notice" letters <u>sent directly</u> by law firms to the homes of class members.  In that instance, the direct mail notice letters included such language as "[t]he only way to protect your rights to future compensation is to sign the enclosed 'opt out' form immediately."  160 F.R.D. at 491.  Other direct mail notice letters represented that there were purported payment minimums that were drastically inconsistent with the actual terms of the settlement at issue.

The *Georgine* court found the challenged direct mail notice letters were improper.  In so holding, the court observed that the "the most disturbing aspect" of the direct mail notice letters was the lack of transparency of the law firm being behind the mailings.  160 F.R.D. at 490.  The court also noted that:

> Instead of providing class members with documents <u>that would enable a reasonable person to make an informed, intelligent decision whether to opt out or remain a member of the class</u>, some counsel have now exposed class members to one-sided, misleading claims that likely will prohibit a "free and unfettered" decision to opt out of the class.

160 F.R.D. at 497 (underlining added).

The *Georgine* court also made clear that the principal problem with challenged direct mail notice letters was the lack of any explanation as to the reasoning (if any) supporting the representations made regarding the settlement at issue:

> Although I recognize that some recipients of this letter may not qualify for compensation under the terms of the settlement, <u>the letter does not explain the reasons</u> why a recipient would not be eligible for benefits or that the person might qualify for benefits in the future under specified circumstances. In fact, the letter

10

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

creates the impression to all readers, both those who will be eligible to receive compensation in the future and those who will not, that the only way to obtain future compensation is to sign the enclosed opt-out form. That simply is incorrect.

*Id.* at 491 (underlining added; footnote omitted).

The *Gegorine* court's concerns simply do not exist here. For example, the Website and Video explain, in exhaustive detail, the basis for Lawyers' concerns about the Settlement, e.g., the disparity between vehicle owners' reasonable expectations and the benefit Members actually were to receive, e.g., the fact that there was no benefit for 94% of the Class. Lawyers also provided direct, easy-to-use access (by way of the internet links in the Website) to the Settlement documentation and the Settlement website. [17] Further, Lawyers encouraged users of the Website to read fully and understand that Settlement and if necessary, to speak with other knowledgeable counsel if needed to make a fully informed decision. In doing so, Lawyers provided both a basis for their analysis and the basis for a "reasonable investigation" by those who accessed the Lawyers' Website and viewed the Video about which Ford complains.

Thus, *Georgine* is, like *McKesson*, merely another abstract statement of law that Ford does not, and cannot, tie to the facts actually presented in this case. The few additional cases that Ford cites in the remaining sub-sections of its Motion are addressed, as required, below. But these few additional cases do not change the conclusion that Ford's arguments are based on abstract legal principles and holdings that are irrelevant given the facts actually presented, e.g., what the Lawyers actually did, rather than what Ford falsely accuses them of doing.

\ \ \

\ \ \

---

[17] See Stern Decl., ¶¶ 17-22.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

**B. Ford's Accusations Re Lawyers' Ethically Approved Website And Video Are Either Factually False; Unsupported By Evidence; Or Challenge Fair Comment/Opinion**

With Ford's legal "authorities" disposed of, the analysis turns to the eight (8) accusations that Ford makes against Lawyers under the subheadings in Section B, pp. 9 – 22 of its Motion. For clarity, the following analysis will use, to the extent possible, the same subheadings that Ford used it its Motion as to these accusations.

At the outset however, Lawyers note the difficulty involved in responding to some of Ford's accusations, given the "*Scatter Gun*" and selective, out-of-context approach to which Ford often resorts. What follows represents Lawyers' best efforts to "*Cut Through*" Ford's accusations, often hyperbolic language, and bald pronouncements of Ford's opinion or belief, to get to the purported facts, if any, relevant to Ford's charges.

**Issue: Alleged representations re the "very misleading" and "very deceptive" court-approved settlement (Motion, pp. 9-10)**

Broadly stated, this "lead" accusation, and Ford's seven other "follow on" accusations, all are based on the charge that Lawyers used the Website and Video to engage in a "campaign" by which they "actively discouraged clients and potential clients from reading or trusting" the notice and other settlement documentation See Motion, p. 9 lns. 17–18. As shown above, any fair review of the Website and Video refutes all of Fords' charges.

