# EXHIBIT B

EXHIBIT 2-70

1  Alina Mooradian (#245470)
   amooradian@swlaw.com
2  SNELL & WILMER L.L.P.
   600 Anton Blvd, Suite 1400
3  Costa Mesa, California 92626-7689
   Telephone: 714.427.7000
4  Facsimile: 714.427.7799

5  Attorneys for Defendant
   FORD MOTOR COMPANY

6

7

8                    UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11

12  MOHAMMED ALTIKRITI and          CASE NO.   2:17-CV-7369
    NOFAL ALTIKRITI,

13           Plaintiffs,            [*Originally filed in Los Angeles Superior
                                    Court; Case No.: BC674645*]
14      v.

15  FORD MOTOR COMPANY, and         **DECLARATION OF ALINA**
    DOES 1 through 10, inclusive,   **MOORADIAN IN SUPPORT OF**
16                                  **FORD MOTOR COMPANY'S**
            Defendants.             **NOTICE OF REMOVAL OF CIVIL**
17                                  **ACTION**

18

19                                  Complaint filed:    September 1, 2017

20

21

22

23

24

25

26

27                                              EXHIBIT 2-41

28

4818-8453-6913.1                    DECLARATION OF ALINA MOORADIAN
                                    IN SUPPORT OF FORD'S REMOVAL

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

## DECLARATION OF ALINA MOORADIAN

I, Alina Mooradian, declare as follows:

1.      I am an attorney duly licensed to practice law before all courts of the State of California and the United States District Court for the Central District of California, and am an associate with Snell & Wilmer, LLP attorney for Defendant Ford Motor Company ("Ford"). I am a member in good standing with the State Bar of California. I have personal knowledge of the following facts, except for those based on information and belief, which I believe to be true, and if called upon to testify, I could and would competently testify to their truth and accuracy.

2.      This Declaration is submitted in support of Ford's Notice of Removal to the United States District Court for the Central District of California under 28 U.S.C. §§1331, 1332, 1441 and 1446.

3.      In executing this Declaration, I do not intend, and Ford has not authorized me, to waive any protections or privileges Ford may have as to proprietary, trade secret, and/or confidential information, or to waive Ford's attorney-client privilege as to any of its communications or to waive the work product immunity developed in anticipation of or in response to litigation. I intend only to describe certain factual matters that are pertinent to this Declaration.

4.      Paragraph 12 of Plaintiff's complaint alleges that Plaintiff suffered damages in a sum to be proven at trial that exceeds $25,000.00.

5.      Paragraph 14 of Plaintiff's complaint additionally alleges that Plaintiff is entitled to a civil penalty of 2 times "actual damages". Civil penalties are not damages of any kind.

6.      Taking together Plaintiff's claimed actual damages and just the civil penalty sought, the damages sought by Plaintiff's Complaint exceed $75,000.00.

7.      Additionally and as more fully described in the declaration of Spencer P. Hugret which is submitted with this petition for removal as **Exhibit C**, it is

SNELL & WILMER
——— L.L.P. ———
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

- 2 -

EXHIBIT 2-42

1  common for claims for attorney's fees and costs to exceed $50,000.00. Attorney's

2  fees and costs are recoverable elements of damages under both the Song-Beverly

3  Act and the Magnuson-Moss Act.

4  8.  In addition to the Song-Beverly claims, Plaintiff's complaint also

5  contains a claim for alleged violation of the Magnuson-Moss Act. That Act has a

6  threshold minimum amount of $50,000.00 rather than $75,000.00.

7  9.  These allegations of Plaintiff's Complaint demonstrate that the amount

8  of damages sought exceeds the amount required to meet the requirements of federal

9  jurisdiction.

10  10.  Ford Motor Company's Notice of Removal which this Declaration

11  supports contains an offer to settle this case in the amount of $75,001.00 without

12  requiring Plaintiff to return the vehicle which is the subject of this litigation.

13  11.  Attached as **Exhibit D** is a true and correct copy of Declaration of Dr.

14  Barbara C. Luna filed in *Cazares v. Ford Motor Company*, Case No. BC635153 in

15  the Superior Court of California, County of Los Angeles (without exhibits).

16  12.  Attached as **Exhibit E** is a true and correct copy of an excerpt from

17  Ford's 10-K filing for the fiscal year ending December 31, 2016, which was

18  downloaded on September 19, 2017 from the 2016 Annual Report posted on Ford's

19  website, http://shareholder.ford.com/reports-and-filings/annual-reports.

20

21  I declare under penalty of perjury under the laws of the United States of

22  America that the foregoing is true and correct and if called as a witness I could and

23  would so testify.

24  Executed this 9th day of October, 2017, in Los Angeles, California.

25

26  /s/Alina Mooradian
    Alina Mooradian

27

28  EXHIBIT 2-13

- 3 -

4818-8453-6913.1

DECLARATION OF ALINA MOORADIAN
IN SUPPORT OF FORD'S REMOVAL

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, STE. 1400
COSTA MESA, CALIFORNIA 92626-7689

# EXHIBIT C

EXHIBIT 2-44

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

## DECLARATION OF SPENCER P. HUGRET

I, Spencer P. Hugret, declare as follows:

1.     I am an attorney duly licensed to practice law before all courts of the State of California and this Court, and am a partner with Gordon & Rees LLP. I am a member in good standing with the State Bar of California. I have personal knowledge of the following facts, except for those based on information and belief, which I believe to be true, and if called upon to testify, I could and would competently testify to their truth and accuracy.

2.     This declaration is submitted in support of Ford Motor Company's ("Ford's") Notice of Removal to the United States District Court under 28 U.S.C. §§1332, 1441 and 1446.

3.     In executing this declaration, I do not intend, and Ford has not authorized me, to waive any protections or privileges Ford may have as to proprietary, trade secret, and/or confidential information, or to waive Ford's attorney-client privilege as to any of its communications or to waive the work product immunity developed in anticipation of or in response to litigation. I intend only to describe certain factual matters that are pertinent to this declaration.

4.     I have extensive experience litigating consumer, class action, and/or product liability lawsuits throughout California in both state and federal courts. Towards that end, I am lead trial counsel on a significant number of litigation-related matters on behalf of Ford, General Motors LLC ("GM"), Hyundai Motors America ("HMA") and Kia Motors America ("KMA"). I have also represented Ford, GM and HMA in cases involving claimed violations of the Song-Beverly Act, the Magnusson-Moss Act and including allegations of fraud, violation of the Consumer Legal Remedy Act and punitive damages.   Specifically, I have represented Ford in over one-thousand (1,000) of such lawsuits (i.e. for violations of the Song-Beverly Act, Magnusson-Moss Act, Fraud, CLRA and punitive damages, either in whole or in part of such claims).

1      5.     The Song-Beverly Act and Magnusson-Moss Act allow for the

2 recovery of attorney's fees and costs to the prevailing party pursuant to California

3 Civil Code section 1794(d). In my vast experience litigating such cases, it is not

4 uncommon, and in fact quite regular, for attorney's fee and cost awards (or

5 resolutions through informal discussions with opposing counsel) to exceed $50,000.

6 In fact, in one instance, I represented Ford at a trial in Sacramento County, and after

7 the trial, opposing counsel filed a Motion for Attorney's Fees and Costs that

8 exceeded $1,000,000.[1] In sum, the attorney fee and cost payments tendered (or for

9 judgments entered) to the consumer's counsel routinely adds significant financial

10 exposure to an automotive manufacturer and is a recoverable element of damages in

11 lawsuits involving the Song-Beverly Act and Magnusson Moss Act.

12      6.     In cases brought under the Song-Beverly Act and/or Magnusson-Moss

13 Act where the Plaintiff's attorney perceived a right to recover attorney's fees and

14 costs, the lawyers often indicate a billing rate of $300 to $500 per hour, and they

15 typically seek to recover fees representing the plaintiff. The total amount of fees

16 requested in such matters regularly exceeds $50,000.

