1 | **DYKEMA GOSSETT LLC**
2 | TAMARA A. BUSH (197153)
tbush@dykema.com
3 | 333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
4 | Tele: (213) 457-1800 / Fax:  (213) 457-1850

5 | **DYKEMA GOSSETT PLLC**
JOHN M. THOMAS (266842)
jthomas@dykema.com
6 | KRISTA L. LENART (admitted *pro hac vice*)
klenart@dykema.com
7 | JANET L. CONIGLIARO (admitted *pro hac vice*)
jconigliaro@dykema.com
8 | FRED J. FRESARD (admitted p*ro hac vice*)
Ffresard@Dykema.com
9 | 2723 South State Street, Suite 400
Ann Arbor, MI  48104
10 | Tele:  (734) 214-7613 / Fax: (734) 214-7696

11 | Attorneys for Defendant
FORD MOTOR COMPANY

12 |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

*Left margin (vertical):* DYKEMA GOSSETT LLP 2723 SOUTH STATE STREET, SUITE 400 ANN ARBOR, MICHIGAN 48104

| | |
|---|---|
| OMAR VARGAS, ROBERT BERTONE, MICHELLE HARRIS, and SHARON HEBERLING, individually, and on behalf of a class of similarly situated individuals, | Case No. 2:2012-cv-08388 AB (FFMx)<br><br>[Assigned to Hon. Andre Birotte, Jr., Rm 7B Magistrate Frederick F. Mumm, Rm 580] Courtroom 790] |
| Plaintiffs, | CLASS ACTION |
| vs. | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO INVALIDATE** |
| FORD MOTOR COMPANY, | **CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO** |
| Defendants. | **ESTABLISH A SECOND OPT-OUT PERIOD**<br><br>**DATE:  DECEMBER 8, 2017**<br>**TIME:   10:00 A.M.**<br>**ROOM: 4**<br><br>Complaint served: October 1, 2012<br>1st Amended Complaint:  Dec. 12, 2012<br>2nd Amended Complaint:  Aug 30, 2013 |

---

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................1

II.   STERN AND LIBLANG'S OPPOSITION MISREPRESENTS
      THE FACTS. .................................................................................2

III.  STERN AND LIBLANG'S RESPONSE CONFIRMS THE
      FALSE AND MISLEADING NATURE OF THEIR CAMPAIGN
      TO SOLICIT EXCLUSIONS FROM THE SETTLEMENT..............3

      A.   The "Assembly-Line Process" Used To Exclude More Than
           12,000 Owners And Lessees From The Settlement Warrants
           Strict Scrutiny. ........................................................................3

      B.   Stern Did Not "Encourage" Clients Or Potential Clients To
           Read The "Very Deceptive" Court-Approved Notice Or
           The "Nonsense" In The Settlement Agreement. ........................5

      C.   Stern Falsely Represented That Arbitrators Would Be
           "Selected, Appointed, And Paid For By Ford." ........................6

      D.   Stern Misrepresented The Benefits Of The Mass Action
           Versus the Settlement. ..............................................................7

      E.   Stern Falsely Promised A Never-Ending "Opt-In" Period.......10

      F.   Stern Falsely Suggested That Recovery In The Class Action
           Would Be Uniform And Plaintiffs In The Mass Action
           Would Get Individual Attention. ..............................................11

      G.   Stern Falsely Told Viewers That He Could Not Help Them
           If They Did Not Opt Out. .........................................................11

      H.   Stern And Liblang Continue To Ignore The Role Of
           Plaintiffs' Counsel And This Court. .........................................12

IV.   THIS COURT'S APPROVAL OF THE SETTLEMENT DOES
      NOT PRECLUDE THE RELIEF FORD SEEKS. ............................13

CONCLUSION.................................................................................15

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Churchill Vill., LLC v. GE*,
  361 F.3d 566 (9th Cir. 2004) .................................................. 13

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) ................................................. 9

*Davis v. Forest River, Inc.*,
  485 Mich. 941 (2009) ...................................................... 9, 10

*Georgine v. Amchem Prods.*,
  160 F.R.D. 478 (E.D. Pa. 1995) .......................................... 10, 13

*Hamdan v. Land Rover N. Am., Inc.*,
  No. 03 C 2051, 2003 U.S. Dist. LEXIS 13896
  (N.D. Ill. Aug. 4, 2003) ..................................................... 8, 9

*Hernandez v. Vitamin Shoppe Indus. Inc.*,
  174 Cal. App. 4th 1441 (2009) ............................................... 12

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1239 (N.D. Cal. 2000) ................................ 3, 10, 13

*Jellison v. Fleetwood Enters.*,
  No. 03-71502, 2004 U.S. Dist. LEXIS 28835
  (E.D. Mich. Apr. 7, 2004) ..................................................... 9

*Miekstyn v. Bmc Choppers & Am. Disc. Cyclemart*,
  No. 266439, 2007 Mich. App. LEXIS 975 (Ct. App. Apr. 10, 2007) ........... 9

