Ryan H. Wu (SBN 222323)
Ryan.Wu@capstonelawyers.com
Steven R. Weinmann (SBN 190956)
Steven.Weinmann@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 556-4811
Facsimile:     (310) 943-0396

Attorneys for Plaintiffs

*[Additional Counsel Listed on Signature Pages]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| OMAR VARGAS, ROBERT BERTONE, MICHELLE HARRIS, and SHARON HEBERLING individually, and on behalf of a class of similarly situated individuals,<br><br>        Plaintiffs,<br><br>    v.<br><br>FORD MOTOR COMPANY,<br><br>        Defendant. | Case No. CV12-08388 AB (FFMx)<br><br>The Hon. André Birotte Jr.<br><br>**PLAINTIFFS' NOTICE OF MOTION AND RENEWED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        February 28, 2020<br>Time:        10:00 a.m.<br>Place:        Courtroom 7B |

1  **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on February 28, 2020, at 10:00 a.m., in

3  Courtroom 7B of the above-captioned Court, located at 350 West First Street, Los

4  Angeles, CA 90012, the Honorable André Birotte Jr. presiding, Plaintiffs, on behalf of

5  themselves and all others similarly situated, will, and hereby do, move this Court to:

6       1.     Enter an order finally approving the settlement described in the Settlement

7  Agreement and the Amendment to Settlement;

8       2.     Finally certify the Settlement Class;

9       3.     Enter a judgment to dismiss the action.

10       This Renewed Motion, unopposed by Ford, is based upon: (1) this Notice of

11  Motion and Renewed Motion; (2) the Memorandum of Points and Authorities in

12  Support of the Renewed Motion for Final Approval of Class Action Settlement; (3) the

13  Declarations of Ryan H. Wu, Russell D. Paul, Kathleen Wyatt, and G. Keith Barron; (4)

14  the Settlement Agreement and Amendment, and attached exhibits thereto; (5) the

15  [Proposed] Final Approval Order and [Proposed] Judgment; (6) the records, pleadings,

16  and papers filed in this action; and (7) such other documentary and oral evidence or

17  argument as may be presented to the Court at or prior to the hearing of this Motion.

18  Dated: January 24, 2020           Respectfully submitted,

19

20                    By: /S/ Ryan H. Wu
                     Ryan H. Wu

21                       **CAPSTONE LAW APC**
                     1875 Century Park East, Suite 1000

22                       Los Angeles, CA 90067

23                       Russell D. Paul
                     **BERGER & MONTAGUE P.C.**

24                       1622 Locust Street
                     Philadelphia, PA 19103

25                       Thomas A. Zimmerman, Jr.

26                       **ZIMMERMAN LAW OFFICES P.C.**
                     77 W. Washington St., Suite 1220

27                       Chicago, Illinois 60602

28                       *Attorneys for Plaintiffs and the Class*

# TABLE OF CONTENTS

I.     INTRODUCTION ..............................................................................................1

II.    FACTS AND PROCEDURE ............................................................................4

       A.    Overview of the Litigation ...................................................................4

       B.    Preliminary Approval and Class Notice ...............................................6

       C.    Final Approval, Appeal, and Settlement With Former
             Objectors ..............................................................................................9

       D.    Material Terms of the Class Action Settlement ................................. 10

             1.    Cash Payments for Service Visits – Guaranteed at $30
                   Million ..................................................................................... 10

             2.    Repurchases Through the Arbitration Program ......................... 11

             3.    Compelling Ford to Perform Repairs or Reimburse
                   Class Members Through the Arbitration Program .................... 13

             4.    Reimbursements for Clutch Replacement .................................. 13

             5.    Ongoing Claims Process Open to Class Members for
                   Years ........................................................................................ 14

             6.    The Limited Release .................................................................. 15

             7.    Ford's Payment of Claims Administration Costs,
                   Attorneys' Fees and Costs, and Service Payments .................... 15

III.   ARGUMENT ................................................................................................. 16

       A.    The Parties Have Met Their Obligations Under Preliminary
             Approval Order .................................................................................. 16

             1.    CAFA Notice Requirements Were Satisfied .............................. 16

             2.    Rule 23(c) Notice Requirements Were Satisfied ....................... 17

       B.    Class Certification Requirements Are Met ......................................... 18

             1.    Rule 23(a) Requirements Are Met ............................................. 19

             2.    Rule 23(b)(3) Is Satisfied ......................................................... 20

PLAINTIFFS' NOTICE OF MOTION AND RENEWED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1       C.     The Court Should Grant Final Approval of the Class

2            Settlement ............................................................................... 21

3            1.     Class Representatives and Class Counsel Have

4                   Adequately Represented the Class and the Settlement

5                   Was Negotiated at Arm's-Length ................................. 23

6            2.     The Settlement Delivers Exceptional Relief to the

7                   Class, Particularly In Light of the Risks of Further

8                   Litigation ........................................................................ 24

9                   **fees**     The Relief to the Class Is Exceptional ............................... 25

10                   **(b)**      The Strength of Plaintiffs' Case and Risks of

11                         Further Litigation Support Final Approval ....................... 30

12                   **(c)**       The Method of Distribution, Attorneys' Fees,

13                         and Other Agreements ....................................................... 34

14            3.     The Settlement Treats Class Members Equitably ....................... 36

15            4.     The Extent of Discovery and Stage of Proceedings .................... 37

16            5.     The Views of Experienced Counsel ............................................ 37

17            6.     The Reaction of Class Members to the Proposed

18                 Settlement ......................................................................... 38

19      D.     The Settlement Satisfies the *Bluetooth* Factors ......................................... 38

20      E.     Ms. Maharry's Request To Circumvent Rule 23 Procedures

21          Must Be Rejected ......................................................................... 41

22 IV.     CONCLUSION ............................................................................... 43

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

3  CASES

4  *Aarons v. BMW of N. Am. LLC*, No. 11-7667, 2014 U.S. Dist. LEXIS

5      118442 (C.D. Cal. Apr. 29, 2014) .......................................................................33

6  *Adoma v. Univ. of Phoenix, Inc.,* 913 F. Supp. 2d 964 (E.D. Cal. 2012) .........................24

7  *Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) ....................................................9, 22

8  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).........................................20

9  *Asghari v. Volkswagen Grp. of Am.*, No. 13-02529-MMM, 2015 WL

10      12732462 (C.D. Cal. May 29, 2015) ............................................................. 35, 36

11  *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir. 1999). ........................................31

12  *Brown v. W. Covina Toyota*, 26 Cal. App. 4th 555 (1994).........................................29

13  *Browne v. Am. Honda Motor Co.*, 2010 U.S. Dist. LEXIS 145475 (C.D.

14      Cal. July 29, 2010) ..............................................................................................30

15  *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877 (C.D. Cal. 2016) ............... 19, 25, 33

16  *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012)...................32

17  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010)...................38

18  *Churchill Vill. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ..........................................38

19  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .....................................21

20  *Coba v. Ford Motor Co.*, 932 F.3d 114 (3d Cir. 2019).........................................32

21  *Collado v. Toyota Motor Sales, U.S.A., Inc.*, No. 10-3113, 2011 U.S. Dist.

22      LEXIS 133572 (C.D. Cal. Oct. 17, 2011) .......................................................30

23  *Corson v. Toyota Motor Sales U.S.A.*, No. 12-8499-JGB, 2016 WL

24      1375838 (C.D. Cal. Apr. 4, 2016) .......................................................................25

25  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ......................................................17

26  *Eisen v. Porsche Cars North American, Inc.,* No. 11-09405-CAS, 2014

27      WL 439006 (C.D. Cal. Jan. 30, 2014) .................................................*passim*

28  *Fleisher v. Phoenix Life Ins. Co.*, No. 11-8405, 2015 WL 10847814

1      (S.D.N.Y. Sept. 9, 2015) ........................................................................23

2   *Grodzitsky v. Am. Honda Motor Co.*, No. 2-01142-SVW, 2014 U.S. Dist.

3      LEXIS 24599 (C.D. Cal. Feb. 19, 2014) ........................................................32

4   *Halley v. Honeywell Int'l, Inc.*, No. 10-3345, 2016 WL 1682943 (D.N.J.

5      Apr. 26, 2016) ........................................................................................23

6   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)........................................*passim*

7   *Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011)..................................................18

8   *Hensley v. Eckerhart*, 461 U.S. 424 (1983)........................................................................40

9   *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ....................22

10   *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152 (N.D. Cal. 2001) ......................35

11   *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-04883, 2019 WL 3290770

12      (N.D. Cal. July 22, 2019) ........................................................................22

13   *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No.

14      17-06656-AB, 2019 WL 6998668 (C.D. Cal. Sept. 5, 2019)........................................28

15   *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) ....................20, 34, 39

16   *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573 (N.D. Cal. 2015) .............................17

17   *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)............................30

18   *In re MyFord Touch Consumer Litg.*, No. 13-03072-EMC, 2019 WL

19      1411510 (N.D. Cal. Mar. 28, 2019) ..............................................27, 32, 40

20   *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015). ............ 18, 23, 26

21   *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995)..................................................37

22   *In re Portal Software, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 88886 (N.D.

23      Cal. Nov. 26, 2007)........................................................................33

24   *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,*

25      *& Prods. Liab. Litig.*, No. 08-ML-02151-JVS, 2013 U.S. Dist. LEXIS

26      123298 (C.D. Cal. July 24, 2013)........................................................................4

27   *In re Volkswagen "Clean Diesel" Mktng., Sales Practices, and Prods.*

28      *Litig.*, 895 F.3d 597 (9th Cir. 2018) ..............................................36, 38, 41

1 | *Keegan v. Am. Honda Motor Co.*, No. 10-09508-MMM, 2014 WL

2 |     12551213 (C.D. Cal. Jan. 21, 2014)......................................................34

3 | *Lane v. Facebook, Inc*., 696 F.3d 811 (9th Cir. 2012) ........................................25

4 | *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ............36

5 | *Low v. Trump Univ., LLC*, 881 F.3d 1111 (9th Cir. 2018) ..................................30

6 | *MacDonald v. Ford Motor Co*., No. 13-2988, 2016 WL 3055643 (N.D.

7 |     Cal. May 31, 2016) ........................................................................................40

8 | *Maine State Ret. Sys. v. Countrywide Fin. Corp*., No. 10-00302 MRP, 2013

9 |     WL 6577020 (C.D. Cal. Dec. 5, 2013).........................................................23

10 | *Mazza v. Am. Honda Motor. Co*, 666 F.3d 581 (9th Cir. 2012).........................32

11 | *Mendoza v. Hyundai Motor Co.*, No. 15-01685-BLF, 2017 WL 342059

12 |     (N.D. Cal. Jan. 23, 2017).......................................................................... 26, 40

13 | *Milligan v. Toyota Motor Sales, U.S.A*., No. 09-05418-RS, 2012 U.S. Dist.

14 |     LEXIS 189782 (N.D. Cal. Jan. 6, 2012).......................................................38

15 | *Molina v. Pacer Cartage, Inc.*, No. 13-cv-2344-LAB, 2016 U.S. Dist.

16 |     LEXIS 142142 (S.D. Cal. Oct. 12, 2016)........................................................4

17 | *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615 (9th Cir. 1982) ...................25

18 | *Pedente v. Ford Motor Co*., No. 18-ML-2814-AB (C.D. Cal. Oct. 29,

19 |     2019)................................................................................................................31

20 | *Philips v. Ford Motor Co*., No. 14-02989, 2016 WL 7428810 (N.D. Cal.

21 |     Dec. 22, 2016) ................................................................................................32

22 | *Rannis v. Recchia*, 380 F. App'x 646 (9th Cir. 2010) ........................................17

23 | *Rodriguez v. West Pub. Corp*., 463 F.3d 948 (9th Cir. 2009).............................24

24 | *Sadowska v. Volkswagen Group of America*, No. 11-00665-BRO, 2013

25 |     WL 9500948 (C.D. Cal. Sep. 25, 2013) .................................................. 25, 30

26 | *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673 (N.D. Cal.