Further, Ford's quotation of *McKesson*, *supra*, (at p. 9, lns. 11-14) in this section of its Motion as purported grounds for this Court to be "'particularly troubled' . . . given the 'assembly-line pre-authorization',", of Opt-Outs is yet another example of Ford's reliance on "abstract law" not linked to any facts in this case. This is because, and as detailed above, the *McKesson* court

was concerned with the use of POAs as part of such an "assembly-line pre-authorization" by which the attorneys relied on POAs to sign all the Opt-Outs for their clients, <u>without providing them any meaningful information</u> regarding the settlement at issue.

Here, Lawyers did no such thing. *See generally* Stern Decl., ¶ 26 et seq. As detailed below, Lawyers used a process that involved a significant "*Back-and-Forth*" that fully involved each client in the Opt-Out decision. Among other things, the Opt-Out clients supplied, when available and many times through multiple contacts with Lawyers, all the information required to initiate their claim and to complete the Opt-out as required by the Court. When Lawyers were satisfied with the completeness of the information supplied, they emailed an opt-out form to the client incorporating all the information provided, and a Representation Agreement containing the POA so that Lawyers could use the client's electronic signature on the documents. Only <u>after</u> the client had all this information, and only <u>after</u> the client had signed the Representation Agreement after having had a chance to review the information provided, did Lawyers complete and submit each Opt-Out. [18]

**Issue: Alleged representations re the arbitrators "selected," "appointed, and paid for by Ford" (Motion, p. 11)**

Ford's follow-on accusations as to Lawyer's characterization of the arbitrators amounts to an argument that Lawyers cannot criticize or comment negatively about the arbitration provisions of the Settlement. Ford bases this argument on the theory that – because the arbitrators are

---

[18] In fact, of the approximate 4,300 Opt-Outs Lawyers submitted, only approximately 125 (i.e., less than 3%) were signed by Lawyers without the client's signature. But Lawyers did so in these few instances only because they lost communication with the client as the deadline approached. Further, these few instances occurred only where the client previously had provided the required information and signed the Representation Agreement, which included the POA. In reliance on, and as authorized by, the POA, Lawyers submitted these Opt-Outs on behalf of their clients in an attempt to preserve their rights. Thus, these limited number of "*Attorney Signature*" Opt-Outs do not even remotely resemble the situation that concerned the *McKesson* court.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

appointed by DeMars & Associates ("DeMars"), a private "alternative dispute resolution" firm, and/or because the arbitration provisions were approved by Plaintiffs' counsel (who received over $8 million in fees via the Settlement); and/or preliminarily approved by this Court – the arbitration provisions of the Settlement somehow are beyond criticism. *Nonsense!*

Under the express terms of the Settlement Agreement, DeMars and its arbitrators were selected by, and paid for by, Ford.[19]  Consistent with this, DeMars's corporate website expressly refers to Ford Motor Company as a "client." [20]

This relationship between DeMars and Ford as its "client," and Ford's undeniable control of the *"Purse Strings,"* raises legitimate concerns that DeMars arbitrators will be biased, to a greater or lesser degree, in Ford's favor because this "Client" is a "repeat player." Such bias would render the entire arbitration process unfair, a concern recognized by the courts. See, e.g., *McMullen v. Meijer, Inc.*, 335 F. 3d 485, 493-494 (6th Cir. 2004) (discussion of potential "symbiotic relationship" where one party repeatedly uses the same arbitrators).