17      I declare under penalty of perjury under the laws of the United States of

18 America that the foregoing is true and correct and if called as a witness I could and

19 would so testify.

20

21      Executed this 25th day of September, 2017, in San Francisco, California.

22

23                               Spencer P. Hugret

24                               Liaison Counsel for Defendant
                                    Ford Motor Company

25

26

27

28    [1] In this particular proceeding, the Court awarded opposing counsel over $300,000 in fees and costs after briefing and oral argument on the motion.

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

DECLARATION OF SPENCER HUGRET IN
SUPPORT OF FORD'S REMOVAL

# EXHIBIT D

EXHIBIT 2-47

Case 2:12-cv-08388-AB-FFM    Document 220-4    Filed 11/13/17    Page 9 of 36    Page ID
Case 2:17-cv-07369-AB-FFM    Document 1-5 Filed 10/09/17    Page 2 of 26    Page ID #:48
#:4553

1  **KNIGHT LAW GROUP, LLP**
   Steve Mikhov (SBN 224676)
   Lauren A. Ungs (SBN 273374)
2  1801 Century Park East Suite 2300
   Los Angeles, CA 90067
3  Telephone: (310) 552-2250
   Fax: (310) 552-7973
4

5  **LAW OFFICES OF MICHAEL H. ROSENSTEIN**
   Michael H. Rosenstein (SBN 169091)
6  Radomir R. Kirnos (SBN 283163)
   1801 Century Park East Suite 2300
7  Los Angeles, CA 90067
   Telephone: (310) 286-0275
8  Fax: (310) 286-0274

9
   Attorneys for Plaintiff,
10 HECTOR CAZARES

11

12
                    SUPERIOR COURT OF CALIFORNIA
13
                    COUNTY OF LOS ANGELES
14

15
   HECTOR CAZARES,                    ) Case No.: BC635153
16                                     )
            Plaintiff,                 ) Unlimited Jurisdiction
17                                     )
       vs.                            ) **DECLARATION OF**
18                                     ) **DR. BARBARA C. LUNA**
   FORD MOTOR COMPANY, a Delaware      )
19 Corporation, and DOES 1 through 10, )
   inclusive,                          )
20                                     )
21                                     )
            Defendant.                 )
22                                     )
                                       )
23                                     )
                                       )
24 ─────────────────────────────

25      I, Dr. Barbara C. Luna, declare:

26      1.  I am over 18 years of age. The facts stated herein are within my personal knowledge. If

27 called as a witness, I could and would testify competently.

28
                                    - 1 -
                    DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.1**

EXHIBIT 2-48

Case 2:12-cv-08388-AB-FFM  Document 220-4  Filed 11/13/17  Page 10 of 36  Page ID
#:4554
Case 2:17-cv-07369-AB-FFM  Document 1-5  Filed 10/09/17  Page 3 of 26  Page ID #:49

1    ## Work and Educational Background

2       2.  I am a Senior Partner in the accounting and litigation services firm of White,

3  Zuckerman, Warsavsky, Luna & Hunt, LLP ("White Zuckerman").  I analyze financial, accounting,

4  indicia of fraud, economic, business, real estate and valuation issues relating to liability and

5  damages in litigation matters and reorganization of businesses.  I have testified as an expert on my

6  findings in over 500 trials and arbitrations during the past 39 years.  I have also testified in well

7  over 500 depositions as an expert witness during the same period.

8       3.  Prior to joining White Zuckerman, I was a Partner with Coopers & Lybrand specializing

9  in litigation and financial advisory services.  Prior thereto, I was the National Director of Litigation

10  Consulting for Kenneth Leventhal & Company, where I was responsible for directing the litigation

11  services practice nationwide.  Previously, I was a Partner with Pannell Kerr Forster, where I was

12  responsible for providing litigation and reorganization services, and was a Senior Manager with

13  Price Waterhouse specializing in litigation services.  Before focusing on litigation services, I was an

14  investment banker specializing in corporate finance.

15       4.  I obtained my BA degree from Wellesley College, and my MS and PhD degrees in

16  Applied Mathematics from Harvard University.  I have taught graduate and undergraduate courses

17  in working capital management, business finance, forensic accounting and intermediate accounting

18  at UCLA Graduate School of Management, California State University at Northridge and

19  Pepperdine University.  I have also addressed numerous audiences and appeared on several

20  professional panels.

21       5.  I am a Certified Public Accountant, a Certified Fraud Examiner, Certified in Financial

22  Forensics, a Master Analyst in Financial Forensics, an Accredited Senior Appraiser in Business

23  Valuation, Accredited in Business Valuation, a Certified Valuation Analyst, a Certified General

24  Real Estate Appraiser, a Certified Commercial Real Estate Appraiser, a Certified Residential Real

25  Estate Appraiser, a Certified Management Consultant, and a Diplomate Board Certified Forensic

26  Examiner and Accountant.  I am also a member of the American Institute of Certified Public

27  Accountants (and hold the AICPA's CFF and ABV designations), the California Society of

28

- 2 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.2**

EXHIBIT 2 - 49

Case 2:12-cv-08388-AB-FFM  Document 220-4  Filed 11/13/17  Page 11 of 36  Page ID
#:4555
Case 2:17-cv-07369-AB-FFM  Document 1-5  Filed 10/09/17  Page 4 of 26  Page ID #:50

1 │ Certified Public Accountants (and the Society's Economic Damages, Fraud and Business Valuation
2 │ Common Interest Member Services Committees), the Association of Certified Fraud Examiners, the
3 │ Association of Business Trial Lawyers (and the Association's Committee on Experts), the National
4 │ Association of Forensic Economists, the American Boards of Forensic Examiners and Accountants,
5 │ the American Society of Appraisers, the National Association of Certified Valuation Analysts, the
6 │ National Association of Real Estate Appraisers, and the Institute of Management Consultants. My
7 │ Curriculum Vitae is attached hereto as **Exhibit** 1.

8

9 │ **Assignment**

10 │     6.  I have been retained by Knight Law Group, LLP and Law Offices of Michael H.
11 │ Rosenstein, attorneys of record for Hector Cazares, to testify in Plaintiff's case as to matters
12 │ including, but not limited to, indicia of fraud, corporate business culture, customs and practices,
13 │ industry standards of misrepresentation, concealing or omitting material information, the materiality
14 │ of such information, repeated intentional misrepresentations, omissions and concealments,
15 │ corporate philosophy and risk management strategy.

16 │     7.  I have also been retained to testify as to the valuation of damages based on the financial
17 │ impact of misrepresentations, omissions and concealments, the quantification of underlying and
18 │ punitive damages relating to the culpability of the Defendant, the quantification of the Defendant's
19 │ conduct including, but not limited to, the repeated wrongdoing, and profitability of the scheme.

20 │     8.  Fees for my firm, White Zuckerman, range from $130 per hour to $495 per hour
21 │ depending on the level of experience of personnel. My fees for time spent testifying are $495 per
22 │ hour. Our compensation is not contingent upon my testimony, or upon any outcomes or court
23 │ proceedings. I have no interest, either present or contemplated, in the parties on which the report,
24 │ analysis and testimony may be based.