*Mydlach v. DaimlerChrysler Corp.*,
  846 N.E.2d 126 (Ill. App. 2006), *reversed in relevant part*,
  875 N.E.2d 1047 (Ill. 2007) ................................................... 9

*Retiree Support Group of Contra Costa County v. Contra Costa County*,
  2016 WL 4080294 (N.D. Cal.) ................................................. 13

*Smith v. Monaco Coach Corp.*,
  334 F. Supp. 2d 1065 (N.D. Ill. 2004) ........................................ 9

ii

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

STATUTES

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* ........................................ 8, 9

Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.* ..................... 15

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

## I.     INTRODUCTION

Stern and Liblang's Opposition to Ford's motion does not respond at all to many of Ford's arguments, but it does make at least one thing clear:  Whether it is a good idea to abandon lemon law claims that can be asserted in the Settlement's arbitration program (with the benefit of an extended statute of limitations, relaxed notice requirements, and resolution within 30-60 days) in favor of a Michigan mass action (litigation that could take years to resolve and that waives all lemon law claims) depends on the facts of each individual case, the law applicable to that case, and the objectives of each individual claimant.  And yet, Stern and Liblang, with the assistance of at most two additional lawyers, recruited more than 12,000 putative clients with an assembly-line process and "one size fits all" websites and videos that characterized the Settlement Agreement as "nonsense," that never referred to the long-form notice or the settlement website, and that made no attempt to explain that for some people the Settlement's arbitration program might well be preferable to a mass action.  Stern apparently thinks that litigation was better for everyone, without regard to individual circumstances, applicable law, or individual objectives, because it "seems undeniable" that the arbitrators "serve[] at Ford's pleasure" and can be terminated "if Ford isn't pleased with the results." (Dkt. 260-1, Stern Decl. ¶ 41.)  But this is undeniably false, whether Stern intends to refer to the arbitrators who actually decide cases or the independent organization that selects the arbitrators.

As set forth below, the evidence provided by Ford—as well as Stern's own Declaration—demonstrate that Stern stated a wholly biased view of the settlement in inflammatory language, his websites and videos contained one-sided attacks on the proposed settlement without any mention of its benefits, and he provided an inadequate disclosure of the comparative costs and benefits of participating in a class action.  The authorities cited in Ford's motion fully support the relief it seeks.

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

## II.  STERN AND LIBLANG'S OPPOSITION MISREPRESENTS THE FACTS.

Stern and Liblang's Opposition to Ford's motion begins with an Introduction that contains two assertions that reflect the same disregard for the truth as Stern's websites and videos.

First, Stern and Liblang assert that their "operation of the Website and Video were pursuant to, and consistent with, an express agreement between Lawyers and Ford to the effect, in exchange for their not objecting to the Settlement, Lawyers could solicit Class Members to opt out of the Vargas Class." (Dkt. 206, Opp. at 1.) They repeat this assertion later in their brief. (*Id.* at 6.)  As support, they cite Exhibit 3 to Stern's declaration, which Stern asserts "are true and correct copies of emails, exchanged between Lawyers (i.e., me) and counsel for Ford and counsel for Plaintiff class, documenting this agreement." (Dkt. 206-1, Stern Decl. ¶ 27.)  This is false. The emails were exchanged between various lawyers representing plaintiffs and Jordan Lurie, Plaintiffs' counsel in this case. (Dkt. 206-5, E-mail Chain.)  None of the e-mails were sent by or to Ford or Ford's counsel, and none of them even mention Ford or Ford's counsel. (*Id.*)  If there was any agreement at all, it was with Class Counsel, Mr. Lurie, not Ford—and nothing in the emails even remotely suggests that Mr. Lurie agreed that Stern could solicit class members with misrepresentations and misleading omissions.

Second, Stern and Liblang assert that "Ford's admission that 94% of the Class are 'not eligible for anything' was addressed at the October 2, 2017 hearing." (Dkt. 206, Opp. at 2 n. 6.)  They rely heavily on this purported admission throughout their brief. (*See, e.g., id.* at 21.)  For this assertion Stern and Liblang cite no evidence at all.  In fact, Ford never admitted that 94% of the class would receive no benefit, and this could not have been addressed at the hearing.  What *was* addressed at the hearing was a claim made by certain Objectors that "it's only six percent at most of the class which is going to be eligible for a cash payment right now." (Dkt 205-2 , 10/2/17

2

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

Transcript, at 7.)  This claim referred to only one component of a complex settlement—the cash payment benefit which will be paid out over the course of the next several years to an indeterminate number of class members—and ignores the rest of the settlement.  (*Id.; See* Dkt. 121-1, Settlement Agreement ¶¶ 2(B), 2(C).)  The Objectors' claim was not based on anything Ford said but on Objectors' interpretation of an expert report obtained by and submitted by Plaintiffs.  (Dkt 205-2 , 10/2/17 Transcript, at 7.)[1]  Neither Ford nor Plaintiffs ever conceded that this interpretation was correct; on the contrary, Plaintiffs' counsel expressly challenged this interpretation of their expert's opinion.  (Dkt. 205-3, 10/2/17 Transcript, at 42).