27 |     2016).................................................................................................................40

28 | *Seifi v. Mercedes-Benz USA*, No. 12-05493-THE, 2015 WL 12964340

1     (N.D. Cal. Aug. 18, 2015) ...................................................................... 26, 30

2     *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980 (N.D. Cal. 2010) ..................................... 31

3     *Temple v. Fleetwood Enterprises*, 133 Fed App'x 254 (6th Cir. 2005) ........................... 28

4     *Vargas v. Lott*, 787 Fed.Appx. 372 (9th Cir. 2019) ..................................................... 9, 22

5     *Warner v. Toyota Motor Sales U.S.A.*, No. 15-02171-FMO (C.D. Cal. May

6         21, 2017) ...................................................................................................... 25

7     *Yaeger v. Subaru of Am., Inc.*, No. 11-4490-JBS, 2016 WL 4541861

8         (D.N.J. Aug. 31, 2016) ..................................................................................... 30, 33

9     *Zakskorn v. Am. Honda Motor Co.*, No. 11-02610-KJM, 2015 WL

10    3622990 (E.D. Cal. June 9, 2015) .......................................................................... 25

11

12    **STATUTES**

13    28 U.S.C. § 1332(d) Class Action Fairness Act (CAFA)) .............................................. 7, 16

14    28 U.S.C. § 1715(b) .......................................................................................................... 16

15    Fed. R. Civ. P. 23(a) ......................................................................................................... 18

16    Fed. R. CIV. P. 23(a)(1) ..................................................................................................... 19

17    Fed. R. Civ. P. 23(a)(2) ..................................................................................................... 19

18    Fed. R. Civ. P. 23(b)(3) ................................................................................................. 7, 18

19    Fed. R. Civ. P. 23(c)(2) ..................................................................................................... 17

20    Fed. R. Civ. P. 23(e)(2) ..................................................................................................... 22

21    Fed. R. Civ. 54(d)(2)(B) .................................................................................................... 35

22

23    **SECONDARY AUTHORITIES**

24    https://static.nhtsa.gov/odi/tsbs/2019/MC-10164603-0001.pdf. ........................................ 5

25    Michael Hanin, Carter Greenbaum, and Jeremy Aron-Dine, *Interpreting*

26        *the Reasonable Number of Repair Attempts Standard in Lemon Law*

27        *Arbitrations*, 29 Loy. Consumer L. Rev. 327 (2016-2017) ........................................... 28

28

## I.      INTRODUCTION

In its initial order granting final approval, this Court, after summarizing the benefits of the Vehicle Repurchase and cash payment remedies, found that "the settlement provides valuable remedies."[1] (ECF 192, at 3.) The Court's assessment has now been proven correct, as Class Members have already received over **$47.4 million** from Defendant Ford Motor Company ("Ford") for Repurchase claims proceeding under the Arbitration Program *alone*.[2] (*See* Declaration of G. Keith Barron ["Barron Decl."] ¶ 3.)  Because Class Members began submitting claims after initial final approval, the payout information was obviously not available at the time of this Court's approval order (nor was it part of the record on appeal). Thus, the verified payout figures before this Court now confirm that the Settlement delivers not just valuable, but indeed underline exceptional value to the Class.[3] And based on this figure, it is reasonable to expect that many additional Class Members will receive cash payments from claims for Repurchase after final approval of the Amended Settlement. Notably, the Assisting Class Members, who had previously objected to, among other things, the sufficiency of the Class relief offered by the Settlement, have withdrawn their objections and now support the Amended Settlement. On remand, this Court should grant Plaintiffs' renewed motion for final approval, taking into consideration both the updated payout information and the

---

[1] Plaintiffs seek leave of court to file this memorandum of points and authorities that exceeds the page limit under Central District Local Rule 11-6. This oversized brief will not prejudice any party because no party with standing opposes this Renewed Motion. Moreover, Plaintiffs needed additional pages in assisting the Court with its "more searching inquiry," as instructed by the circuit court, by thoroughly accounting for every factor evaluated for class action settlement approval.

[2] All capitalized terms herein are defined in the Stipulation and Agreement of Settlement ("Settlement Agreement"), attached as Exhibit 1 and Amendment of Stipulation and Agreement of Settlement ("Amendment"), attached as Exhibit 2 to the Declaration of Ryan H. Wu ("Wu Decl."). The documents together comprise the "Amended Settlement" or "Amended Settlement Agreement."

[3] Additional Class benefits are memorialized in the Amendment, which resolves the objections of former Objectors to the Settlement, which include Brenda Lott, Suzanne Lutz, Carlie Olivant, Gail Slomine, and Philip Woloszyn (the "Lott Group") and James "Jason" DeBolt (collectively "Assisting Class Members").

1  new benefits provided by the Amended Settlement.

2         The Repurchase benefit is the centerpiece of this Settlement. Through an

3  expeditious arbitration process, Class Members may be awarded a Repurchase, which is

4  a cash payment of up to $25,000 or more in exchange for returning a vehicle that they

5  may have driven for years. Under some circumstances, Class Members need not even be

6  in possession of the Class Vehicle to obtain a Repurchase under the Settlement. This is a

7  boon to Class Members. In most class action settlements involving alleged automotive

8  defects, such claims are completely extinguished in exchange for a modest payment or

9  reimbursement for out-of-pocket expenses. And unlike consumers pursuing individual

10 lemon law cases, who have waited several years for a jury trial, Class Members with

11 valid lemon law claims can obtain complete relief within 3 months after first providing

12 notice to Ford, through a speedy process paid for by Ford.

13        Class Members also benefit from two very significant lemon law rule-changes—

14 available only in the Arbitration Program—to qualify for Repurchase. First, the

15 Settlement extends the statute of limitations for consumers for repurchase claims under

16 state law to six years from the date of original sale or six months of the Effective Date of

17 the Settlement, whichever is later (which is considerably longer than the limitations

18 period for most states' lemon laws). Notably, this Court held that the statute of

19 limitations had not been tolled for those pursuing lemon claims in the *Ford DPS6 MDL*.[4]

20 Second, even if a Class Member does not qualify under state lemon law, a Repurchase

21 can be awarded if he or she meets the Settlement-created fallback standard, which is four

22 Transmission Hardware Replacements within 5 years/60,000 miles from delivery of the

23 vehicle to the first owner or lessees. This standard is more generous than most states'

24 lemon laws. Thus, most Class Members will do better by seeking Repurchase through

25 the Settlement than through a court action.

26        But the Repurchase benefit is not the only Settlement benefit that reaches eight

27

28        _____
           [4] *In re Ford Motor Co. DPS6 PowerShift Transmission Prods. Liab. Litig.*, No.
           18-ML-2814-AB (C.D. Cal.) ("*Ford DPS6 MDL*").

figures in value. Under the Amended Settlement, Ford has now guaranteed that a minimum of **$30 million** dollars will be paid to Class Members for claims on the cash payment component of the Settlement, with no reversion to Ford. The cash payment component includes payments of $200 up to $2,325 for three or more Service Visits for Transmission-related repairs or $50, up to $600, for Software Flashes—even where Class Members have incurred no out-of-pocket costs. The Amended Settlement also provides a *new benefit*: a $20 payment to Class Members who submit a claim under oath that they were denied a Transmission repair after a complaint. Those payments will count toward the $30 million guaranteed minimum.

Taken together, Ford is obligated to pay out a minimum of **$77.4 million** to the Class. This firm number does not require extrapolation, projection, or other forms of speculative valuation. And with the Settlement's ongoing claims process, which allows Class Members to continue to seek Repurchase and cash payments (for additional repairs performed within 7 years/100,000 miles), the overall benefit will be substantially greater. Moreover, Ford is obligated to pay the Claims Administrator, the arbitrators, the Arbitration Administrator, Class Counsel, Assisting Class Members' counsel, and counsel representing Claimants seeking Repurchase (if the claim is successful)—all of which are for the benefit of the Class. These costs will also run into eight figures, and so the overall value of the Settlement will easily surpass **$100 million**.

This Settlement thus confers extraordinary relief to the Class and is fair, reasonable and adequate. The Settlement directly responds to and thereby resolves allegations that Ford manufactured, marketed and sold Class Vehicles[5] with an alleged undisclosed defect in the DPS6 or dual clutch PowerShift automatic transmission ("Transmission"). The Settlement's benefits are particularly impressive when set against the considerable risks faced by Plaintiffs if litigation continued, including the uncertainty of certifying the Class based on the alleged defect prevailing at trial, and surviving an

---

[5] 2011-2016 Ford Fiesta and 2012-2016 Ford Focus vehicles equipped with the Transmission.

1    appeal. This Court recently entered summary judgment in favor of Ford regarding the
2    individual Plaintiffs' fraud claim, with reasoning suggesting that Plaintiffs' core
3    consumer fraud claim would fare no better had litigation continued.

4         With Class Members having waited years to receive their cash payments,
5    Plaintiffs respectfully request that the Court, at its earliest convenience, enter an order (a)
6    granting final approval of the Amended Settlement, (b) finally certifying the Settlement
7    Class, (c) granting Plaintiffs' Renewed Motion for Attorneys' Fees, Costs, and Service
8    Awards, and (d) entering the proposed Final Approval Order and Final Judgment.[6]

9    **II.    FACTS AND PROCEDURE**

10        **A.    Overview of the Litigation**

11        This action consolidates three cases. The original action was filed by Plaintiff
12   Omar Vargas on September 28, 2012, in the Central District of California against Ford.
13   The Complaint alleged that the Transmission, which Ford billed as a new type that
14   combines the best features of automatic and standard transmissions, causes Class
15   Vehicles to slip, buck, jerk, and suffer sudden or delayed acceleration and delays in
16   downshifts ("Alleged Defect"). (ECF No. 1.) Alleging Ford failed to disclose to
17   consumers the Alleged Defect and that it was a safety hazard, Plaintiff sought damages
18   and injunctive relief under California consumer protection laws, breach of express
19   warranty, and breach of implied warranty under the Song-Beverly Consumer Warranty
20   Act. Subsequent amended pleadings added new claims and additional plaintiffs Robert
21   Bertone, Michelle Harris, and Sharon Heberling. (ECF Nos. 24, 57.) Another suit

22
23        [6] Because the new terms only further benefit the Class without any trade-offs, no
24   new notice to the Class is required. *See In re Toyota Motor Corp. Unintended
     Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 08-ML-02151-JVS, 2013
     U.S. Dist. LEXIS 123298, at *244 n.15 (C.D. Cal. July 24, 2013) ("Where the benefit to
25   the class is increased by changes to proposed class action settlements, courts have held
     that supplemental direct notice to the class is not required. … This is so because an
26   increase to a class member's recovery is not the type of change that would cause a class
     member to request exclusion from the class settlement."); *see also, e.g., Molina v. Pacer
27   Cartage, Inc.*, No. 13-cv-2344-LAB, 2016 U.S. Dist. LEXIS 142142 (S.D. Cal. Oct. 12,
     2016) ("Because the modification did not alter the amount each class member would
28   receive, the Court concluded that a second notice to class members was not needed.").

1  alleging nearly identical claims, *Klipfel v. Ford Motor Co.*, No. 15-CVP0044, was
2  consolidated with *Vargas* on December 2, 2015. (ECF No. 34.) Two additional actions
3  alleging similar claims, *Cusick v. Ford Motor Company*, Case No. 2:15-cv-08831-AB
4  (C.D. Cal.), filed on November 12, 2015, and *Anderson v. Ford Motor Co.*, No. 1:16-cv-
5  01632 (N.D. Ill.), filed on April 21, 2016, were also brought by Ford consumers. *Cusick*
6  was consolidated with the instant action on February 22, 2017 (ECF No. 52), and the
7  First Amended Complaint in *Cusick*, filed on February 22, 2016, was deemed the
8  "Operative Complaint" for settlement purposes.[7]

9       Both before and after these actions were filed, Plaintiffs thoroughly investigated
10 and litigated their claims, including conducting testing regarding the Alleged Defect,
11 which allowed Plaintiffs' counsel to evaluate Ford's representations concerning the
12 alleged Transmission problems and repair solutions. (Wu Decl. ¶ 9.) Among other tasks,
13 Plaintiffs fielded tens of thousands of inquiries from putative Class Members and
14 investigated many of their reported claims. They consulted and retained automotive
15 experts and researched publicly available materials and information provided by the
16 National Highway Traffic Safety Administration ("NHTSA") concerning consumer
17 complaints about the Transmission. They reviewed and researched consumer complaints
18 and discussions of Transmission problems in articles and forums online, in addition to
19 various manuals and technical service bulletins ("TSBs") discussing the alleged defect.

20      Furthermore, Plaintiffs propounded discovery on Ford. (Wu Decl. ¶ 10.) In
21 response, Ford produced over 1.5 million pages of documents, including spreadsheets

23 _____
[7] Ford instituted three Customer Satisfaction Programs during the pendency of the
24 litigation. (*See* Declaration of Ryan H. Wu ["Wu Decl."], ¶ 5.) The 14M01 Program
attempted to address the problems Plaintiffs identified in this lawsuit by extending the
25 warranty coverage for the Transmission's input shafts, clutch, and software calibration in
those Class Vehicles manufactured prior to June 5, 2013. (*Id.*) The 14M02 Program
26 extended the warranty on the Transmission Control Module to 10 years of service or
150,000 miles for specific 2011-2015 Fiesta and 2012-2015 Focus vehicles. (*Id.*) In
27 August 2019, Ford issued Program 19N08 which extended the warranty on the clutch on
additional Class Vehicles to 7 years/100,000 miles.
28 https://static.nhtsa.gov/odi/tsbs/2019/MC-10164603-0001.pdf.