Lawyers' criticism of the Settlement's arbitration provisions thus amounts to nothing more than an expression of a problem the courts have recognized, and which most members of the plaintiffs' Bar know to be true:  Arbitrators, and the arbitration process itself, tends to favor corporate defendants/parties.[21]

Ford fails to cite any legal authority to support its argument that Lawyers have no right to question using DeMars to arbitrate any disputes under the Settlement. But *McKesson* – one of the two cases on which Ford heavily relies – expressly notes that it was not unethical for lawyers to express unfavorable opinions as to class-related orders, and that lawyers were not obliged to

---

[19] See Stern Decl., ¶¶ 38-45 (citing to Settlement Agreement).
[20] See Stern Decl., ¶ 9 (detailing review by ethics counsel).
[21] See Stern Decl., ¶ 46, Exh. 4 (printout of Demars & Associates website page; underlining added).

14

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

provide "glowing references" for those persons or entities the court selects to implement the settlement process. 126 F. Supp. 2d at 1244.

> **Issue: Alleged Representations re the Mass Actions in which more than 12,000 owners will "get everything the law says [they are] entitled to receive" (Motion, pp. 12-16)**

This subsection, which at five (5) pages is the longest of Ford's accusations, is best addressed by starting with Ford's "*Ringing Conclusion*": "In short, 'almost all of [Stern's communications *[i.e., the Website and Video]*] contain one-sided attacks on the proposed settlement without any mention of its benefits.'" Motion, p. 16, lns. 17-18 (italicized bracketed material added) (quoting *Georgine, supra*). [22]

This *Ringing Conclusion* simply is not supported by the facts, i.e., actual content of the Website and the Video as detailed above, and in the Stern Declaration. See generally Stern Decl., ¶ 28 et seq. To summarize: Lawyers believe that this is an accurate statement – or at the very least, a legitimate expression of Lawyers' professional opinion. But regardless, the Opt-Outs who have decided to pursue their claims against Ford via the Mass Actions at least have a chance of receiving more than the 94 % of the Members that will get nothing if they remain in the Class.

> **Issue: Alleged Representations re the Mass Actions in which more than 12,000 owners will "get everything the law says [they are] entitled to receive – within six to nine months" (Motion, pp. 12-16)**

The gist of this accusation is that Ford disagrees with the assertion that Mr. Stern made, in the Video, that he "thinks" – as of the date the Video was posted, August 11, 2017 – that there

---

[22] In the same *Ringing Conclusion,* Ford also cites/quotes *McKesson* for the proposition that "The solicitations [i.e., the Website and Video] provide an inadequate disclosure of the comparative costs and benefits of participating in a class action." Motion, p. 19-21 (bracketed material added).

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

"probably" or "perhaps" would be a recovery in the Mass Actions via settlements within the next six to nine months," or "within the year." See Motion, p. 16, ln.1 – p. 17, ln. 5.

The obvious flaw in Ford's accusation is that the "thinks, "probably," and "perhaps" language at issue clearly is conditional, rather than an affirmative pronouncement or guarantee. Further, the Terms and Conditions of Lawyers' Website, and the other content of the Video, belies any argument that a reasonable person could have been "misled" or "deceived." Finally, this conditional statement represents Mr. Sterns' thinking as the date the Video was posted, August 11, 2017. These conditional statements would not become "misleading" or "deceptive" if circumstances changed afterwards.

In addition, whether circumstances have changed materially in regards to the Mass Action is open to debate, as detailed in the Stern Declaration. In fact, in Lawyers' view, the Mass Actions are moving along with all due speed, despite Ford's efforts to delay or derail any progress.

**Issue: Alleged Representations re the never-ending "opt-in" period (Motion, pp. 18-19)**

This accusation is based on a section of the Video in which Mr. Stern is responding to questions raised by Members as to the opt-out procedures under the Settlement. As Mr. Stern's comments make clear, at that time there was some confusion as to the opt-out deadlines, and the effect of opting out.

But Ford's argument as to whether an Opt-Out could *Opt Back In"* borders on the absurd, because 94% of the Class will get nothing from the Settlement. Is Ford seriously representing to this Court that, if one of the *"94 Percenters"* wanted to opt back into the Class after opting out, Ford would say "No"?