25

26

27

28 │
                                        - 3 -
                        DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.3**

EXHIBIT 2-50

**Background**

9. This case arises from alleged intentional misrepresentations, omissions and concealments by Ford Motor Company ("Ford," "FMC" or "Defendant") relating to the purchase of a used 2011 Ford Fiesta ("Subject Vehicle") by Hector Cazares ("Plaintiff"). Plaintiff alleges the Subject Vehicle was delivered by Ford with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to, transmission defects.[1]

10. Plaintiff alleges Ford's PowerShift Transmission slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and eventually, premature transmission failure (the "Transmission Defect"), which causes unsafe driving conditions and presents a safety hazard.[2]

11. Plaintiff further alleges that Ford knew, or should have known, about the PowerShift Transmission design and manufacturing defects through its exclusive knowledge of non-public, internal data about the Transmission Defect. Ford and its agents appear to have actively concealed the Transmission Defect, and appear to have failed to inform the Plaintiff at the time of purchase or any time thereafter.[3]

12. On January 29, 2012, Plaintiff purchased a used 2011 Ford Fiesta, VIN: 1FADP4FJ7BM207799 from South Bay Ford, Inc. in Hawthorne, California.[4]

FORD'S POWERSHIFT TRANSMISSION

13. Ford's PowerShift Transmission is the sole "automatic transmission" option on the Subject Vehicle.[5] The PowerShift Transmission is neither a traditional manual transmission nor an automatic transmission, but rather is a computerized "automated manual" transmission.[6]

---

[1] **Exhibit 2** – Complaint, filed September 23, 2016, ¶3.
[2] Id., ¶¶19 and 20.
[3] Id., ¶¶22 and 23.
[4] **Exhibit 3** – Lease Agreement.
[5] **Exhibit 2** ¶10 and **Exhibit 4** – 2011 Ford Fiesta Brochure.
[6] **Exhibit 2** ¶11.

- 4 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.4**

EXHIBIT 2-51

Case 2:12-cv-08388-AB-FFM   Document 220-4   Filed 11/13/17   Page 13 of 36   Page ID
#:4597
Case 2:17-cv-07369-AB-FFM   Document 1-5   Filed 10/09/17   Page 6 of 26   Page ID #:52

1      14. Ford marketed and sold its PowerShift Transmission as the best of both worlds between

2   a manual transmission and an automatic transmission, combining the efficiency of a manual

3   transmission with the ease of operation of an automatic transmission. Ford's PowerShift

4   Transmission is not an automatic transmission, but a set of computerized manual transmissions.

5   And instead of using a "wet" clutch, like similar "automated transmissions," the PowerShift uses

6   two "dry" clutches.[7]

7      15. According to a Ford press release on March 10, 2010, "Powershift with dry-clutch

8   facings and new energy-saving electromechanical actuation for clutches and gear shifts saves

9   weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction

10   gear lubricant for the life of the vehicle. The transmission requires no maintenance."[8]

11

12   FORD APPEARS TO HAVE PRODUCED AND SOLD VEHICLES WITH KNOWLEDGE OF A DEFECTIVE

13   POWERSHIFT TRANSMISSION

14      16. Ford appears to have had exclusive knowledge of the Transmission Defect through

15   sources that were not available to consumers, and it appears that the Transmission Defect was not

16   known or reasonably discoverable by Plaintiff before he purchased the vehicle on January 29, 2012,

17   including:

18          a)   Similar defects were found in the European and Australian models, which were

19   offered in those markets before the United States. The European and Australian models have a

20   similar dual-clutch transmission, although it is "wet" and not "dry" like U.S. models. Ford even

21   acknowledged in its own press release that the transmission offered in U.S. models is a "derivative"

22   of the European and Australian design. Those designs suffered similar defects as the U.S. design.[9]

23          b)   Ford had access to years of pre-release testing data and feedback from the

24   European and Australian markets for the dual-clutch transmission. According to Ford, its team

25   "logged approximately three years and 6,000 man-hours of computer aided mathematical modeling,

26   _____

27   [7] Id., ¶¶15 and 16.
    [8] Exhibit 2 ¶17 and Exhibit 5 – Ford Press Release, March 2010.
28   [9] Exhibit 2 ¶¶24 and 44.

- 5 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.5**

EXHIBIT 2-52

1  simulation and analysis of engine speeds, torque and clutch capacity in only 24 months real time to

2  prove the THF [torque hole filling] concept was production ready."[10]

3        c)   Complaints received from consumers and automotive journalists regarding the

4  PowerShift Transmission and testing done in response to those transmission complaints. A July 15,

5  2011 *New York Times* review criticized the PowerShift Transmission's "jerks, pauses and lethargic

6  accelerations." In the same article, a Ford engineer named Greg Burgess admitted that Ford made

7  "tradeoffs" in terms of drivability in order to "deliver something that is very, very fuel efficient."

8  The review further stated: "the logical explanation is that they [Ford engineers] were given a fuel

9  economy target and no option but to meet it. One might wonder why a top executive didn't step in

10 to keep the transmission from reaching market."[11]

11       17. Therefore, it is my understanding that Ford appeared to have had knowledge of the

12 Transmission Defect, and appeared to have known or should have known that the defect was not

13 known by or reasonably discoverable by Plaintiff before Plaintiff leased the Subject Vehicle. Ford

14 appeared to have had knowledge that the root cause defect in the PowerShift Transmission could

15 not be repaired under applicable warranties. A timeline of observations of FMC's appearance of

16 knowledge of the Transmission Defect is provided in **Exhibit 30, Schedule 6.**

17

18 FORD APPEARED TO HAVE CONCEALED THE TRANSMISSION DEFECT AND APPEARED TO HAVE

19 INTENTIONALLY MISREPRESENTED THAT VEHICLES WERE OF HIGH QUALITY EVEN THOUGH IT

20 APPEARED TO HAVE HAD KNOWLEDGE OF THE TRANSMISSION DEFECT

21       18. Ford appeared to have had knowledge that the PowerShift Transmission was defective,

22 yet actively concealed the existence and nature of the Transmission Defect from Plaintiff at time of

23 sale, repair and thereafter.[12] The defective Powershift Transmission was used by Ford in their

24

25

26

----

27 [10] **Exhibit 2** ¶24 and 25 and **Exhibit 6** – Ford Press Release, January 2011
   [11] **Exhibit 2** ¶¶46 and 47 and **Exhibit 7** – *New York Times* article.
28 [12] **Exhibit 2** ¶39.

- 6 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.6**

EXHIBIT 2-53

1   2011-2013 Ford Fiesta vehicles and 2012-2013 Ford Focus vehicles[13].  A timeline of my

2   observations is provided in **Exhibit 30, Schedule 6.**

3         a)  In September 2010, Ford issued a TSB (Technical Service Bulletin) covering the

4   2011 Fiesta informing dealers and service personnel of "concerns such as no engagement or

5   intermittent no engagement in Drive or Reverse when shifting Park to Drive or Reverse, grinding

6   noise during engagement, and/or check engine light with transmission control module (CM)

7   diagnostic trouble code…"[14]

8         b)  On January 1, 2011, Ford issued a TSB, covering the 2011 Fiesta, informing

9   dealers and service personnel of problems with the PowerShift Transmission causing "a loss of

10   power, hesitation, surge, or lack of throttle response while driving."[15]

11         c)  On March 31, 2011, Ford issued a TSB, covering the 2011 Fiesta, informing

12   dealers and service personnel of problems where the PowerShift Transmission "exhibit[s] a

13   rattle/grind noise in reverse only."[16]

14         d)  On May 25, 2011, Ford issued a TSB covering the 2011 Fiesta addressing

15   problems with the PowerShift Transmission engagement stating "may exhibit engine start concerns,

16   no crank, no start, hard start, intermittent start, noise during start and/or various automatic

17   transmission engagement concerns in Drive or Reverse when shifting from Park including no

18   engagement, delayed engagement, intermittent engagement, noise during engagement…"[17]

19         e)  On May 26, 2011, Ford issued a TSB covering the 2011 Ford Fiesta addressing

20   problems with the PowerShift Transmission including "may exhibit transmission engagement

21   concerns in Drive or Reverse when shifting from Park to Drive or Reverse, no engagement, delayed

22   engagement, intermittent engagement, noise during engagement…"[18]

23

24

25   ---

[13] Exhibit 2 ¶3.

26   [14] Id., ¶31 and **Exhibit 8** – September 2010 Technical Service Bulletin. Replaced by TSB 11-5-23
     [15] **Exhibit 2** ¶32 and **Exhibit 9** – January 1, 2011 Technical Service Bulletin.

27   [16] **Exhibit 2** ¶33 and **Exhibit 10** – March 31, 2011 Technical Service Bulletin.
     [17] **Exhibit 2** ¶34 and **Exhibit 11** – May 25, 2011 Technical Service Bulletin.