The rest of Stern and Liblang's Opposition is just as flawed as the Introduction and it establishes that Stern and Liblang either do not understand the Settlement Agreement or are deliberately misrepresenting its terms.

**III.   STERN AND LIBLANG'S RESPONSE CONFIRMS THE FALSE AND MISLEADING NATURE OF THEIR CAMPAIGN TO SOLICIT EXCLUSIONS FROM THE SETTLEMENT.**

**A.    The "Assembly-Line Process" Used To Exclude More Than 12,000 Owners And Lessees From The Settlement Warrants Strict Scrutiny.**

As Ford argued in its motion, this Court should be "particularly troubled" by Stern and Liblang's misleading representations and omissions because of the "assembly-line" process used by Stern and Liblang to recruit clients and obtain their authorization to exclude them from the Settlement.  *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1239, 1246 (N.D. Cal. 2000).  Stern and Liblang's response confirms that there is reason to be concerned.

---

[1] Liblang and her co-counsel, Neil Gieleghem, incorrectly assert in their declarations that that this expert, Ted Stockton, was "Ford's own expert."  (Dkt. 205-7, Liblang Decl. ¶ 12(A); Dkt. 205-1, Gieleghem Decl. ¶ 13(A).)  In fact, while Mr. Stockton reviewed warranty data produced by Ford in discovery, he was retained by Plaintiffs.

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1    Stern and Liblang do not deny that there were a maximum of four lawyers at
2    Stern's and Liblang's firms available to advise more than 12,000 putative clients.
3    According to Stern, his "website served as the portal or only means by which clients
4    could complete a contact form to initiate contact with Stern and Liblang." (Dkt. 206-
5    1, Stern Decl. ¶ 31.)  "No one could become a Stern and Liblang client without first
6    providing their personal and vehicle information at the aforementioned website
7    contact form, and by agreeing to the aforementioned Terms and Conditions …." (*Id.*
8    ¶ 16.)  "Even the very few clients that called … were encouraged to first register and
9    provide their information at the website …." (*Id.* ¶15.)  Stern and Liblang then e-
10   mailed an opt-out form and a Representation Agreement that included a Power of
11   Attorney that authorized Stern and Liblang to serve the opt-out request on behalf of
12   the client, even without the client's signature and without the client's express
13   authorization.  (Dkt. 206, Opp. at 13 and note 18.)  In fact, Stern and Liblang admit
14   that they submitted about 125 opt out requests without their client's signature.  (*Id.*)

15       At various points, Stern and Liblang rely on the nine page "Important Legal
16   Disclaimers and Notices" that appeared on their website.  (*See, e.g.,* Dkt. 206, Opp. at
17   3-4.)  Stern and Liblang appear to be claiming that the more than 12,000 people who
18   signed up online could not have been misled by anything on the websites or in the
19   videos because on page two of the disclaimers it says that the material on the website
20   "is general in nature, only, and may not apply to you[r] … particular factual … or
21   legal circumstance."  (Dkt. 206, Opp. at 3, quoting Dkt. 206-4, "Important Legal
22   Disclaimers and Notices" at 2.)  But the same disclaimers also advises viewers of the
23   website who happened to read all nine pages that "[t]he determination of whether you
24   need … legal services and your choice of a … lawyer are very important matters that
25   *should not be premised alone on websites or advertisements."*  (Dkt. 206-4,
26   "Important Legal Disclaimers and Notices" at 2, emphasis added.)  Stern and Liblang
27   must have known that more than 12,000 people signed the Representation Agreement
28   based on the representations on Stern's website.  Indeed, according to Stern himself,

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

4

1   very few people actually called for additional information, and those that did were

2   referred back to the website.  (Dkt. 206-1, Stern Decl. ¶ 15.)  Stern and Liblang knew

3   so little about the individual facts of the more than 12,000 owners and lessees who

4   signed up through Stern's website that they apparently did not realize that many of

5   their putative clients were already represented by other lawyers who had already filed

6   suit on their behalf.  (Dkt. 188-2, Erskine Decl. ¶ 11(b)).

7          In short, Stern and Liblang have offered nothing to suggest that their more than

8   12,000 putative clients relied on anything other than the misleading representations

9   and omissions on Stern's websites and videos.

10         **B.    Stern Did Not "Encourage" Clients Or Potential Clients To Read**

11                 **The "Very Deceptive" Court-Approved Notice Or The "Nonsense"**

12                 **In The Settlement Agreement.**

13         Stern and Liblang argue that they "encouraged" viewers of Stern's websites

14  and videos to read the entire Settlement Agreement by providing "multiple 'links' to

15  the *Vargas* Settlement Agreement (which included the Short-Form and Long-Form

16  Notices, and directions to access the Class Action Website."  (Dkt. 206, Opp. at 4.)

17  They assert that they "acted to prevent any potentially misleading communications,

18  by providing 'links' from their Website to the actual Settlement Agreement, including

19  its Exhibits, the Short-Form and Long-Form Notices, and the instructions on how to

20  access the Class Settlement website."  (*Id.*)