1    with millions of lines of data, owners' manuals, maintenance and warranty manuals,

2    design documents (*e.g.*, technical drawings), VIN Decoders, TSBs, field reports,

3    customer comments detail reports, warranty data, and internal emails and emails

4    between Ford and third parties regarding the Transmission. Class Counsel also defended

5    the depositions of four class representatives. (*Id.*) Plaintiffs obtained additional discovery

6    from third parties Getrag Transmission Corporation ("Getrag"), and LuK USA LLC,

7    LuK Clutch Systems, LLC and LuK Transmission Systems, LLC (collectively, "LuK"),

8    the manufacturers and suppliers of the Transmission and its clutches. Plaintiffs

9    subpoenaed and received over 20,000 documents comprised of 117,000 pages from

10   Getrag and nearly 10,000 documents comprised of over 36,000 pages from LuK. In

11   addition, Plaintiffs took the deposition of Getrag's corporate representative. (Declaration

12   of Russell D. Paul ["Paul Decl."] ¶¶ 7-11.)  Plaintiffs also took Fed. R. Civ. P. 30(b)(6)

13   depositions, including that of Chris Kwasniewicz, the engineer Ford assigned to

14   "problem solve" the Transmission, and Matt Fyie, a Ford Design Analysis Engineer.

15   (Wu Decl. ¶ 11.) These depositions elicited information about the Transmission's

16   design, its dual-clutch function, the manufacturing processes of its various components,

17   the problems it exhibited and their root causes, changes to the clutch material, the input

18   shaft seals, control software, and the customer service programs and warranty extensions

19   Ford initiated during the litigation. (*Id.*)

20        Also, over the course of litigation, tens of thousands of Class Members contacted

21   Class Counsel to report problems with their Class Vehicles and seek relief. (Wu Decl. ¶

22   9.) Class Counsel logged each Class Member's complaint in a database and developed a

23   plan for litigation and settlement based in part on Class Members' reported experiences

24   with their Class Vehicles and with Ford dealers. (*Id.*)

25        **B.    Preliminary Approval and Class Notice**

26        The proposed Settlement is the culmination of lengthy discussions between the

27   Parties, consultation with their experts, comprehensive discovery, and thorough analysis

28   of the pertinent facts and law at issue. (Wu Decl. ¶ 15.) On August 18, 2015, the Parties

1    attended the first of five in-person mediation sessions in Boston, Massachusetts with one

2    of the top mediators in the field, Professor Eric D. Green of Resolutions LLC. (*Id*.)

3    Following a second session on May 6, 2016, the Parties made substantial progress, and,

4    with Prof. Green's continuing assistance, agreed to terms regarding relief for the Class

5    during a third session on June 2, 2016. (*Id*. ¶ 16.) On June 9, 2016, after confirming the

6    terms for Class relief, the Parties participated in a fourth mediation session in Boston

7    with Prof. Green focused solely on the issue of attorneys' fees, costs, and service awards,

8    which they were ultimately able to resolve. (*Id*.) Plaintiffs and Class Counsel ensured

9    that their interests aligned with the Class's by negotiating attorneys' fees, costs, and

10   service awards only after the Settlement benefits for the Class had been determined. (*Id*.)

11           After completing mediation, the Parties worked diligently to formalize this

12   complex, sweeping Settlement and its supporting documents. (Wu Decl. ¶ 17.) Class

13   Counsel then filed Plaintiffs' Motion for Preliminary Approval of the Class Action

14   Settlement on March 24, 2017. (ECF No. 120.) The Court granted preliminary approval

15   on April 25, 2017, certifying the Settlement Class, designating Plaintiffs as Class

16   Representatives, and appointed Capstone Law APC, Berger & Montague, P.C., and

17   Zimmerman Law Offices, P.C. as Class Counsel and designated Capstone as Lead Class

18   Counsel. 23(b)(3). (ECF No. 133.) This Court also found that the Settlement's "terms

19   appear sufficiently fair, reasonable, and adequate" for the purposes of preliminary

20   approval. (*Id*. ¶ 8.) The Court approved the form of the notices, including the Short Form

21   Class Notice to be disseminated to Class Members and a Long Form Class Notice that

22   will be stored on the Settlement website. (*Id*. ¶ 9.) The Court then appointed KCC as

23   Claims Administrator to administer the notice and claims process. (*Id*. ¶ 11.)

24           Pursuant to the Settlement Agreement and the Preliminary Approval Order, KCC

25   and the Parties successfully implemented the Class Notice plan. On April 3, 2017, 10

26   days after Plaintiffs filed the Motion for Preliminary Approval, KCC sent out notices to

27   attorneys general of all fifty states pursuant to the Class Action Fairness Act ("CAFA").

28   (Declaration of Kathleen Wyatt ["Wyatt Decl."] ¶ 3.) KCC then obtained the contact

information for Class Members from Ford and a third-party vendor, Polk. (*Id*. ¶¶ 4-10.)
On July 7, 2017, KCC sent over 2.15 million Short Form Class Notices to Class
Members.[8] (*Id*. ¶ 11.) The Short Form Class Notice, which was approved by the Court,
advises Class Members about their rights under the Settlement and the Settlement's
benefits, including the deadline to object, opt-out, or opt-in (for those with pending
suits). The Short Form Class Notice also provides KCC's toll-free number and website
address www.FordTransmissionSettlement.com, which provides additional information
and will serve as the primary claims portal. The Settlement website provides extensive
information regarding the Settlement, including FAQs for Class Members, and
maintains important documents for Class Members to review. KCC then caused the
publication notice to be published in the USA Today on July 13, 2017. (*Id*. ¶ 14.)
129,996 mailed Class Notices were returned as undeliverable. After performing an
additional search through a third-party locator service to update addresses, KCC re-
mailed 87,342 Class Notices. (*Id*. ¶ 16.)

As of the opt-out/objection deadline of September 5, 2017, approximately 10,350
recipients of the class notice validly opted out.[9] (Wu Decl. 22.) Fifteen Class Members,
including the Assisting Class Members, timely objected. (*Id*. at ¶ 23.) The Lott Group
took issue with the approval papers' lack of valuation of both the claims and settlement,
the adequacy of the benefits offered by the Settlement, the documentation requirements,
and their concern that the Program would not benefit Ford consumers as much as
individual litigation would, among other objections. (*Id*.) DeBolt objected to, among
other things, the relief provided to former owners, the documentation requirements, the
scope of the release, the overall sufficiency of the benefits, and the attorneys' fee request.

---

[8] Approximately 258,726 non-Class Members (owners/lessees of Focus and
Fiestas not equipped with the DPS6 PowerShift Transmission) were inadvertently sent
Class Notices. (Wyatt Decl. ¶ 15.)

[9] Several disputes arose regarding the validity of certain Class Members' opt-outs.
The Court entered an order memorializing the final opt-out list on December 13, 2017.
(ECF No. 240.) The same opt-out list is attached to the Proposed Final Approval Order
as Exhibit A.

1   (*Id.*) In response, Plaintiffs submitted a 40-page supplemental brief, attaching

2   painstakingly assembled summaries of the lemon law requirements of the 50 states and

3   the features of comparable automotive settlements. (*Id.*)

### C.    Final Approval, Appeal, and Settlement With Former Objectors

5   At the initial Final Fairness Hearing on October 2, 2017, the Court questioned

6   counsel for the parties and objectors for several hours. Following the hearing, this Court

7   issued a Final Order and Judgment, overruling the objections and determining that the

8   Settlement, with its uncapped structure and repurchase benefit under consumer-friendly

9   rules, was fair, reasonable, and adequate. (ECF No. 192-193, 204.) The Court awarded

10  attorneys' fees, costs, and incentive awards under the lodestar method, finding that

11  Plaintiffs' submissions demonstrated reasonable hours and reasonable rates, and applied

12  a modest 1.22 multiplier. (ECF No. 196.) Both the Lott Group and DeBolt appealed.

13  Following separate briefing by the Lott Group and DeBolt and oral argument, a

14  Ninth Circuit panel issued a memorandum decision on September 13, 2019. In a 2-1

15  split, the panel did not adopt the appellants' arguments but instead vacated the final

16  approval order and remanded the matter for a "more searching inquiry" pursuant to *Allen*

17  *v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015). *See Vargas v. Lott*, 787 Fed.Appx. 372,

18  374 (9th Cir. 2019). The majority stated that this Court's purportedly cursory order did

19  not allow for substantive review. In a sharp dissent, Judge Rawlinson observed that the

20  majority ignored binding precedent supporting this Court's order granting approval and

21  found that the Settlement delivers valuable relief to the Class. *Id.* at 375-76.

22  On December 9, 2019, Class Counsel, counsel for Ford, and counsel for both the

23  Lott Group and DeBolt participated in a mediation conducted by Prof. Green. Through

24  arm's-length negotiations, the parties reached a global settlement to provide additional

25  benefits to the Class. The additional Class benefits include: (1) Ford's guarantee of a

26  minimum payment of $30 million for the cash payment component; (2) a new $20

27  payment to Class Members who attest to having been turned away from obtaining a

28  Transmission repair; (3) favorable modifications for former owners/lessees, including

1  allowing them to have the same SOL extension covering current owners/lessees and to

2  obtain a Repurchase under the "default" standard; (4) additional changes to the

3  Arbitration Program for the benefit of Class Members, including removing the

4  "opportunity to repair" prerequisite for certain Claimants and the bar on civil penalties;

5  and (5) an informational notice to all Class Members alerting them to new benefits. (*See*

6  Wu Decl ¶ 26; Ex. 2.) These terms resolve the Lott Group's concerns regarding the lack

7  of a settlement valuation, the treatment of former owners, and certain issues with the

8  Arbitration Program. (*Id*.) These terms also resolve DeBolt's specific objections to the

9  Arbitration Program's rules regarding former owners and the documentation

10  requirements for cash payments. (*Id*.)  Ford also agrees to pay attorneys' fees (up to their

11  documented lodestar enhanced by a 1.2 multiplier) and service awards of $5000 to the

12  Lott Group and DeBolt, if the Court approves their request. (*Id*.) The parties have

13  reached final agreement on the proposed language.[10] (*See* Wu Decl. ¶ 3; Ex. 2.)

14  **D.    Material Terms of the Class Action Settlement**

15  **1.    Cash Payments for Service Visits – Guaranteed at $30 Million**

16  The Settlement provides cash payments to Class Members who have had three or

17  more qualifying Service Visits to authorized Ford dealers. There are three subcategories

18  of the cash payment benefit. First, Class Members who have made three or more visits to

19  authorized Ford dealers ("Service Visits") to replace certain Transmission components

20  ("Transmission Hardware Replacements") are entitled to either a cash payment or a

21  discount certificate, valued at twice the amount of the cash payment, toward the

22  purchase or lease of a new Ford vehicle. (Sett. Agmt. ¶ II.C.) Payments start with $200

23  for the third Service Visit, an additional $275 for the next Service Visit, and an

24  additional $350 after that, and so on, up to a cumulative $2,325 after the eighth Visit:

25  Second, Class Members who do not qualify for Transmission Hardware

26

27  —————————
    [10] The parties have agreed to the terms of the Amendment. Because the final
    version was agreed upon just days before filing, the parties require more time to secure

28  client signatures. A fully executed copy will be submitted prior to the fairness hearing.
    (Wu Decl. ¶ 3.)

Replacement payments may qualify to receive compensation for multiple updates of the Transmission Control Module ("Software Flashes), starting with the third, which entitles them to cash payments of $50 for each, up to $600, performed within the same 7 year/100,000 mile limitation. (Sett. Agmt. ¶ II.B.)

Third, Class Members who complained about Transmission problems but were denied repairs by a Ford Dealer may receive $20 cash by attesting to those facts under penalty of perjury. (Amendment ¶ 8.) This will provide relief to Class Members who have reported being denied repairs by a Ford Dealer.

For these payments, Ford has guaranteed a minimum net payout of $30 million. (Amendment ¶ 9.) Ford is obligated to provide an accounting to Class Counsel following the last possible day to submit Claims, October 21, 2024. (*Id.*) If the accounting shows that the total payout is less than $30 million, then Ford will distribute the entire residue, on a per capita basis, to all Class Members who have received cash payments or benefits following a notice of intent to arbitrate. (*Id.*) After the residual payments are made, any remaining funds (which would simply be money that was unused in cash cards (the form of payment) when the cards expire) will be distributed to a *cy pres* beneficiary to ensure that nothing reverts to Ford. (*Id.*)

## 2.   Repurchases Through the Arbitration Program

Class Members may obtain a Repurchase of their Class Vehicles if they qualify under their state's lemon law or under a Settlement-created fall back standard. (Sett. Agmt. ¶ II.N.) For Claimants who prevail, Ford refunds the actual amount that the Class Member paid for the vehicle (excluding any modifications or additions after the vehicle's purchase or lease), including finance charges, less a reasonable allowance for use. If the vehicle was leased, Ford refunds the payments made to the lending institution or lessor plus net trade-in and cash down payment, less a reasonable allowance for use.