\ \ \

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

**Issue: Alleged representations re the class action settlement in which "most people will recover the same amount" (Motion, p. 19)**

This accusation is based on Ford's complaint that the Video states that "typically and historically, most people will recover the same amount" via the Settlement. Motion, p. 19:11-12. Ford claims this is incorrect because the Settlement's benefits will be "customized to each class members individual circumstances." *Id.*, p. 19, lns. 12-14.

But by Ford's own admission, <u>most</u> Class members – specifically, 94% of the Class – in fact <u>will</u> "recover the same amount" via the Settlement, because this 94% will get <u>nothing</u>. Thus, the statement about which Ford complains is true, and not grounds for relief.

**Issue: Alleged representations re the class members who did not opt out and whom Lawyers cannot help (Motion, pp. 19-22)**

The statements on which Ford bases this accusation were published on or about August 11, 2017. At the time of said publication, these statements were true: Class Members who failed to opt-out on or before September 5, 2017 were in fact subject to the terms of the *Vargas* Class Action Settlement. As the statements about which Ford complains were true, they are no grounds for the relief Ford demands.

**Issue: Alleged representations re the "deceptive Settlement crafted and approved solely by Ford with no approval by class counsel or the Court" (Motion, pp. 20 – 22).**

To the extent it is intelligible, this accusation is based largely not on what Lawyers actually said, but what they <u>didn't</u> say. For example, Ford complains that, in one of the videos:

- ■ "Nowhere does Stern mention that counsel for the class had a substantial role in developing the postcard and the 'fine print.'" Motion, p. 21, lns. 1-3.

- ■ "Nowhere does Stern note that the Settlement 'would be implemented only if the Court concluded that it was fair to the class." *Id.*, p. 21, lns. 4-5.

- ■ "When Stern did invite owners and lessees to consult other sources, he did not urge them to review the long-form notice approved by this Court." *Id.*, p. 21, lns. 6-7.

Regardless of whether Lawyers "mentioned" the role played by Class Attorneys, Lawyers undeniably acknowledged the existence of, and repeatedly referred to, the Long or Short Form Notices, the Settlement website, and the other aspects of the Settlement Agreement. Any suggested by Ford to the contrary is demonstrably false.

Other than citing one of its two "favorite" cases, *Georgine*, *supra*, (at p. 21), the only legal authority that Ford cites in this section of its Motion is *Hernandez v. Vitamin Shoppe Indust. Inc.*, 174 Cal. App. 4th 1441 (2009) (at p. 21), in which the California Court of Appeal invalidated opt-outs based, at least in part, on alleged omissions by counsel rather than affirmative misstatements. Although Ford claims that *Hernandez* presented circumstances "virtually identical" to those presented here, even a cursory review of the decision belies this claim. Indeed, even the block quote from *Hernandez* that Ford includes in its Motion (at pp. 21-22) reveals that, in *Hernandez*, the California court was faced with a lawyer who "stated a wholly biased view of the settlement in inflammatory language in order to persuade class members to opt out of the" settlements at issue. See Motion, p. 21, lns. 16-18 (quoting *Hernandez*). As shown above, this clearly is not the situation presented. Accordingly, *Hernandez* only serves to show how distorted Ford's view of the facts and the controlling law are.

\ \ \

\ \ \

\ \ \

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

### C.  The Remedy Sought By Ford Is Neither "Appropriate" Nor Warranted Given The Actual Facts And Controlling Law, And Given The Approval Of The Settlement

Ford's Motion was legally unsupported when filed on October 13, 2017.  But on October 18, 2017, the legal "hole" in Ford's argument became a "yawning chasm," when this Court (Hon. Andre Birotte, Jr.) granted (via Dkt. # 193) Plaintiffs' Motion for Final Approval of Class Action Settlement (Dkt. # 15).

Neither of the two cases relied on by Ford (*McKesson*, one of its two *Passim* cases; and *Retiree Support Group of Contra Costa County v. Contra Costa County,* 2106 WL 4080294 (N.D. Cal.) involve, or otherwise address, a "*Post-Settlement Approval*" situation such as that presented here.  With good reason.  The "Opt-Outs" now represented by the Lawyers would be deprived their Due Process rights (including the right to object to the Settlement), and the attorney-client relationship between Lawyers and their Opt-Out clients would be improperly impaired, were this Court to comply with Ford's demand to "invalidate" the Opt-Outs' decision; to "amend the Class definition" to require a "corrective Notice," and to establish a "second opt-out period."