28   [18] **Exhibit 2** ¶34 and **Exhibit 12** – May 26, 2011 Technical Service Bulletins.

- 7 -

DECLARATION OF DR. BARBARA C. LUNA

EXHIBIT 68.7

EXHIBIT  2-54

f)   In July 2011, Ford implemented a communications strategy to "improve customer expectations" about the behavior characteristics of the PowerShift Transmission.  Ford also noted that some common and normal characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding and a reverse gear whine.[19]

g)   In September 2011, Ford issued a TSB advising dealers to reprogram the transmission computer of 2011 Fiestas whose owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop." Another TSB also issued in September of 2011 informed dealers and service personnel of 2012 Focus transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"[20]

h)   In May 2012, Ford issued a "Customer Satisfaction Program: Program Number 12B37." Ford sent a letter to Focus drivers indicating that they "may experience rough or jerky automatic transmission shifts.  In addition, the vehicle may experience roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline."  However, Ford issued no recall, nor did it inform drivers of any potential safety issues.[21]

19. Despite its apparent knowledge of the Transmission Defect, Ford appeared to have concealed its knowledge of the Transmission Defect.  Ford's marketing and advertising materials, including its marketing brochures, advertised and represented that:[22]

a)   The 2011 Fiesta with the PowerShift 6-speed automatic transmission "shifts crisply and efficiently to keep you smiling" and "responds in an instant, when needed."

b)   The 2011 Fiesta with an available "PowerShift 6-speed automatic transmission can provide torque to the wheels 100% of the time during shifts, for an extra-connected feel."

---

[19] Exhibit 2 ¶56 and Exhibit 13 – Ford Memo to its Dealers and Service Personnel.
[20] Exhibit 2 ¶¶35 and 36 and Exhibit 14 – September 2011 Technical Service Bulletins.
[21] Exhibit 2 ¶37 and Exhibit 15 – May 2012 Customer Service Satisfaction Program.
[22] Exhibit 4 – Marketing Brochure year 2013 Focus, p. 4.

- 8 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.8**

EXHIBIT 2-55

1    20. Plaintiff's Ford Fiesta came with a New Vehicle Limited Warranty, which provided the

2  following general warranty coverage:[23]

3         a) 3 year / 36,000 mile bumper-to-bumper coverage;

4         b) 5 year / 60,000 mile powertrain coverage;

5         c) 5 year / 60,000 mile safety restraint coverage; and

6         d) 5 year / unlimited corrosion coverage.

7    21. Ford recommended its customers follow these steps should they have any questions or

8  concerns: (1) contact your Sales Representative or Service Advisor at selling dealership; (2) because

9  not all selling dealerships are authorized to perform all warranty repairs, the vehicle may need to be

10 taken to another dealer; and (3) if a particular dealership cannot assist, contact the Ford Customer

11 Relationship Center.[24]

12   22. If warranty concerns cannot be resolved, Ford's warranty informs the customers that

13 they are required to submit their warranty dispute to the BBB (Better Business Bureau) Auto Line

14 program, which consists of two parts, mediation and arbitration. Ford's warranty also provides

15 brief information on state warranty enforcement laws, or "Lemon Laws," which may allow owners

16 to receive a refund of the purchase price under certain circumstances. However, Ford requires

17 written notification first of any defects or non-conformities with the vehicle.[25]

18   23. The 5 year / 60,000 mile powertrain warranty covers the transmission against *defect*

19 involved factory-supplied materials or workmanship. Covered transmission components include all

20 internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal

21 parts), transmission case and transmission mounts.[26]

22   24. The PowerShift Transmission was allegedly defective in both materials and

23 workmanship. Despite Ford being notified of the defects and non-conformities Plaintiff realized

24

25

26 [23] Exhibit 16, p 14.
27 [24] Id., p. 7.
   [25] Id., pp. 15 and 39.
28 [26] Id., pp. 16 and 17.

- 9 -
DECLARATION OF DR. BARBARA C. LUNA

EXHIBIT 68.9

EXHIBIT 2-56

Case 2:12-cv-08388-AB-FFM   Document 220-4   Filed 11/13/17   Page 18 of 36   Page ID
#:4562
Case 2:17-cv-07369-AB-FFM   Document 15-4   Filed 10/09/17   Page 11 of 26   Page ID #:57

1   from the Subject Vehicle, Ford appeared never to have cured the defects pursuant to the terms of its

2   express warranty.

3

4   FORD'S PROCESS DETAIL FOR THE FORD CUSTOMER SERVICE DIVISION (FCSD)

5        25. Ford has various guidelines and manuals it provides to its employees regarding Ford's

6   procedures for its FCSD regarding the handling of various customer related issues.  Initially, a

7   FCSD representative determines the reason for the customer contact and determines the course of

8   action based on information to provide based on Ford's "Smart Script path and customer

9   phraseology" from its software.  If need be, additional information is documented in Ford's various

10  informational databases like CuDL (Customer Data Link), GCQIS (Global Common Quality

11  Indicator System) and Siebel System, (now called FMC 360), among others.  In instances where

12  further, or higher level, assistance is requested, the FCSD representative transfers the customer to

13  the appropriate FCSD destinations.  This is generally a "Tier I" level contact.[27]

14       26. For vehicle concerns like unresolved issues, including repair issues, customers are

15  directed to various customer service agents depending on their issues like a DRP (Dispute

16  Resolution Program), CLP (Customer Loyalty Plan), Buyback Request, etc.  If customers are

17  requesting financial assistance or are "At Risk," they are considered "Tier II" customer escalations

18  and are handled by the FCSD Customer Care Solutions Team.  "At Risk" is defined as: (i) multiple

19  repair attempts; (ii) >10 days out of service; (iii) unable to duplicate; (iv) customer perceived two or

20  more repeat repairs; and (v) parts delay. The FCSD Process Detail suggests that every attempt be

21  made to help the customer work with the dealer to resolve the problem.  Problems are ranked from

22  low to high levels of a 01 case to a 04 case.  The 04 case is high risk.  Ford's FCSD system instructs

23  its customer service personnel to document each phase and what "phraseology" to provide

24  customers at various levels, 02, 03, 04.[28]

25

26

27  [27] Exhibit 17 - FCSD Customer Care Team Process Detail 11/2/10.

28  [28] Exhibit 18 – FCSD Customer Care Solutions Team Process Detail 3/4/10.

- 10 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.10**

EXHIBIT 2-57

1     27. The FCSD Process Detail also deals with the handling and escalation of Tier II high risk

2    cases for RAVs (Reacquired Vehicle), Buyback Request (civil penalty states including CA), and

3    Lemon Law claims, among others.[29]

4     28. For the state of California, a Lemon Law Rights Period is not specified, but applies to

5    the entire manufacturer's written warranty. The FCSD Customer Care Solutions Team is assigned

6    to investigate the issue. Ford offers an arbitration process through the Better Business Bureau Auto

7    Line, as part of Ford's Dispute Resolution Program. The arbitration decision is binding if the

8    customer agrees to the decision. Customers could explore other options if they do not want to

9    proceed with this arbitration process or do not like the decision. Ford's buyback requests are not

10    handled through the BBB Auto Line arbitration process.[30]

11     29. The alleged non-disclosure to purchasers and lessees of the vehicles with the

12    Transmission Defect problems appears to be at odds with the customer-helpful attitude portrayed in

13    Ford's customer service training materials for handling unresolved repair and Lemon Law issues.

14

15    FORD CODE OF CONDUCT

16     30. Ford has a written Code of Conduct Handbook, prepared in November 2007, which

17    emphasizes its corporate policies and directives regarding ethics, integrity, quality, supervision,

18    responsibilities and communication, among other items, with its workforce and with the

19    community.[31] A written Code of Conduct for Ford Motor Company prior to November 2007 has not

20    been provided.