21         These assertions are misleading at best.  The truth is that nowhere on his

22  websites or in his videos does Stern mention the long-form notice or the settlement

23  website—the documents designed by the parties and approved by the Court to

24  provide the information needed by class members to make a decision.  Nowhere on

25  his website or in his videos does Stern provide links to the long-form notice or the

26  settlement website.  (The links he provided to the Settlement Agreement took viewers

27  to pdf versions of those documents on the settlement website, with no links to the

28  long form notice or any of the other information on the Settlement website.)  Stern

5

1    and Liblang seem to be arguing that by providing links to the Settlement Agreement
2    itself they were encouraging viewers to read the entire 129 page document and all of
3    the exhibits—including Exhibit B which was a draft of the long-form notice.  But
4    Stern told viewers that the Settlement Agreement was "two inches of fine print that
5    most of you are not going to have the time to read or understand." (Dkt. 188-4, 8/11
6    Video Tr. at 8, 10.)  According to Stern, "I wouldn't blame you" if they did not take
7    the time to read or understand the Settlement Agreement, and "[t]hat's why it should
8    mean so little to you." (*Id.* at 10.)

9    Stern in his declaration actually emphasizes the fact that he characterized the
10   Settlement Agreement as "nonsense." (Dkt. 206-2, Stern Decl. ¶ 79, quoting Dkt.
11   188-4, 8/11 Video Tr. at 48.)  Stern and Liblang's argument that they were
12   encouraging viewers to read Settlement Agreement and all of the associated
13   "nonsense" is simply untrue.

14       **C.    Stern Falsely Represented That Arbitrators Would Be "Selected,**
15               **Appointed, And Paid For By Ford."**

16   Stern and Liblang assert that Ford is arguing that "the arbitration provisions of
17   the Settlement somehow are beyond criticism," and that Ford's argument is
18   "*Nonsense!*" (Dkt. 206, Opp. at 14.)  Nonsense.  Ford's argument is that Stern and
19   Liblang misrepresented the arbitration program by repeatedly telling viewers that the
20   arbitrators were "selected, appointed and paid for by Ford" and that this is "really no
21   different" than having a Ford dealer decide the claims. (Dkt. 188-4, 8/11 Video Tr. at
22   9; Dkt. 188-7, Web Page at 10, 14.)  This is simply untrue, regardless of any other
23   criticism that might be levelled against the program.

24   Stern and Liblang argue that they have "legitimate concerns" that DeMars
25   arbitrators will be biased because "Ford's repeated use of the same entity for
26   arbitration on multiple occasions potentially exposes claimants to 'repeat player
27   bias.'" (Dkt. 206, Opp. at 14; Dkt. 206-1, Stern Decl. ¶ 42.)  If Stern's website and
28   videos had criticized the arbitration program in these terms, it might have been more

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1  defensible, but this is not what Stern and Liblang told clients and prospective clients.

2  Besides, even that criticism would have been misleading, because it falsely assumes

3  that Ford could unilaterally terminate DeMars if it was unhappy with the decisions of

4  arbitrators selected by DeMars.  But under the express terms of the Settlement

5  Agreement, Ford cannot replace DeMars without the approval of Plaintiffs or, on a

6  showing of good cause, by this Court.  (Dkt. 121-1, Settlement Agreement ¶ 1(D).)

7  Even now, Stern does not seem to understand this, because he asserts in his

8  declaration that "[i]t seems undeniable that if Ford isn't pleased with the results, it

9  can terminate the arbitrator which serves at Ford's pleasure."  (Dkt. 206-1, Stern

10  Decl. ¶ 41.)  This is false regardless of whether Stern intended to refer to the

11  arbitrators, who are selected by DeMars without Ford's input (Dkt. 188-1, Morris

12  Decl. ¶ 6), or whether he meant to refer to DeMars itself.

13       Stern now asserts that consumers who lose in arbitration have a right to appeal

14  at their own expense to the American Arbitration Association ("AAA").  (Dkt. 206-1,

15  Stern Decl. ¶ 43.)  This is true in part, but it does not help Stern and Liblang.  The

16  fact that appeals from the initial arbitration decision are available, and that they are

17  heard by an arbitrator that will *not* be paid by Ford, either directly or indirectly, is

18  another important fact that Stern and Liblang never mentioned to their clients and

19  prospective clients.  But this assertion also displays Stern's unfamiliarity with the

20  Settlement's arbitration process; appeals from the initial arbitration award are heard

21  by JAMS, not AAA.  (Dkt. 121-1, Settlement Agreement ¶ I(D).)

22      **D.**    **Stern Misrepresented The Benefits Of The Mass Action Versus the**

23                **Settlement.**

24       Ford's motion catalogued all of the many ways in which Stern misrepresented

25  the benefits of the mass action in Michigan relative to the Settlement Agreement, and

26  all of the many misleading omissions.  In their opposition, Stern and Liblang do not

27  attempt to defend any of these misrepresentations or omissions—with one exception.