The Repurchase remedy is awarded through an Arbitration Program that enhances Class Members' rights in several ways. First, the Program resolves Class Members' lemon law claims within two or three months of submission, rather than the

year or more for a lemon law suit filed in court. Second, the Program extends the applicable statute of limitations, preserving claims for six years from the date of original sale or six months of the Effective Date of the Settlement, whichever is later for both current and former owner/lessees. (*Id*., ¶ II.N.1.d.; Amendment ¶ 12.)

Claims for Repurchase will be governed either by the state lemon law applicable to each Class Member or, if the claims do not qualify under state lemon law, by the Settlement's consumer-friendly standard. (Sett. Agmt. ¶ II.N.1.e.) Under the Settlement's fallback standard, the Arbitrator may award a repurchase if 4 or more Transmission Hardware Replacements were performed within 5 years/60,000 miles, and the vehicle continues to malfunction. This is more generous to consumers than most state's lemon laws. And Ford will pay a maximum of $6,000 in attorneys' fees to each Class Member who prevails on his or her claim in arbitration.[11] (*Id*., ¶ II.N.1.h.)

The Amended Settlement removes several prior limitations on Repurchases. First, it eliminated the original Settlement's requirement allowing Ford to perform one final repair attempt after receiving a notice of intent to arbitrate from a Claimant with three or fewer repair attempts. (Amendment ¶ 10.) Second, it permits Class Members to recover civil penalties not to exceed the amount of the Repurchase award, if (a) their state's law authorizes civil penalties, (b) Ford knew of its obligation under state law or the Settlement Agreement, as amended, to repurchase the vehicle, and (c) prior to the arbitrator's award, declined to do so after being provided with the Claimant's notice of

---

[11] Significantly, Class Members will have the opportunity to appeal an adverse Program decision to a JAMS arbitrator, though any costs for an appeal must be advanced by the Class Member, to be reimbursed by Ford if the Class Member prevails. (*Id*., ¶ II.N.1.g.) Ford has no right to appeal, except for an award of civil penalties, which can be awarded under certain circumstances in jurisdictions that allow for it. (Amendment ¶ 15.)  The Arbitrator may not award punitive damages. (*Id*., II.N.1.g.) Furthermore, even if a Class Member's first repurchase claim is denied, he or she may pursue a second repurchase claim under the Program if his or her Class Vehicle has subsequent qualifying repairs. (*Id*., ¶ II.N.1.i.) Finally, Class Members will not be denied the opportunity to re-submit a repurchase claim to the Program, even if an initial claim for a buyback made with the Better Business Bureau or other similar organization prior to the Settlement was denied. (*Id.*)

1    intent to proceed to arbitration under the Settlement Agreement. (*Id.* ¶ 15.) Third, the
2    identical statute of limitations period extension for current owners/lessees will be
3    extended to former owners/lessees. (*Id.* ¶ 12.) Fourth, a former owner/lessee may obtain
4    a Repurchase award if they meet the Settlement's fallback standard, even if her state's
5    lemon law does not allow repurchase for former owners/lessees. (*Id.* ¶ 11.)

6         Due to the Settlement's consumer-friendly rules and speed of resolution, most
7    Class Members would do better under the Arbitration Program rather than in court. And
8    Ford has already paid $47.4 million to Class Members for claims proceeding under the
9    Settlement's Repurchase remedy. (Barron Decl. ¶ 3.)

### 3.    Compelling Ford to Perform Repairs or Reimburse Class Members Through the Arbitration Program

12        Class Members who have incurred out-of-pocket expenses for repairs they
13   believe should have been covered by Ford's New Vehicle Limited Warranty
14   ("Warranty") or who believe that a Ford dealer improperly denied Warranty repairs are
15   eligible to pursue their claims in a qualified version of the Program ("Warranty
16   Arbitration"). (Settlement Agreement ¶ II.N.2.) Ford will pay the costs of each Warranty
17   Arbitration, and the Arbitrator is authorized to award reimbursement, a free repair, an
18   extension of warranty by Ford, or any combination thereof.

### 4.    Reimbursements for Clutch Replacement

20        The Settlement provides that Class Members who own or lease a Class Vehicle
21   manufactured after June 5, 2013, and who had two clutches replaced during the 5-
22   year/60,000-mile Powertrain Warranty, are entitled to reimbursement for out-of-pocket
23   costs for a third clutch replacement made within 7 years/100,000 miles from delivery to
24   the first retail customer. (Settlement Agreement ¶ II.G.) The replacement clutch will also
25   be covered by a two-year warranty. Ford's Customer Satisfaction Program 19N08,
26   issued in August 2019, improves on this provision. Under Program 19N08 and the
27   previously issued Program 14M01, the clutches on most if not all Class Vehicles are
28   covered by an extended warranty of 7 years/100,000 miles.

5.        **Ongoing Claims Process Open to Class Members for Years**

The claims process has been designed to minimize the burden on Class Members while ensuring that only valid claims are paid. The Settlement requires Class Members to submit documentation typically required to substantiate such claims. (Settlement Agreement ¶ II.E.) Except for the sworn declaration payment, Class Members need only provide, either electronically through the Claims Administrator's website portal or by mail, a receipt, repair order, or other invoice containing standard information, (*e.g.*, repair date, a description of the vehicle, the dealership or facility where the work was performed, the vehicle' mileage at the time of repair, an itemized list of parts and labor), along with proof of ownership and a sworn written statement attesting to the authenticity of the documents provided.[12] (*Id.*) Subsequent claims for cash payments will have a reduced standard for proof, as the Claims Administrator will retain previous submissions. (*Id.*, ¶ II.E.4.)  For those who were denied repairs and therefore cannot document Service Visits, the Amended Settlement provides a cash payment of $20, if the Class Member attests to those facts. (Amendment ¶ 8.)

Claims can be submitted through the Settlement website. A portal will walk Class Members through a series of prompts and fields in which to provide the information required. The site provides clear instructions, and the portal permits Class Members to upload scanned documents supporting their claims.

Ford will pay the Claims Administrator to process Class Members' claims expeditiously following the Effective Date. (Settlement Agreement ¶ II.O.) Class Members who are entitled to a cash payment or Certificate will be paid promptly following the claim submission or after the Effective Date, whichever is later. (*Id.*) The Claims Administrator's duties will continue for many years due to the ongoing claims process. So long as a Service Visit for a Transmission Hardware Replacement or

---

[12] For reimbursement of a clutch replacement, Class Members will need to show proof of payment, common for such claims, and a diagnostic from a Ford dealer showing that a clutch replacement was necessary, which is provided as a matter of course. (*Id.* ¶ II.G.1-2.)

1  Software Flash is made within the 7 year/100,000 mile period of eligibility, the Class
2  Member may continue to submit claims for qualifying Service Visits made after the
3  Effective Date. Class Members will have up to 180 days from the qualifying visit to
4  submit such claims. Some Class Members may have up to October 2024 to submit a
5  claim for cash payments.

6          The Program is also streamlined. A Class Member initiates the process by calling
7  a dedicated phone number or by submitting a form through the Settlement website or by
8  mail, indicating directly to Ford his or her intent to submit a claim for repurchase or
9  breach of warranty. (Settlement Agreement ¶ II.N.1.) Ford will then have ten days to
10 resolve the matter informally with the Class Member. (*Id.*) After that, the Class Member
11 may proceed directly to arbitration.

12                    **6.      The Limited Release**

13         The Settlement specifically excludes from the Settlement Class consumers with
14 suits related to the Transmission pending as of July 14, 2017, while giving them the
15 choice to opt-in to the Settlement. (Settlement Agreement ¶¶ I.L.) In addition, while
16 Class Members do not release personal injury and property claims under the Settlement,
17 they will release claims that were or could have been asserted by them in connection
18 with the Alleged Transmission Defect. (*Id.*, ¶ I.CC.)

19              **7.      Ford's Payment of Claims Administration Costs, Attorneys'**
20                    **Fees and Costs, and Service Payments**

21         Under the Settlement, Ford will pay the Claims Administration costs, including
22 the Arbitration Administrator's costs, attorneys' fees and costs, and service awards to the
23 Class Representatives. (*See* Sett. Agmt. ¶¶ II.N., II.P, III.C.) These costs are
24 considerable. As detailed below, the Claims Administrator, Kurtzman Carson
25 Consultants ("KCC"), mailed over 2 million notices and has already devoted substantial
26 resources to maintaining the Settlement website. The costs to process Class Members'
27 claims is also high. Furthermore, the Arbitration Administrator, DeMars & Associates,
28 Ltd. ("DeMars"), is currently administering Repurchase and Warranty arbitrations under

1  a voluntary process agreed upon by Class Counsel and Ford to provide immediate relief

2  to Class Members. Ford is incurring ongoing costs for this program, and it will increase

3  when the full Settlement Arbitration Program is up and running. And Ford will pay

4  reasonable attorneys' fees of up to $6,000 to Class Members who obtain a Repurchase.

5  (Sett. Agmt. ¶¶ II.N., II.N.1.h.)

6         The Parties have negotiated sums for attorneys' fees, expenses, and service

7  awards separately, with the amount finally awarded by the Court not affecting or

8  diminishing the Class benefits in any way. (*See* Sett. Agmt. ¶ II.P.) Subject to Court

9  approval, Ford has agreed to pay Class Counsel's attorneys' fees and documented costs

10 of a combined sum up to $8,856,600 on behalf of all Plaintiffs' Counsel. (*Id.*) Subject to

11 Court approval, Ford has also agreed to pay service awards to the named Class

12 Representatives for their efforts to secure relief on behalf of the Settlement Class, in the

13 sum of between $1,000 and $10,000 each, to be paid separately from the Class benefits.

14 (*Id.* ¶ II.Q.) Support for Plaintiffs' fees, costs, and service awards is set forth in the

15 concurrently-filed Renewed Motion for Attorneys' Fees, Costs, and Service Awards.

16        Finally, subject to Court approval, Ford has agreed to pay attorneys' fees and

17 service awards to the Assisting Class Members for their contributions to the Amended

18 Settlement and for withdrawing their objections. (Amendment ¶ 3.) The Lott Group and

19 DeBolt will separately submit their own motions for approving their request for fees and

20 service awards. That payment will also be separate from the Class relief.

21 **III.   ARGUMENT**

22      **A.    The Parties Have Met Their Obligations Under The Preliminary**

23             **Approval Order**

24        In its Order Granting Preliminary Approval (ECF No. 133), the Court set forth

25 certain obligations that need to be satisfied, including the CAFA Notice and the Class

26 Notice requirements. Both requirements have been satisfied.

27             **1.    CAFA Notice Requirements Were Satisfied**

28        Notice under CAFA, 28 U.S.C. § 1715, has been satisfied. CAFA requires that

"[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official." 28 U.S.C. § 1715(b). On April 3, 2017, 10 days after the filing of Plaintiffs' Motion for Preliminary Approval, the Claims Administrator timely and properly sent notices to the Attorney General of the United States and the attorneys general of all 50 states and the relevant U.S. territories and districts, informing them of the proposed Settlement.[13] (Wyatt Decl. ¶ 3.) No governmental authority has objected to the Settlement. *See In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (noting that "CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures.").

### 2.    Rule 23(c) Notice Requirements Were Satisfied

The Court "must direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2). Notice serves to afford class members due process, providing them with the opportunity to be excluded from the class action and not be bound by any subsequent judgment. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974). However, "due process requires reasonable effort to inform affected class members through individual notice, not receipt of individual notice." *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010). As detailed in project manager Kathleen Wyatt's declaration, KCC undertook considerable effort to collect the names and contact information of the owners/lessees of Class Vehicles. (Wyatt Decl. ¶¶ 4-10.) After compiling this information, KCC mailed 2.1 million individual Short Form Class Notices. (*Id.* ¶ 11.) This Notice, approved by this Court, provides basic information

---

[13] At the request of the attorneys general of California, Arizona, Michigan, New Jersey, North Carolina, Texas, and Washington, the Parties stipulated to amend the Preliminary Approval Order to ensure that Class Members can cooperate with any state investigation, and that stipulation was filed on July 7, 2017. (ECF No. 138.) The Court granted the request and entered the amended order on July 11, 2017. (ECF No. 139.)

about the case and its allegations, the Settlement's benefits, Class Members' rights, and the opt-out and objection deadlines and identifies the Settlement website address and KCC's toll-free number.

A mailed or e-mailed notice with more detailed information posted on a case website (and updated with new information) satisfies Rule 23(e) and due process. *See In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 946 (9th Cir. 2015). Here the Settlement website maintained by KCC provides detailed information about the case and the Settlement Agreement, including a FAQ section and a downloadable copy of the Long Form Class Notice that provides detailed information about the case and answers anticipated questions from Class Members. (Wyatt Decl., ¶ 12-13.) For their part, Lead Class Counsel also maintains a Settlement website with detailed explanations, in layman's terms, about the Settlement benefits and Class Members' rights. (Wu Decl. ¶ 46.) As noted above, KCC took additional steps to update addresses and re-mail 87,342 of the notices that were returned as undeliverable, and caused the publication notice to be published in USA Today. (Wyatt Decl. ¶¶ 14, 16.) The Settling Parties have consistently updated the website with new information. (Wu Decl. ¶ 47.) And updated information on the Amended Settlement will be posted following the Effective Date. (*Id*.)