Despite this, Lawyers and their Opt-Out clients would have no objection if this Court were to "re-start" the Settlement notice and Opt-Out/Objection process as to the entire Class (as composed as of July 7, 2017, the start date for the Notice Period.  Such relief arguably would be appropriate given the misrepresentations and factually unsupported assertions that were made to this Court during the October 2, 2017 hearing on Plaintiffs' Motion for Final Approval, and Class Members' misunderstanding and confusion re the Short-Form notice, as detailed below.  But absent such "global" relief, Lawyers and their Opt-Out clients should be allowed to pursue alternative relief against Ford via the Mass Actions.

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

Significantly, the Opt-Outs would have grounds to contest the fairness of the Settlement. The Opt-Outs do not wish to argue a fairness motion here, and cannot reasonably be required to do so. But several representations were made to this Court at the October 2, 2017 hearing on the Motion for Approval that the Opt-Outs contend either were untrue, or not supported by any evidence. These representations include:

■   Claims by Plaintiffs' counsel to the effect that service and repair warranty extensions that Ford gave as to the DPS6/Powershift transmission at issue were part of the negotiated Settlement. No evidence was presented to support this contention and the warranty extensions at issue were made by Ford long before any of the negotiations that led to the Settlement. [23]

■   Claims by counsel as to the monetary settlement value of individual DPS6 "Lemon Law" cases in California and other jurisdictions that either (1) were not supported by any evidence (because Ford apparently has never actually tried a DPS6/Powershift case in California, and instead has settled all such lawsuits pursuant to confidential settlement agreements) or (2) were, on information and belief and to the extent Lawyers can represent to this Court at this time, substantially below the settlements actually obtained (particularly in California). [24]

The Opt-Outs, because they elected to opt out (and have commenced separate lawsuits) did not have an opportunity to address these issues in connection with the approval of the Settlement.

---

[23] See accompanying Declaration of Neil Gieleghem ("Gieleghem Decl."), ¶ 7, Exh. A (Reporter's Transcript of Proceedings, October 2, 2017 (filed as Dkt. # 200), *passim.*

[24] See Gieleghem Decl., Exh. A (Transcript) (Dkt. # 200)), p. 22, lns. 16-23; p. 45, lns. 7-19; Liblang Decl., ¶ 12(A), (B) (expert opinion re value of individual DPS6/Powershift cases, and explaining that counsel cannot say more at this juncture due confidential settlement provisions); Gieleghem Decl., ¶¶ 6, 12 (detailing that Ford apparently has never tried a DPS6 "Lemon Law" case in California; and explaining that counsel cannot say more at this juncture due to confidentiality considerations); ¶ 11, Exh. B (likelihood of awards of civil penalties pursuant to California Lemon Law).

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

Fundamental Due Process requires that the Opt-Outs be given such an opportunity – including conducting discovery as to Ford's settlement payouts in other DPS6/Powershift cases – if their opt outs are "invalidated," etc., as Ford demands.

If this Court nonetheless believes that further notice should and can be made under the post-approval circumstances presented, such further notice should include a description of the defects in the settlement raised by the Objections of Class Members Lott, Lutz, Olivant, Slomine, and Wolosyn (Dkt. 157, filed 9/05/17), which is incorporated herein by reference. These defects include that, as noted above, Ford admits that 94% of the Class will receive no benefit from the Settlement.

In addition, any such further notice should not be required as to Opt-Outs who made the decision not to be part of the Class <u>before</u> Lawyers made the representations about which Ford complains.

Finally, since Ford's own notices are misleading and confusing – which notices were "linked" in Lawyers' website and video – Ford should bear the cost of further notices.