21     31. The alleged non-disclosure to purchasers and lessees of vehicles with Transmission

22    Defect appears to be at odds with Ford's Code of Conduct emphasizing ethics, integrity and

23    communication with its workforce (which includes dealers) and the community (which includes

24    customers).

25      a) Mark Fields, Ford's President of the Americas and Chief Executive Officer, at

26

27    [29] Id.
      [30] Exhibit 19 – FCSD Case Management Customer Solutions Team 1/10/10, pp. 43 through 65.

28    [31] Exhibit 20 – Ford Motor Company Code of Conduct 11/2007.

- 11 -

DECLARATION OF DR. BARBARA C. LUNA

EXHIBIT 68.11

EXHIBIT 2-59

Case 2:12-cv-08388-AB-FFM   Document 220-4   Filed 11/13/17   Page 20 of 36   Page ID
                                      #:4564
Case 2:17-cv-07369-AB-FFM   Document 1-5   Filed 10/09/17   Page 13 of 26   Page ID #:59

1   the time, states "It is critical that Ford Motor Company personnel around the world adhere to the

2   highest ethical standards so that we can earn the trust of our customers…"[32]

3         b)  Responsibility – "Ford Motor Company is committed to conducting business

4   fairly and honestly."[33]

5         c)  Product Quality and Safety – "the quality of our products and services must be

6   our number one priority today and tomorrow."[34]

7

8   PLAINTIFF'S EXPERIENCES

9      32. Relying on the material misrepresentations, omissions and concealments by Ford, its

10   authorized agents, and its marketing materials regarding the 2011 Fiesta, including an "automatic"

11   transmission, Plaintiff purchased the Subject Vehicle on January 29, 2012, pursuant to the Retail

12   Installment Sales Contract.[35]

13      33. Prior to purchasing the Subject Vehicle, Plaintiff had reviewed marketing materials at a

14   display for the Fiesta at the L.A. Auto Show and at the X Games in 2010 and specifically

15   remembers statements such as "transmission shifts smooth[ly]".[36]  Plaintiff also subscribes to a Ford

16   YouTube channel, where he saw articles and short videos about the Fiesta around the time he was

17   looking to purchase the Subject Vehicle.  When Plaintiff visited South Bay Ford in Hawthorne,

18   California, he was looking to purchase a Ford Fiesta vehicle and was "swayed" to purchase the one

19   with the automatic transmission because it was presented as getting better gas mileage.[37]  During his

20   visit to the dealership, Plaintiff reviewed window stickers of multiple Fiesta models, talked with the

21   salesperson, was provided a sales brochure, and test drove the Subject Vehicle.  The salesperson

22   never disclosed that the Subject Vehicle was not equipped with an automatic transmission.  In

23   addition to all the materials mentioned above, Plaintiff also subscribes to Muscle Mustangs & Fast

24

25   [32] Id., p. 5.

26   [33] Id., p. 7.
    [34] Id., p. 37.

27   [35] Exhibit 3.
    [36] Exhibit 35, pg. 51.

28   [37] Exhibit 35, pg. 48-49.

- 12 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.12**

EXHIBIT ___ 2 60

1   Fords and states that he saw similar advertisements as in those subscriptions he received and in the

2   brochures he received from the dealer and as shown on YouTube. [38]  In his deposition, he did not

3   mention that he reviewed any NHTSA investigations or TSBs.

4        34. Ford and its authorized agents allegedly did not disclose to Plaintiff any information

5   about the Transmission Defect.  Lack of disclosure of the Transmission Defect was material to

6   Plaintiff's decision to purchase the Subject Vehicle.[39]

7        35. Plaintiff had a total of $1,474.06 in warranty claims since purchasing the Subject

8   Vehicle.  Plaintiff began experiencing problems with the engine within 16,000 miles of purchasing

9   the Fiesta.  The vehicle was taken to an authorized Ford dealership approximately seven (7)

10  separate times that were covered by warranty for specific transmission related issues, including:

11  Transmission hesitates, makes clunking noises and jerks on takeoff.  The total known warranty

12  costs for the transmission related warranty claims as of the date of this declaration were $1,331.97

13  and are summarized below.[40]  Since there are at least three (3) warranty claims that do not appear on

14  the AWS Report (and therefore the corresponding amount of warranty repair is not known), the

15  total amount of warranty claims related to the transmission repair is subject to change if or when

16  additional information is received, at which time the declaration will be updated.  A timeline of my

17  observations regarding these repairs is provided in **Exhibit 30, Schedule 6.1.**

18        a)  February 28, 2013 – 30,633 miles – Issues with acceleration, deceleration and

19  gear shifts.  $23.40 was incurred in labor, parts and rental car covered under the warranty.

20        b)  September 8, 2014 – 46,058 miles – Transmission jerks on takeoff and makes

21  clunking noises.  $133.90 was incurred in labor, parts and rental car covered under the warranty.

22        c)  June 9, 2015 – 53,608 miles – Transmission hesitates and jerks on acceleration

23  and when coming to a stop. $134.57 was incurred in labor and parts covered under the warranty.

24        d)  November 4, 2015 – 58,025 miles – Transmission jerks on takeoff.  $1,040.10

25  was incurred in labor and parts covered under the warranty.

26  ───────────────

27  [38] **Exhibit 35, pg. 52-58**
    [39] **Exhibit 2, ¶69.**
28  [40] **Exhibit 21 – Warranty claims and repair data.**

- 13 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.13**

EXHIBIT 2-6

1    e) March 17, 2016 – 60,371 miles – Transmission jerks on takeoff. This visit does
2 not appear on the AWS report; thus the amount incurred in labor and parts covered under warranty
3 is not known at the time of this declaration. Should this information be obtained, the declaration
4 will be updated.

5    f) May 26, 2016 – 61,296 miles – Transmission jerks on takeoff (related to visit on
6 March 17, 2016, where a replacement clutch was ordered). This visit does not appear on the AWS
7 report; thus the amount incurred in labor and parts covered under warranty is not known at the time
8 of this declaration. Should this information be obtained, the declaration will be updated.

9    g) April 17, 2017 – 66,083 miles – Transmission jerks on takeoff. This visit does
10 not appear on the AWS report; thus the amount incurred in labor and parts covered under warranty
11 is not known at the time of this declaration. Should this information be obtained, the declaration
12 will be updated.

13    36. Ford initiated seven (7) manufacturer's recalls on the Subject Vehicle. Three (3) were
14 for the transmission (two (2) published in August 2015 and one (1) in March 2016) and one each for
15 the following: engine block heater leakage, enable auto-lock and auto-unlock features, reprogram
16 Restrain Control Module and door latch replacement.[41]

17    37. Based on the information available to Ford regarding problems with the PowerShift
18 Transmission and other issues prior to production, post production, and from Ford's own
19 informational databases from customer repairs referenced above, Ford appears to have had
20 knowledge of the Transmission Defect, and appears to have known or should have known that the
21 defects were not known by, or reasonably discoverable by Plaintiff, before Plaintiff purchased the
22 Subject Vehicle on January 29, 2012, or during the warranty period. It appears that FMC then
23 fraudulently induced Plaintiff to purchase the vehicle on January 29, 2012.

24

25                                    **Indicia of Fraud**

26    38. Indicia of fraud is a term of art used by accountants and certified fraud examiners and is

27

28 [41] **Exhibit 22** – Ford Recalls.
                                    - 14 -
                        DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.14**

EXHIBIT 2-62

1   not a legal term. Indicia of fraud is not part of the knowledge of the general public or within the

2   public domain. Fraud investigation and the ability to recognize indicia of fraud are specialized

3   knowledge, which take years of study and practice as a certified fraud examiner to identify. Indicia

4   of fraud or indications of fraud is not a legal opinion and I am not stating that fraud occurred or did

5   not occur, which is the decision of the jury. My observations do not invade the province of the jury,

6   but will aid them in determining whether FMC acted responsibly or whether their actions warrant an

7   award of punitive damages.