28  (*See* Dkt. 206, Opp. at 15-16.).  According to Stern and Liblang, Stern's repeated

7

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

representation that the mass action would be resolved within six to nine months was not false or misleading because it was qualified with words like "think," "probably," or "perhaps." (*Id.*)  But Stern never used the word "perhaps" in this context, and a lawyer with Sterns' purported qualifications—among them "Top 25 Mass Tort Trial Lawyers" (Dkt. 206-1, Stern Decl. ¶ 6)—could not reasonably "think" that more than 12,000 cases handled by at most four lawyers and one court could "probably" be resolved on an individual basis within six to nine months.

As for the rest of the misrepresentations and omissions, Stern and Liblang's brief offers no response except to repeat the misrepresentation that plaintiffs in the mass action "at least have a chance of receiving more than the 94% of the [Class] Members that will get nothing." (Dkt. 206, Opp. at 15).  Again, the 94% figure comes from an Objector's interpretation of a report from Plaintiffs' expert that relates solely to the cash payment component of the Settlement.  Stern and Liblang's argument ignores all of the benefits of the arbitration program, including the fact that all of their putative clients would have been free to pursue lemon law claims for repurchase in arbitration, with relaxed notice requirements, extended statutes of limitations, and resolution within 30-60 days.  None of these benefits are available to Stern and Liblang's putative clients in the Michigan mass actions, in which Stern and Liblang effectively waive all of their lemon law claims.

In an apparent attempt to avoid applicable page limits, Stern in his declaration attempts to defend his failure to assert lemon law claims in the mass action, but he does so by relying on novel and risky theories that have been rejected by many courts or that might apply, if at all, only to some of his more than 12,000 putative clients.  For example, Stern claims that a repurchase remedy is available from a remote manufacturer as a matter of federal law under the Magnuson-Moss Warranty Act ("MMWA", 15 U.S.C. § 2301 *et seq.*), even if it is not available under state law. (Dkt. 206-2, Stern Decl. ¶ 63.)  For this proposition he cites a single unpublished decision of an Illinois district court, *Hamdan v. Land Rover N. Am., Inc.*, No. 03 C

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

8

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

2051, 2003 U.S. Dist. LEXIS 13896 (N.D. Ill. Aug. 4, 2003), a decision that has never been followed except by the Illinois Appellate Court in a decision that was reversed on this precise point by the Illinois Supreme Court. *Mydlach v. DaimlerChrysler Corp.*, 846 N.E.2d 126, 144 (Ill. App. 2006), *reversed in relevant part,* 875 N.E.2d 1047, 1064 (Ill. 2007). *Hamdan* has also been expressly rejected by the only Michigan decision that cites it. *Jellison v. Fleetwood Enters.*, No. 03-71502, 2004 U.S. Dist. LEXIS 28835, at *32 n.4 (E.D. Mich. Apr. 7, 2004). Other courts (including courts in Illinois) almost uniformly hold that "[i]n order to determine whether a specific remedy is available [under the MMWA], we must again consult state law." *Smith v. Monaco Coach Corp.*, 334 F. Supp. 2d 1065, 1070 (N.D. Ill. 2004); *see generally Daniel v. Ford Motor Co*., 806 F.3d 1217, 1227 (9th Cir. 2015) ("Claims under the Magnuson-Moss Warranty Act 'stand or fall with . . . express and implied warranty claims under state law.'"). The Michigan Court of Appeals, whose decisions even if unpublished will carry special weight with a Michigan trial court, has expressly recognized that "'[T]he MMWA calls for the application of state written and implied warranty law, not the creation of additional federal law.'" *Miekstyn v. Bmc Choppers & Am. Disc. Cyclemart*, No. 266439, 2007 Mich. App. LEXIS 975, at *11-12 (Ct. App. Apr. 10, 2007).

Stern also asserts that the decision in *Davis v. Forest River, Inc.,* 485 Mich. 941 (2009) allowed repurchase as damages for breach of warranty, without requiring the showing necessary for revocation of acceptance. (Dkt. 206-2, Stern Decl. ¶ 64.) But the Michigan Supreme Court's decision in *Davis* allowed a departure from the normal measure of damages for breach of warranty only because of the "special circumstances" present in that case; among other things, "at one point, the vehicle was not returned to the plaintiff for 169 days, and, in total, it was out of service for 219 days during its first year." *Davis*, 485 Mich. at 941. Some of Stern and Liblang's Michigan clients might be able to show comparable "special circumstances," but many will not. And *Davis* does not even apply to Stern and

9

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1    Liblang's clients who live and purchased vehicles outside of Michigan.  Stern and

2    Liblang cannot safely count on *Davis* applying to any but a small fraction of their

3    more than 12,000 putative clients.

4         The point here is not that Stern's interpretation if the law is necessarily wrong

5    in all jurisdictions, or as to all of his 12,000-plus putative clients.  Rather, the point is

6    that all of Stern's communications were "one size fits all," they "contain[ed] one-

7    sided attacks on the proposed settlement without any mention of its benefits,"

8    *Georgine v. Amchem Prods*., 160 F.R.D. 478, 496 (E.D. Pa. 1995), and Stern

9    "provide[d] an inadequate disclosure of the comparative costs and benefits of

10   participating in a class action," *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp.