Under Rule 23(e), the notice need only provide sufficient detail to alert "those with adverse viewpoints to investigate and come forward and be heard." *In re Online DVD-Rental*, 779 F.3d at 946 (internal quotations omitted). The existence of the former objectors, who had sufficient information to provide comprehensive objections, speaks to the sufficiency of the notice. And no Class Member has directly objected to the sufficiency of the Notice. The notice requirement has therefore been satisfied.[14]

**B.      Class Certification Requirements Are Met**

The Court certified the Class for settlement purposes upon Preliminary Approval,

---

[14] *See, e.g*., *Hartless v. Clorox Co*., 273 F.R.D. 630, 636 (S.D. Cal. 2011) (granting final approval of class action settlement where the notice contained a description of the lawsuit and settlement relief, a description of class members' rights, and the settlement website and toll-free number).

1  finding that requirements under Rule 23(a) and Rule 23(b)(3) are satisfied. (*See* Dkt. No.

2  133, ¶¶ 3-7.) Nothing has changed that would affect the Court's ruling on class

3  certification. (Wu Decl. ¶ 30.) *See Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877

4  (C.D. Cal. 2016) (reconfirming the certification set forth in the preliminary approval

5  order "[b]ecause the circumstances have not changed" since that order).

## 1.   Rule 23(a) Requirements Are Met

7       For certification of a class to be appropriate, its members must be so numerous

8  that joinder would be "impracticable." FED. R. CIV. P. 23(a)(1). It is undisputed that there

9  are over one million Class Members in this case. (Wyatt Decl. ¶ 11.) The second

10  requirement of Rule 23 is the existence of common questions of law or fact. FED. R. CIV.

11  P. 23(A)(2). All Class Members are subject to the allegations at issue—that they took

12  possession of a Class Vehicle with an undisclosed Alleged Defect. Given that the issues

13  in dispute—*e.g.*, whether the Transmission is defective, and, if so, whether and when

14  Ford knew about the defect; whether Ford had a legal obligation to disclose the defect

15  pursuant to consumer protection statues; and whether Ford had the legal obligation to

16  repair the defect under warranty—all reflect common questions of fact and law, the

17  resolution of those issues are apt to drive resolution of this litigation. The commonality

18  element is therefore met.

19       Third, "[u]nder the rule's permissive standards, representative claims are 'typical'

20  if they are reasonably co-extensive with those of absent class members; they need not be

21  substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

22  Both Plaintiffs and Class Members' claims arise from the same alleged course of

23  conduct—that Ford knowingly failed to disclose that the Transmission is defective to its

24  customers.  Because Plaintiffs' claims are co-extensive with those of Class Members,

25  typicality is satisfied.

26       The final requirement of Rule 23(a) is that the representative plaintiffs will fairly

27  and adequately represent the interests of the class. This requires only that a class member

28  does not have interests that are antagonistic to or in conflict with the interests of the class.

1    *Hanlon*, 150 F.3d at 1020. Here, there is no conflict between Plaintiffs and the Class.

2    Nor is there any conflict between Class Counsel and the Class. Class Counsel has

3    diligently prosecuted the case on behalf of the Class and negotiated (and defended) a

4    valuable Settlement. (*See infra*.) The requirement of adequate representation is therefore

5    also satisfied.

6                          **2.    Rule 23(b)(3) Is Satisfied**

7              Once the prerequisites of Rule 23(a) are satisfied, the Court must determine if one

8    of the subparts of Rule 23(b) is also satisfied. The Court must apply the criteria for class

9    certification "differently in litigation classes and settlement classes." *In re Hyundai & Kia*

10   *Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (*en banc*). For example, in deciding

11   whether to certify a litigation class, a district court must be concerned with manageability at

12   trial. However, such "manageability is not a concern in certifying a settlement class where,

13   by definition, there will be no trial." *Id.* So long as there is a "clear justification for handling

14   the dispute on a representative rather than an individual basis," *Hanlon*, 150 F.3d at 1022,

15   the inquiry is satisfied.  Thus, if "just one common question predominates" the action may

16   be considered proper under Rule 23(b)(3), and regardless whether "other important matters

17   [would] have to be tried separately." *Hyundai*, 926 F.3d at 557.

18            As the Ninth Circuit en banc court recently pronounced, "predominance is

19   'readily met' in cases alleging consumer fraud." *Hyundai,* 926 F.3d at 559. In *Hyundai*,

20   the *en banc* court found that a nationwide class of consumers alleging state law

21   violations was appropriately certified because they were all subject to Hyundai's alleged

22   fraudulent conduct.  *Id.* at 559-560. Here, all Class Members were alleged to have been

23   subject to the fraudulent omissions at issue. As in *Hyundai*, while Class Members'

24   damages may vary, the common nucleus of facts regarding the alleged omissions and

25   Alleged Defect predominate over individual questions.

26            And a class action is superior under Rule 23(b)(3) because it represents the best

27   method for current and former owners/lessees of the Class Vehicles to obtain relief.

28   Manageability at trial is not a concern in the class action settlement context, "for the

proposal is that there be no trial." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon*, 150 F.3d at 1023. Indeed, if the Class were not certified, most of those in the splintered Class would not qualify for lemon law buybacks. A fraction would potentially join the *Ford DPS6 MDL*, consuming judicial resources. These new MDL plaintiffs would have likely done better under the Amended Settlement.

Therefore, the Court should definitively certify the Class for final approval.

## C.   The Court Should Grant Final Approval of the Class Settlement

Upon final approval, the Court's duty is to determine whether the proposed Settlement is "fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026. In evaluating the Settlement, the Court is guided by several important policies. First, federal courts favor settlements, particularly in class actions, where the costs, delays and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong policy that favors settlements, particularly where complex class action litigation is concerned"). Second, for settlements reached through arm's-length negotiations, courts are to give:

> proper deference to the private consensual decision of the parties. . . . [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Hanlon*, 150 F.3d at 1027.

Guided by these policies, the district court then may consider some or all of the following factors in evaluating the reasonableness of a settlement: (1) the strength of the plaintiff's case and the risk, expense, complexity, and likely duration of further litigation;

1  (2) the risk of maintaining class action status throughout trial; (3) the amount offered in

2  settlement; (4) the extent of discovery completed and the stage of proceedings; (5) the

3  participation of a governmental participant; (6) the experience and views of counsel; and

4  (7) the reaction of class members. *See Hanlon*, 150 F.3d at 1026 ("*Hanlon* factors") .

5        The recent amendments to Rule 23 direct the Court to consider a similar list of

6  factors, including whether: (A) the class representatives and class counsel have

7  adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the

8  relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay

9  of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to

10  the class, including the method of processing class-member claims; (iii) the terms of any

11  proposed award of attorney's fees, including timing of payment; and (iv) any agreement

12  required to be identified under Rule 23(e)(3); and (D) the proposal treats class members

13  equitably relative to each other. FED. R. CIV. P. 23(e)(2). The Advisory Committee's

14  notes clarify that this list of factors does not "displace" the *Hanlon* factors, "but instead

15  aim to focus the court and attorneys on 'the core concerns of procedure and substance

16  that should guide the decision whether to approve the proposal.'" *In re Extreme*

17  *Networks, Inc. Sec. Litig.*, No. 15-04883, 2019 WL 3290770, at *6 (N.D. Cal. July 22,

18  2019) (quoting FED. R. CIV. P. 23(e)(2) advisory committee's note to 2018 amendment).

19        Additionally, for pre-certification settlements, the Ninth Circuit further requires

20  that the Court scrutinize the settlement even more closely, applying the so-called

21  *Bluetooth* factors.[15] *See Allen*, 797 F.3d at 1224. On remand, the Ninth Circuit majority

22  ordered the Court to conduct a more "searching inquiry" under *Allen* regarding the value

23  of the Settlement. *See Vargas*, 787 Fed.Appx. at 374. As set forth below, the Amended

24  Settlement satisfies all of these factors, meriting final approval.

25

26

27

28

---

[15] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 938 (9th Cir. 2011).

**1.      Class Representatives and Class Counsel Have Adequately Represented the Class and the Settlement Was Negotiated at Arm's-Length**

Under Rule 23(e)(2)(A)-(B), the Court considers whether Plaintiffs and Class Counsel adequately represented the class and whether the proposed settlement was negotiated at arm's length. Both factors are amply satisfied. There is no suggestion of a conflict between the Class Representatives and Class Counsel on the one hand, and Class Members on the other. *See In re Online DVD-Rental*, 779 F.3d at 942 (conflict cannot be "speculative" or "trivial" but must go to "the heart of the litigation"). Plaintiffs and Class Counsel have vigorously pursued the claims on behalf of the Class, adducing important facts regarding Ford's pre-sale knowledge of the Alleged Defect, litigating the matter, and negotiating a valuable Settlement to deliver immediate relief to the Class. (Wu Decl. ¶ 65.) Thereafter, Class Counsel forcefully defended a Settlement that has already delivered over $47.4 million to the Class and, together with Assisting Class Members, bargained for even greater benefits as part of a global settlement. (*Id*.) Given the heightened interest in the Settlement, Class Counsel has devoted substantial resources to answering inquiries and instructing Class Members regarding claims submissions, documentation, problems with Ford Dealers and myriad other issues. (*Id*.)

Rule 23(e)(2)(B) is also satisfied, as both the original Settlement and the Amended Settlement were the products of arm's-length negotiations presided by renowned mediator Eric Green, who is the co-author of the first textbook on alternative dispute resolution and a mediator of many high stakes cases, including the landmark *United States v. Microsoft* antitrust case.[16] *See Fleisher v. Phoenix Life Ins. Co*., No. 11-

---

[16] *See*, *e.g*., *Halley v. Honeywell Int'l, Inc*., 2016 WL 1682943, at *12 (D.N.J. Apr. 26, 2016)  (considering the participation of mediator Eric Green, "whose background the Court has independently reviewed," as an important factor in approving a $10 million settlement); *Fleisher*, 2015 WL 10847814, at *5 (finding that "the extensive participation of an experienced mediator [Prof.. Green] also 'reinforces that the Settlement Agreement is non-collusive'" in a case valued at over $100 million); *Maine State Ret. Sys. v. Countrywide Fin. Corp*., 2013 WL 6577020, at *12 (C.D. Cal. Dec. 5, 2013)  (naming Prof. Green as one factor in finding presumption of fairness of a

1    8405, 2015 WL 10847814, at *3 (S.D.N.Y. Sept. 9, 2015) (summarizing Prof. Green's

2    impressive credentials).

3            The Settling Parties participated in four contentious in-person mediation sessions

4    over the span of a year-and-a-half before reaching a settlement in principle, and another

5    six months battling over the details of the original Settlement. (Wu Decl. ¶¶ 14-16.)

6    Following the circuit court mandate, Prof. Green conducted another mediation, this time

7    a multi-lateral negotiation between counsel for Plaintiffs, Ford, and Assisting Class

8    Members. (*Id.* ¶ 26.) An agreement in principle was reached at mediation. (*Id.*) The

9    Amended Settlement is the product of arm's-length negotiations between Plaintiffs,

10   Ford, and two sets of Class Members who had substantive objections to the original

11   terms. (*Id.*) Each of these parties now believe that the Amended Settlement represents a

12   fair, reasonable and adequate resolution of the claims here. (Amendment ¶ 1.)

13                     **2.      The Settlement Delivers Exceptional Relief to the Class,**

14                             **Particularly In Light of the Risks of Further Litigation**

15           Approval is also warranted under Rule 23(e)(2)(C), which asks the Court to

16   examine "the relief to the Class in light of the costs, risks, and delay of trial and appeal,

17   the effectiveness of any proposed method of distributing relief to the class, including the

18   method of processing class-member claims, the terms of any proposed award of

19   attorney's fees, including timing of payment; and any agreement required to be

20   identified." This overlaps with first three *Hanlon* factors, the strength of the plaintiff's

21   case balanced against the risk, expense, complexity and likely duration of further

22   litigation, the risk of maintaining class certification through trial, and the amount of

23   settlement. In evaluating these considerations, a court assesses "objectively the strengths

24   and weaknesses inherent in the litigation and the impact of those considerations on the

25   parties' decisions to reach [a settlement]." *Adoma v. Univ. of Phoenix, Inc.,* 913 F. Supp.

26   2d 964, 975 (E.D. Cal. 2012). However, there is "no single formula" to be applied, but

27   the court may presume that the parties' counsel and the mediator arrived at a reasonable

28

settlement valued at over $500 million).

1   range of settlement by considering the plaintiffs' likelihood of recovery. *Rodriguez v.*

2   *West Pub. Corp.*, 463 F.3d 948, 965 (9th Cir. 2009).