## CONCLUSION

Whether taken individually or collectively, Lawyers' Website and Video do not "mislead" or "deceive" anyone. Just the opposite: The Website and Video are true and accurate as to the Settlement's issues and Lawyers' concerns, and helpful to any Class Member that may have viewed them before deciding to opt out. Accordingly, and under the law that actually controls, Ford's Motion should be denied.

Further, even if any grounds for relief existed – and they do not – this Court's approval of the Settlement Agreement makes unworkable the relief that Ford demands – unless the entire Settlement approval and notice process is "redone." This, too, requires that Ford's Motion be

21

denied, or that any such relief be conditioned as Lawyers request in this Opposition.

Dated: October 27, 2017

STERN LAW, PLLC

By:

/s/ Kenneth A. Stern
KENNETH A. STERN
Attorney for Opt-Outs

Dated: October 27, 2017

THE LIBLANG LAW FIRM, P.C.

By:

/s/ Dani K. Liblang
DANI K. LIBLANG
Attorney for Opt-Outs

Dated: October 27, 2017

GIELEGHEM LAW OFFICE

By:

/s/ Neil Gieleghem
NEIL GIELEGHEM
Attorney for Opt-Outs

22

OPPOSITION TO MOTION TO INVALIDATE CERTAIN OPT-OUTS, ETC.

1

PROOF OF SERVICE

2

3   STATE OF CALIFORNIA        )
                                ) ss.
4   COUNTRY OF LOS ANGELES     )

5   I am employed in the County of San Diego, State of California. I am over the age of 18 and not a
6   party to the within action. My business address is: 1840 Century Park East, Suite 430, Los Angeles,
    CA 90067.
7

8         On the date shown below, I served the foregoing document described as:

9   **OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO**
    **INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE**
10  **CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD**

11  to the interested parties in this action addressed as follows:

12
                              SERVICE LIST
13                      Vargas v. Ford Motor Company
                              2:12-CV-08388
14  Stephen C. Borgsdorf
15  Dykema Gossett PLLC
    2723 South State Street Suite 400
16  Ann Arbor, MI 48104
    734-214-7663
17  734-214-7696 (fax)
    sborgsdorf@dykema.com
18  Counsel for Defendant Ford

19
    Tamara A Bush
20  Dykema Gossett LLP
    333 South Grand Avenue Suite 2100
21  Los Angeles, CA 90071
    213-457-1815
22  213-457-1850 (fax)
    tbush@dykema.com
23  Counsel for Defendant Ford

24

25

26

27

28

Janet L Conigliaro
Dykema Gossett PLLC
400 Renaissance Center
Detroit Ml 48243
(313) 568-5372
(855) 262-6803 (fax)
JConigliaro@dyKema.com
Counsel for Defendant Ford

Fred J Fresard
Dykema PLLC
39577 Woodward Suite 300
Bloomfield Hills, Ml 48304
248-203-0593
855-233-1801 (fax)
ffresard@dykema.com
Counsel for Defendant Ford

David M George
Dykema Gossett PLLC
2723 South State Street Suite 400
Ann Arbor, MI 48104
734-214-7673
734-214-7696 (fax)
dgeorge@dykema.com
Counsel for Defendant Ford

Krista L Lenart
Dykema Gossett LLP
2723 South State Street Suite 400
Ann Arbor, Ml 48104
734-214-7676
724-214-7696 (fax)
klenart@dykema.com
Counsel for Defendant Ford

Robert K Fried
Capstone Law APC
1840 Century Park East Suite 450
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
robert.friedl@capstonelawyers.com
Counsel for Consol Plaintiffs

2
PROOF OF SERVICE

Eric Lechtzin
Berger and Montague P C
1622 Locust Street Philadelphia, PA 19103 215-875-3038 215-875-4604 (fax) elechtzin@bm.net
Counsel for Consol Plaintiff

Jordan L Lurie
Capstone Law APC
1875 Century Park East Suite 1000
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
Jordan.Lurie@capstonelawyers.com
Counsel for Consol Plaintiff

Sue Kim Leung
Capstone Law APC
1840 Century Park East Suite 450
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
sue.kim@capstonelawyers.com
Counsel for Plaintiff Omar Vargas