8      39. According to the Certified Fraud Examiners Manual (the "CFE Manual" or "Fraud

9   Examiners Manual"), "fraud includes any intentional or deliberate act to deprive another of property

10   or money by guile, deception, or other unfair means."[42]

11      40. One of the principles of fraud illustrated in the Fraud Examiners Manual includes

12   "concealment of material facts".[43] The essential elements include:

13            a)   The defendant had knowledge of a material fact;

14            b)   The defendant had a duty to disclose the material fact;

15            c)   The defendant failed to disclose the material fact; and

16            d)   The defendant acted with intent to mislead or deceive the victim.[44]

17      41. Concealment can also include fraud by omission, the elements of which include:[45]

18            a)   The defendant must have concealed or suppressed a material fact;

19            b)   The defendant must have been under a duty to disclose the fact to the plaintiff;

20            c)   The defendant must have intentionally concealed or suppressed the fact with the

21   intent to defraud the plaintiff;

22

23   [42] See **Exhibit 23** (2016 Fraud Examiners Manual), pp.1-5 (2.201-2.205). See also **Exhibit 24**, p.2 (generally for
elements for fraud by omission). See **Exhibit 25** for other sources of definitions of fraud, including (among others): p.1

24   FRAUD ("Act or course of deception, an intentional concealment, omission, or perversion of truth, to (1) gain unlawful
or unfair advantage, (2) induce another to part with some valuable item or surrender a legal right, or (3) inflict injury in

25   some manner."); p.3 OMISSION ("Apathy toward, or neglect of, duty resulting in something not properly done or
remaining undone."); p.4 CONCEALMENT ("Intentional suppression or withholding of, or neglect to communicate, a

26   material fact. In contractual arrangements, fraudulent concealment may provide grounds for setting aside (rescission) of
a contract and for a claim of damages.").

27   [43] **Exhibit 23**, p.1 (2.201).
[44] Id., p.4 (2.204).

28   [45] See **Exhibit 24**, p.2 (a journal article detailing Fraud by Omission elements in California).
                             - 15 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.15**

EXHIBIT 2-63

1        d) The plaintiff must have been unaware of the fact and would not have acted as he

2  did if he had known of the concealed or suppressed fact; and

3        e) As a result of the concealment or suppression of the fact, the plaintiff must have

4  sustained damage.

5

6  MATERIALITY AND FAILURE TO DISCLOSE

7      42. Based upon the facts alleged in the Complaint[46], it appears that a reasonable person

8  would consider the Transmission Defect important and would not have purchased or leased a

9  vehicle equipped with the Transmission Defect were the defect disclosed in advance.

10     43. Materiality is defined as the principle that had information whose omission or

11  misstatement been disclosed, it may have influenced or changed the judgment of a reasonable

12  person.[47]

13     44. Here, assuming the Plaintiff would have acted differently (not purchased the vehicle),

14  the fact that the Transmission Defect was not disclosed is material.

15

16  APPARENT KNOWLEDGE

17     45. Based upon Ford's experience with a derivative of the PowerShift Transmission in the

18  European and Australian markets, pre-release testing data and feedback, Technical Service

19  Bulletins, consumer complaints and warranty claims, and data collected on repairs from Ford's

20  computer systems (including AWS, MORS and CQIS) (now called FMC 360), it appears Ford had

21  knowledge of the Transmission Defect before Plaintiff's purchase of the Subject Vehicle on January

22  29, 2011, and during the warranty period.

23

24

25

26

27  [46] **Exhibit 2.**

28  [47] **Exhibit 23**, pp.2, 27, 76 (Fraud Examiners Manual, pp.2.202, 4.318, 4.1022).

- 16 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.16**

EXHIBIT 264

1 | DUTY TO DISCLOSE

2      46. Given the materiality and the Defendant's alleged knowledge of the Transmission

3 | Defect, I assume that the Defendant had a duty to disclose the Transmission Defect to the Plaintiff.

4

5 | INTENT TO MISLEAD OR DECEIVE

6      47. As described above, several facts make it appear as though Ford withheld disclosure of

7 | the Transmission Defect in order to induce a reasonable person to purchase or lease a vehicle or,

8 | after such purchase or lease, failed to cure the Transmission Defect. These include:

9        a) Experience in the European and Australian markets with a similar dual-clutch

10 | transmission, for which the PowerShift Transmission is a derivative;

11        b) The post production issuance of Technical Service Bulletins in response to

12 | complaints about the Transmission Defect;

13        c) Post production warranty claims and repairs as part of Ford's informational

14 | databases: including MORS (Master Owner Relations System); AWS (Analytical Warranty

15 | System); and CQIS (Common Quality Indicator System) (now called FMC 360);

16        d) The long history of consumer complaints described above, as well as the alleged

17 | Transmission Defect without effective replacement;

18        e) That a reasonable person would consider the Transmission Defect important and

19 | would not have purchased or leased a vehicle equipped with the Transmission Defect if the

20 | Transmission Defect was disclosed in advance; and

21        f) That Ford did not disclose the Transmission Defect.

22      48. Because of the extent of the Transmission Defect (e.g., long history), withholding

23 | disclosure of such information appears more than mere coincidence or oversight, but rather more

24 | along the lines of an intentional act.

25

26

27

28

- 17 -

DECLARATION OF DR. BARBARA C. LUNA

EXHIBIT 68.17

EXHIBIT 2-65

1  RESPONSIBILITIES OF MANAGEMENT AND DIRECTORS

2      49. Officers and directors of companies in the U.S. have a responsibility to identify and
3  investigate employee misconduct and deal with any known or suspected instances of misconduct
4  with efficient and decisive measures.  Officers and directors aware of potentially illegal conduct by
5  senior employees may be liable for any recurrence of similar misconduct and have an obligation to
6  halt and cure continuing effects of the initial misconduct.[48]

7      50. The Corporate Sentencing Guidelines provide penalties for corporations that fail to take
8  voluntary action to redress misconduct by senior employees.[49] Directors and senior management set
9  the moral and ethical tone of an organization, reinforcing the importance of internal controls and
10  expected standards of conduct.  According to the Committee of Sponsoring Organizations, the
11  control environment provides the foundation for internal controls throughout the organization.[50]

12      51. Under the Sarbanes-Oxley Act ("SOX"), the CEO and CFO of a publicly traded
13  company must certify that the financial reports fairly present, in all material respects, the financial
14  condition and results of the company's operation and do not contain any material misstatement that
15  would render the financials misleading and that disclosure was made to the auditors and audit
16  committee regarding any material weaknesses in controls and any fraud, whether material or not,
17  that involves management or other employees who have a significant role in the company's internal
18  controls.  Internal controls covered include those relating to the prevention, identification and
19  detection of fraud.[51]

20      52. Senior financial management of Ford likely are CPA's subject to the AICPA Code of
21  Professional Conduct.  As such, according to 0.300.030 of that Code, they have an obligation to act
22  in a way that serves the public interest, honors the public trust, and demonstrates a commitment to
23  professionalism.[52] They have an obligation to discharge their responsibilities with integrity,
24  objectivity, due professional care and a general interest in serving the public.