11   2d 1239, 1245 (N.D. Cal. 2000).  Stern and Liblang never even suggested to viewers

12   of Stern's websites and videos that it might not be good for everyone to abandon the

13   lemon law claims that could be asserted in arbitration, and resolved within 30-60

14   days, in favor of risky and potentially inapplicable legal theories that could take years

15   to resolve.  In fact, Stern's websites and videos never even told putative clients that

16   they would be abandoning their lemon law claims.

17        Nor, of course, did Stern and Liblang ever mention the other disadvantages of

18   the mass action litigation, such as the potential that litigants in those actions would be

19   subject to discovery and depositions and even trial.  Instead, Stern encouraged

20   *everyone* to opt out, regardless of the law that would apply to their claims and

21   regardless of their individual circumstances; he provided an "assembly-line" process

22   for them to do so; and if he could not confirm that they actually wanted to opt out he

23   opted out for them anyway.

24        **E.    Stern Falsely Promised A Never-Ending "Opt-In" Period.**

25        Stern unequivocally told viewers of his video that "if, for some reason, you

26   ever decided you wanted back into the class action settlement, you can do that."

27   (Dkt. 188-4, 8/11 Video Tr. at 48.)  Stern and Liblang do not deny this in their brief

28   (although Stern makes a convoluted argument in his declaration to the effect that he

10

1   meant to say that people who opted out by September 5 could also opt back in by
2   September 5).  (Dkt. 206 Opp. at 16; Dkt. 206-2, Stern Decl. ¶¶ 80-83.)  Instead,
3   Stern and Liblang once again falsely assert that 94% of class members get nothing
4   from the settlement, and based on this suggest that "if one of the '*94 Percenters*'
5   wanted to opt back into the class" Ford would allow them to do so.  (Dkt. 206, Opp.
6   at 16.)  But everyone in the class gets the benefit of an extended statute of limitations
7   and relaxed notice requirements for asserting lemon law claims; it is not so clear, for
8   example, that Ford would allow class members who opted out to opt back in if their
9   claims in litigation would be barred by the statute of limitations or a failure to give
10   the required notice.

11          **F.      Stern Falsely Suggested That Recovery In The Class Action Would**
12                  **Be Uniform And Plaintiffs In The Mass Action Would Get**
13                  **Individual Attention.**

14          Stern told owners and lessees of class vehicles that "in our mass action, every
15   award is customized, which is to say that depending upon everyone's individual
16   circumstances, there will be different awards."  (Dkt. 188-4, 8/11 Video Tr. at 11.)  In
17   a class action, he said, "typically and historically, most people will recover the same
18   amount."  (*Id.*)  These statements were untrue or misleading; the mass actions cannot
19   be resolved in six to nine months if "every award is customized" for more than
20   12,000 people, and every arbitration award in *this* class action will be "customized."
21   In their brief, Stern and Liblang do not attempt to justify these statements except by
22   repeating their misrepresentation that "by Ford's own admission" 94% of the class
23   "<u>will</u> 'recover the same amount'—nothing."  (Dkt. 206, Opp at 17.)  Ford never made
24   such an admission, because it is untrue.

25          **G.      Stern Falsely Told Viewers That He Could Not Help Them If They**
26                  **Did Not Opt Out.**

27          Before the September 5 opt-out date, Stern unequivocally told owners and
28   lessees that if they did not opt out by September 5 "we will not be able to help you."

11
**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

1   (Dkt. 188-4, 8/11 Video Tr. at 22-23.)  After September 5, Stern unequivocally told

2   owners and lessees the opposite,  that "we can still provide you with the help securing

3   the buyback so many of you we know deserve." (Dkt. 188-9, Web Page at 2.)  Stern

4   and Liblang's response in their brief is that the statements made before September 5

5   were true because class members who failed to opt out "were in fact subject to the

6   terms of the *Vargas* Class Action Settlement." (Dkt. 206, Opp. at 17.)  This, of

7   course, is no response at all.  Stern effectively told clients and prospective clients that

8   he could not help them secure a repurchase unless they excluded themselves from the

9   settlement—and then, when it was too late for his putative clients to change their

10  minds, began soliciting new clients by telling them he could help them secure a

11  repurchase.[2]

12         **H.    Stern And Liblang Continue To Ignore The Role Of Plaintiffs'**

13                **Counsel And This Court.**

14         Ford's motion demonstrated that Stern urged owners and lessees of class

15  vehicles to reject the Settlement in favor of his mass actions simply because Ford

16  crafted the Settlement and because Ford had already demonstrated that it could not be

17  trusted.  Stern and Liblang offer no meaningful response, they simply assert that

18  Stern's communications were not like those in *Hernandez v. Vitamin Shoppe Indus.*

19  *Inc.*, 174 Cal. App. 4th 1441 (2009), where the lawyer "stated a wholly biased view

20  of the settlement in inflammatory language in order to persuade class members to opt

21  out." (Dkt. 206, Opp. at 18.)  But this describes Stern's communications exactly.