3   (a)     **The Relief to the Class Is Exceptional**

4      The Court must consider the relief or remedy offered in the Settlement in granting

5   final approval. In assessing the settlement's value, courts are instructed to take into

6   account that "the very essence of a settlement is compromise, 'a yielding of absolutes

7   and an abandoning of highest hopes.'" *Officers for Justice v. Civil Service Comm'n*, 688

8   F.2d 615, 624 (9th Cir. 1982) (citations omitted). The Court "need not include a specific

9   finding of fact as to the potential recovery for each of the plaintiffs' causes of action."

10  *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012). Indeed, *Lane* expressly

11  rejected any requirement that district courts calculate the value of the claims—explaining

12  that "not only would such a requirement be onerous, it would often be impossible...

13  [since] the amount of damages of a given plaintiff (or class of plaintiffs) has suffered in a

14  question of fact that must be proved at trial." *Id.* [17]

15     **$47.4 Million Net Payout for Repurchase Claims**. A little over two years after

16  the start of the Repurchase process, Class Members who initiated the process (by serving

17  a notice of intent to arbitrate) have already received **$47.4 million** in payments. (*See*

18  Barron Decl. ¶ 3.) This is before the start of the formal Arbitration Program, which

19  would be implemented after all direct appeals are exhausted.[18] Plaintiffs expect, based

20

21     ———————————

[17] Accordingly, courts, in evaluating automotive defect settlements, do not require
22  the plaintiff to present speculative measures of the maximum value of the action upon a
   successful trial. *See*, *e.g.*, *Warner v. Toyota Motor Sales U.S.A.*, No. 15-02171-FMO
23  (C.D. Cal. May 21, 2017), Dkt. No. 140, at *13 (granting final approval without a
   maximum valuation, noting that settlements involve "abandoning of highest hopes");
24  *Corson v. Toyota Motor Sales U.S.A.*, No. 12-8499-JGB, 2016 WL 1375838, *7 (C.D.
   Cal. Apr. 4, 2016) (granting final approval, based in part, on "substantial recovery" that
25  class members would receive as a result of the settlement); *See also Chambers*, 214 F.
   Supp. 3d at 888-89 (no valuation required to approve consumer class action settlement);
26  *Zakskorn v. Am. Honda Motor Co.*, No. 11-02610-KJM, 2015 WL 3622990, at *8 (E.D.
   Cal. June 9, 2015) (same); (finding that settlement provides adequate compensation
27  without requiring extensive valuation); *Sadowska v. Volkswagen Group of America*, No.
   11-00665-BRO, 2013 WL 9500948, *4 (C.D. Cal. Sep. 25, 2013) (same).

28     [18] The Settling Parties have implemented a voluntary arbitration program,

on consultations with thousands of Class Members, that many more will pursue Repurchase once the formal program begins. (Wu Decl. ¶ 31.) While the Ninth Circuit panel did not have the benefit of this payout information, this updated information confirms that the Class has already received valuable benefits.

**$30 Million Guaranteed Minimum for Cash Payments**. The Amended Settlement provides a minimum guarantee of $30 million for the cash payment benefits alone. That is, the $30 million guarantee is separate from (and do not account for) the $47.4 million already paid out for Repurchase claim. Thus, the Settlement guarantees that the Class will receive a minimum of **$77.4 million**.

**Total Value Exceeds $100 Million**. The $77.4 million does not include the value of the reimbursements or the non-purchase warranty arbitrations.[19] And with the claims period open until October of 2024, the total cash payout for the Class will be substantially higher. In addition, Ford is obligated to pay millions more for other benefits to the Class, including for claims administration, arbitration administration, arbitrator's fees, and attorneys' fees and costs to Class Counsel, counsel representing successful claimants, and counsel for Assisting Class Members. *See In re Online DVD-Rental*, 779 F.3d at 953 (explaining that administrative costs and litigation costs are properly considered expenses that benefit the Class). The value of the Settlement, which will be **well over $100 million** when all is said and done, is exceptional. Few settlements for these types of claims can be valued at all, and an examination of the benefits offered by comparable settlements demonstrates that Class Members are entitled to unusually

---

proceeding under the same rules as the Arbitration Program, to meet Class Member demand. However, individual claimants proceeding under the voluntary program must execute a separate release because the Settlement is not yet finally approved with all direct appeals exhausted.

[19] Furthermore, the Settlement's expedited Warranty Arbitration is an additional benefit to Class Members who believe they have unreasonably incurred out-of-pocket costs for Transmission repairs. *See Mendoza v. Hyundai Motor Co., Ltd*, No. 15-01685-BLF, 2017 WL 342059, *3 (N.D. Cal. Jan. 23, 2017 (finally approving a settlement that provides for warranty disputes to be resolved through Better Business Bureau ("BBB") arbitration).

valuable relief under the Amended Settlement.[20] (*See* Wu Decl. 4; Ex. 3.)

Aside from its absolute overall value, the Settlement's benefits deliver exceptional value directly to Class Members. First, the $30 million in cash benefits are for repairs that were largely performed under warranty—Class Members receive payment even though they had no direct out-of-pocket expenses for repairs. This was one of the first settlements providing for such a benefit. (*See* Ex. 3.). As far as Plaintiffs know, the only other settlement with similar benefits is *In re MyFord Touch Consumer Litg.*, No. 13-03072-EMC, 2019 WL 1411510 (N.D. Cal. Mar. 28, 2019).[21] The *MyFord Touch* settlement, recently approved by District Judge Edward Chen, primarily provides cash payments of up to $445 for multiple warranty repairs (on a part that the plaintiffs claim to cause a safety problem) and a minimum guarantee payout of $17 million.

This Settlement is superior to the otherwise impressive *MyFord Touch* settlement by almost any measure. Aside from the higher minimum guarantee, Class Members may receive up to $2,325 for multiple Service Visits, rather than up to $445. More importantly, the cash payment is not the most valuable benefit of this Settlement; the Repurchase benefit is. In the vast majority of settlements, including *MyFord Touch*, settlement class members *release* all claims that could have been brought, including lemon law claims, with no right to a buyback.[22] *Id.* at **2-3. Here, Repurchase claims are preserved, and the total value of the Settlement exceeds $100 million. The value of the Amended Settlement thus strongly supports final approval.

**The Extraordinary Value Conferred by the Repurchase Benefit**. The Repurchase is a unique benefit, and the benefits go beyond the amount of the payout.

---

[20] *See, e.g., Seifi v. Mercedes-Benz USA*, No. 12-05493-THE, 2015 WL 12964340, *2 (N.D. Cal. Aug. 18, 2015) (finding that "this [s]ettlement is similar to other approved automotive class action settlements.").

[21] The district court granted final approval in *MyFord Touch* on November 27, 2019 and awarded fees and costs as requested of $16 million. (*See In re MyFord Touch*, ECF No. 548)

[22] *MyFord Touch* class members have no right to a buyback ranging from $15,000 to $25,000, but are eligible for payments up to only $445, even if they had multiple defects on the on-screen system that plaintiffs assert to be a safety problem.

Because the Settlement enhances Class Members' rights in the Arbitration Program, most Class Members are in a better position to obtain a repurchase than they would be if the Settlement were set aside, and consumers were left to pursue claims on their own.

First, the Settlement extends the statute of limitations for Repurchase to six years from the date of original sale or six months from the Approval Date, whichever is later. (Sett. Agmt. ¶ II(N)(1)(d).) The statutes of limitation in most states are far more restrictive, often requiring claims to be brought within two or three years of original delivery or purchase.[23] Moreover, this Court had rejected tolling the statute of limitations for warranty claims in the *Ford DPS6 MDL. In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. 17-06656-AB, 2019 WL 6998668, at **3-4 (C.D. Cal. Sept. 5, 2019). And the majority of states do not recognize cross-jurisdictional tolling of the statute of limitations.[24] The Settlement will therefore make available a repurchase remedy for many Class Members who otherwise would have been without recourse because their claims would have expired.

Second, the Settlement authorizes the Arbitrator to award a Repurchase consistent with the Class Member's state lemon law and, if the Class Member does not meet its requirements, provides a unique fallback standard of 4 or more Transmission Hardware Replacements being performed within 5 years/60,000 miles (and the vehicle continues to malfunction). (Sett. Agmt. ¶ II(N)(1)(e).) The fallback standard is valuable because the state lemon law presumption for a repurchase, which essentially determines the burden

---

[23] Many states, including Alabama, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kentucky, Maine, Massachusetts, Nevada, New Mexico, South Carolina, South Dakota, Virginia, and Wisconsin limit lemon law claims to those that can be brought within one and one-half to three years from the date of original delivery or sale (sometimes with further limitations based on the timing of the express warranty).

[24] Fifteen states have officially rejected cross-jurisdictional tolling: Arizona, California, Illinois, Kansas, Kentucky, Louisiana, Minnesota, New Mexico, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, & Virginia, with a combined population of 161,922,528. Ten states have not expressly ruled on the issue: Maine, Maryland, Mississippi, New York Nebraska, Nevada, New Hampshire, North Dakota, Rhode Island, Vermont, Wisconsin, Wyoming) with a combined population of 26,346,391.

of proof a consumer must meet to prevail on the claim, is generally far more demanding.[25] (*See* Ex. 4.) Because of these Settlement enhancements, most Class Members would do at least as well or better under the Settlement than in court.[26]

Importantly, former owners/lessees are provided the same limitations extension and can take advantage of the Settlement-created fallback standard under the Amended Settlement. (Amendment ¶ 12.)  Only six states expressly authorize repurchase for former owners/lessees, so many more former owners/lessees would be able to obtain a repurchase under the Settlement than if they had opted out.[27] Other benefits include a one-way fee shifting provision, where prevailing claimants have their attorneys' fees up to $6000 paid by Ford, with no liability to pay Ford's attorneys' fees if they should lose.[28] (Settlement Agreement ¶ II.N.1.h.) *See Brown v. W. Covina Toyota*, 26 Cal. App. 4th 555, 561 (1994) (explaining that one-way fee statutes provide important protection for consumers). And limited civil penalties are now available to be awarded to Claimants

---

[25] *See*, *e.g.*, *Temple v. Fleetwood Enterprises*, 133 Fed App'x 254, 262 (6th Cir. 2005) ("[T]he Ohio Supreme Court has interpreted the statute that purports to establish a presumption of reasonableness to establish instead a definition of reasonableness that a consumer must meet to survive summary judgment.").

[26] *See* also, Michael Hanin, Carter Greenbaum, and Jeremy Aron-Dine, *Interpreting the Reasonable Number of Repair Attempts Standard in Lemon Law Arbitrations*, 29 Loy. Consumer L. Rev. 327 (2016-2017) In this article, which actually references this case, three arbitrators explain that transmission problems often manifest after 10,000 or 15,000 miles, "mak[ing] it difficult [for these claimants] to recover under Connecticut's Lemon Law, which was the first such statute enacted and set the standard for subsequent Lemon Laws in all-forty-nine other states and the District of Columbia." *Id.* The authors found that the ways in which the transmission problems manifest "test the ability of state Lemon Laws to provide consumers adequate recourse against manufacturers for alleged defects." *Id.* at 328 (explaining that many states' lemon laws mirror Connecticut's).

[27] The following states expressly authorize repurchase for former owners or lessees: California, Delaware, Florida, Maryland, New Jersey, and New York.

[28] While, in some instances, there may be other ways to obtain attorneys' fees to a prevailing consumer, states that lack express one-way fee shifting statutes for lemon law claims include: Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Texas, Utah, Virginia, US Virgin Islands.

who reside in states that authorize it. (Amendment ¶ 15.)

Perhaps most importantly, Class Members will be able to resolve their claims in three months or less, rather than many years, as is the case for consumers pursuing claims in court, including in the *Ford DPS6 MDL*.[29] Based on these changes, most Class Members would be better off under the Settlement than if the Settlement were set aside. And anyone who thought "his or her personal claim was being sacrificed for the greater good… had the right to opt-out of the class." *Hanlon*, 150 F.3d at 1027. As a whole, the Settlement's benefits—assuredly exceeding $100 million—are far more valuable than typical benefits, such as an extended warranty for the alleged part and reimbursement for out-of-pocket costs, offered in automotive settlements approved by federal courts.[30]

### (b)   The Strength of Plaintiffs' Case and Risks of Further Litigation Support Final Approval

The first two *Hanlon* factors (and the new Rule 23(e)(2)(C)(i)) require the Court to evaluate the benefits offered by the Settlement against the "risks, expense, complexity, and likely duration of further litigation." *Low v. Trump Univ., LLC*, 881 F.3d 1111, 1122 (9th Cir. 2018). The risks presented here—including the difficulty of prevailing, the

---

[29] That the Settlement will confer immediate monetary and equitable relief to Class Members is a strong factor in approving the proposed Settlement. *Browne v. Am. Honda,* 2010 U.S. Dist. LEXIS 145475, at **42-43 (C.D. Cal. July 29, 2010) (finding that, despite the fact that class members may not be fully compensated by the proposed reimbursement program, immediate relief conferred by settlement supports final approval); *see also, In re Mego Financial Corp. Sec. Litig*., 213 F.3d 454, 459 (9th Cir. 2000) (approving a settlement that provides immediate relief constituting one-sixth of the potential recovery in light of the difficulties of continued litigation).