Cody R Padgett
Capstone Law APC
1875 Century Park East Suite 1000
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
Cody.Padgett@capstonelawyers.com
Counsel for Plaintiff Omar Vargas

Russell D Paul
Berger and Montague PC
1622 Locust Street
Philadelphia, PA 19103
215-875-3000
215-875-4604 (fax)
rpaul@bm.net
Counsel for Consol Plaintiff

3
PROOF OF SERVICE

1  Arvin Ratanavongse
   The Law Offices of Todd M. Friedman. P.C.
2  369 S. Doheny Drive., #415
3  Beverly Hills., CA 90211
   310-776-66^7
4  866-633-0228 (fax)
5  aratanavongse@toddflaw.com
   Counsel for Plaintiff Omar Vargas
6
   John Mark Thomas
7  Dykema Gossett PLLC
   2723 South State Street Suite 400
8  Ann Arbor, Ml 48104
9  734-214-7613
   734-214-7696 (fax)
10 jthomas@dykema.com
   Counsellor Defendant Ford
11
   Lane L Vines
12 Berger and Montague PC
13 1622 Locust Street
   Philadelphia, PA 19103
14 215-875-4658
15 215-875-4604 (fax)
   lvines@bm.net
16 Counsel for Class Plaintiffs
17
   Karen L Wallace
18 Capstone Law APC
   1875 Century Park East Suite 1000
19 Los Angeles, CA 90067
   310-556-4811
20 310-943-0396 (fax)
21 karen.wallace@capstonelawyers.com
   Counsel for Plaintiff Michelle Harris
22
   Thomas A Zimmerman, Jr
23 Zimmerman Law Offices PC
24 77 West Washington Street Suite 1220
   Chicago, IL 60602
25 312-440-0020
   312-440-4180 (fax)
26 tom@attorneyzim.com
27 Counsel for Plaintiff Omar Vargas
28

Tarek H Zohdy
Capstone Law APC
1875 Century Park East Suite 1000
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
tarek.zohdy@capstonelawyers.com
Counsel for Plaintiff Omar Vargas

[X]  (BY E-FILE) The above document was served on the interested party named above by electronic means via E-file.

[ ]  (BY MAIL) The envelope was mailed with postage thereon fully prepaid. As follows: I am "readily familiar" with this office's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]  (BY PERSONAL SERVICE) I caused to be delivered such envelope by hand to the addressee.

[X]  (FEDERAL] I declare that I am a member of the Bar of this Court.

Executed on October 27, 2017, at Los Angeles, CA.

/s/ Neil Gieleghem

5
PROOF OF SERVICE

## PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss.
COUNTRY OF LOS ANGELES )

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action. My business address is: 1840 Century Park East, Suite 430, Los Angeles, CA 90067.

On the date shown below, I served the foregoing document described as:

**OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD**

to the interested parties in this action addressed as follows:

SERVICE LIST
Vargas v. Ford Motor Company
2:12-CV-08388

Stephen C. Borgsdorf
Dykema Gossett PLLC
2723 South State Street Suite 400
Ann Arbor, MI 48104
734-214-7663
734-214-7696 (fax)
sborgsdorf@dykema.com
Counsel for Defendant Ford

Tamara A Bush
Dykema Gossett LLP
333 South Grand Avenue Suite 2100
Los Angeles, CA 90071
213-457-1815
213-457-1850 (fax)
tbush@dykema.com
Counsel for Defendant Ford

Janet L Conigliaro
Dykema Gossett PLLC
400 Renaissance Center
Detroit Ml 48243
(313) 568-5372
(855) 262-6803 (fax)
JConigliaro@dyKema.com
Counsel for Defendant Ford

Fred J Fresard
Dykema PLLC
39577 Woodward Suite 300
Bloomfield Hills, Ml 48304
248-203-0593
855-233-1801 (fax)
ffresard@dykema.com
Counsel for Defendant Ford