25  _____

26  [48] See Exhibit 23, p.31 (Fraud Examiners Manual, p.4.402).
    [49] Id., pp.31-38, 43-46 (4.402-4.409 and 4.414-4.417).
27  [50] Id., p.33 (4.404).
    [51] Id., pp.46-51 (4.417-4.422).
28  [52] See Exhibit 26, p.7 (AICPA Code of Professional Conduct).
                                    - 18 -
                DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.18**

EXHIBIT 2 -66

53. The Public Company Accounting Oversight Board ("PCAOB") alerts auditors to be alert to intentional misstatements or omissions of amounts or disclosures in financial statements of events, transactions or other significant information.[53]

54. An example of a company and senior management taking responsibility would be General Motors' (GM) response to ignition switch issues.  The actions of GM and particularly Chairman and CEO Mary Barra are discussed in a recent article titled "GM shaken up by CEO Mary Barra", by Mark Phelan of USA Today.  Mark Phelan stated that "the company accepted responsibility, apologized and essentially wrote a blank check when a GM employee allegedly concealed faulty ignition switches that led to accidents and multiple deaths."  Mary Barra is quoted as saying "We are going to do the right thing.  We are going to deliver value even when it's hard."[54]

55. GM settled with the U.S. Securities and Exchange Commission ("SEC") for $1 million relating to the SEC's investigation of GM's ignition switch recalls.  As part of the agreement, GM did not admit any wrongdoing and GM's financial statements or disclosures were not called into question.  The SEC said that deficient internal accounting controls hindered GM from assessing the financial impact of the faulty ignition switches, which were linked to at least 124 deaths.  The SEC stated that GM's accountants did not learn of GM's internal investigation into the ignition switches until three months before the recall and 18 months after other GM personnel understood that there was a safety issue.  The SEC went on to say that "proper consideration of loss contingencies and assessment of the need for disclosure are vital to the preparation of financial statements that conform with Generally Accepted Accounting Principles."  GM paid billions of dollars in legal settlements and other penalties related to the ignition switches, including $900 million to the U.S. Department of Justice and $595 million through a fund it established for crash victims and their families.  Documents showed the fix would have cost about 57 cents per vehicle at the time of production.[55]

---

[53] See **Exhibit 27**, p.3 (PCAOB AU Section 316 Consideration of Fraud in a Financial Statement Audit-.06-Description and Characteristics of Fraud).
[54] **Exhibit 28**, pp. 10, 15.
[55] **Exhibit 28**, pp. 1-2.

- 19 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.19**

EXHIBIT 2-67

1
2   REPORTING OF CONTINGENT LIABILITIES

3       56. Ford's reporting of warranty costs, liabilities and lawsuits relating to the Transmission

4   Defect is covered in its public filings of 10K's and 10Q's as a contingent liability, since the

5   amounts are not reasonably estimable, even though they may be probable.  Additionally, they are

6   grouped with all other warranty costs, liabilities and lawsuits, given the magnitude of Ford's size

7   and materiality considerations, so that figures relating specifically to Transmission Defect problems

8   cannot be specifically identified.[56]  In FMC's June 30, 2017 10-Q, which is the latest publicly filed

9   financial statement report as of the time of my declaration, other liabilities are reported in Note 11

10  to the financial statements and show dealer and dealers' customer allowances and claims of $13.8

11  billion and litigation and claims are reported in Note 16, which include those relating to alleged

12  product defects and product warranties.[57]

13

14                              **Damages**

15      57. As alleged in the Complaint, a reasonable person would consider the Transmission

16  Defect important (material) and would not have purchased or leased a vehicle equipped with the

17  Transmission Defect were the Transmission Defect disclosed in advance.[58]  I have assumed

18  liability, particularly considering the observations summarized in the timeline provided in **Exhibit**

19  **30, Schedule 6.**

20

21  RESCISSION

22      58. As shown in **Exhibit 3**, the Plaintiff purchased a 2011 Ford Fiesta VIN:

23  1FADP4FJ7BM207799 on January 29, 2012.[59]  It is my understanding that Plaintiff retains

24  ownership of the vehicle[60].

25  _____

26  [56] **Exhibit 29** – Ford Motor Company SEC filings.
    [57] **Exhibit 29** – Note 11 and Note 16 to Ford Motor Company 10-Q ending March 31, 2017.
27  [58] **Exhibit 2**, ¶54.
    [59] **Exhibit 3**.
28  [60] **Exhibit 35**, pg 23.
                                - 20 -
                    DECLARATION OF DR. BARBARA C. LUNA

                                            **EXHIBIT 68.20**

                                       EXHIBIT 2-68

59. The total cash price of the vehicle including accessories, options and other fees was

$17,155.02.[61]  Based on total due and a cash down payment of $500.00 Plaintiff financed

$16,655.02 at a 4.90% interest rate for a total of 60 equal monthly payments of $314.16 beginning

March 14, 2012 and ending February 14, 2017.[62]

60. I have not received any actual payment information for the loan taken on the Subject

Vehicle; however, for purposes of this declaration, it has been assumed that all payments have been

made according to the terms of the Retail Installment Agreement.  As of the assumed trial date,

September 15, 2017, the Plaintiff will have paid $18,850 in payments and $500 down payment, for

a total of $19,350 for the Subject vehicle.[63]  Pre-judgment interest at 10% simple per annum to the

assumed trial date is $6,023.  The total historical amount paid by Plaintiff for the Subject Vehicle

plus pre-judgment interest is $25,373.[64]

OUT-OF-POCKET COSTS FOR RELATED REPAIRS

61. It is my understanding that Plaintiff did not incur any Out-of-pocket Costs for related

repairs.[65]  If or when such information is received, the declaration will be updated.

OTHER OUT-OF-POCKET COSTS

62. Plaintiff incurred other costs related to the care for the Subject Vehicle.  As of the date

of this declaration, I have received receipts for other out-of-pocket costs paid in the total amount of

$1,481.  Total out-of-pocket costs considering prejudgment interest at 10% simple per annum to the

assumed trial date are $1,986.[66]  If and when additional other out-of-pocket costs, such as insurance,

additional registration and maintenance costs, are provided, the analysis will be updated.

---

[61] Id., p.2.
[62] Id., pp.1-2.
[63] Exhibit 30, Sch. 2.
[64] Exhibit 30, Schedule 1.
[65] Exhibit 30, Schedule 3.
[66] Exhibit 30, Schedule 3.1 and Exhibit 31.

- 21 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.21**

EXHIBIT 269

Case 2:12-cv-08388-AB-FFM  Document 220-4  Filed 11/13/17  Page 30 of 36  Page ID
Case 2:17-cv-07369-AB-FFM  Document 1-5  Filed 10/09/17  Page 23 of 26  Page ID #:69
#:4574

1  SUMMARY OF RESCISSION AND OUT-OF-POCKET COSTS

2      63. As shown in **Exhibit 30**, Schedule 1, the total historical cost of purchase to the assumed

3  trial date of September 15, 2017 is $19,350. Pre-judgment interest at 10% simple per annum to the

4  assumed trial date is $6,023, and the total amount of historical cost plus pre-judgment interest is

5  $25,373. There are no out-of-pocket repair costs to date pursuant to warranty repairs.

6

7  CURRENT LOAN BALANCE

8      64. As noted above, I have not received any actual loan payment information; however, for

9  purposes of this declaration, it has been assumed that all payments have been made according to the

10  terms of the purchase agreement. Based on this assumption, there is currently no balance due.[67]

11

12  TOTAL COSTS

13      65. As shown in **Exhibit 30**, since there is no balance currently due, the historical amounts

14  paid to purchase the vehicle and repair costs through the date of trial (excluding other out-of-pocket

15  costs), yields a total sum of $19,350 (or $25,373 considering pre-judgment interest).[68]

16      66. As shown in **Exhibit 30**, the current loan balance of $0.00, the historical amounts paid to

17  purchase the vehicle, repair costs and other out-of-pocket costs through the date of trial, yields a

18  total sum of $20,831 (or $27,359 considering pre-judgment interest).[69]  These figures will be

19  updated if or when other out-of-pocket costs are provided.

20

21  PUNITIVE DAMAGES

22      67. Punitive damages are addressed in *State Farm Mutual Ins. Co. v. Campbell et al.*, 538

23  U.S. 408 (2003)[70] and *Johnson v. Ford Motor Co.*, 135 Cal.App.4th 137 (2005)[71].  Based upon my

24  experience as a forensic accounting and damages expert, it is my understanding that the objective of

25

26  [67] Exhibit 30, Schedule 2 and Exhibit 35, pg. 34
[68] Id., Schedule 1.
27  [69] Id.
[70] Exhibit 32.
28  [71] Exhibit 33 (on remand from the California Supreme Court, see Exhibit 34).