22         In fact, Stern and Liblang confirm that they *still* view the role of Plaintiffs'

23  counsel and this Court as irrelevant.  They argue that Ford should be required to pay

24

25  [2] Stern asserts in his declaration that he "had not decided at that time, *or since,* to
    enter into any Representation Agreements with any clients that did not timely or

26  appropriately opt-out." (Dkt. 206-2, Stern Decl. ¶ 110, emphasis added.)  But his

27  web page expressly asserts that "Stern Law is now reviewing *and accepting* requests
    for a complete buyback" from class members who did not opt out. (Dkt. 188-9, Web

28  Page 2, emphasis added.)

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

for any corrective notice because "Ford's own notices are misleading and confusing—which notices were 'linked' in Lawyers' website and video." (Dkt. 206, Opp. at 21.) But, of course, the notices were not "Ford's notices" at all; they were notices crafted jointly by Plaintiffs' counsel and Ford and approved by this Court as the best notice practicable under the circumstances.

## IV.   THIS COURT'S APPROVAL OF THE SETTLEMENT DOES NOT PRECLUDE THE RELIEF FORD SEEKS.

Stern and Liblang' brief asserts that "[n]either of the two cases relied on by Ford (*McKesson*, one of its two *Passim* cases; and *Retiree Support Group of Contra Costa County v. Contra Costa County*, 2016 WL 4080294 (N.D. Cal. July 29, 2016) involve, or otherwise address, a '*Post-Settlement Approval*' situation such as that presented here." (Dkt. 201, Opp. at 19.) But those were not the only cases relied on by Ford. In particular, *Georgine v. Amchem Prods*., 160 F.R.D. 478 (E.D. Pa. 1995) involved a second opt-out period after the settlement had been approved. As *Georgine* establishes, the fact that this Court has already approved the settlement does not preclude granting the relief Ford has requested.

Stern and Liblang suggest that the due process rights of their putative clients would be denied unless they were given an opportunity to object to the settlement. If, after review of a corrective notice approved by this Court, any of Stern and Liblang's putative clients are unhappy with the Settlement, they have no need to object; they can simply opt out and pursue the litigation that Stern and Liblang have already commenced. This is not a situation where the claims are "too small to justify individual litigation" and "a class action is the only feasible means of obtaining relief." *Churchill Vill., LLC v. GE,* 361 F.3d 566, 572 (9th Cir. 2004).

In any event, the two objections that Stern and Liblang apparently would make if any of their clients decided to participate in the Settlement are either without merit or have already been considered and rejected by this Court. First, Stern and Liblang complain that there was no evidence presented to support Plaintiffs' counsel's

13

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

contention that the warranty extensions provided by Ford were "part of the negotiated settlement." (Dkt. 206, Opp. at 20.) But this Court knew that the warranty extensions were not part of the negotiated settlement itself because they were announced before the settlement was reached. This Court clearly understood Plaintiffs' counsel's position: the warranty extensions "may not have been part of the, quote/unquote, 'settlement,'" but that "the litigation is the catalyst or the primary motivating factor of that extended warranty." (Dkt. 205-3, 10/2/17 Transcript at 56.) Counsel for one of the Objectors argued that the warranty extensions should not be considered in evaluating the settlement. (*Id.* at 56-57.) And in the end this Court did not rely on the warranty extensions, either in its order overruling the objections or its order approving the settlement. (*See* Dkt.192, Order Overruling Objections; Dkt. 193. Order Granting Final Approval.)

Second, Stern and Liblang argue that "claims by counsel" as to the settlement value of individual DPS6 cases "were not supported by any evidence" and were "substantially below settlements actually obtained (particularly in California)." (Dkt. 206, Opp. at 20.) But the only claims made in this case as to the settlement values of individual DPS6 cases were made by counsel for the Objectors, who said Song-Beverly claims in California will settle for $25-$30,000 and lemon law claims elsewhere routinely settle for $8-$10,000. (Dkt. 205-3, 10/2/17 Transcript at 22.) Assuming these estimates were inaccurate, inaccurate claims made by an Objector do not constitute grounds for rejecting a settlement. Moreover, in the end, Stern and Liblang's objection, like the Objectors' objection, is based on the undisputed fact that some people will do better in litigation than in the settlement. As this Court observed, this "is always the case," (*id.* at 51), and "[c]lass members who wish to forego the faster arbitration remedy to preserve fraud and other claims in more drawn-out litigation may do so by opting out." (Dkt. 192, Order Overruling Objections at 3.)[3]

---

[3] Stern and Liblang's California co-counsel devotes several paragraphs in his declaration to discussing what a California jury might award in a case seeking civil

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

**CONCLUSION**

The class should be modified to include Plaintiffs in the Stern and Liblang mass actions.  Stern and Liblang should be ordered to send a corrective notice, approved by the Court, to clients who are Plaintiffs in their mass actions or who timely opted-out of the settlement.  These clients should be given 30 days from the receipt of the corrective notice to opt out by mailing an opt out form approved by the Court, and personally signed by the client (not by counsel on their behalf) to the Settlement Administrator.