[30] *See, e.g*., *Yaeger*, 2016 WL 4541861, **8-10 (primarily extending warranty for oil consumption problems); *Seifi v. Mercedes-Benz USA*, No. 12-05493-THE, 2015 WL 12964340 (N.D. Cal. Aug. 18, 2015) (primarily extending warranty and providing reimbursement]; *Sadowska*, 2013 WL 9500948 (primarily extended warranty on CVT transmissions); *Eisen v. Porsche.*, 2014 WL 439006, at **2-3 (approving settlement primarily extending the mileage/years of coverage on the warranty for that defect, along with a reimbursement program with limitations); *Collado v. Toyota Motor Sales, U.S.A., Inc*., No. 10-3113, 2011 U.S. Dist. LEXIS 133572 (C.D. Cal. Oct. 17, 2011), *fee order rev'd*, 550 Fed. Appx. 368 (9th Cir. Cal. 2013) (approving settlement extending warranty coverage for defective headlights along with a limited reimbursement program for out-of-pocket expenses for repairs).

future expenses that must be incurred, and the duration of litigation—strongly favor

approving the Settlement. To prevail in a verdict, Plaintiffs would first have to prove that

the problems experienced by Class Members can be traced to a transmission design

defect, and that the defected persisted in multiple versions of the Transmission and

multiple engine/transmission combinations. Even if Plaintiffs can maintain certification

through trial, they would have to prove that Ford had pre-sale knowledge of the Alleged

Defect, that it acted on that knowledge, and that Class Members were damaged.

Plaintiffs would have to overcome Ford's affirmative defenses, which include, among

others, that no Transmission defect exists, or that, even if the Alleged Defect existed,

Plaintiffs would not be able to show that it constitutes a safety concern.

As a threshold matter, the existence of a defect may not lead to legal liability

under federal or state statutes. *See*, *e.g*., *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980,

991-92 (N.D. Cal. 2010) (granting defendant's motion for summary judgment and

finding alleged ignition-lock defect not a safety risk), *aff'd*, 462 F. App'x 660 (9th Cir.

2011). Moreover, it would be highly risky to pursue theories that hinge on diminution of

value. *See Briehl v. General Motors Corp*., 172 F.3d 623, 628-629 (8th Cir. 1999).

Accordingly, Plaintiffs must meet a high burden to establish violations of state and

federal consumer protection and warranty statutes.

This Court had already rejected a version of Plaintiffs' core claim that Ford

committed consumer fraud by failing to disclose a known defect. In the lead case on the

*Ford DPS6 MDL*, the plaintiff sought to marshal evidence, much of which was first

adduced by Plaintiffs here, to establish that Ford committed consumer fraud. *See*

*Pedente v. Ford Motor Co*., No. 18-ML-2814-AB (C.D. Cal. Oct. 29, 2019), ECF No.

605., at 5-12. The Court rejected the plaintiff's contention that Ford knew ATIC 91 chips

were defective or that the leaking seal defect caused a safety hazard. *Id*. at 5-8. The Court

also found that the plaintiff cannot establish damages stemming from the fraud

allegations. *Id*. at 12-14. While the plaintiff in the MDL undoubtedly intends to appeal

this ruling, Plaintiffs likewise may well lose on summary judgment on the consumer

1    fraud claims. As for the warranty claims, Plaintiffs face the potential problem that a

2    substantial portion of the Class Vehicles will not have warranty claims, and therefore

3    may not have had symptoms of the Alleged Defect at all. Plaintiffs' claims may

4    potentially fail due to the difficulties of establishing causation. *See Coba v. Ford Motor*

5    *Co.*, 932 F.3d 114 (3d Cir. 2019) (affirming summary judgment in favor of Ford on

6    consumer law and warranty claims).

7          Furthermore, Plaintiffs may well have been unable to maintain class status

8    through trial. Ford contends that, as a result of changes in the manufacturing process,

9    design, and software, there are multiple versions of the Transmission, precluding the

10   likelihood that one common defect exists. (Wu Decl. ¶ 53.) Had litigation continued,

11   Ford would have argued that the variations in the Transmission and in the Alleged

12   Defect also preclude class certification of the consumer fraud claims for omission. In

13   addition, Ford would have argued that, among other individual variations, questions

14   regarding each customer's proper maintenance of the vehicle, driving conditions, and

15   repair attempts, such as whether the vehicle was timely taken to the dealer for repairs,

16   among others, would preclude certification of the warranty claims. While Plaintiffs

17   would vigorously dispute these claims, consumers bringing automotive defect actions

18   face an uphill battle and are frequently denied class certification due to lack of common

19   proof.[31] The Ninth Circuit's decision in *Mazza v. Am. Honda Motor. Co.,* 666 F.3d 581,

20   594 (9th Cir. 2012), which makes it difficult to certify a nationwide class based on

21   alleged violations of state law, would also likely have stymied Plaintiffs' efforts. Even if

22

23   _____

     [31] *See*, *e.g.*, *See Philips v. Ford Motor Co.*, No. 14-02989, 2016 WL 7428810,

24   *17 (N.D. Cal. Dec. 22, 2016), *aff'd* 726 Fed.Appx. 608 (9th Cir. 2018) (finding that the
     plaintiffs failed to present a compelling damages model supporting a classwide

25   determination regarding Ford's alleged omission of a "systemic defect" in the vehicle's
     electronic steering system); *Grodzitsky v. Am. Honda Motor Co.*, No. 2-01142-SVW,

26   2014 U.S. Dist. LEXIS 24599 (C.D. Cal. Feb. 19, 2014) (denying certification due to
     lack of evidence that common materials were used for all defective "window regulators"

27   in the class); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 553 (C.D. Cal.
     2012) ("There is also no evidence that a single design flaw that is common across all of

28   the drains in question is responsible for the alleged water leak defect…").

1    Plaintiffs were to prevail certification, *Mazza* would have required subclasses for some

2    states; consumers in many other states may be left out altogether. *See*, *e.g.*, *In re MyFord*

3    *Touch*, 2019 WL 1411510, at *6 (settlement involving seven litigation state-specific

4    subclasses).

5         The anticipated additional expenses that must be incurred also support final

6    approval. *See Chambers*, 214 F. Supp. 3d at 888 ("In assessing the risk, expense and

7    complexity of further litigation, the court evaluates the time and cost required." [citation

8    omitted]). Here, Plaintiffs shoulder exceedingly high financial risks in pursuing this

9    action. This class action against a major automotive manufacturer, where Plaintiffs

10   allege that nearly 1.5 million vehicles suffer a serious defect, has the strong potential to

11   engulf Plaintiffs and Class Counsel in protracted, resource-draining court battles. In a

12   contested certification motion, Ford would likely submit expert testimony from a Ford

13   engineer showing that the Transmissions for various Class Vehicles differs in various

14   respects. Plaintiffs would rely on the testimony of a technical expert to dispute the import

15   of what they consider to be minor part variations, along with that of an expert on

16   consumer expectations and a damages expert. These hefty costs would have to be

17   advanced by Plaintiffs and Class Counsel and would add significantly to the risks of

18   proceeding in litigation, which already exceeds $300,000 without them. *See Aarons v.*

19   *BMW of N. Am. LLC*, No. 11-7667, 2014 U.S. Dist. LEXIS 118442, at *29-31 (C.D.

20   Cal. Apr. 29, 2014) (approving a settlement on a transmission defect and observing that

21   "it is the very uncertainty of outcome in litigation and avoidance of wasteful and

22   expensive litigation that induce consensual settlements." [citation omitted]).

23        Finally, prompt settlements are highly preferable to protracted litigation. In

24   actions involving automotive defects, "where motor vehicles have a relatively short

25   lifespan, there is a premium upon promptly finding a remedy for alleged defects to

26   restore full enjoyment of the vehicle." *Yaeger v. Subaru of Am., Inc.*, No. 11-4490-JBS,

27   2016 WL 4541861, *9 (D.N.J. Aug. 31, 2016). Thus, even if Plaintiffs were to certify

28

the Class on contested motion, and prevail on dispositive motions and at trial,[32] the years of litigating this action would almost certainly diminish the relief to Class Members, as their Vehicles' value will depreciate over time. Because any repurchase or rescission remedy requires that a consumer return the product in a condition comparable to what he or she received, and because the vehicle's value depreciates significantly with use and time, Plaintiffs believe that a prompt resolution of this action provides the greatest benefit to Class Members. (Wu Decl. ¶ 59.)

It is generally accepted that "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Eisen v. Porsche Cars North American, Inc.,* No. 11-09405-CAS, 2014 WL 439006, at *3 (C.D. Cal. Jan. 30, 2014) (citation omitted). Here, the risk of continuing litigation, including the risk of certification and/or judgment on the merits, increased costs, and potential for protracted litigation, weighs heavily in favor of settlement.

### (c)    The Method of Distribution, Attorneys' Fees, and Other Agreements

Rule 23(e)(2)(C)(ii)-(iv) require review of the method of distribution, attorneys' fees and the existence of other agreements. As set forth above, the Repurchase benefit is provided through a streamlined arbitration process, where the Class Member need only provide a Notice of Intent to Arbitrate to commence the process.

The cash payments for Service Visits can be submitted by pre-populated information on the claim form. *See Hyundai*, 926 F.3d at 568 (finding that online claims process where class member must input VIN and class member ID not overly burdensome). Service Visits require documentation, but it is standard in settlements to require repair orders or receipts to substantiate a claim. *See Keegan*, *v. Am. Honda Motor Co.*, No. 10-09508-MMM, 2014 WL 12551213, *15 (C.D. Cal. Jan. 21, 2014) ("Courts

---

[32] The inherent risks of proceeding to trial weigh in favor of settlement. *See In re Portal Software, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 88886, *7-8 (N.D. Cal. Nov. 26, 2007) (recognizing that "inherent risks of proceeding to… trial and appeal also support the settlement").

frequently approve settlements that require class members to submit receipts or other documentation."). In fact, most states have record-retention laws, and "dealerships and service centers routinely maintain such records; thus, to the extent that class members do not have an invoice in their possession, it is likely that they would be able to secure such documentation." *Asghari v. Volkswagen Grp. of Am.*, No. 13-02529-MMM, 2015 WL 12732462, at *29 (C.D. Cal. May 29, 2015) (overruling objection that requiring claimants to submit proof of compliance with scheduled oil changes in warranty maintenance manual is unfair and overly burdensome). And the Amended Settlement permits those who attempted to make repairs, but were turned away by a Ford Dealer, to submit claims for $20 without any documentation other than an attestation under oath. (Amendment ¶ 8.)

If there is residue left from the guaranteed minimum at the end of the claims period, the Amendment contemplates an accounting and a second distribution, on a per capita basis, to all Class Members who submitted a valid claim for cash payment or received a payment through the Repurchase process. (Amendment ¶ 9.)

Class Counsel will seek attorneys' fees through the concurrently-filed renewed fee application. Attorneys for Assisting Class Members will do so in the following week. Fees will be paid within 14 days after the Effective Date. (Sett. Agmt. ¶ II.P.)

Finally, aside from the Settlement Agreement and the Amendment, Lead Class Counsel have fee-sharing agreements with both Class Counsel Berger & Montague and Class Counsel Zimmerman Law Offices P.C. ("Zimmerman"), each of which has been consented to by each firm's respective clients.[33] The existence of these fee-sharing agreements was previously presented to the Court, prompted by DeBolt's objection. (ECF No. 167.) No other agreements have been made in connection with this Settlement under Rule 23(e)(3).

---

[33] The terms of the fee-sharing agreements are confidential, but Class Counsel will disclose the fee arrangement, *in camera*, if ordered by the Court pursuant to Rule 54(d)(2)(B) "If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made."

### 3.    The Settlement Treats Class Members Equitably

Rule 23(e)(2)(D) requires that the Court consider whether "the proposal treats class members equitably relative to each other." The Settlement does not grant preferential treatment to any other segment of the Class. Rather, the Settlement was structured to deliver the most complete relief to those Class Members that experienced persistent defects—which is a requirement of a breach of warranty claim. *See In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."). Class Members receiving more than others do so because they have had more Service Visits, which is indicative of the seriousness of their Transmission problems. This is an objective and logical explanation for the variations in monetary recovery.