David M George
Dykema Gossett PLLC
2723 South State Street Suite 400
Ann Arbor, MI 48104
734-214-7673
734-214-7696 (fax)
dgeorge@dykema.com
Counsel for Defendant Ford

Krista L Lenart
Dykema Gossett LLP
2723 South State Street Suite 400
Ann Arbor, Ml 48104
734-214-7676
724-214-7696 (fax)
klenart@dykema.com
Counsel for Defendant Ford

Robert K Fried
Capstone Law APC
1840 Century Park East Suite 450
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
robert.friedl@capstonelawyers.com
Counsel for Consol Plaintiffs

Eric Lechtzin
Berger and Montague P C
1622 Locust Street Philadelphia, PA 19103
215-875-3038
215-875-4604 (fax)
elechtzin@bm.net
Counsel for Consol Plaintiff

Jordan L Lurie
Capstone Law APC
1875 Century Park East Suite 1000
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
Jordan.Lurie@capstonelawyers.com
Counsel for Consol Plaintiff

Sue Kim Leung
Capstone Law APC
1840 Century Park East Suite 450
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
sue.kim@capstonelawyers.com
Counsel for Plaintiff Omar Vargas

Cody R Padgett
Capstone Law APC
1875 Century Park East Suite 1000
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
Cody.Padgett@capstonelawyers.com
Counsel for Plaintiff Omar Vargas

Russell D Paul
Berger and Montague PC
1622 Locust Street
Philadelphia, PA 19103
215-875-3000
215-875-4604 (fax)
rpaul@bm.net
Counsel for Consol Plaintiff

3
PROOF OF SERVICE

Arvin Ratanavongse
The Law Offices of Todd M. Friedman. P.C.
369 S. Doheny Drive., #415
Beverly Hills., CA 90211
310-776-66^7
866-633-0228 (fax)
aratanavongse@toddflaw.com
Counsel for Plaintiff Omar Vargas

John Mark Thomas
Dykema Gossett PLLC
2723 South State Street Suite 400
Ann Arbor, Ml 48104
734-214-7613
734-214-7696 (fax)
jthomas@dykema.com
Counsellor Defendant Ford

Lane L Vines
Berger and Montague PC
1622 Locust Street
Philadelphia, PA 19103
215-875-4658
215-875-4604 (fax)
lvines@bm.net
Counsel for Class Plaintiffs

Karen L Wallace
Capstone Law APC
1875 Century Park East Suite 1000
Los Angeles, CA 90067
310-556-4811
310-943-0396 (fax)
karen.wallace@capstonelawyers.com
Counsel for Plaintiff Michelle Harris

Thomas A Zimmerman, Jr
Zimmerman Law Offices PC
77 West Washington Street Suite 1220
Chicago, IL 60602
312-440-0020
312-440-4180 (fax)
tom@attorneyzim.com
Counsel for Plaintiff Omar Vargas

4
PROOF OF SERVICE

1 | Tarek H Zohdy
Capstone Law APC
2 | 1875 Century Park East Suite 1000
3 | Los Angeles, CA 90067
310-556-4811
4 | 310-943-0396 (fax)
tarek.zohdy@capstonelawyers.com
5 | Counsel for Plaintiff Omar Vargas

6

[X]     (BY E-FILE) The above document was served on the interested party named above
7 | by electronic means via E-file.

8

[ ]     (BY MAIL) The envelope was mailed with postage thereon fully prepaid. As
9 | follows: I am "readily familiar" with this office's practice of collecting and processing
correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on
10 | that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course
of business. I am aware that on motion of the party served, service is presumed invalid if postal
11 | cancellation date or postage meter date is more than one day after date of deposit for mailing in
12 | affidavit.

13 | [ ]     (BY PERSONAL SERVICE) I caused to be delivered such envelope by hand to
the addressee.
14

15 | [X]     (FEDERAL] I declare that I am a member of the Bar of this Court.

16

17 | Executed on October 27, 2017, at Los Angeles, CA.

18 | /s/ Neil Gieleghem

19

20

21

22

23

24

25

26

27

28

5
PROOF OF SERVICE