- 22 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.22**

EXHIBIT 2-7

Case 2:12-cv-08388-AB-FFM   Document 220-4   Filed 11/13/17   Page 31 of 36   Page ID
#:4575
Case 2:17-cv-07369-AB-FFM   Document 1-5   Filed 10/09/17   Page 24 of 26   Page ID #:70

1   punitive damages is to deter a defendant from repeating intentional willful bad acts.

2        68. In general, while there is no "bright-line ratio which a punitive damage cannot exceed",

3   generally, the ratio between punitive and compensatory damages is a "single-digit ratio".[72]

4        69. In *Johnson v. Ford*,[73] a California case where the manufacturer concealed the

5   automobile's history of transmission repairs and replacements when reselling the car, the *State*

6   *Farm* analysis is applied, ultimately finding a ratio of just under 10-to-1 as appropriate.[74] There, in

7   analyzing the third prong of the *State Farm* analysis, the court found that the punitive ratio should

8   be greater than the 2-to-1 Song-Beverly civil penalty "willful" standard because the "defendant

9   *intentionally* concealed information with the *intent* to defraud Plaintiff....[T]he present intentional

10   conduct (based, as it was, on formal companywide practices and policies) was significantly more

11   egregious than the minimum 'willful' conduct sufficient to support a Song-Beverly civil penalty."[75]

12        70. While I am not a lawyer and do not presume to opine on legal analysis, here, I have

13   considered the final punitive damage award in the *Johnson v. Ford* matter[76] and provide a

14   placeholder quantification of punitive damages.  I also have given talks on punitive damages to

15   accountants and attorneys from an accounting perspective, have been on panels focusing on

16   punitive damages and have presented accounting expert testimony on punitive damages.

17        71. Assuming punitive damages at 9x the underlying compensatory damages excluding

18   other out-of-pocket costs, punitive damages are $174,150, yielding total compensatory and punitive

19   damages of $193,500.  Considering pre-judgment interest, the total compensatory and punitive

20   damages are $199,523.[77]

21        72. Including other out-of-pocket costs in the underlying compensatory damages, punitive

22   damages at 9x the underlying compensatory damages are $187,479, yielding total compensatory

23

24   [72] Exhibit 32, p.11.
25   [73] Exhibit 33.
     [74] Exhibit 33, pp.1 and 9 (9.83x punitive-to-compensatory ratio based on $175,000 punitive damages to $17,811.60
26   compensatory damages).
     [75] Id., p.8.
27   [76] Exhibit 33, pp.1 and 9 (9.83x punitive-to-compensatory ratio based on $175,000 punitive damages to $17,811.60
     compensatory damages).
28   [77] Exhibit 30, Schedule 4.

- 23 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.23**

EXHIBIT 2-71

1   and punitive damages of $208,310.  Considering pre-judgment interest, total compensatory damages

2   (including other out-of-pocket costs) and punitive damages, the total is $214,838.[78]  These figures

3   will be updated if or when other out-of-pocket costs are provided.

4          73. As of June 30, 2017, the last date for which stand-alone information is publicly available

5   for Ford Motor Company, Ford had a net worth of $32,262 million.[79]  Punitive damages (wherein

6   other out-of-pocket costs are excluded from underlying damages) of $174,150 represent 0.0005% of

7   the net worth of Ford Motor Company as of June 30, 2017.  For the trailing twelve months ended

8   June 30, 2017, Ford Motor Company had net income of $3,803 million.  Punitive damages

9   (excluding other out-of-pocket costs) of $174,150 represent 0.0046% of the net income of Ford

10   Motor Company for the trailing twelve months ended June 30, 2017.[80]

11          74. As of June 30, 2017, the last date for which stand-alone information is publicly available

12   for Ford Motor Company, Ford had a net worth of $32,262 million.[81]  Punitive damages (wherein

13   other out-of-pocket costs are included in underlying damages) of $187,479 represent 0.0006% of

14   the net worth of Ford Motor Company as of June 30, 2017.  For the trailing twelve months ended

15   June 30, 2017, Ford Motor Company had net income of $3,803 million.  Punitive damages,

16   (including other out-of-pocket costs) of $187,479, represent 0.0049% of the net income of Ford

17   Motor Company for the trailing twelve months ended June 30, 2017.[82]  These figures will be

18   updated if or when other out-of-pocket costs are provided.

19

20

21

22

23

24

25

26   [78] Id.
     [79] See Exhibit 29.
27   [80] Exhibit 30, Schedule 5.1.
     [81] See Exhibit 29.
28   [82] Exhibit 30, Schedule 5.1.

- 24 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.24**

EXHIBIT 2-72

Case 2:12-cv-08388-AB-FFM   Document 220-4   Filed 11/13/17   Page 33 of 36   Page ID
Case 2:17-cv-07369-AB-FFM   Document 1-5   Filed 10/09/17   Page 26 of 26   Page ID #:72
#:4577

1

2                                    **Pending Information**

3            75. If I receive additional information, my declaration will be supplemented accordingly.

4

5            76. I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct and that this declaration has been executed on August 22, 2017 at

7  Sherman Oaks, California.

8                                                        Dr. Barbara C. Luna

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          - 25 -
                           DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.25**

EXHIBIT ___2—73___

# EXHIBIT E

EXHIBIT 2-74

Case 2:12-cv-08388-AB-FFM  Document 220-4  Filed 11/13/17  Page 35 of 36  Page ID
#:4579
Case 2:17-cv-07369-AB-FFM  Document 1-6  Filed 10/09/17  Page 2 of 3  Page ID #:74

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

**FORM 10-K**

(Mark One)

☑ Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**For the fiscal year ended December 31, 2016**

or

☐ Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from _____ to _____

**Commission file number 1-3950**

# Ford Motor Company
*(Exact name of Registrant as specified in its charter)*

| Delaware | 38-0549190 |
|---|---|
| *(State of incorporation)* | *(I.R.S. Employer Identification No.)* |
| One American Road, Dearborn, Michigan | 48126 |
| *(Address of principal executive offices)* | *(Zip Code)* |

313-322-3000
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered* |
|---|---|
| Common Stock, par value $.01 per share | New York Stock Exchange |

* In addition, shares of Common Stock of Ford are listed on certain stock exchanges in Europe.

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark if the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑ No ☐

008

EXHIBIT 2-75

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.    Large accelerated filer ☑   Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).
Yes ☐   No ☑

As of June 30, 2016, Ford had outstanding 3,902,375,117 shares of Common Stock and 70,852,076 shares of Class B Stock. Based on the New York Stock Exchange Composite Transaction closing price of the Common Stock on that date ($12.57 per share), the aggregate market value of such Common Stock was $49,052,855,221. Although there is no quoted market for our Class B Stock, shares of Class B Stock may be converted at any time into an equal number of shares of Common Stock for the purpose of effecting the sale or other disposition of such shares of Common Stock. The shares of Common Stock and Class B Stock outstanding at June 30, 2016 included shares owned by persons who may be deemed to be "affiliates" of Ford. We do not believe, however, that any such person should be considered to be an affiliate. For information concerning ownership of outstanding Common Stock and Class B Stock, see the Proxy Statement for Ford's Annual Meeting of Stockholders currently scheduled to be held on May 11, 2017 (our "Proxy Statement"), which is incorporated by reference under various Items of this Report as indicated below.

As of January 31, 2017, Ford had outstanding 3,903,445,093 shares of Common Stock and 70,852,076 shares of Class B Stock. Based on the New York Stock Exchange Composite Transaction closing price of the Common Stock on that date ($12.36 per share), the aggregate market value of such Common Stock was $48,246,581,349.

### DOCUMENTS INCORPORATED BY REFERENCE

| Document | Where Incorporated |
|---|---|
| Proxy Statement* | Part III (Items 10, 11, 12, 13, and 14) |

* As stated under various Items of this Report, only certain specified portions of such document are incorporated by reference in this Report.

Exhibit Index begins on page 102

009

EXHIBIT 2-76