DATED:  November 22, 2017           Respectfully submitted,

DYKEMA GOSSETT PLLC

/s/John M. Thomas
John M. Thomas
Tamara A. Bush
Attorneys for Defendant
FORD MOTOR COMPANY

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

penalties under "California's Lemon Law" (i.e., the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.*).  (Dkt. 205-1, Gieleghem Decl. ¶¶ 8-12.)   This discussion is irrelevant.  Stern and Liblang's mass actions will be tried (or settled) in Michigan, not California, and they are not raising any claims under "California's Lemon Law."

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO INVALIDATE OPT-OUTS**

**PROOF OF SERVICE**
*Omar Vargas v. Ford Motor Company*
*USDC, Central District, Case No.:  2:12-cv-08388-AB-FFM*
*USDC, 350 West 1ˢᵗ Street, Courtroom 7B, Los Angeles, CA 90012*

I am over the age of 18 and not a party to the within action.  I am employed in the County of Washtenaw, State of Michigan by Dykema Gossett LLP.  My business address is 2723 South State Street, Suite 400, Ann Arbor MI 48104.

On the below date, I served the foregoing documents described as

1.   REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD

2.   PROOF OF SERVICE OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD

on the following interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Ronald Darrell Taylor
P.O. Box 12688
Jacksonville, FL 32209

☒   (**BY MAIL**) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing on affidavit.

and on all other interested parties in this action:

☒   (**BY ELECTRONIC MAIL**) By emailing, via cc'ing, the recipients listed on the attached service list, I caused the above-named documents to be served via e-mail.

☒   (**BY ELECTRONIC SERVICE**) By E-filing and transmission of the above-listed documents on all parties via the CM/ECF system with the Court.

☒   (**FEDERAL**)  I declare that I employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of the United State of America that the foregoing is true and correct.

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

1

DEF.'S PROOF OF SERVICE OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD

Executed on **November 22,  2017,** at Ann Arbor, Michigan.

*/s/ Rachel Anger*
Rachel Anger

### **SERVICE LIST**

Cody R Padgett    Cody.Padgett@capstonelawyers.com,
Pouneh.Porooshani@capstonelawyers.com

Dani K. Liblang    danil@liblanglaw.com

Daniel S Imber    dimber@imberlawgroup.com, dimber@gmail.com

David J Gorberg    david@mylemon.com

David M George    dgeorge@dykema.com, chammond@dykema.com,
docket@dykema.com

Elliot J Conn    elliot@kbklegal.com

Emma C Robison    emma@mylemon.com

Eric Lechtzin    elechtzin@bm.net

Fred J Fresard    ffresard@dykema.com, jbrancheau@dykema.com

J Neil Gieleghem    ngieleghem@sbcglobal.net

Janet L Conigliaro    JConigliaro@dykema.com, abooth@dykema.com,
docket@dykema.com, jjackson@dykema.com

John Mark Thomas    jthomas@dykema.com, abooth@dykema.com,
docket@dykema.com, ranger@dykema.com

John W Hanson    john@thesandiegolemonlawyer.com

Jordan L Lurie    Jordan.Lurie@capstonelawyers.com

Karen L Wallace    karen.wallace@capstonelawyers.com,
Pouneh.Porooshani@capstonelawyers.com

Kenneth A. Stern    Ken@sternlawonline.com

Krista L Lenart    klenart@dykema.com, docket@dykema.com,
ranger@dykema.com

Lane L Vines    lvines@bm.net

Michael T Kirkpatrick    mkirkpatrick@citizen.org

Nancy E Gray    ngray@grayfirm.com

DYKEMA GOSSETT LLP
2723 SOUTH STATE STREET, SUITE 400
ANN ARBOR, MICHIGAN 48104

2

DEF.'S PROOF OF SERVICE OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO
REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD

1

2
Robert K Friedl     robert.friedl@capstonelawyers.com,
Christine.Duncan@capstonelawyers.com

3
Rowena G Santos     rsantos@slpattorney.com, vmartinez@slpattorney.com

4
Russell D Paul     rpaul@bm.net

5
Ryan H Wu     ryan.wu@capstonelawyers.com,
elizabeth.dempsey@capstonelawyers.com

6

7
Tamara A Bush     tbush@dykema.com, docketla@dykema.com,
kforrand@dykema.com, svital@dykema.com

8
Tarek H Zohdy     tarek.zohdy@capstonelawyers.com,
Pouneh.Porooshani@capstonelawyers.com, Ryan.Wu@Capstonelawyers.com

9

10
Thomas A Zimmerman , Jr     tom@attorneyzim.com, dawn@attorneyzim.com,
firm@attorneyzim.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DYKEMA GOSSETT LLP**
**2723 SOUTH STATE STREET, SUITE 400**
**ANN ARBOR, MICHIGAN 48104**

3

DEF.'S PROOF OF SERVICE OF REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO INVALIDATE CERTAIN OPT-OUTS, TO AMEND CLASS DEFINITION, TO
REQUIRE CORRECTIVE NOTICE, AND TO ESTABLISH A SECOND OPT-OUT PERIOD