The Amended Settlement does not provide different benefits for former owners/lessees vis-a-vis current owners/lessees. Both groups are subject to the same requirements. Of course, former owners cannot qualify for additional cash payments for future Service Visits or breach of warranty claims, just as former owners cannot benefit from an extended warranty, but that difference is not a structural division created by the Settlement.[34] However, it would not be unfair even if the Settlement were to favor current owners structurally, since, under Ninth Circuit case law, such structural advantages are permitted (as current owners exert more litigation leverage than former owners). *See In re Volkswagen "Clean Diesel" Mktng., Sales Practices, and Prods. Litig.*, 895 F.3d 597, 608-609 (9th Cir. 2018) (finding no intra-class conflict even though settlement provides more benefits to current owners).  Here, the Amended Settlement does not structurally favor any segment of class members over any other. As such, there is not even a question that the Settlement treats all Class Members fairly.

---

[34] *See Asghari*, 2015 WL 12732462, at *22 ([t]he possibility that the settlement does not provide for a payout to every conceivable class member who in some way may have been affected by the purported defect does not establish that the settlement is unfair or unreasonable.").

### 4.      The Extent of Discovery and Stage of Proceedings

Courts may also consider the extent of discovery and the current stage of the litigation to evaluate whether parties have sufficient information to make an informed decision to settle the action. *See Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1239 (9th Cir. 1998). A settlement negotiated at an earlier stage in the litigation will not be denied so long as sufficient investigation has been conducted. *Eisen v. Porsche*, 2014 WL 439006, at *13 (finding that counsel had "ample information and opportunity to assess the strengths and weaknesses of their claims" despite "discovery [being] limited because the parties decided to pursue settlement discussions early on.").

As described in Section II.B, *supra*, Plaintiffs engaged in extensive investigation and discovery, including reviewing over a million documents, retaining experts and conducting their own testing, and taking depositions of two of Defendant's corporate representatives in Michigan and a corporate representative of Transmission part supplier Getrag. (*See* Wu Decl ¶¶ 9-14; Paul Decl. ¶¶ 7-11.)

### 5.      The Views of Experienced Counsel

The fact that sophisticated parties with experienced counsel have agreed to settle their dispute should be given considerable weight by courts, since "parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Here, the Parties achieved a settlement after a thorough review of relevant documents and testimony, as well as a rigorous analysis of the Parties' claims and defenses. The Amended Settlement incorporates the expectations of all Parties and, as set forth above, is non-collusive, being the product of arm's-length negotiations and finalized with the assistance of an experienced and respected mediator.

The Parties were represented by counsel possessing significant experience in automotive defect and class action matters. (*See, e.g.*, Wu Decl. ¶¶ 38-40; Paul Decl. ¶¶ 21-28.) Likewise, Ford's counsel, Dykema Gossett, is a well-respected defense firm. The Parties' recommendation to approve this Settlement should therefore "be given

great weight." *Eisen*, 2014 WL 439006, at \*5 (crediting the experience and views of counsel in approving a settlement resolving automotive defect allegations). The proposed Amended Settlement is also supported by Assisting Class Members, who had good faith objections to the original Settlement. Counsel for Assisting Class Members include Michael Kirkpatrick, who litigates on behalf of Public Citizen, a highly regarded public interest organization that regularly advocates on behalf of consumers and employees before the U.S. Supreme Court.  (*See* Amendment.)

> **6.     The Reaction of Class Members to the Proposed Settlement**[35]

The objection, opt-out, and opt-in deadline was September 5, 2017. Approximately 10,350 of the 1.9 million Class Members, or under 1 percent of the Class, have chosen to opt out. (Wu Decl. ¶ 22; ECF No. 240, Ex. A.) This small percentage of exclusions demonstrate that Class Members have reacted favorably to the Settlement, supporting final approval. *See, e.g., See Churchill Vill. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval where "only 45" of the approximately 90,000 class members objected and 500 opted out); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (granting final approval where the opt-out rate was 4.86% of the class); *Eisen,* 2014 WL 439006, at \*5 ("Although 235,152 class notices were sent, 243 class members have asked to be excluded …."); *Milligan v. Toyota Motor Sales, U.S.A.*, No. 09-05418-RS, 2012 U.S. Dist. LEXIS 189782, \*25 (N.D. Cal. Jan. 6, 2012) (finding favorable reaction where 364 individuals opted out [0.06%] following a mailing of 613,960 notices). Further, only fifteen Class Members had objected, and all six who have appealed final approval have now withdrawn their objections and support final approval of the Amended Settlement. (Amendment ¶ 1.) The reaction of the Class supports final approval.

> **D.     The Settlement Satisfies the *Bluetooth* Factors**

Finally, pre-certification settlements require further inquiry for "more subtle signs" of potential collusion between class counsel and defendant. *In re Bluetooth*, 654

---

[35] There is no governmental participant in this case, and so this factor is neutral.

F.3d at 946-47. But in applying "all of these factors, considerations, 'subtle signs,' and red flags, the underlying question remains this: Is the settlement fair?" *Volkswagen "Clean Diesel,"* 895 F.3d at 611. These factors "in the end are just guideposts." *Id.*

As discussed, the Settlement creates a minimum of $77.4 million to be delivered to the Class (facts that were not before the Ninth Circuit panel in this case). This settlement does not bear the hallmarks of collusion, such as when class counsel "receive a disproportionate distribution of the settlement" or when "class receives no monetary distribution but class counsel are amply rewarded." *Bluetooth*, 654 F.3d at 947. Counsel's fees and costs are $8.85 million, or under 12% of the $77.4 million minimum class payout, and under 10% of the overall settlement value, is decidedly not disproportionate to Class's benefits. The Settlement is not collusive under the first *Bluetooth* factor.

The *Hyundai Fuel Economy* case is instructive. In *Hyundai*, the settlement delivered roughly $100 million in benefits (much of which is also attributable to a voluntary program created by automakers in response to an EPA investigation), had a clear sailing provision for several but not all of the firms serving as class counsel, and no reverter. On those facts, the Ninth Circuit en banc panel found that it bore "none of the typical signs of collusion." *Hyundai*, 926 F.3d at 569. The en banc panel distinguished its facts from *Bluetooth*, in which "the settlement paid the class zero dollars," a clear-sailing provision where defendants agreed not to contest "an award of attorneys' fees totaling eight times the *cy pres* award," and a kicker clause on fees. *Id.*

Even though there was a "clear sailing" provision for some class counsel, the *en banc* court in *Hyundai* held that it was not problematic, since "[t]he settling parties agreed on the amount of class compensation" well before negotiating, "'over multiple mediation sessions with a respected and experience mediator,' the 'reasonable attorney's fees provided in the settlement agreement.'" *Hyundai*, 926 F.3d at 569-70. The en banc panel emphasized that the Ninth Circuit had "previously approved such an approach," as it "put a good deal of stock in the product of an arm's-length, non-collusive, negotiated

resolution." *Id*. (citation omitted). That fees were separately awarded under the lodestar method, with a multiplier ranging from 1.22 to 1.55, also supports a finding that the settlement was not collusive. *Id*. at 571-72.

Under *Hyundai*, therefore, a "clear-sailing" provision is not inherently problematic so long as the fees do not dwarf the class benefits and were negotiated separately, with the assistance of an experienced mediator. This is in accord with pre-*Hyundai* cases. *See, e.g., MyFord Touch*, 2019 WL 1411510, at *7 (approving settlement with a "clear-sailing provision" partly because the fee agreement were reached under the auspices of an experienced mediator); *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 687 (N.D. Cal. 2016) (clear-sailing provision does not signal collusion when the agreed-upon fees are reasonable and the relief negotiated for the class is favorable). Indeed, the U.S. Supreme Court had instructed parties to "settle the amount of a fee" to avoid uncertainty, risk, and the potential of a resource-draining "second major litigation" on fees. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

Thus, even though the Settlement contains a clear-sailing provision, it is not problematic and does not support collusiveness under the second *Bluetooth* factor. The fees were negotiated in a separate mediation after class relief was finalized, an approach approved by the *Hyundai* en banc court. (Wu Decl. ¶ 16.) Moreover, the attorneys' fees constitute less than 10% of the $100 million+ value of the Settlement. And, as set forth in Plaintiffs' renewed fee application, the requested fees will represent a negative multiplier on Class Counsel's $10,541,276.65 lodestar. "[C]ourts view self-reduced fees" representing a negative multiplier on the lodestar "favorably." *MyFord Touch*, 2019 WL 1411510, at *7 (quoting *Schuchardt*, 314 F.R.D. at 690). "[H]ad the fee amount been litigated and not negotiated, a [substantial] multiplier could have been awarded and the fees substantially higher." *Mendoza*, 2017 WL 342059, at *12. Indeed, *Mendoza*'s example for the risks of not resolving fees was a case involving these very counsel, where Lead Class Counsel secured a 2.0 multiplier on their contested catalyst fees after Ford performed a recall. *Id*. (citing *MacDonald v. Ford Motor Co.*, No. 13-

2988, 2016 WL 3055643, at **9-10 (N.D. Cal. May 31, 2016)). The existence of a clear-sailing provision, on these facts, is not an indicia of collusiveness.

Finally, the third *Bluetooth* factor is also absent, as there is no reversion to Ford. For the cash payments, the Settling Parties have negotiated a multi-stage distribution process to ensure that no amount reverts to Ford. Other benefits are claimed on a "claims-made" basis and would not revert.

Quite simply, no badges of collusion exist. The Court, after applying the *Bluetooth* factors, should find that the Settlement is not the product of collusion and is fair, reasonable and adequate, meriting final approval.

**E.      Ms. Maharry's Request To Circumvent Rule 23 Procedures Must Be Rejected**

Finally, the Court asked the parties to respond to Class Member Ayanna Maharry, who has filed an objection-like correspondence with the Court more than two years after the objection deadline. (ECF No. 277.) First, Ms. Maharry did not timely object and her correspondence cannot be deemed an objection. Second, Ms. Maharry's letter is premised on Ford's liability having been established; it has not. As set forth above, the MDL plaintiff's fraud claims have been adjudicated in Ford's favor by this Court.

Third, Ms. Maharry was actually offered a Repurchase by Ford, presumably after providing notice to Ford under the Settlement but believes that this was not good enough. She wants civil penalties, too. Setting aside that she was offered essentially full relief under the Settlement, that a settlement "could have been better" is not a ground for disapproving it. *See Hanlon*, 150 F.3d at 1027. Moreover, the Amended Settlement now permits Class Members to recover civil penalties under certain circumstances if state law authorizes it. (Amendment ¶ 15.)

Fourth, Ms. Maharry said she is subject to California lemon laws, yet she retained a lemon lawyer who apparently advised her that she needed to retain her vehicle to obtain a Repurchase. (ECF No. 277, at 2-3.) If she qualifies for a Repurchase under California lemon law then she can receive payment under the Settlement even if she no

1    longer has possession of the Class Vehicle. (Amendment ¶ 11.) The Settlement cannot

2    be blamed for her own lawyer's apparently misguided advice.

3         Fifth, Ms. Maharry has presented no facts for excusable neglect or good cause for

4    the Court to permit a belated opt-out. *See Volkswagen "Clean Diesel,"* 895 F.3d at 614-

5    615 (affirming denial of belated opt-out for lack of good cause). In fact, she did not try to

6    opt out after learning of the Settlement. Instead, she apparently sought to file a claim first

7    and was offered a Repurchase. (ECF No. 277 at 3.) As set forth above, the dissemination

8    of the Class Notice satisfied Rule 23(e) and due process, and there was no timely

9    objection to the notice process. Further, the Ninth Circuit opinion did not vacate the

10   preliminary approval order establishing the dates of the opt-out and objections. The

11   Ninth Circuit's only directive is for this Court to engage in "a more searching inquiry"

12   before rendering a decision on whether to finally approve the proposed Settlement.

13   Allowing Ms. Maharry to belatedly opt out without good cause would create disarray, as

14   it would encourage lemon lawyers to inundate the Court with belated opt-out requests.

15   This Court must therefore reject Ms. Maharry's attempt to throw a wrench in the

16   settlement process and delay final approval of a settlement exceeding $100 million.

17   ///

18

19

20

21

22

23

24

25

26

27

28

1   **IV.   CONCLUSION**

2           Based on the foregoing, the proposed Settlement is fair, adequate, and reasonable,

3   and satisfies the standard for final approval. Accordingly, Plaintiffs move the Court to

4   enter the Order Granting Final Approval of the Settlement Agreement, enter Final

5   Judgment, and grant such other and additional relief as the Court may deem appropriate.

6

7

8   Dated: January 24, 2020                    Respectfully submitted,

9

10                                  By: /S/ Ryan H. Wu
                                       Ryan H. Wu
11                                     CAPSTONE LAW APC
                                       1875 Century Park East, Suite 1000
12                                     Los Angeles, California 90067

13                                     Russell D. Paul
14                                     BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
15                                     Philadelphia, PA 19103
16                                     Telephone: (215) 875-4601

17                                     Thomas A. Zimmerman, Jr.
18                                     ZIMMERMAN LAW OFFICES P.C.
                                       77 W. Washington St., Suite 1220
19                                     Chicago, Illinois 60602

20
                                       *Attorneys for Plaintiffs and the Class*
21

22

23

24

25

26

27

28